## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES L. BROWN on behalf of himself and all others similarly situated, | : : : | Case No.:  14 _____ |
| Plaintiff, | : : | |
| v. | : : | **CLASS ACTION** |
| | : | **JURY TRIAL DEMANDED** |
| ACCESS MIDSTREAM PARTNERS, L.P., CHESAPEAKE ENERGY CORP., and DOMENIC J. DELL'OSSO, JR., | : : : : | **ELECTRONICALLY FILED** |
| Defendants. | : : | |

## CLASS ACTION COMPLAINT

Plaintiff James L. Brown, by his attorneys, brings this action on his own behalf and on behalf of all others similarly situated against Defendants Access Midstream Partners, L.P. ("Access Midstream"), Chesapeake Energy Corporation ("Chesapeake"), and Domenic J. Dell'Osso, Jr. ("Dell'Osso"), and alleges as follows:

## INTRODUCTION

1.      This is a civil RICO case brought on behalf of Pennsylvania oil and natural gas lessors against individuals and entities who implemented an off-balance sheet corporate financing scheme to enrich themselves by wrongfully reducing royalty payments to these lessors. Plaintiff seeks relief on behalf of all similarly situated Pennsylvania oil and gas lessors for violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.  Plaintiff also asserts a claim for unjust enrichment against Defendants.

2.      Since at least 2012, Defendants and their unnamed co-conspirator Chesapeake

Appalachia, LLC ("Chesapeake Appalachia")[1] have engaged in a conspiracy, combination and

enterprise to pass on to Pennsylvania oil and gas lessors vastly inflated oil and gas gathering and

transportation costs – thereby decreasing the monthly royalty payments to the oil and gas lessors

– in connection with an off-balance sheet financing scheme that has provided over $2 Billion in

proceeds to Chesapeake and a contractually guaranteed stream of payments to Access

Midstream.

3.      Prior to December 20, 2012, the "actual" oil and gas gathering and transportation

costs chargeable to lessors' royalty payments had been provided by Chesapeake's subsidiary,

Chesapeake Midstream Operating, LLC ("CMO").  On December 20, 2012, CMO was acquired

by Access Midstream, an entity newly formed by Chesapeake to purchase certain midstream gas

gathering, transport, processing and related assets in the Marcellus basin, among other oil and

gas geological regions.  Access Midstream paid Chesapeake over $2 Billion to acquire these

midstream assets.

4.      "On December 20, 2012, in connection with the closing of the CMO Acquisition,

Access Midstream entered into new gas gathering agreements (the "Gas Gathering Agreements")

with certain subsidiaries of Chesapeake Energy Corporation," including Chesapeake Appalachia,

LLC ("Chesapeake Appalachia").[2]  Chesapeake Appalachia entered into a fixed-price 15-year

"cost-of-service" contract that "provides a [15%] pre-income tax rate of return on invested

---

[1]      Chesapeake Appalachia, LLC has not been named herein because it is a signatory to an
oil and gas lease with Plaintiff, which contains an arbitration clause.  As a result, Plaintiff, on
behalf of himself and the Class defined herein, has brought claims in arbitration against
Chesapeake Appalachia before the American Arbitration Association.

[2]      *See* Access Midstream SEC Form 8-K, Dec. 19, 2012, at 2-5.
(http://www.sec.gov/Archives/edgar/data/1483096/00119312512514085/d457818d8k.htm) .

capital" to Access Midstream,[3] which is a confiscatory and monopolistic pricing that is anything but an arm's-length price for gas gathering and transportation costs for Marcellus basin oil and gas.  In connection with the new Gas Gathering Agreements, Access Midstream also agreed to rebate to certain subsidiaries and affiliates of Chesapeake various payments for use of machinery, services, IT support and other related assets and operations, so that Chesapeake would, in effect, share in the inflated gas gathering and transportation costs set forth in the new Gas Gathering Agreements.

5.     The evident purpose of the Gas Gathering Agreement between Access Midstream and Chesapeake Appalachia was to pass on to Marcellus basin oil and gas lessors the inflated costs built into the Gas Gathering Agreement, which are actually a subterfuge to repay to Access Midstream the purchase price for Chesapeake's gas gathering and transportation operations plus an inflated 15% per annum pre-income tax rate of return that would itself be rebated in part to Chesapeake.

6.     The enterprises underlying this conspiracy are Access Midstream and the association-in-fact enterprise of Access Midstream, Chesapeake Appalachia, Chesapeake, and Dell'Osso.  Through these enterprises, Defendants and Chesapeake Appalachia directed:  (a) the payment of over $2 Billion for the midstream operations to Chesapeake; (b) the agreements by Chesapeake Appalachia and other Chesapeake subsidiaries to pay vastly inflated gas gathering and transportation fees to Access Midstream and to share, in effect, in Access Midstream's receipt of these fees through rebates and ostensible fees for equipment, IT and other services provided by the Chesapeake subsidiaries and affiliates; (c) the treatment by Chesapeake of the billions of dollars in payments due to Access Midstream under the Gas Gathering Agreement as off-balance sheet obligations; and (d) the reductions in royalty payments to oil and gas lessors

---

3     *Id.* at 5.

throughout the United States, including Pennsylvania, by cost deductions made by Chesapeake
Appalachia and other Chesapeake subsidiaries which included the inflated gas gathering and
transportation fees paid to Access Midstream.

7.     These enterprises have engaged in mail and wire fraud through Chesapeake
Appalachia's passing-on to Marcellus basin oil and gas lessors royalty statements and payments
that have deducted inflated gas gathering and transportation costs that do not reflect the true
market cost for gas gathering and transportation but instead reflect related-party and inflated
costs (set by the new Gas Gathering Agreement) that should not be deducted from the lessors' oil
and gas royalty payments.  As a result, Defendants, along with their co-conspirator Chesapeake
Appalachia, have violated and continue to violate RICO, and have otherwise deprived Plaintiff
and the members of the Class of their rightful royalties from oil and gas extracted from their
lands.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action pursuant to 18 U.S.C. § 1964, which confers
jurisdiction upon this Court over Plaintiff's claims brought under RICO.  The jurisdiction of this
Court also arises under 28 U.S.C. § 1331.  Supplemental jurisdiction over the state law claims
exists pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a)—which provides
for venue in any district in which a RICO defendant transacts his affairs—and 28 U.S.C. §
1391(b), in that a substantial part of the events giving rise to Plaintiff's claims occurred in this
District and the Defendants are subject to personal jurisdiction in this District.

## PARTIES

10.     Plaintiff James L. Brown ("Brown") is a citizen of Pennsylvania who resides at
3002 Herrickville Rd., Wyalusing, PA 18853.  He is the lessor on the oil and gas lease attached

hereto as Exhibit A and, pursuant thereto, has received oil and gas royalty payments from or on behalf of Chesapeake Appalachia during the relevant period.

11.     Defendant Chesapeake Energy Corporation ("Chesapeake") is an Oklahoma corporation, with a stated address at 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

12.     Access Midstream Partners, L.P. ("Access Midstream") is a Delaware limited partnership, with a stated address at 525 Central Park Drive, Oklahoma City, Oklahoma 73105.

13.     Chesapeake Appalachia, LLC, a co-conspirator, has not been named herein because it is a signatory to an oil and gas lease with Plaintiff, which contains an arbitration clause.  As a result, Plaintiff, on behalf of himself and the Class defined herein, has brought claims in arbitration against Chesapeake Appalachia before the American Arbitration Association.

14.     Domenic J. Dell'Osso, Jr. ("Dell'Osso") is and has been, at all pertinent times, the Executive Vice President and Chief Financial Officer of Chesapeake, as well as a member of the board of directors of Access Midstream.  He was formerly the Executive Vice President and Chief Financial Officer of Chesapeake Appalachia.  Mr. Dell'Osso was also Executive Vice President and Chief Financial Officer of the following Chesapeake affiliates:  Chesapeake Midstream Development, LLC; Chesapeake Energy Marketing, Inc.; Chesapeake Exploration LLC and Chesapeake Operating, Inc.  On information and belief, Mr. Dell'Osso is a resident of Oklahoma.

## FACTUAL BACKGROUND

### A.     Plaintiff's Relationship with Chesapeake Appalachia

15.     Plaintiff is a Pennsylvania resident who owns land in Pennsylvania's Marcellus basin.

16.     On or about June 20, 2007, Plaintiff entered into a "Paid-Up Oil & Gas Lease" with Chesapeake Appalachia, dated June 20, 2007, which is attached hereto as Exhibit A.

17.     As reflected in Exhibit A, these leases are in a common pre-printed form, drafted by Chesapeake Appalachia, and are practically uniform throughout the Marcellus basin for oil and gas lessors.

**B.     Defendants' Natural Gas Operations in Pennsylvania**

18.     Chesapeake is a NYSE-traded company which is one of the largest natural gas producers in the United States.

19.     Natural gas is generally located in sub-surface deposits and is extracted either through drilling or hydraulic fracturing ("fracking").  Once a natural gas deposit is reached through these processes, a wellhead is placed on the deposit.  After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline.  Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States.  The transport and processing steps which follow removal of natural gas from the wellhead but precede entry of the gas into an interstate transmission pipeline are sometimes referred to by industry participants in a collective fashion as "gathering."

20.     The Marcellus basin in Pennsylvania contains large natural gas deposits. Chesapeake, among other companies, has conducted extensive natural gas drilling and fracking operations in the basin over the past decade.

21.     In order to facilitate Chesapeake's drilling and fracking operations in the Marcellus basin, its subsidiary Chesapeake Appalachia entered into agreements to lease land from Pennsylvania residents.  These lease agreements, such as the one entered into by Plaintiff

and attached as Exhibit A, give Chesapeake Appalachia the right to extract oil and natural gas from lessors' lands and to transport and sell the oil and gas.

22.     In return for the right to extract oil and gas, the lease agreements promise a royalty to the lessors based on the price ultimately realized by Chesapeake Appalachia for the oil and gas.

### C.     Chesapeake's Financial Difficulties in 2012

23.     Due to major capital expenditures and lower natural gas prices, Chesapeake found itself in severe financial difficulty at the beginning of 2012.  The company was in immediate need of additional liquidity to service its debt and fund its operations.[4]

24.     Among other plans to extricate itself from its difficulties, Chesapeake announced in February 2012 its intent to sell its "midstream assets," which included its natural gas gathering and intrastate pipeline operations in the Marcellus basin.[5]

25.     Chesapeake's midstream assets were held by its subsidiary, Chesapeake Midstream Operating, L.L.C. ("CMO").[6]

### D.     The Scheme to Raise Money from the Sale of Chesapeake's Midstream Assets and Pass the Transaction Costs to Oil and Gas Lessors

26.     On December 20, 2012, Chesapeake completed the sale of CMO to Access Midstream, which is a publicly traded Master Limited Partnership formed by Chesapeake in July

---

[4]     *See, e.g.*, *Chesapeake Energy's New Plan:  Desperate Measures for Desperate Times*, Christopher Helman (Forbes Feb. 13, 2012). http://www.forbes.com/sites/christopherhelman/2012/02/13/chesapeake-energys-new-plan-desperate-measures-for-desperate-times/.

[5]     Feb. 13, 2012 Chesapeake Press Release. http://www.chk.com/News/Articles/Pages/1660501.aspx.

[6]     Access Midstream SEC Form 8-K, Dec. 19, 2012, at 2. http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm.

2012 to acquire Chesapeake's midstream assets in the Marcellus basin, among other oil and gas geological regions.[7]

27.      Access Midstream paid Chesapeake $2.16 billion to acquire these midstream assets.[8]

28.      In return for this substantial payment, Access Midstream acquired more than just Chesapeake's midstream assets, however.  In connection with the acquisition, Access Midstream also entered into gas gathering agreements ("Gas Gathering Agreements") with certain Chesapeake subsidiaries, including Chesapeake Appalachia.[9]

29.      Pursuant to the Gas Gathering Agreements, Chesapeake's subsidiaries agreed to pay Access Midstream for natural gas gathering and transportation services, including intrastate transport.[10]

30.      The Gas Gathering Agreement between Access Midstream and Chesapeake Appalachia covered Chesapeake's operations in the Marcellus basin ("Marcellus Gas Gathering Agreement").[11]  Under the Marcellus Gas Gathering Agreement, Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services were referred to as the "Marcellus fee."  *Id.*  Access Midstream characterizes the Marcellus fee as "a cost-of-service based fee."  *Id.*  However, as explained in the paragraphs immediately following, the Marcellus

---

[7]      Access Midstream SEC Form 8-K, Dec. 19, 2012, at 2.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm

[8]      Dec. 11, 2012 Chesapeake Press Release.
http://www.chk.com/news/articles/Pages/1766390.aspx.

[9]      Access Midstream SEC Form 8-K, Dec. 19, 2012, at 2-5.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm.

[10]     *Chesapeake Energy's $5 Billion Shuffle*, Abrahm Lustgarten (ProPublica Mar. 13, 2014) ("ProPublica Report"), attached hereto as Ex. B.

[11]     Access Midstream SEC Form 8-K, Dec. 19, 2012, at 5.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818d8k.htm.

fee is not based on Access Midstream's costs of service but is, instead, an inflated fee meant to provide Access Midstream with a guaranteed, above-market return as an incentive and consideration for the $2.16 Billion payment it made to Chesapeake.

31.     The Marcellus Gas Gathering Agreement has a 15-year term and provides that, on January 1 of each year, the Marcellus fee will be recalculated to provide "a specified pre-income tax rate of return on invested capital."[12]

32.     Thus, the Marcellus Gas Gathering Agreement was structured to insure a guaranteed rate of return to Access Midstream for a 15-year period.[13]   Although neither Chesapeake nor Access Midstream has filed the Marcellus Gas Gathering Agreement with the SEC, ProPublica has reported that this rate of return is 15% per year.   *Chesapeake Energy's $5 Billion Shuffle*, Abrahm Lustgarten (ProPublica Mar. 13, 2014) ("ProPublica Report"), attached hereto as Ex. B.

33.     As the Pro Publica Report details, the Marcellus fee is not cost-of-service based but was instead intended to provide Access Midstream with a guaranteed interest rate on its investment, much like a loan.   *Id.*

34.     Not only did Chesapeake Appalachia agree to this above-market rate of return, but it has also agreed to pay Access Midstream supra-competitive prices for natural gas gathering and transportation services, as part of the Marcellus fee.   On information and belief, Chesapeake Appalachia has, in some instances, paid fees for gas pipeline transport to Access Midstream that are many multiples of Access Midstream's actual costs and far more than the costs previously incurred by Chesapeake Appalachia when it owned the pipelines itself.   Exhibit B, ProPublica Report.

---

[12]     *Id.*

[13]     *Id.*

35.     Chesapeake Appalachia has, in turn, passed the costs of the Marcellus fee along to Pennsylvania oil and gas lessors, by deducting the inflated expenses built into the Marcellus fee from lessors' royalty payments.  Indeed, the Pro Publica Report details how Chesapeake subsidiaries have even deducted amounts far in excess of their payments to Access Midstream for gas gathering and transportation services.  *Id.*

36.     As a result of the Marcellus Gas Gathering Agreement going into effect, the amounts of Chesapeake Appalachia's royalty payments to Pennsylvania oil and gas lessors began to drop significantly, with each increasing cost deduction for charges such as "gathering," "transport," and payments to a "third party."

37.     Plaintiff's royalty statements from Chesapeake Appalachia, attached hereto as Exhibit C, reflect these wrongful deductions:

- December 21, 2012 Statement (deductions for gathering and third party costs); [14]

- January 24, 2013 Statement (deductions for gathering and third party costs);

- February 21, 2013 Statement (deductions for gathering and third party costs);

- March 21, 2013 Statement (deductions for gathering and third party costs);

- April 23, 2013 Statement (deductions for gathering and third party costs);

- May 23, 2013 Statement (deductions for gathering and third party costs);

- June 21, 2013 Statement (deductions for gathering and third party costs);

- July 24, 2013 Statement (deductions for gathering and transportation costs);

- August 22, 2013 Statement (deductions for gathering and third party costs);

- September 23, 2013 Statement (deductions for gathering and third party costs);

- October 23, 2013 Statement (deductions for gathering and third party costs);

---

[14]     The statements do not make clear the meaning of "Third Party" costs but, on information and belief, these costs include gas gathering and transportation fees paid to Access Midstream under the Marcellus Gas Gathering Agreement.

- November 22, 2013 Statement (deductions for gathering and third party costs);

- December 23, 2013 Statement (deductions for gathering and third party costs);

- January 31, 2014 Statement (deductions for gathering and fuel costs); and

- February 28, 2014 Statement (deductions for gathering and transportation costs).

**E.    Chesapeake's Self-Dealing and Collusion with Access Midstream**

38.     As noted, Access Midstream was formed by Chesapeake from a prior Chesapeake entity named Chesapeake Midstream Partners, L.P., on or about July 24, 2012.[15]

39.     Access Midstream is managed and directed by several current and former Chesapeake officers.

40.     Access Midstream CEO J. Mike Stice was formerly President and Chief Operating Officer of Chesapeake Midstream Development, L.P. a wholly-owned subsidiary of Chesapeake, and Senior Vice President – Natural Gas Projects for Chesapeake.

41.     As late as December 20, 2012, Mr. Dell'Osso, Jr. had been the Executive Vice President and Chief Financial Officer of Chesapeake Appalachia.  At the same time, Mr. Dell'Osso was also a member of the board of directors of Access Midstream and the Executive Vice President and Chief Financial Officer of the following Chesapeake affiliates:  Chesapeake Midstream Development, LLC; Chesapeake Energy Marketing, Inc.; Chesapeake Exploration LLC and Chesapeake Operating, Inc.  Most importantly, Mr. Dell'Osso is and has been, at all pertinent times, the Executive Vice President and Chief Financial Officer of Chesapeake.

42.     Thus, both Mr. Stice and Mr. Dell'Osso were formerly officers of a wholly-owned subsidiary of Chesapeake, responsible for its midstream assets – assets which are now owned by Access Midstream.  Currently, Mr. Dell'Osso is both a director of Access Midstream

---

[15]     July 24, 2012 Access Midstream Press Release. http://www.accessmidstream.com/Media/News/Articles/Pages/1717606.aspx.

and an officer of Chesapeake, while Mr. Stice is the Chief Executive Officer of Access Midstream.

43.     The collusive, non-arm's length relationship between Chesapeake, Chesapeake Appalachia, and Access Midstream is further evidenced by the provisions of a Transition Services Agreement entered into by Chesapeake, certain of its subsidiaries, and Access Midstream, dated June 15, 2012, and later amended ("Transition Agreement").[16]

44.     The Transition Agreement provides that Access Midstream will pay Chesapeake for certain services on a going-forward basis, as well as guarantee the "secondment" [sic] (assignment) of Chesapeake employees to Access Midstream to assist in its operations.[17]  The Transition Agreement -- and on information and belief other agreements between Chesapeake, Chesapeake Appalachia, and Access Midstream -- insures that Chesapeake and certain of its subsidiaries and affiliates get a rebate of some of the monies they will pay out to Access Midstream under the Gas Gathering Agreements, in the form of payments for services and additional assets.  *See* Exhibit B, ProPublica Report.

45.     Thus, Chesapeake created an entity, Access Midstream, which allowed it to raise more than $2 Billion of desperately needed capital, in return for which it agreed to pay Access Midstream supra-competitive fees for gas gathering and transportation services and guarantee an above-market rate of return on Access Midstream's purchase price of Chesapeake's assets over a 15-year term.  Offsetting the costs to Chesapeake is Access Midstream's agreement to purchase certain services and assets from Chesapeake over time.  Facilitating this collusive arrangement is

---

[16]     Access Midstream SEC Form 8-K, Dec. 19, 2012.  Ex. 10.2.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512514085/d457818dex102.htm.

[17]     Access Midstream SEC Form 8-K, June 20, 2012.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512277276/d370028d8k.htm.
Access Midstream SEC Form 8-K, Dec. 19, 2012.
http://www.sec.gov/Archives/edgar/data/1483096/000119312512508121/d455921d8k.htm .

the fact that Access Midstream is managed and directed by former and current Chesapeake officers, and makes use of other Chesapeake employees in conducting its operations.

46.     Finally, in aid of Chesapeake's ability to make good on its promise to lock in Access Midstream's rate of return, Chesapeake Appalachia has deducted the inflated costs for gas gathering and transportation services paid by Chesapeake to Access Midstream from oil and gas lessors' royalty payments.  The Defendants have not, of course, shared the real reason behind this surge in the costs assessed against royalty payments with oil and gas lessors.

47.     Nor has Chesapeake fully shared the reasons for its increasing gas gathering and transportation costs with its own shareholders.  Chesapeake treats its obligations under the Gas Gathering Agreements as off-balance sheet arrangements and only recently disclosed in a footnote in its 2013 SEC Form 10-K, the significant liabilities it has incurred under the Gas Gathering Agreements.[18]

### CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on his own behalf and on behalf of all other members of the Class ("Class"), defined as:

> All lessors having oil and gas leases in Pennsylvania with Chesapeake Appalachia, LLC, during the period 2012 through the date of class notice herein, where Chesapeake Appalachia, LLC has subtracted from the lessor's royalty payment gas gathering and transportation costs calculated based on the Gas Gathering Agreement entered into by Chesapeake Appalachia, LLC and Access Midstream in or around December 2012.

49.     There are over forty (40) persons who are members of the Class, and the members of the Class are geographically dispersed throughout the Commonwealth of Pennsylvania and the United States.  Therefore, individual joinder of all members of the Class would be impracticable.

---

[18]     Chesapeake SEC Form 10-K, February 28, 2014 (Note 4 to Consolidated Financial Statements), at 93.  http://www.sec.gov/Archives/edgar/data/895126/000089512614000104/chk-20131231_10xk.htm.

50.     Common questions of law or fact exist as to all members of the Class.  These questions predominate over the questions affecting only individual class members.  These common legal or factual questions include:

a.     Whether Defendants have engaged in a common scheme, plan and course of conduct to impose inflated gas gathering and transportation costs on oil and gas lessors through the artifice of an off-balance sheet financing scheme and the monopolistic and non-arm's-length pricing structure of the Marcellus Gas Gathering Agreement;

b.     Whether Defendants' scheme has resulted in the improper deduction of inflated gas gathering and transportation costs from Plaintiff and Class members' royalties and whether Chesapeake Appalachia failed to pay Plaintiff and Class members the proper due and owing oil and gas royalties;

c.     Whether Defendants have been unjustly enriched by deducting inflated gas gathering and transportation costs and failing to pay Plaintiff and Class members the proper due and owing oil and gas revenues;

d.     Whether Class members have suffered damage as a result of Defendants' conduct; and

e.     The appropriate measure of damages.

51.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff is an oil and gas lessor to Chesapeake Appalachia and was not paid the due and owing royalties because of the deductions made pursuant to Defendants' scheme.  Plaintiff, therefore, is no different in any relevant respect from any other Class member, and the relief sought is common to the Class.

52.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, and he has retained

counsel competent and experienced in conducting complex class action litigation.  The interests

of the Class will be adequately protected by Plaintiff and his counsel.

53.     A class action is superior to other available means for the fair and efficient

adjudication of this dispute.  The damages suffered by each individual Class member likely will

be relatively small, especially given the burden and expense of individual prosecution of the

complex litigation necessitated by Defendants' conduct.  Thus, it would be virtually impossible

for the Class members individually to redress effectively the wrongs done to them.  Moreover,

even if the Class members themselves could afford to pursue individual cases, it would still not

be preferable to a class action.  Individual cases present the potential for inconsistent or

contradictory judgments.  By contrast, a class action presents far fewer management difficulties

and provides the benefits of single adjudication, economies of scale, and comprehensive

supervision by a single tribunal.

54.     In the alternative, the Class may be certified under Fed. R. Civ. P. 23(b)(2)

because Defendants have acted or refused to act on grounds generally applicable to the Class,

thereby making appropriate preliminary and final equitable relief with respect to the Class as a

whole.

## **FIRST CAUSE OF ACTION**

### **(Violation of RICO, 18 U.S.C. § 1962(c) and (d), On Behalf of the Class)**

55.     Plaintiff incorporates by reference all previous paragraphs as though set forth

herein.

56.     Access Midstream and the association-in-fact enterprise of Access Midstream,

Dell'Osso, Chesapeake Appalachia, and Chesapeake, are each an "enterprise" as that term is

used in 18 U.S.C. § 1961(4).

57.     Since 2012, the association-in-fact enterprise of Access Midstream, Dell'Osso, Chesapeake Appalachia, and Chesapeake had the purposes of entering into non-arm's length agreements to:  (1) aid Chesapeake with its liquidity problems by transferring to it a payment of more than $2 Billion; (2) guaranteeing Access Midstream supra-competitive fees and a high rate of return on its multi-billion dollar payment to Chesapeake; (3) rebating to Chesapeake and its subsidiaries and affiliates some of the inflated fees paid to Access Midstream; and (4) passing on the inflated fees charged by Access Midstream and paid by Chesapeake and/or its subsidiaries, through reduced royalty payments to oil and gas lessors, including lessors in Pennsylvania.

58.     The association-in-fact enterprise of Access Midstream, Dell'Osso, Chesapeake Appalachia, and Chesapeake were related by the non-arm's length agreements entered into between Access Midstream and Chesapeake Appalachia, including the Marcellus Gas Gathering Agreement, as well as other agreements between Access Midstream and Chesapeake Appalachia's parent, Chesapeake, and Chesapeake's other subsidiaries and affiliates.  Dell'Osso was related to Access Midstream as a member of its board of directors and to Chesapeake Appalachia as its former CFO and as the current CFO of its parent, Chesapeake.

59.     The foregoing enterprises have been engaged in activities which affect interstate commerce in that their gas gathering and transportation charges and deductions have reduced oil and gas royalty payments to lessors throughout the United States and have been directed against lessors throughout the Commonwealth of Pennsylvania and other states.  Further, the Gas Gathering Agreements and other non-arm's length agreements entered into by Defendants and their co-conspirator, Chesapeake Appalachia, govern assets and employees located throughout the United States, and prescribe payments to be sent throughout the United States.

60.     Chesapeake Appalachia, Access Midstream, Chesapeake and Dell'Osso are each "persons" as that term is used in 18 U.S.C. § 1961(3) ("the RICO Conspirators").

61.     Starting in 2012, with the creation, financing and acquisition of the gas gathering operations of Chesapeake Midstream Operating, L.L.C., and continuing to the present time, the RICO Conspirators have participated in the conduct of the affairs of each of the enterprises identified above through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §§ 1961(1) and (5).  The RICO Conspirators have shared common management and direction, including Dell'Osso and Chesapeake, and have entered into non-arm's length agreements for the purpose of passing on inflated oil and gas gathering and transportation costs, through fraudulent royalty statements and payments to lessors, delivered by the mails and wires.

62.     The conduct of the RICO Conspirators as described in this complaint constituted the execution of a scheme and artifice to deprive oil and gas lessors throughout the United States of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.  Their use of the mails formed a central feature of the scheme and included, by way of example and as described above, sending oil and gas lessors royalty statements and royalty payments which reflected deductions for vastly inflated gas gathering and transportation fees incurred by Chesapeake Appalachia and Chesapeake pursuant to the Marcellus Gas Gathering Agreement.  Hundreds, and likely many thousands, of such royalty statements and royalty payments have been sent by Chesapeake Appalachia through the mails and wires across state lines.  Each of these statements and payments fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.

63.     By way of example, the royalty statements sent to Plaintiff, attached hereto as Exhibit C, and described in detail in paragraph 37 herein, each represent an instance of mail fraud on the dates of December 21, 2012; January 24, 2013; February 21, 2013; March 21, 2013;

April 23, 2013; May 23, 2013; June 21, 2013; July 24, 2013; August 22, 2013; September 23, 2013; October 23, 2013; November 22, 2013; December 23, 2013; January 31, 2014; and February 28, 2014.

64.     The conduct described above constituted multiple violations of 18 U.S.C. § 1341, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

65.     Further, on a monthly basis since 2012, the RICO Conspirators have sent by wire thousands of royalty statements and royalty payments to oil and gas lessors which have fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases.  In addition, the RICO Conspirators have, on a monthly basis transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and monopolistic agreements described herein.  This conduct constituted multiple violations of 18 U.S.C. § 1343, which is a predicate offense for purposes of 18 U.S.C. § 1962(c).

66.     With full knowledge of the deceptive, fraudulent and unlawful conduct described herein, the RICO Conspirators have conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  This conspiracy was consummated in 2012, by the non-arm's length Gas Gathering Agreements entered into by Access Midstream with certain Chesapeake subsidiaries, including Chesapeake Appalachia.  The Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were the quid pro quo afforded Access Midstream whereby Chesapeake would guarantee Access Midstream a high rate of return on its purchase price of Chesapeake's midstream assets and supra-competitive fees.  The RICO Conspirators knew that the Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were not reached at arm's-length and, further, that they were not cost-of-service based agreements, as evidenced by their guaranteed 15% "pre-income tax rate of return on invested capital" to Access Midstream.

18

The RICO Conspirators also knew that the fees charged by Access Midstream under the Gas Gathering Agreements, including the Marcellus Gas Gathering Agreement, were far in excess of the market rates of such fees.

67.     In addition, the RICO Conspirators also knew and agreed that Access Midstream would rebate a portion of these inflated fees to Chesapeake and its subsidiaries and affiliates, ostensibly for the use of other equipment and services to be utilized by Access Midstream.

68.     The RICO Conspirators also knew and agreed that the inflated gas gathering and transportation fees would be passed along to Pennsylvania oil and gas lessors by Chesapeake and/or its subsidiaries in the form of cost deductions from the lessors' royalty payments.

69.     The unlawful conduct by the RICO Conspirators alleged above, through Access Midstream and the association-in-fact enterprise of Access Midstream, Dell'Osso, Chesapeake Appalachia, and Chesapeake, injured tens of thousands of victims by depriving them of their rightful royalty payments, was continuous and open ended and was intended to continue, and indeed, it continues today.

70.     Plaintiff and the members of the Class were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the RICO Conspirators.  The financial harms suffered by Plaintiff and members of the Class were the direct result of that conduct and were the intended and reasonably foreseeable consequence of such conduct.

71.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff and the members of the Class are entitled to threefold the damages they sustained, together with reasonable attorney's fees and costs.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment on Behalf of the Class)

72.     Plaintiff incorporates by reference all previous paragraphs as though set forth herein.

73.     Under the common law doctrine of unjust enrichment, Defendants, by their policies and actions, benefited from, and increased their profits by effecting a scheme which deprived Plaintiff and the Class of the full royalties due to them.

74.     Specifically, Chesapeake benefited from the royalty amounts wrongfully withheld by its subsidiary, Chesapeake Appalachia, whose financial results are included in Chesapeake's and whose costs were substantially reduced by not paying the proper royalty amounts.  Access Midstream benefited from the royalty amounts wrongfully withheld by Chesapeake Appalachia because some of the monies which should have been paid to oil and gas lessors were, instead, paid to Access Midstream.  Defendant Dell'Osso, as a board member of Access Midstream and the CFO of Chesapeake, also benefited from the wrongfully withheld royalty amounts.

75.     Defendants accepted and received the benefits of royalty monies properly due Plaintiff and the Class.  It is inequitable and unjust for Defendants to retain these monies, which were procured by fraudulent pretenses and representations.

76.     Plaintiff and the Class are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the Class, requests relief on all causes of action as follows:

A.     An Order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed as Class Representative and Plaintiff's counsel be appointed Class Counsel;

B.     Award Plaintiff and each member of the Class monetary damages as allowed by law and determined to have been sustained by them, including treble damages pursuant to 18 U.S.C. § 1964(c), together with their costs of suit, including reasonable attorneys' fees;

C.      Enjoin Defendants from continuing their unlawful scheme to force Plaintiff and the Class to bear inflated gas gathering and transportation costs through reduced royalty payments;

D.      An Order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unlawful and unjust conduct alleged herein;

E.      Award Plaintiff reasonable attorneys' fees and costs of this suit, including fees of experts;

F.      Award Plaintiff pre- and post-judgment interest; and

G.      Grant such other and further relief as may be deemed necessary or appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure of all issues triable of right by a jury

Dated:  March 28, 2014                          Respectfully submitted,

s/ Michael D. Donovan
Michael D. Donovan (PA51895)
Noah Axler (PA85324)
DONOVAN AXLER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Phone:  215-732-6067
Fax:  215-732-8060
mdonovan@donovanaxler.com
naxler@donovanaxler.com

Robert E. McCann
McCann & Wall, LLC
Two Penn Center Plaza
Philadelphia, PA 19102
Telephone - 215-569-8488
Fax - 215-569-8288
rmccann@mccannwallinjurylaw.com

*Counsel for Plaintiff and the Class*

# EXHIBIT A



# PAID-UP
# OIL & GAS LEASE

Lease No. *1242306-000*

1/07 - PA

This Lease made this **20th** day of **June, 2007**, by and between: **James L. Brown, a single man**, of **RR 3 Box 281, Wyalusing, PA 18853**, hereinafter collectively called "Lessor" **CHESAPEAKE APPALACHIA, L.L.C.**, an Oklahoma limited liability company, 900 Pennsylvania Ave., P. O. Box 6070, Charleston, WV 25362, hereinafter called "Lessee".

WITNESSETH, that for and in consideration of the premises, and of the mutual covenants and agreements hereinafter set forth, the Lessor and Lessee agree as follows:

LEASING CLAUSE. Lessor hereby leases exclusively to Lessee all the oil and gas (including, but not limited to coal seam gas, coalbed methane gas, coalbed gas, methane gas, gob gas, occluded methane/natural gas and all associated natural gas and other hydrocarbons and non-hydrocarbons contained in, associated with, emitting from, or produced/originating within any formation, gob area, mined-out area, coal seam, and all communicating zones), and their liquid or gaseous constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities, including data acquisition, compression and collection facilities for use in the production and transportation of products from the Leasehold or from neighboring lands across the Leasehold, to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground, regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

DESCRIPTION. The Leasehold is located in the Township of **Herrick**, in the County of **Bradford**, in the Commonwealth of Pennsylvania, and described as follows:

Property Tax Parcel Identification Number: **20-090.00-120-000-000 (108.00 ac)**

and is bounded formerly or currently as follows:

On the North by lands of **F. Preston**
On the East by lands of **R. Ferguson Trust**
On the South by lands of **L. Otis**
On the West by lands of **D. Berkley; L. Woznicki**

Including lands acquired from James L. Brown and Sherri L. Brown, husband and wife, by virtue of deed dated **November 26, 2001**, and recorded at Instrument **#200115047**, and described for the purposes of this agreement as containing a total of **108.00** Leasehold acres, whether actually more or less, and including contiguous lands owned by Lessor. This Lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor, by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land.

LEASE TERM. This Lease shall remain in force for a primary term of (Ten) (10) years from 12:00 A.M. **June 20, 2007** (effective date) to 11:59 P.M. **June 19, 2017** (last day of primary term) and shall continue beyond the primary term as to the entirety of the Leasehold if any of the following is satisfied: (i) operations are conducted on the Leasehold or lands pooled/unitized therewith in search of oil, gas, or their constituents, or (ii) a well deemed by Lessee to be capable of production is located on the Leasehold or lands pooled/unitized therewith, or (iii) oil or gas, or their constituents, are produced from the Leasehold or lands pooled/unitized therewith, or (iv) if the Leasehold or lands pooled/unitized therewith is used for the underground storage of gas, or for the protection of stored gas, or (v) if prescribed payments are made, or (vi) if Lessee's operations are delayed, postponed or interrupted as a result of any coal, stone or other mining or mining related operation under any existing and effective lease, permit or authorization covering such operations on the leased premises or on other lands affecting the leased premises, such delay will automatically extend the primary term of this oil and gas lease for a period of time equal to any such delay, postponement or interruption.

If there is any dispute concerning the extension of this Lease beyond the primary term by reason of any of the alternative mechanisms specified herein, the payment to the Lessor of the prescribed payments provided below shall be conclusive evidence that the Lease has been extended beyond the primary term.

NO AUTOMATIC TERMINATION OR FORFEITURE.

(A) CONSTRUCTION OF LEASE: The language of this Lease (including, but not limited to, the Lease Term and Extension of Term clauses) shall never be read as language of special limitation. This Lease shall be construed against termination, forfeiture, cancellation or expiration and in favor of giving effect to the continuation of this Lease where the circumstances exist to maintain this Lease in effect under any of the alternative mechanisms set forth above. In connection therewith, (i) a well shall be deemed to be capable of production if it has the capacity to produce a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (ii) the Lessee shall be deemed to be conducting operations in search of oil or gas, or their constituents, if the Lessee is engaged in geophysical and other exploratory work including, but not limited to, activities to drill an initial well, to drill a new well, or to rework, stimulate, deepen, sidetrack, frac, plug back in the same or different formation or repair a well or equipment on the Leasehold or any lands pooled/unitized therewith (such activities shall include, but not be limited to, performing any preliminary or preparatory work necessary for drilling, conducting internal technical analysis to initiate and/or further develop a well, obtaining permits and approvals associated therewith and may include reasonable gaps in activities provided that there is a continuum of activities showing a good faith effort to develop a well or that the cessation or interruption of activities was beyond the control of Lessee, including interruptions caused by the acts of third parties over whom Lessee has no control or regulatory delays associated with any approval process required for conducting such activities).

(B) LIMITATION OF FORFEITURE: This Lease shall never be subject to a civil action or proceeding to enforce a claim of termination, cancellation, expiration or forfeiture due to any action or inaction by the Lessee, including, but not limited to making any prescribed payments authorized under the terms of this Lease, unless the Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy or provide justification responding to Lessor's demand within 60 days from the receipt of such notice. If Lessee timely responds to Lessor's demand, but in good faith disagrees with Lessor's position and sets forth the reasons therefore, such a response shall be deemed to satisfy this provision, this Lease shall continue in full force and effect and no further damages (or other claims for relief) will accrue in Lessor's favor during the pendency of the dispute, other than claims for payments that may be due under the terms of this Lease.

PAYMENTS TO LESSOR. In addition to the bonus paid by Lessee for the execution hereof, Lessee covenants to pay Lessor, proportionate to Lessor's percentage of ownership, as follows:

(A) DELAY RENTAL: To pay Lessor as Delay Rental, after the first year, at the rate of **five dollars ($5.00)** per net acre per year payable in advance. **The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof.**

(B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustments on production from the Leasehold, as follows:

1. OIL: To deliver to the credit of Lessor, free of cost, a Royalty of the equal one-eighth (1/8) part of all oil and any constituents thereof produced and marketed from the Leasehold.

2. GAS: To pay Lessor an amount equal to one-eighth (1/8) of the revenue realized by Lessee for all gas and the constituents thereof produced and marketed from the Leasehold, less the cost to transport, treat and process the gas and any losses in volumes to point of measurement that determines the revenue realized by Lessee. Lessee may withhold Royalty payment until such time as the total withheld exceeds fifty dollars ($50.00).

(C) DELAY IN MARKETING: In the event that Lessee drills a well on the Leasehold or lands pooled/unitized therewith that Lessee deems to be capable of production, but does not market producible gas, oil, or their constituents therefrom and there is no other basis for extending this Lease, Lessee shall pay after the primary term and until such time as marketing is established (or Lessee surrenders the Lease) a Delay in Marketing payment equal in amount and frequency to the annual Delay Rental payment, and this Lease shall remain in full force and effect to the same extent as payment of Royalty.

(D) SHUT-IN: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of six months,

and there is no producing well on the Leasehold or lands pooled/unitized therewith, Lessee shall thereafter, as Royalty for constructive production, pay a Shut-in Royalty equal in amount and frequency to the annual Delay Rental payment until such time as production is re-established (or lessee surrenders the Lease) and this Lease shall remain in full force and effect. During Shut-in, Lessee shall have the right to rework, stimulate, or deepen any well on the Leasehold or to drill a new well on the Leasehold in an effort to re-establish production, whether from an original producing formation or from a different formation. In the event that the production from the only producing well on the Leasehold is interrupted for a period of less than six months, this Lease shall remain in full force and effect without payment of Royalty or Shut-in Royalty.

(E) DAMAGES: Lessee will remove unnecessary equipment and materials and reclaim all disturbed lands at the completion of activities, and Lessee agrees to repair any damaged improvements to the land and pay for the loss of growing crops or marketable timber.

(F) MANNER OF PAYMENT: Lessee shall make or tender all payments due hereunder by check, payable to Lessor, at Lessor's last known address, and Lessee may withhold any payment pending notification by Lessor of a change in address. Payment may be tendered by mail or any comparable method (e.g., Federal Express), and payment is deemed complete upon mailing or dispatch. Where the due date for any payment specified herein falls on a holiday, Saturday or Sunday, payment tendered (mailed or dispatched) on the next business day is timely.

(G) CHANGE IN LAND OWNERSHIP: Lessee shall not be bound by any change in the ownership of the Leasehold until furnished with such documentation as Lessee may reasonably require. Pending the receipt of documentation, Lessee may elect either to continue to make or withhold payments as if such a change had not occurred.

(H) TITLE: If Lessee receives evidence that Lessor does not have title to all or any part of the rights herein leased, Lessee may immediately withhold payments that would be otherwise due and payable hereunder to Lessor until the adverse claim is fully resolved.

(I) LIENS: Lessee may at its option pay and discharge any past due taxes, mortgages, judgments, or other liens and encumbrances on or against any land or interest included in the Leasehold; and Lessee shall be entitled to recover from the debtor, with legal interest and costs, by deduction from any future payments to Lessor or by any other lawful means.

(J) CHARACTERIZATION OF PAYMENTS: Payments set forth herein are covenants, not special limitations, regardless of the manner in which these payments may be invoked. Any failure on the part of the Lessee to timely or otherwise properly tender payment can never result in an automatic termination, expiration, cancellation, or forfeiture of this Lease. Lessor recognizes and acknowledges that oil and gas lease payments, in the form of rental, bonus and royalty, can vary depending on multiple factors and that this Lease is the product of good faith negotiations. Lessor hereby agrees that the payment terms, as set forth herein, and any bonus payments paid to Lessor constitute full consideration for the Leasehold. Lessor further agrees that such payment terms and bonus payments are final and that Lessor will not seek to amend or modify the lease payments, seek additional consideration or register any complaint based upon any differing terms which Lessee has or will negotiate with any other lessor/oil and gas owner.

(K) PAYMENT REDUCTIONS: If Lessor owns a lesser interest in the oil or gas than the entire undivided fee simple estate, then the rentals (except for Delay Rental payments as set forth above), royalties and shut-in royalties hereunder shall be paid to Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

UNITIZATION AND POOLING. Lessor grants Lessee the right to pool, unitize, or combine all or parts of the Leasehold with other lands, whether contiguous or not contiguous, leased or unleased, whether owned by Lessee or by others, at a time before or after drilling to create drilling or production units either by contract right or pursuant to governmental authorization. Pooling or unitizing in one or more instances shall not exhaust Lessee's pooling and unitizing rights hereunder, and Lessee is granted the right to change the size, shape, and conditions of operation or payment of any unit created. Lessor agrees to accept and receive out of the production or the revenue realized from the production of such unit, such proportional share of the Royalty from each unit well as the number of Leasehold acres included in the unit bears to the total number of acres in the unit. Otherwise, as to any part of the unit, drilling, operations in preparation for drilling, production, or shut-in production from the unit, or payment of Royalty, Shut-in Royalty, Delay in Marketing payment or Delay Rental attributable to any part of the unit (including non-Leasehold land) shall have the same effect upon the terms of this Lease as if a well were located on, or the subject activity attributable to, the Leasehold. In the event of conflict or inconsistency between the Leasehold acres ascribed to the Lease and the local property tax assessment calculation of the lands covered by the Lease, Lessee may, at its option, rely on the latter as being determinative for the purposes of this paragraph.

FACILITIES. Lessee shall not drill a well within 200 feet of any structure located on the Leasehold without Lessor's written consent. Lessor shall not erect any building or structure, or plant any trees within 200 feet of a well or within 25 feet of a pipeline without Lessee's written consent. Lessor shall not improve, modify, degrade, or restrict roads and facilities built by Lessee without Lessee's written consent.

CONVERSION TO STORAGE. Lessee is hereby granted the right to convert the Leasehold or lands pooled/unitized therewith to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well drilled pursuant to this Lease using methods of calculating gas reserves as are generally accepted by the natural gas industry and, and in the event that all wells on the Leasehold and/or lands pooled/unitized therewith have permanently ceased production, Lessor shall be paid a Conversion to Storage payment in an amount equal to Delay Rental for as long thereafter as the Leasehold or lands pooled/unitized therewith is/are used for gas storage or for protection of gas storage; such Conversion to Storage payment shall first become due upon the next ensuing Delay Rental anniversary date. The use of any part of the Leasehold or lands pooled or unitized therewith for the underground storage of gas, or for the protection of stored gas will extend this Lease beyond the primary term as to all rights granted by this Lease, including but not limited to production rights, regardless of whether the production and storage rights are owned together or separately.

TITLE AND INTERESTS. Lessor hereby warrants generally and agrees to defend title to the Leasehold and covenants that Lessee shall have quiet enjoyment hereunder and shall have benefit of the doctrine of after acquired title. Should any person having title to the Leasehold fail to execute this Lease, the Lease shall nevertheless be binding upon all persons who do execute it as Lessor.

LEASE DEVELOPMENT. There is no implied covenant to develop or market within the primary term or any extension of term of this Lease. There is no covenant to develop the Leasehold within a certain time frame, and there shall be no Leasehold forfeiture, termination, expiration or cancellation for failure to comply with the implied covenant to produce. Provisions herein, including, but not limited to, the prescribed payments, constitute full compensation for the privileges herein granted.

COVENANTS. This Lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is effectively prevented by federal, state, or local law, regulation, or decree, or the acts God and/or third parties over whom Lessee has no control.

RIGHT OF FIRST REFUSAL. If at any time within the primary term of this Lease or any continuation or extension thereof, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional lease ("Top Lease") covering all or part of the Leasehold, Lessee shall have the continuing option by meeting any such offer to acquire a Top Lease on equivalent terms and conditions. Any offer must be in writing and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Top Lease, and include a copy of the lease form to be utilized reflecting all pertinent and relevant terms and conditions of the Top Lease. Lessee shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer. Any Top Lease granted by Lessor in violation of this provision shall be null and void.

ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

ENTIRE CONTRACT. The entire agreement between Lessor and Lessee is embodied herein. No oral warranties, representations, or promises have been made or relied upon by either party as an inducement to or modification of this Lease.

SURRENDER. Lessee, at any time, and from time to time, may surrender and cancel this Lease as to all or any part of the Leasehold by recording a Surrender of Lease and thereupon this Lease, and the rights and obligations of the parties hereunder, shall terminate as to the part so surrendered; provided, however, that upon each surrender as to any part of the Leasehold, Lessee shall have reasonable and convenient easements for then existing wells, pipelines, pole lines, roadways and other facilities on the lands surrendered.

SUCCESSORS. All rights, duties, and liabilities herein benefit and bind Lessor and Lessee and their heirs, successors, and assigns.

FORCE MAJEURE. When drilling, reworking, production or other operations hereunder, or Lessee's fulfillment of its obligations hereunder are prevented or delayed by such laws, rules, regulations or orders, or by inability to obtain necessary permits, equipment, services, material, water, electricity, fuel, access or easements, or by fire, flood, adverse weather conditions, war, sabotage, rebellion, insurrection, riot, strike or labor disputes, or by inability to obtain a satisfactory market for production or failure of purchasers or carriers to take or transport such production, or by any other cause not reasonably within Lessee's control, this Lease shall not terminate because of such prevention or delay, and, at

Lessee's option, the period of such prevention or delay shall be added to the term hereof. Lessee shall not be liable for breach of any provisions or implied covenants of this Lease when drilling, production or other operations are so prevented or delayed.

SEVERABILITY. If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

COUNTERPARTS. This Lease may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Lease and all of which, when taken together, will be deemed to constitute one and the same agreement.

**SEE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**

IN WITNESS WHEREOF, Lessor hereunto sets hand and seal.

Witness _____     _James L. Brown_____ (Seal)
                                       James L. Brown, a single man

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)

Witness _____     _____ (Seal)


### ACKNOWLEDGMENT

STATE OF Pennsylvania)
                                    ) SS:
COUNTY OF Bradford )

On this the 6 day of ~~June~~ July, 2007, before me, the undersigned authority, personally appeared **James L. Brown, a single man**, who, being duly sworn according to law, depose and say that he/she/they executed the foregoing instrument for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: 6-25-2010

Signature/Notary Public _Barbara K. Lord_
Name/Notary Public (print): _Barbara K. Lord_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Barbara K. Lord, Notary Public
Wyalusing Boro, Bradford County
My Commission Expires June 25, 2010
Member, Pennsylvania Association of Notaries


### CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                                        ) SS:
COUNTY OF _____ )

On this the _____ day of _____, 2007, before me, the undersigned authority, personally appeared _____, who acknowledged to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself/herself as

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

My Commission Expires: _____

Signature/Notary Public _____
Name/Notary Public (print): _____


Prepared by Kim Soule and return to Chesapeake Appalachia, L.L.C., Land Dept., P. O. Box 6070, Charleston, WV 25362-0070

# ADDENDUM

This Addendum is attached to and made a part of that certain Oil and Gas Lease dated, **June 20, 2007** , by and between, **James L. Brown, a single man**, as Lessor, and Chesapeake Appalachia, L.L.C., as Lessee.  If any of the following provisions conflict with or are inconsistent with any of the printed provisions or terms of this Lease, the following provisions shall control.

1.  *Location Approval Clause:*  Lessee and Lessor to mutually agree on all drill site, pipeline and access road locations, consent not to be unreasonably withheld, delayed or conditioned by Lessor.
2.  *Reclamation Clause*:  Lessee hereby agrees the surface of the leased premises will be restored as near as practical to the contour which existed prior to commencement of operations.
3.  *Water Damage Clause*:  In the event any activity carried on by Lessee pursuant to the terms of this lease damages, disturbs, or injures any fresh water well or source located on these leased premises, Lessee shall at its sole cost and expense use its best efforts to correct any such damage, disturbance or injury.

_____          _____
                                       James L. Brown, a single man

_____          _____

# EXHIBIT B

# Chesapeake Energy's $5 Billion Shuffle

*The energy giant raised the cash it needed to survive by slashing royalties it paid property owners to drill on their land.*

*by Abrahm Lustgarten*
*ProPublica, March 13, 2014, 5:45 a.m.*



Joe Drake
(Abrahm Lustgarten for Propublica)

*This story was co-published with The Daily Beast.*

At the end of 2011, Chesapeake Energy, one of the nation's biggest oil and gas companies, was teetering on the brink of failure.

Its legendary chief executive officer, Aubrey McClendon, was being pilloried for questionable deals, its stock price was getting hammered and the company needed to raise billions of dollars quickly.

The money could be borrowed, but only on onerous terms. Chesapeake, which had burned money on a lavish steel-and-glass office complex in Oklahoma City even while the selling price for its gas plummeted, already had too much debt.

In the months that followed, Chesapeake executed an adroit escape, raising nearly $5 billion with a previously undisclosed twist: By gouging many rural landowners out of royalty payments they were supposed to receive in exchange for allowing the company to drill for natural gas on their property.

In lawsuits state after state, private landowners have won cases accusing companies like Chesapeake of stiffing them on royalties they were due. Federal investigators have repeatedly identified underpayments of royalties for drilling on federal

lands, including a case in which Chesapeake was fined $765,000 for "knowing or willful submission of inaccurate information" last year.

Last month, Pennsylvania governor Tom Corbett, who is seeking reelection, sent a letter to Chesapeake's CEO saying the company's expense billing "defies logic" and called for the state Attorney General to open an investigation.

McClendon, a swashbuckling executive and fracking pioneer, was ultimately pushed out of his job. But the impact of the financial maneuvers that he made to save the company will reverberate for years. The winners, aside from Chesapeake, were a competing oil company and a New York private equity firm that fronted much of the money in exchange for promises of double-digit returns for the next two decades.

The losers were landowners in Pennsylvania and elsewhere who leased their land to Chesapeake and saw their hopes of cashing in on the gas-drilling boom vanish without explanation.

People like Joe Drake.

"I got the check out of the mail… I saw what the gross was," said Drake, a third-generation Pennsylvania farmer whose monthly royalty payments for the same amount of gas plummeted from $5,300 in July 2012 to $541 last February.  This sort of precipitous drop can reflect gyrations in the  price of gas. But in this case, Drake's shrinking check resulted from a corporate decision to radically reinterpret the terms of the deal it had struck to drill on his land. "If you or I did that we'd be in jail," Drake said.

Chesapeake's conduct is part of a larger national pattern in which many giant energy companies have maneuvered to pay as little as possible to the owners of the land they drill. Last year, a ProPublica investigation found that Pennsylvania landowners were paying ever-higher fees to companies for transporting their gas to market, and that Chesapeake was charging more than other companies in the region. The question was "why"?

ProPublica pieced together the story of how Chesapeake shifted borrowing costs to landowners from documents filed with the U.S. Securities and Exchange Commission, interviews with landowners, people who worked for the company and employees at other oil and gas concerns.

The deals took advantage of a simple economic principle: Monopoly power.

Boiled down to basics, they worked like this: When energy companies lease land above the shale rock that contains natural gas, they typically agree to pay the owner the market price for any gas they find, minus certain expenses.

Federal rules limit the tolls that can be charged on inter-state pipelines to prevent gouging. But drilling companies like Chesapeake can levy any fees they want for moving gas through local pipelines, known in the industry as gathering lines, that link backwoods wells to the nation's interstate pipelines. Property owners have no alternative but to pay up. There's no other practical way to transport natural gas to market.

Chesapeake took full advantage of this. In a series of deals, it sold off the network of local pipelines it had built in Pennsylvania, Ohio, Louisiana, Texas and the Midwest to a newly formed company that had evolved out of Chesapeake itself, raising $4.76 billion in cash.

In exchange, Chesapeake promised the new company, Access Midstream, that it would send much of the gas it discovered for at least the next decade through those pipes. Chesapeake pledged to pay Access enough in fees to repay the $5 billion plus a 15 percent return on its pipelines.

That much profit was possible only if Access charged Chesapeake significantly more for its services. And that's exactly what appears to have happened: While the precise details of Access' pricing remains private, immediately after the transactions Access reported to the SEC that it collected more money to move each unit of gas, while Chesapeake reported that it also paid more to have that gas moved. Access said that gathering fees are its predominant source of income, and that Chesapeake accounts for 84 percent of the company's business.

What's more, SEC documents show, Chesapeake retained a stake in the gathering process. While Chesapeake collected fees from landowners like Drake to cover the costs of what it paid Access to move the gas, Access in turn paid Chesapeake for equipment it used to complete that process, circulating at least a portion of the money back to Chesapeake.

ProPublica repeatedly sought comment and explanations from both Chesapeake and Access Midstream over the course of several months. Both companies declined to make executives available to discuss the deals or to respond to written questions submitted by ProPublica.

Days after the last of the deals closed, Drake and other landowners learned the expense of sending their gas through Access's pipelines would eat up nearly all of the money they had been previously earning from their wells. Some saw their monthly checks fall by as much as 94 percent.

An executive at a rival company who reviewed the deal at ProPublica's request said it looked like Chesapeake had found a way to make the landowners pay the principal and interest on what amounts to a multi-billion loan to the company from Access Midstream.

"They were trying to figure out any way to raise money and keep their company alive,'' said the executive, who declined to be named because it would jeopardize his dealings with Chesapeake. "I think they looked at it as an opportunity to effectively get disguised financing…that is going to be repaid at a premium.''

\*\*\*

At 54, Joe Drake guns his six-wheeler up a steep rock-rutted trail on the backwoods of his 494-acre tract and points to his property line, marked by a large maple in a sea of indistinguishable trees. He knows where it lies, because as a kid his father made him walk that line to string barbed wire. The wire is long gone, but a rusted snag remains entombed in the bark. Back then, the Drakes ran a dairy farm in these pastures.

"It's just something you've got in your blood that you do," Drake said. "But dairy farmers are a dying breed… It was a good way of life."



# The Chesapeake-Access Deal

**Chesapeake**
Natural Gas Producer & Well Operator

**Access**
Natural Gas Services Company

**Joe Drake**
Farmer & Landowner



1   Chesapeake needed cash, so it sold Access most of its national network of pipelines.

$4.8 BILLION

2   Access and its investors paid Chesapeake $4.8 billion



3   Chesapeake promised to transport gas through Access' pipelines and pay them a minimum fee, enough for Access to earn back the billions it had just paid (plus extra).



4   In return, Access promised to hire Chesapeake-owned companies for part of the work, giving them back a slice of the business.



5   Access raised fees for transporting gas, passing them on to Chesapeake.



6   Chesapeake, in turn, passed the cost on to landowners like Joe Drake, who now pays a much higer bill.

Today, the milking stalls have been ripped out of a long barn that still carries the stench of their manure, but stores 20-foot stacks of bailed hay instead. Drake sold all 187 head of cattle two years ago, pinched by regulated milk prices and the rising costs of independent farming. He took out a second mortgage to keep the farm afloat.

Across the road, past his house and just beyond a stand of oak and ash, the hillside's natural shape transitions to a steep slope of pushed dirt, capped by a 7-acre flat the size of a large gravel parking lot. In the middle stands a 6-foot stack of steel pipes and valves – a gas well.

When Chesapeake arrived at Drake's door, he was optimistic. Drake plastered a "Drill, baby, drill" bumper sticker in the window of his Ford F-250 pickup. He welcomed the chance to draw an easy income from his land, and was unswayed when his neighbors raised questions about the environmental risks of drilling. Chesapeake promised Drake one-eighth the value of whatever it made from his well.  It seemed like a fair deal.

If any driller was going to make money for Drake, he thought, it would be Chesapeake. The company had built an empire off finding and drilling natural gas discoveries as the fracking boom rolled across the country. With uncanny foresight, its founder, McClendon, locked up exclusive access to immense tracts of land across the country by promising property owners that their lives would be transformed by the wealth the gas under it would bring.

Then the company drilled furiously -- in Oklahoma, then Texas, Louisiana and later in Pennsylvania's Marcellus Shale – catapulting itself to the rank of second-largest producer of natural gas in the United States. It made McClendon – who snatched up a stake in the Oklahoma City Thunder basketball team and moved into a stone mansion in the posh Oklahoma City suburb of Nichols Hills -- one of the richest men in the world.

McClendon – named by Forbes in 2011 as "America's Most Reckless Billionaire" -- would find his way into plenty of personal trouble. He took a personal stake in Chesapeake's wells, and then liquidated his stock in the company in order to cover his own losses, rattling investors and ringing corporate governance alarm bells. He drew scrutiny for selling his $12 million antique map collection to the company and ire for taking a $75 million bonus as Chesapeake struggled.

In 2012, he borrowed as much as a billion dollars from the company's private equity partners to fund his private interests.  Separately, an investigation by Reuters alleged Chesapeake had rigged land leasing prices in Michigan, under McClendon's direction, sparking a federal criminal probe.

But McClendon's overarching design for the business nonetheless made it a formidable player. Chesapeake aggressively pursued business opportunities beyond its drilling. It created interlocking businesses and took advantage of tax breaks that deliver out-sized benefits to energy companies.

By structuring itself this way, Chesapeake earned a slice of profit from each step. Chesapeake's subsidiaries trucked the drilling materials, drilled the wells, fracked the gas, gathered and piped it away to a hub, and then marketed the end product – what economists call vertical integration. In fact, he built Chesapeake into a powerhouse, an echo of the old Standard Oil empire, positioned to control almost every variable and armed with the leverage to get its way.

Neither McClendon nor his staff responded to requests for comment for this article.

From early on, the company viewed the local pipelines as a profit source.  Chesapeake formed subsidiaries to build and run the lines, then spun them off into a separate, publicly traded company. That company would eventually evolve into Access Midstream, when Chesapeake sold its shares – one of the three deals – for $2 billion in 2012.
The strategy paid dividends. At Chesapeake's headquarters, a group of new, distinctively-designed office buildings went up, with views south over the state capital and the city's small skyline. The company lavished its employees with perks, too. "They've got a 72,000-square-foot gym, free trainers… free Thunder tickets," said Andrea Watiker, who scheduled pipeline capacity for gas traders in one of the company's new towers.
Confident he was in good hands, Drake endured the trucks, dirt and noise that accompanied gas drilling and signed agreements that allowed Chesapeake to run pipelines across his fields. To transport the gas from Drake's well, Chesapeake built a pipeline that stretched south from within spitting distance of the New York border, cutting a wide swath through the forest. Then it went down beyond the white-spired church in Litchfield, and ran some 35 miles further to its handoff at the Tennessee interstate pipeline near the Susquehanna River.

What Drake didn't know at the time was that the pipeline was more than a way to move his gas to market. It would become part of a strategy to make more money off of Drake himself.

\*\*\*

When the first gas flowed from the well on Drake's land in July 2012, it was abundant, and the royalty checks were fat. "We were hoping to get these loans paid off…with the big money," said Drake, who earned more than $59,400 from the first few months of production, referring to the mortgages on his farm.

That year, many Pennsylvania landowners began receiving similarly sized payments as thousands of new wells – many of them drilled by Chesapeake -- finally began producing gas. Pennsylvania fast approached Texas as the largest source of natural gas in the country, and with it, the prosperity long promised to this rural part of the United States seemed about to arrive.

But then, in January 2013, without warning or explanation, the expenses withheld from Chesapeake's royalty checks for use of the gathering pipelines tripled. Drake's income dwindled. His contract with Chesapeake – and Pennsylvania law that sets a minimum royalty share in the state – promised him at least 12.5 percent of the value of the gas. Drake says the company led him to believe any expenses would be negligible. "Well, they lied."

A few miles away, the same month, his brother-in-law had 94 percent of his gas income withheld to pay for what Chesapeake called "gathering fees." Others across the northern part of the state also saw their income slashed. "I've got a stack," said Taunya Rosenbloom, a lawyer representing Pennsylvania landowners with natural gas leases. She pulled the statements of all of her Chesapeake clients into an eight-inch pile on her desk. "Everyone is having this issue."
Drake found the statements Chesapeake mailed him each month mystifying. He pored over the papers, hired a lawyer, compared notes with his neighbors, but couldn't make sense of the charges.

# The Great Chesapeake Markup



**9¢**

**What it Cost**

It cost Access Midstream 9 cents per 1,000 cubic feet (Mcf) to move gas through the pipelines connected to Joe Drake's farm.



**85¢**

**What Chesapeake Paid**

Chesapeake paid Access 85 cents per Mcf to move gas through Access's national pipeline network (on average).



**$2.94**

**What They Charged Drake**

Chesapeake then charged Joe Drake $2.94 per Mcf — more than 30 times the actual cost and three times what they paid Access on average — to transfer Drake's gas through the pipeline.

Other Pennsylvanians were similarly baffled. Sometimes, Chesapeake charged different fees to neighbors whose wells fed into the same gathering line. Other times, companies that had partnered with Chesapeake on the same well charged vastly less for expenses. No one at the Chesapeake could seem to explain how the charges were set.

"There is no rhyme or reason why one client would have such an exorbitant amount taken out when another no more than 3 miles away has only 20 percent of their royalty taken," said Harold Moyer, an accountant in Bradford County, Pa., who represents more than 150 landowners with royalty rights. Moyer said he saw a dramatic difference between what Chesapeake usually charged compared to other energy companies in the area.

Different contracts may entitle Chesapeake to charge varying amounts. Some of the leases examined by ProPublica limit a landowner's share of expenses to 12.5 percent – or the same as their share of the proceeds. Other contracts prohibit Chesapeake from withholding any expenses at all. Drake's contract appears to allow Chesapeake to recoup as much money as it wants; it stipulates that he can be charged for the expense of gathering and transporting his gas without specifying his share of such expenses.
Gas drillers differ significantly in how much they charge landowners for expenses. The Norwegian energy company Statoil owns a portion of the gas extracted from Drake's well, as well as a portion of the gathering line that moves the gas to an interstate pipeline. Yet Statoil rakes off virtually nothing for its expenses, according to its statements. Statoil told ProPublica that it sells its gas independently and makes decisions about billing separately from Chesapeake.
"When it comes to deciding which, if any, deductions are appropriate, we make that assessment according to the terms of each lease and the applicable laws," wrote Ola Morten Aanestad, in an e-mailed response to questions.


Neighboring workover rig in Sayre, PA (Abrahm Lustgarten for Propublica)

Drake peers out the window, over the hills that descend from his porch into a valley brightening with the changing colors of fall, and scowls. He can't stand being indoors. He's worried that he'll spend most of next hunting season here at this table, trying to decipher Chesapeake's statements. His monthly gas statements pile up, unorganized, on the kitchen table, below a rack of deer antlers and beside two empty cans of Coors Light and a camouflage baseball cap.

Drake's gathering pipeline only extends a few dozen miles, far less distance than the interstate pipeline it feeds into that carries his gas through New Jersey towards White Plains, NY. Yet public documents filed with the Federal Energy Regulatory Commission show it only cost about $.38 – on average -- to move a unit of gas on the interstate system – a fraction of the $2.94 Chesapeake charged Drake to move a unit of gas a vastly shorter distance that February. "Nobody can tell you why or how come," Drake said. "They pass the buck, they tell you to call this person, and you are lucky if you can even get an answering machine."

Chesapeake declined to explain its charges to Drake or to ProPublica. When a ProPublica reporter visited Chesapeake's headquarters in Oklahoma City, the company's director of external communications sent a message that he was "booked solid" and couldn't talk.

*** 

There has long been dispute over how drilling companies calculate royalty payments due landowners.

A 2007 report commissioned from a forensic oil and gas accountant by the National Association of Royalty Owners (NARO) – an organization representing landowners in their dealings with the oil and gas industry – found that almost every company it examined had "used affiliates and subsidiaries to reduce income to royalty owners and taxing authorities."

Nine out of 10 of the top producers in Colorado, Texas, Arkansas and Oklahoma – including ConocoPhillips, Chevron, BP and Chesapeake -- had used subsidiaries to sell their gas for significantly more than the amount they reported to landowners, according to the report. They inflated their expenses, too – at least according to the six companies that provided that level of detail for the report -- charging landowners, on average, 43 percent more than what they actually paid to handle the gas. (Neither Chevron nor Chesapeake provided information about their expense deductions.)

ConocoPhillips and BP declined to comment for this article. Chevron did not respond to a request for comment.

Other companies have been ensnared in similar controversies. The giant pipeline company, Kinder Morgan, which also declined to speak to ProPublica, has been accused by Montezuma County, Colo., of overstating its transportation and other expenses, and underpaying $2 million in taxes as a result. (Kinder Morgan has paid that bill, but is appealing the decision.) Chevron has faced multiple lawsuits for underpaying royalties and overstating expense deductions because of alleged self-dealing through its affiliate relationships, including a 2009 case the company settled with the U.S. Department of Justice for $45 million.

"Every company has been involved," said Jeffrey Matthews, a vice president and forensic accounting expert at Charles River Associates, a consulting firm, in a lecture to landowners and oil and gas industry accountants in Houston. "If you're dealing with related parties,'' the technical term for the sort of inter-locking subsidiaries created by Chesapeake, "the costs can be double, or triple. You don't know if you are paying for something two to three times over."

Even so, Chesapeake stands out among its peers and is widely known to interpret contracts to match its strategies, executives in the oil and gas industry say.

The company has faced numerous lawsuits – filed by the billionaire Ed Bass, and the city of Fort Worth, among others -- claiming it misrepresented its expenses. Chesapeake has paid hundreds of millions of dollars in settlements and judgments in such cases, including a $7.5 million settlement with Pennsylvania landowners last fall.

One Oklahoma lawsuit, brought by other oil companies that had partnered with Chesapeake, alleged that Chesapeake cheated them out of the final sales price of their gas and artificially inflated its operating expenses, in part by folding in the salaries of high-level management, the cost of seminars they attended, and rent and office expenses for field offices. The suit was settled in late 2004 for $6.5 million. Chesapeake denied any wrongdoing, and the settlement explicitly states that Chesapeake did not agree to "change the practices complained of" in the lawsuit.



Joe Drake surveys the well pad located on his property. (Abrahm Lustgarten for Propublica)

"They were making excessive, unwarranted, and unauthorized charges," said Charles Watson, an Oklahoma attorney involved in the case. "I don't think it's mistaken interpretation, I think it's an intentional accounting maneuver to reduce the amount of money going to the royalty owners and increase the amount of money going to the operator."

Chesapeake declined to comment about the case.

For Drake to know how Chesapeake calculated his gathering costs, he has to pay lawyers and accountants to audit the company, or take his grievance to arbitration, a process that would cost him tens of thousands of dollars. In either case, he would need to see the purchase agreements that describe the company's gas sales in detail. They list far more precisely than Drake's own statements exactly what costs were incurred, how much gas might have been lost along the way or used by the company for its own purposes, what marketing fees Chesapeake's subsidiary charged, and the final, real price of the gas.

But Chesapeake isn't required to share these agreements. They are proprietary.

"When it comes to production expense," said Charles River's Matthews, "you're at their mercy."

*\*\**

The deals that led to much higher expense charges for Drake and his neighbors involve some sophisticated financial engineering.

Over 12 months, Chesapeake sold off a significant portion of its nationwide system of gathering pipelines in three separate transactions. By December 2012, almost all of the pipes were controlled by a single company – Chesapeake's former affiliate, Access Midstream. Taken together, the sales brought $4.76 billion in cash into Chesapeake's coffers.

The reason behind the moves was simple: All that profligate spending – the Oklahoma City offices, corporate jets and huge executive salaries -- had come at  roughly the same time that the price of gas tumbled to historic lows, analysts at several Wall Street investment firms told ProPublica. Chesapeake "desperately needed cash," observed Tony Say, who once headed Chesapeake's Marketing division – the same part of the company that now handles transportation for the gas.

In its securities filings, Chesapeake said that the deals brought the company $1.76 billion more than it had invested to build and maintain its pipelines and the companies that ran them, leaving the impression that the sales were an unqualified boon for Chesapeake.

But a look at an SEC filing by Access Midstream tells a different story: Chesapeake was going to have to give much of that money back.

On the same day as the last of the major sales, Chesapeake signed long-term contracts pledging to pay Access a minimum fee for transporting its gas. In some cases, the fee held no matter what happened to the price of gas, or even how little of it flowed out of Chesapeake's wells.
Chesapeake also promised to connect every new well it drilled to Access's lines for the next 15 years in Ohio's Utica Shale, a potentially lucrative emerging drilling field, and made similar agreements elsewhere.
According to ProPublica projections based on figures disclosed by the companies in late 2013, Chesapeake's commitments would have it paying Access a whopping $800 million each year. Over ten years, the contracts would generate nearly twice as much money as Access had paid Chesapeake for its businesses in the first place.



(Abrahm Lustgarten for Propublica)

In plain words, Chesapeake and a company made up of its old subsidiaries were passing money back-and-forth between each other, in a deal that added little productive capacity but allowed both sides of the transaction to rake in billions of dollars.

Access' chief executive, J. Mike Stice, told a group of investment banking analysts last September that the deals amounted to a "low-risk business model" that "most people haven't understood."

"Nobody really has the access to contractual growth that [Access Midstream] has," Stice said."It doesn't get any better than this."

The SEC filings provide other detail about the ways that the two companies devised to remain inextricably linked, even though Chesapeake has sold the stake it once had in Access.

At the same time it signed its contracts, Access pledged to subcontract a slice of its business back – again -- to companies still owned by Chesapeake. It also agreed to buy industrial equipment used to compress the gas for the pipelines from a company owned by Chesapeake. In essence, Chesapeake would get a rebate on the fees it had guaranteed to Access. Chesapeake never answered questions about whether that rebate was figured in to the price it charged Joe Drake and his neighbors.

In its royalty statements to Joe Drake, Chesapeake says the expenses it had deducted reflect what it costs the company to move his gas. The company has said in public statements about the royalty disagreements in Pennsylvania that it is merely recouping its costs.

But ProPublica's projections drawn from figures previously reported by both companies show that Chesapeake could earn back billions of dollars of the transportation fees it is paying Access over the next 10 years.

There are other ties between the two companies. Access's Chief Executive, Stice, once worked for McClendon as the chief operating officer of one of the companies that used to run the pipelines. Chesapeake's chief financial officer, Dominic del Osso, sits on the board of Access Midstream Partners, and as of 2011, according to SEC records, owned thousands of shares of Access stock.

The relationships raise questions about Chesapeake's assertions that its contracts are arm's-length agreements, and that its expenses reflect its true cost of operating.

"They had a lot of disguised debt," said Philip Weiss, a chief investment analyst with Baltimore Washington Financial Advisors, who has covered Chesapeake over the years, and was often concerned that the company has understated its financial obligations. In this case, he said, Chesapeake's expensive contracts with Access might not just be the cost of operating, but another unusual long-term financial obligation that would weigh down the company, but which wouldn't be reflected in the normal measures of debt. "The use of off-balance-sheet debt is often a way to try to avoid getting as much investor scrutiny."

For six months Chesapeake declined to answer questions about these discrepancies posed by ProPublica. But in its latest annual financial filings made public just two weeks ago, Chesapeake noted for the first time that it had $36 billion worth of what it called "off-balance-sheet arrangements," including $17 billion of long-term commitments to buy gathering services. This appears to be the first time the company has acknowledged that it owes more money than what has been identified as debts in previous SEC filings.

In the filings, Chesapeake said that the $17 billion figure didn't include reimbursement from royalty owners, and that landowners and corporate partners alike "where appropriate, will be responsible for their proportionate share of these costs."

In an earlier, September 2013 quarterly filing, there were hints of the same activity, but with no disclosure of the salient details to shareholders that might help them understand what was really going on. Chesapeake reported that its expenses related to its pipeline and marketing business roughly doubled in the months after it sold its pipelines, compared to the same period a year earlier, and that its revenues for that part of its business also increased accordingly, covering the new costs. Chesapeake told investors it had cost the company more than $8 to transport a cubic foot of gas or its oil equivalent – an astronomical amount unheard of in the energy industry.

"Something is wrong with this calculation," said Fadel Gheit, a seasoned industry analyst for the investment firm Oppenheimer, who estimated the figure was off by a decimal point before later confirming that it matched the numbers Chesapeake had reported to the SEC. "It can't be."

In fact, none of the financial analysts who cover Chesapeake that ProPublica spoke with could explain the explosion in Chesapeake's marketing and transportation revenues and expenses using oil sales alone.

"The change in marketing, gathering, compression revenue and expense is staggering," wrote Kevin Kaiser, a financial analyst with Hedgeye, a private equity group in New York, in an email to ProPublica.

Neither Chesapeake's investor relations group, nor its media staff would comment on whether the deals amounted to disguised debt that landowners would repay. In interviews, one former Chesapeake employee with knowledge of the company's operations dismissed the notion that Chesapeake was essentially paying back an off-balance-sheet loan by paying unusually high fees for use of the pipelines.

"The timing supports that --- that Chesapeake got paid a lot of money and the gathering fees get paid back over time, and it looks like a loan arrangement," said the former employee. "But to jump to the conclusion that the whole thing is a sham and a means by which they are going to defraud royalty owners is not true."

Only in its latest filing at the end of February, after months of queries from ProPublica, did Chesapeake add a note – two sentences in 299 pages – stating that its contracts with Access and other companies played into the rising figures. But the company did not specify how much.

And to the extent that the real costs of gathering and transporting gas can be gleaned from securities reports and Joe Drake's own statements, there's still a big gap between what Chesapeake reports it paid out, and what Access reports it received for gathering services.

In the mean time, one thing is for sure: all the escalating costs, side deals, and unexplained debt aside, Access is making more money than ever, while Chesapeake – so recently fighting to stay alive -- has emerged from its troubles and is turning a profit.

Joe Drake, on the other hand, is almost back to where he began.

He recently cancelled a fishing trip to Canada and doubled back on the question of how to make a living from the farm. With his livestock gone he will now focus on growing and bundling hay, which he will sell to other farms so they can feed their animals. The natural gas boom has become little more than a sideshow.

"We are surviving," he said. "But we learned that a good old handshake don't cut it anymore."

# EXHIBIT C

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | VOLUME | TAX | DEDUCT | NET VALUE | DECIMAL | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes. It may reflect the price received from an affiliated purchaser.

```
     831011-OTIS 2H                          STATE: PA   COUNTY: BRADFORD       LEGAL: 425.486216 ACRES: HERRICK TOWN
1012 2   2.78 2 01    54292.00        .00    -733.68UA   151870.87   .00008178    4.44    12.36     .00     -.06      12.42 1023
1012 2    .00 2 01        .00         .00       .002Q         .00   .00008178     .00      .00     .00     2.47      -2.47
1012 2    .00 2 01        .00         .00       .009T         .00   .00008178     .00      .00     .00      .40       -.40
                                                              LEASE TOTAL                 12.36            2.81       9.55

     831012-OTIS 5H                          STATE: PA   COUNTY: BRADFORD       LEGAL: 475.091443 ACRES: HERRICK TOW
1111 2   3.26 2 53   -72787.03        .00    1659.21UA  -238679.61   .01456111 -1059.86  -3451.28   .00     24.16   -3475.44 1032
1111 2    .00 2 53        .00         .00       .002Q         .00   .01456111     .00      .00     .00   -605.83     605.83
1111 2    .00 2 53        .00         .00       .009T         .00   .01456111     .00      .00     .00   -193.89     193.89
1111 2   3.26 2 63    72787.00        .00   -1659.21UA   238679.61   .01456111  1059.86  3451.28    .00    -24.16    3475.44 1032
1111 2    .00 2 63        .00         .00       .002Q         .00   .01456111     .00      .00     .00    605.83    -605.83
1111 2    .00 2 63        .00         .00       .009T         .00   .01456111     .00      .00     .00    193.89    -193.89
1211 2   3.37 2 53  -106858.61        .00    5544.22UA  -365292.21   .01456111 -1555.98  -5238.33   .00     80.73   -5319.06 1032
1211 2    .00 2 53        .00         .00       .002Q         .00   .01456111     .00      .00     .00   -896.92     896.92
1211 2    .00 2 53        .00         .00       .009T         .00   .01456111     .00      .00     .00   -262.77     262.77
1211 2   3.37 2 63   106858.61        .00   -5544.22UA   365292.21   .01456111  1555.98  5238.33    .00    -80.73    5319.06 1032
1211 2    .00 2 63        .00         .00       .002Q         .00   .01456111     .00      .00     .00    896.92    -896.92
1211 2    .00 2 63        .00         .00       .009T         .00   .01456111     .00      .00     .00    262.77    -262.77
 112 2   3.00 2 53  -104373.91        .00    6476.84UA  -319233.22   .01456111 -1519.80  -4554.08   .00     94.31   -4648.39 1032
 112 2    .00 2 53        .00         .00       .002Q         .00   .01456111     .00      .00     .00   -856.34     856.34
 112 2    .00 2 53        .00         .00       .009T         .00   .01456111     .00      .00     .00   -198.58     198.58
 112 2   3.00 2 63   104373.91        .00   -6476.84UA   319233.22   .01456111  1519.80  4554.08    .00    -94.31    4648.39 1032
 112 2    .00 2 63        .00         .00       .002Q         .00   .01456111     .00      .00     .00    856.34    -856.34
 112 2    .00 2 63        .00         .00       .009T         .00   .01456111     .00      .00     .00    198.58    -198.58
 212 2   2.55 2 53   -92924.23        .00    2343.91UA  -239212.53   .01456111 -1353.08  -3449.07   .00     34.13   -3483.20 1030
 212 2    .00 2 63        .00         .00       .002Q         .00   .01456111     .00      .00     .00   -756.51     756.51
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**        **$2,345.48**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 488806 | | CHECK DATE | 12/21/2012 |
|---|---|---|---|---|---|---|---|


004888060

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 2**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.



| PROD DATE | PC | PRICE | IT | PY GP | LEASE VOLUME | LEASE TAX | LEASE DEDUCT | LEASE NET VALUE | PAYMENT DECIMAL | OWNER VOLUME | OWNER GRS VALUE | OWNER TAX | OWNER DEDUCT | OWNER NET | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 212 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -203.28 | 203.28 | |
| 212 | 2 | 2.55 | 2 | 53 | 92924.23 | .00 | -2343.91UA | 239212.53 | .01456111 | 1353.08 | 3449.07 | .00 | -34.13 | 3483.20 | 1030 |
| 212 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 756.51 | -756.51 | |
| 212 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 203.28 | -203.28 | |
| 312 | 2 | 2.28 | 2 | 53 | -102665.25 | .00 | 754.06UA | -234989.64 | .01456111 | -1494.92 | -3410.73 | .00 | 10.98 | -3421.71 | 1031 |
| 312 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -834.86 | 834.86 | |
| 312 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -207.00 | 207.00 | |
| 312 | 2 | 2.28 | 2 | 63 | 102665.25 | .00 | -754.06UA | 234989.64 | .01456111 | 1494.92 | 3410.73 | .00 | -10.98 | 3421.71 | 1031 |
| 312 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 834.86 | -834.86 | |
| 312 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 207.00 | -207.00 | |
| 412 | 2 | 2.05 | 2 | 53 | -78989.17 | .00 | 252.04UA | -161816.65 | .01456111 | -1150.17 | -2352.56 | .00 | 3.67 | -2356.23 | 1030 |
| 412 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -654.92 | 654.92 | |
| 412 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -141.05 | 141.05 | |
| 412 | 2 | 2.05 | 2 | 63 | 78989.17 | .00 | -252.04UA | 161816.65 | .01456111 | 1150.17 | 2352.56 | .00 | -3.67 | 2356.23 | 1030 |
| 412 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 654.92 | -654.92 | |
| 412 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 141.05 | -141.05 | |
| 512 | 2 | 1.95 | 2 | 53 | -77976.20 | .00 | .00 | -151711.65 | .01456111 | -1135.42 | -2209.09 | .00 | .00 | -2209.09 | 1027 |
| 512 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -643.11 | 643.11 | |
| 512 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -136.11 | 136.11 | |
| 512 | 2 | 1.95 | 2 | 63 | 77976.20 | .00 | .00 | 151711.65 | .01456111 | 1135.42 | 2209.09 | .00 | .00 | 2209.09 | 1027 |
| 512 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 643.11 | -643.11 | |
| 512 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 136.11 | -136.11 | |
| 612 | 2 | 2.30 | 2 | 53 | -76558.72 | .00 | 208.78UA | -175952.93 | .01456111 | -1114.78 | -2559.03 | .00 | 3.04 | -2562.07 | 1028 |
| 612 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -632.59 | 632.59 | |
| 612 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -135.02 | 135.02 | |
| 612 | 2 | 2.30 | 2 | 63 | 76558.72 | .00 | -208.78UA | 175952.93 | .01456111 | 1114.78 | 2559.03 | .00 | -3.04 | 2562.07 | 1028 |
| 612 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 632.59 | -632.59 | |
| 612 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 135.02 | -135.02 | |
| 712 | 2 | 2.56 | 2 | 53 | -75895.31 | .00 | 1251.28UA | -195215.89 | .01456111 | -1105.12 | -2824.34 | .00 | 18.22 | -2842.56 | 1028 |
| 712 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -617.77 | 617.77 | |
| 712 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -117.04 | 117.04 | |
| 712 | 2 | 2.56 | 2 | 63 | 75895.31 | .00 | -1251.28UA | 195215.89 | .01456111 | 1105.12 | 2824.34 | .00 | -18.22 | 2842.56 | 1028 |
| 712 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 617.77 | -617.77 | |
| 712 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 117.04 | -117.04 | |
| 812 | 2 | 2.78 | 2 | 53 | -67043.65 | .00 | 905.15UA | -187406.73 | .01456111 | -976.23 | -2715.67 | .00 | 13.18 | -2728.85 | 1028 |
| 812 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -547.63 | 547.63 | |
| 812 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -101.63 | 101.63 | |
| 812 | 2 | 2.78 | 2 | 63 | 67043.65 | .00 | -905.15UA | 187406.73 | .01456111 | 976.23 | 2715.67 | .00 | -13.18 | 2728.85 | 1028 |
| 812 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 547.63 | -547.63 | |
| 812 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 101.63 | -101.63 | |
| 912 | 2 | 2.39 | 2 | 53 | -72798.71 | .00 | 236.93UA | -174437.94 | .01456111 | -1060.03 | -2536.56 | .00 | 3.45 | -2540.01 | 1028 |
| 912 | 2 | .00 | 2 | 53 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | -593.11 | 593.11 | |
| 912 | 2 | .00 | 2 | 53 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | -116.28 | 116.28 | |
| 912 | 2 | 2.39 | 2 | 63 | 72798.71 | .00 | -236.93UA | 174437.94 | .01456111 | 1060.03 | 2536.56 | .00 | -3.45 | 2540.01 | 1028 |
| 912 | 2 | .00 | 2 | 63 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 593.11 | -593.11 | |
| 912 | 2 | .00 | 2 | 63 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 116.28 | -116.28 | |
| 1012 | 2 | 2.79 | 2 | 01 | 74435.26 | .00 | -973.14UA | 208695.63 | .01456111 | 1083.86 | 3024.67 | .00 | -14.17 | 3038.84 | 1028 |
| 1012 | 2 | .00 | 2 | 01 | .00 | .00 | .002Q | | .01456111 | .00 | .00 | .00 | 604.78 | -604.78 | |
| 1012 | 2 | .00 | 2 | 01 | .00 | .00 | .009T | | .01456111 | .00 | .00 | .00 | 98.13 | -98.13 | |

LEASE TOTAL 3024.67 .00 688.74 2335.93

OWNER TOTAL 3037.03 .00

607.25 2*
98.53 9*
-14.23 UA

CHECK TOTAL 2345.48

INTEREST TYPE (IT)          PRODUCT CODE (PC)          DEDUCT CODE

| | | | |
|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING |
| | | IT-INTEREST | 2*- GATHERING |
| | | NE-NETTING EXPENSE | 3*- GATHERING |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION |
| | | UA-LINE VARIANCE | |

6*- MARKETING
7*- HANDLING
8*- TRANSPORTATION
9*- THIRD PARTY

**Total for check                    $2,345.48**

| OWNER NUMBER | 941031 | CHECK NUMBER | 488806 | CHECK DATE | 12/21/2012 |
|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No
duplicates furnished. State taxes have been
deducted and paid where required. When writing,
refer to lease number and owner number.

| PROD | P | PRICE | I | PY | LEASE | | | | PAYMENT | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | C | | T | GP | VOLUME | TAX | DEDUCT | NET VALUE | DECIMAL | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price
received from an affiliated purchaser.

```
  831011-OTIS 2H                      STATE: PA   COUNTY: BRADFORD   LEGAL: 425.486216  ACRES: HERRICK TOWN
 1112 2   3.50 2 01   49645.39      .00          .00   173514.31   .00008178    4.06       14.19      .00        .00       14.19 1028
 1112 2    .00 2 01       .00       .00   .002Q        .00         .00008178     .00         .00      .00       2.25       -2.25
 1112 2    .00 2 01       .00       .00   .009T        .00         .00008178     .00         .00      .00        .30        -.30
                                           LEASE TOTAL                                      14.19      .00       2.55       11.64

  831012-OTIS 5H                      STATE: PA   COUNTY: BRADFORD   LEGAL: 475.091443  ACRES: HERRICK TOW
 1112 2   3.50 2 01   72543.23      .00          .00   253900.97   .01456111  1056.31     3697.08      .00        .00     3697.08 1028
 1112 2    .00 2 01       .00       .00   .002Q        .00         .01456111     .00         .00      .00     585.10     -585.10
 1112 2    .00 2 01       .00       .00   .009T        .00         .01456111     .00         .00      .00      79.24      -79.24
                                           LEASE TOTAL                                    3697.08      .00     664.34     3032.74

                                           OWNER TOTAL                                    3711.27      .00
                                                                                                    587.35 2*
                CHECK TOTAL                                                                           79.54 9*                 3044.38
```



INTEREST TYPE (IT)          PRODUCT CODE (PC)          DEDUCT CODE

| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
|---|---|---|---|---|
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

| | **Total for check** | **$3,044.38** |
|---|---|---|
| OWNER NUMBER   941031 | CHECK NUMBER   498320 | CHECK DATE   01/24/2013 |

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
   831011-OTIS 2H                         STATE: PA  COUNTY: BRADFORD     LEGAL: 425.486216 ACRES; HERRICK TOWN
1212 2   3.72 2 01   52580.09      .00        .00    195646.86  .00008178   4.30       16.00        .00        .00      16.00 1028
1212 2    .00 2 01        .00      .00      .002Q         .00   .00008178    .00        .00        .00       2.34      -2.34
1212 2    .00 2 01        .00      .00      .009T         .00   .00008178    .00        .00        .00        .32       -.32
                                                              LEASE TOTAL             16.00        .00       2.66      13.34

   831012-OTIS 5H                         STATE: PA  COUNTY: BRADFORD     LEGAL: 475.091443 ACRES; HERRICK TOW
1212 2   3.72 2 01   66188.64      .00        .00    246457.17  .01456111  963.78    3588.69        .00        .00    3588.69 1028
1212 2    .00 2 01        .00      .00      .002Q         .00   .01456111    .00        .00        .00     526.74    -526.74
1212 2    .00 2 01        .00      .00      .009T         .00   .01456111    .00        .00        .00      71.05     -71.05
                                                              LEASE TOTAL           3588.69        .00     597.79    2990.90

                                                              OWNER TOTAL           3604.69        .00

                                                                                    529.08 2*
                                                                                     71.37 9*
             CHECK TOTAL                                                                                              3004.24
```



005076450

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**                    **$3,004.24**

| OWNER NUMBER | 941031 | CHECK NUMBER | 507645 | CHECK DATE | 02/21/2013 |
|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                        STATE: PA  COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
113 2   3.28 2 01   51479.58      .00       .00   168623.14  .00008178    4.21      13.79     .00       .00     13.79 1028
113 2    .00 2 01        .00      .00     .002Q        .00   .00008178     .00        .00     .00      1.90     -1.90
113 2    .00 2 01        .00      .00     .009T        .00   .00008178     .00        .00     .00       .28      -.28
                                                            LEASE TOTAL             13.79     .00      2.18     11.61

831012-OTIS 5H                        STATE: PA  COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOW
113 2   3.28 2 01   64451.82      .00       .00   211130.20  .01456111  938.49    3074.29     .00       .00   3074.29 1028
113 2    .00 2 01        .00      .00     .002Q        .00   .01456111     .00        .00     .00    424.87   -424.87
113 2    .00 2 01        .00      .00     .009T        .00   .01456111     .00        .00     .00     62.04    -62.04
                                                            LEASE TOTAL           3074.29     .00    486.91   2587.38

                                                            OWNER TOTAL          3088.08      .00
                                                                                                     426.77 2*
              CHECK TOTAL                                                                              62.32 9*
                                                                                                             2598.99
```



0051710B0

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**                **$2,598.99**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 517108 | | CHECK DATE | 03/21/2013 |
|---|---|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.



| PROD | P | PRICE | I | PY | LEASE | | | | PAYMENT | OWNER | | | | | |
|------|---|-------|---|----|-------|---|---|---|---------|-------|---|---|---|---|---|
| DATE | C | | T | GP | VOLUME | TAX | DEDUCT | NET VALUE | DECIMAL | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                    STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
213 2   3.16 2 01   45365.62      .00      .00    143555.88  .00008178    3.71      11.74      .00         .00       11.74 1028
213 2    .00 2 01       .00       .00    .002Q         .00    .00008178    .00       .00      .00        1.77       -1.77
213 2    .00 2 01       .00       .00    .009T         .00    .00008178    .00       .00      .00         .28        -.28
                                                     LEASE TOTAL                    11.74      .00        2.05        9.69

831012-OTIS 5H                    STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TON
213 2   3.16 2 01   55078.91      .00      .00    174217.49  .01456111  802.01    2536.80      .00         .00     2536.80 1028
213 2    .00 2 01       .00       .00    .002Q         .00    .01456111    .00       .00      .00      382.30     -382.30
213 2    .00 2 01       .00       .00    .009T         .00    .01456111    .00       .00      .00       60.13      -60.13
                                                     LEASE TOTAL                  2536.80      .00      442.43     2094.37

                                                     OWNER TOTAL        2548.54      .00
                                                                                           384.07 2*
                                                                                            60.41 9*
            CHECK TOTAL                                                                                          2104.06
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|--------------------|-------------------|-------------|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**   **$2,104.06**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 526573 | | CHECK DATE | 04/23/2013 |
|--------------|--------|---|--------------|--------|---|------------|------------|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes. It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                       STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216  ACRES: HERRICK TOWN
313 2   3.45 2 01   48667.16    .00         .00        167767.18   .00008178    3.98    13.72    .00       .00      13.72 1028
313 2    .00 2 01       .00     .00       .002Q           .00     .00008178     .00      .00    .00      1.48      -1.48
313 2    .00 2 01       .00     .00       .009T           .00     .00008178     .00      .00    .00       .21       -.21
                                                    LEASE TOTAL                         13.72    .00      1.69      12.03

831012-OTIS 5H                       STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443  ACRES: HERRICK TOW
313 2   3.45 2 01   49779.86    .00         .00        171562.47   .01456111  724.85  2498.14    .00       .00    2498.14 1028
313 2    .00 2 01       .00     .00       .002Q           .00     .01456111     .00      .00    .00    269.24    -269.24
313 2    .00 2 01       .00     .00       .009T           .00     .01456111     .00      .00    .00     37.32     -37.32
                                                    LEASE TOTAL                       2498.14    .00    306.56    2191.58

                                                    OWNER TOTAL             2511.86     .00

                                                                          270.72 2*
                                                                           37.53 9*
              CHECK TOTAL                                                                                          2203.61
```



005368270

---

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check** **$2,203.61**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 536827 | | CHECK DATE | 05/23/2013 |
|---|---|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                      STATE: PA  COUNTY: BRADFORD    LEGAL: 425.486216 ACRES; HERRICK TOWN
413 2   3.95 2 01   45243.34   .00  -2934.70UA  181707.02  .00008178    3.70    14.62      .00    -.24    14.86 1028
413 2    .00 2 01       .00    .00     .002Q        .00    .00008178     .00      .00      .00    1.94    -1.94
413 2    .00 2 01       .00    .00     .009T        .00    .00008178     .00      .00      .00     .44     -.44
                                      LEASE TOTAL                        14.62              .00    2.14    12.48

831012-OTIS 5H                      STATE: PA  COUNTY: BRADFORD    LEGAL: 475.091443 ACRES; HERRICK TOW
413 2   3.95 2 01   54460.82   .00  -3543.69UA  218731.95  .01456111  793.01  3133.38      .00   -51.60  3184.98 1029
413 2    .00 2 01       .00    .00     .002Q        .00    .01456111     .00      .00      .00   414.40  -414.40
413 2    .00 2 01       .00    .00     .009T        .00    .01456111     .00      .00      .00    95.17   -95.17
                                      LEASE TOTAL                      3133.38              .00   457.97  2675.41

                                      OWNER TOTAL                      3148.00      .00

                                                                                               416.34 2*
                                                                                                95.61 9*
                                                                                               -51.84 UA
            CHECK TOTAL                                                                                  2687.89
```



| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**      **$2,687.89**

| OWNER NUMBER | 941031 | CHECK NUMBER | 548481 | CHECK DATE | 06/21/2013 |
|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.



| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                   STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
513 2   4.11 2 01    47322.08       .00        .00    194301.79  .00008178   3.87    15.89      .00      .00       15.89 1028
513 2    .00 2 01       .00         .00       .002Q      .00     .00008178    .00      .00      .00     1.98       -1.98
513 2    .00 2 01       .00         .00       .009T      .00     .00008178    .00      .00      .00      .33        -.33
                                                       LEASE TOTAL                   15.89      .00     2.31       13.58

831012-OTIS 5H                   STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOWN
513 2   4.11 2 01    53559.79       .00        .00    220189.26  .01456111  779.89  3206.20     .00      .00     3206.20 1028
513 2    .00 2 01       .00         .00       .002Q      .00     .01456111    .00      .00      .00   399.17     -399.17
513 2    .00 2 01       .00         .00       .009T      .00     .01456111    .00      .00      .00    67.77      -67.77
                                                       LEASE TOTAL                 3206.20      .00   466.94     2739.26

                                                       OWNER TOTAL                 3222.09      .00
                                                                                                      399.17 2*
            CHECK TOTAL                                                                                 67.77 8*
                                                                                                              2752.84
```



| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**                                    **$2,752.84**

| OWNER NUMBER | 941031 | CHECK NUMBER | 563172 | CHECK DATE | 07/24/2013 |
|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.



| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                      STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
613 2   3.91 2 01   45854.73    .00  -122.28UA   179261.43  .00008178      3.75      14.65      .00      -.01      14.66 1028
613 2    .00 2 01       .00     .00    .002Q          .00   .00008178       .00       .00      .00      1.93      -1.93
613 2    .00 2 01       .00     .00    .009T          .00   .00008178       .00       .00      .00       .31       -.31
                                                           LEASE TOTAL             14.65      .00      2.23      12.42

831012-OTIS 5H                      STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOWN
613 2   3.91 2 01   53580.39    .00  -111.26UA   209550.65  .01456111    780.19    3049.67      .00     -1.62    3051.29 1028
613 2    .00 2 01       .00     .00    .002Q          .00   .01456111       .00       .00      .00    401.31    -401.31
613 2    .00 2 01       .00     .00    .009T          .00   .01456111       .00       .00      .00     66.07     -66.07
                                                           LEASE TOTAL           3049.67      .00    465.76    2583.91

                                                           OWNER TOTAL           3064.32      .00
                                                                                                     403.24  2*
                                                                                                      66.38  9*
                                                                                                      -1.63  UA
            CHECK TOTAL                                                                                       2596.33
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**                                   **$2,596.33**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 574301 | | CHECK DATE | 08/22/2013 |
|---|---|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.





| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes. It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                          STATE: PA  COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
713 2   3.35 2 01   43775.98      .00      .00    146735.14  .00008178   3.58     12.00     .00       .00     12.00 1028
713 2    .00 2 01       .00      .00    .002Q        .00    .00008178    .00       .00     .00      1.84     -1.84
713 2    .00 2 01       .00      .00    .009T        .00    .00008178    .00       .00     .00       .29      -.29
                                                    LEASE TOTAL                   12.00     .00      2.13      9.87

831012-OTIS 5H                          STATE: PA  COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOWN
713 2   3.36 2 01   51590.16      .00      .00    173103.56  .01456111  751.21   2520.58     .00       .00   2520.58 1028
713 2    .00 2 01       .00      .00    .002Q        .00    .01456111    .00       .00     .00    386.09   -386.09
713 2    .00 2 01       .00      .00    .009T        .00    .01456111    .00       .00     .00     60.16    -60.16
                                                    LEASE TOTAL                 2520.58     .00    446.25   2074.33

                                                    OWNER TOTAL        2532.58     .00
              CHECK TOTAL                                                                          387.93 2*
                                                                                                   60.45 9*
                                                                                                            2084.20
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING<br>IT-INTEREST<br>NE-NETTING EXPENSE<br>FR-FIXED RATE ADJ<br>RV-ROYALTY VOL ADJ<br>UA-LINE VARIANCE | 1*- GATHERING<br>2*- GATHERING<br>3*- GATHERING<br>4*- PROCESSING<br>5*- COMPRESSION | 6*- MARKETING<br>7*- HANDLING<br>8*- TRANSPORTATION<br>9*- THIRD PARTY |

**Total for check**      **$2,084.20**

| OWNER NUMBER | 941031 | CHECK NUMBER | 585893 | CHECK DATE | 09/23/2013 |
|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.



```
831011-OTIS 2H                         STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
813 2   2.93 2 01   53680.61   .00   .00    157251.16  .00008178    4.39     12.86    .00      .00      12.86 1028
813 2   .00 2 01    .00        .00   .002Q        .00  .00008178     .00       .00    .00     2.25      -2.25
813 2   .00 2 01    .00        .00   .009T        .00  .00008178     .00       .00    .00      .41      -.41
                                            LEASE TOTAL                       12.86    .00     2.66      10.20

831012-OTIS 5H                         STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOWN
813 2   2.93 2 01   69654.72   .00   .00    204200.09  .01456111   1014.25  2973.38    .00      .00    2973.38 1028
813 2   .00 2 01    .00        .00   .002Q        .00  .01456111     .00       .00    .00    520.06    -520.06
813 2   .00 2 01    .00        .00   .009T        .00  .01456111     .00       .00    .00     93.26     -93.26
                                            LEASE TOTAL                      2973.38    .00    613.32    2360.06

                                            OWNER TOTAL                      2986.24    .00

                                                                                              522.31 2*
                                                                                               93.67 9*

              CHECK TOTAL                                                                                2370.26
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

| | **Total for check** | **$2,370.26** |
|---|---|---|
| OWNER NUMBER   941031 | CHECK NUMBER   598118 | CHECK DATE   10/23/2013 |

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.



| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.

```
831011-OTIS 2H                      STATE: PA   COUNTY: BRADFORD   LEGAL: 425.486216 ACRES: HERRICK TOWN
913 2  3.10 2 01  39007.09    .00       .00  120811.93  .00008178   3.19     9.88      .00        .00    9.88 1028
913 2   .00 2 01      .00      .00      .002Q        .00  .00008178    .00      .00      .00      1.61   -1.61
913 2   .00 2 01      .00      .00      .009T        .00  .00008178    .00      .00      .00       .32    -.32
                                            LEASE TOTAL            9.88      .00     1.93    7.95

831012-OTIS 5H                      STATE: PA   COUNTY: BRADFORD   LEGAL: 475.091443 ACRES: HERRICK TOWN
913 2  3.10 2 01  46824.73    .00       .00  144909.28  .01456111  681.82  2110.04      .00        .00  2110.04 1028
913 2   .00 2 01      .00      .00      .002Q        .00  .01456111    .00      .00      .00    344.02  -344.02
913 2   .00 2 01      .00      .00      .009T        .00  .01456111    .00      .00      .00     68.90   -68.90
                                            LEASE TOTAL         2110.04      .00   412.92  1697.12

                                            OWNER TOTAL         2119.92      .00
                                                                                       345.63 2*
                                                                                        69.22 9*
                   CHECK TOTAL                                                                  1705.07
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | 1*- GATHERING | 6*- MARKETING |
| | | IT-INTEREST | 2*- GATHERING | 7*- HANDLING |
| | | NE-NETTING EXPENSE | 3*- GATHERING | 8*- TRANSPORTATION |
| | | FR-FIXED RATE ADJ | 4*- PROCESSING | 9*- THIRD PARTY |
| | | RV-ROYALTY VOL ADJ | 5*- COMPRESSION | |
| | | UA-LINE VARIANCE | | |

**Total for check**          **$1,705.07**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 611894 | | CHECK DATE | 11/22/2013 |
|---|---|---|---|---|---|---|---|

Chesapeake Appalachia, LLC
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No duplicates furnished. State taxes have been deducted and paid where required. When writing, refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | |

Gross Value refers to the sales price received by the operator/lessee before deduction of taxes.  It may reflect the price received from an affiliated purchaser.



```
  831011-OTIS 2H                      STATE: PA   COUNTY: BRADFORD      LEGAL: 425.486216 ACRES; HERRICK TOWN
1013 2   3.00 2 01   36561.51     .00     .00   109562.24 .00008178   2.99     8.96     .00      .00     -8.96 1028
1013 2    .00 2 01        .00     .00    .002Q       .00 .00008178    .00      .00     .00     1.53     -1.53
1013 2    .00 2 01        .00     .00    .009T       .00 .00008178    .00      .00     .00      .27      -.27
                                                   LEASE TOTAL                8.96     .00     1.80      7.16

  831012-OTIS 5H                      STATE: PA   COUNTY: BRADFORD      LEGAL: 475.091443 ACRES; HERRICK TOWN
1013 2   2.99 2 01   43732.93     .00     .00   130750.33 .01456111  636.80  1903.87   .00      .00    1903.87 1028
1013 2    .00 2 01        .00     .00    .002Q       .00 .01456111    .00      .00     .00   325.81    -325.81
1013 2    .00 2 01        .00     .00    .009T       .00 .01456111    .00      .00     .00    57.25     -57.25
                                                   LEASE TOTAL              1903.87   .00   383.06    1520.81

                                                   OWNER TOTAL              1912.83   .00
                                                                                            327.34 2*
                                                                                             57.52 9*
         CHECK TOTAL                                                                                   1527.97
```

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING<br>IT-INTEREST<br>NE-NETTING EXPENSE<br>FR-FIXED RATE ADJ<br>RV-ROYALTY VOL ADJ<br>UA-LINE VARIANCE | 1*- GATHERING<br>2*- GATHERING<br>3*- GATHERING<br>4*- PROCESSING<br>5*- COMPRESSION | 6*- MARKETING<br>7*- HANDLING<br>8*- TRANSPORTATION<br>9*- THIRD PARTY |

**Total for check**                                        **$1,527.97**

| OWNER NUMBER | 941031 | CHECK NUMBER | 624683 | CHECK DATE | 12/23/2013 |
|---|---|---|---|---|---|

Chesapeake Operating Inc
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No
duplicates furnished. State taxes have been
deducted and paid where required. When writing,
refer to lease number and owner number.

| PROD DATE | P C | PRICE | I T | PY GP | LEASE | | | | PAYMENT DECIMAL | OWNER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOLUME | TAX | DEDUCT | NET VALUE | | VOLUME | GRS VALUE | TAX | DEDUCT | NET | BTU |
| | | | | | | | | | | | | | | | |
| 831011-OTIS 2H | | | | | | | STATE: PA | COUNTY: BRADFORD | | LEGAL: 425.486216 ACRES; HERRICK TOWN | | | | | |
| 1113 | 2 | 3.29 | 2 | 01 | 40421.74 | .00 | -1589.63FL | 134751.77 | .00008178 | 3.31 | 10.89 | .00 | -.13 | 11.02 | 1026 |
| 1113 | 2 | .00 | 2 | 01 | .00 | .00 | .00GA | .00 | .00008178 | .00 | .00 | .00 | 1.72 | -1.72 | |
| 1113 | 2 | .00 | 2 | 01 | .00 | .00 | .00 | .00 | .00008178 | .00 | .00 | .00 | 2.03 | -2.03 | |
| | | | | | | | | | LEASE TOTAL | | 10.89 | .00 | 3.62 | 7.27 | |
| 831012-OTIS 5H | | | | | | | STATE: PA | COUNTY: BRADFORD | | LEGAL: 475.091443 ACRES; HERRICK TOWN | | | | | |
| 1113 | 2 | 3.30 | 2 | 01 | 45800.82 | .00 | -1689.43FL | 152791.92 | .01456111 | 666.91 | 2200.22 | .00 | -24.60 | 2224.82 | 1028 |
| 1113 | 2 | .00 | 2 | 01 | .00 | .00 | .00GA | .00 | .01456111 | .00 | .00 | .00 | 347.64 | -347.64 | |
| 1113 | 2 | .00 | 2 | 01 | .00 | .00 | .00 | .00 | .01456111 | .00 | .00 | .00 | 410.39 | -410.39 | |
| | | | | | | | | | LEASE TOTAL | | 2200.22 | .00 | 733.43 | 1466.79 | |
| | | | | | | | | | OWNER TOTAL | | 2211.11 | .00 | | | |
| | | | | | | | | | | | | | -24.73 | FL | |
| | | | | | | | | | | | | | 349.36 | GA | |
| | | | | | | | | | | | | | 412.42 | | |
| | | | | CHECK TOTAL | | | | | | | | | | 1474.06 | |



INTEREST TYPE (IT)          PRODUCT CODE (PC)          DEDUCT CODE

2-ROYALTY                2-GAS(MCF)      BW-BACKUP WITHHOLDING      CP-COMPRESSION        FL-FUEL
                                          GA-GATHERING              IT-INTEREST           MK-MARKETING
                                          MS-MISCELLANEOUS          NE-NETTING EXPENSE    PC-PROCESSING
                                          PD-OTH PIPELINE DEDUCT    RJ-ROY ADJUSTMENT     SW-STATE WITHHOLDING
                                          TG-TREATING               TX-TRANSPORTATION

**Total for check**                                                    **$1,474.06**

| OWNER NUMBER | 941031 | | CHECK NUMBER | 9593448 | | CHECK DATE | 01/31/2014 |
|---|---|---|---|---|---|---|---|

Chesapeake Operating Inc
P.O. Box 18496
Oklahoma City, OK 73154
(877) 245-1427

**PAGE: 1**

Retain this statement for tax purposes. No
duplicates furnished. State taxes have been
deducted and paid where required. When writing,
refer to lease number and owner number.



| PROD DATE | P C | PRICE | I T | PY GP | LEASE VOLUME | LEASE TAX | LEASE DEDUCT | LEASE NET VALUE | PAYMENT DECIMAL | OWNER VOLUME | OWNER GRS VALUE | OWNER TAX | OWNER DEDUCT | OWNER NET | BTU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 831011-OTIS 2H | | | | | | | | STATE: PA   COUNTY: BRADFORD | | | LEGAL: 425.486216 ACRES; HERRICK TOWN | | | | |
| 1213 | 2 | 3.61 | 2 | 01 | 47596.61 | .00 | .00 | 171802.40 | .00008178 | 3.90 | 14.05 | .00 | .00 | 14.05 | 1026 |
| 1213 | 2 | .00 | 2 | 01 | .00 | .00 | .00GA | .00 | .00008178 | .00 | .00 | .00 | 1.99 | -1.99 | |
| 1213 | 2 | .00 | 2 | 01 | .00 | .00 | .00TX | .00 | .00008178 | .00 | .00 | .00 | 1.53 | -1.53 | |
| | | | | | | | LEASE TOTAL | | | | 14.05 | .00 | 3.52 | 10.53 | |
| 831012-OTIS 5H | | | | | | | | STATE: PA   COUNTY: BRADFORD | | | LEGAL: 475.091443 ACRES; HERRICK TOWN | | | | |
| 1213 | 2 | 3.62 | 2 | 01 | 58005.80 | .00 | .00 | 209712.03 | .01456111 | 844.63 | 3053.64 | .00 | .00 | 3053.64 | 1028 |
| 1213 | 2 | .00 | 2 | 01 | .00 | .00 | .00GA | .00 | .01456111 | .00 | .00 | .00 | 433.11 | -433.11 | |
| 1213 | 2 | .00 | 2 | 01 | .00 | .00 | .00TX | .00 | .01456111 | .00 | .00 | .00 | 331.43 | -331.43 | |
| | | | | | | | LEASE TOTAL | | | | 3053.64 | .00 | 764.54 | 2289.10 | |
| | | | | | | | OWNER TOTAL | | | | 3067.69 | .00 | | | |
| | | | | | | | | | | | | | 435.10 | GA | |
| | | | | | | | | | | | | | 332.96 | TX | |
| | | | | CHECK TOTAL | | | | | | | | | | | 2299.63 | |

| INTEREST TYPE (IT) | PRODUCT CODE (PC) | DEDUCT CODE | | |
|---|---|---|---|---|
| 2-ROYALTY | 2-GAS(MCF) | BW-BACKUP WITHHOLDING | CP-COMPRESSION | FL-FUEL |
| | | GA-GATHERING | IT-INTEREST | MK-MARKETING |
| | | MS-MISCELLANEOUS | NE-NETTING EXPENSE | PC-PROCESSING |
| | | PD-OTH PIPELINE DEDUCT | RJ-ROY ADJUSTMENT | SW-STATE WITHHOLDING |
| | | TG-TREATING | TX-TRANSPORTATION | |

**Total for check**          **$2,299.63**

| OWNER NUMBER | 941031 | CHECK NUMBER | 9693750 | CHECK DATE | 02/28/2014 |
|---|---|---|---|---|---|