# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES L. BROWN and ALICE R. BROWN, on behalf of themselves and all others similarly situated,

                    Plaintiffs,

     v.

ACCESS MIDSTREAM PARTNERS, L.P., CHESAPEAKE ENERGY CORP., and DOMENIC J. DELL'OSSO, JR.,

                    Defendants.

Case No. 3:14-cv-00591

(Judge Mannion)

## DEFENDANT CHESAPEAKE ENERGY CORPORATION'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Daniel T. Brier
Myers, Brier & Kelly LLP
425 Spruce St. Suite 200
Scranton, PA 18501
Tel: (570) 342-6100
Fax: (570) 342-6147

Daniel T. Donovan (*pro hac vice*)
Peter A. Farrell (*pro hac vice*)
Ragan Naresh (*pro hac vice*)
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for Chesapeake Energy Corp.*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................1

ARGUMENT ......................................................................................4

I.    PLAINTIFFS CANNOT PLEAD INJURY PROXIMATELY
      CAUSED BY A RICO VIOLATION. ...........................................4

      A.    Plaintiffs Fail to Plead "Injury."......................................5

      B.    Plaintiffs Fail to Plead Causation. ...................................6

II.   PLAINTIFFS FAIL TO PLEAD THE ELEMENTS OF RICO. ................10

      A.    *Kolar* Precludes Plaintiffs' Scheme to Defraud. ...............10

      B.    *Kehr* Precludes Plaintiffs' "Pattern of Racketeering Activity.".........13

      C.    Plaintiffs Fail to Plead that Chesapeake Energy Directed an
            Enterprise Through a Pattern of Racketeering. ..................15

      D.    Plaintiffs' RICO Conspiracy Claim Fails Too. .................18

III.  PLAINTIFFS DO NOT STATE AN UNJUST ENRICHMENT
      CLAIM...........................................................................19

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALA, Inc. v. CCAIR, Inc.*,
  29 F.3d 855 (3d Cir. 1994) ........................................................................6

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ................................................................... 4, 6, 7

*Bartello v. City of Sunbury*,
  2014 WL 220789 (M.D. Pa. Jan. 21, 2014) ..........................................18

*Breslin v. Brainard*,
  2003 WL 22351297 (E.D. Pa. Oct. 14, 2003) ......................................19

*Bridge v. Phoenix Bond & Indem. Co.*,
  553 U.S. 639 (2008) ........................................................................ 8, 12

*Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
  836 F.2d 173 (3d Cir. 1988) ..................................................................18

*Corley v. Rosewood Care Ctr., Inc. of Peoria*,
  388 F.3d 990 (7th Cir. 2004) ................................................................12

*D.A. Hill Co. v. Clevetrust Realty Investors*,
  573 A.2 1005 (Pa. 1990) .......................................................................20

*Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*,
  900 F.2d 882 (6th Cir. 1990) ..................................................................9

*E. Minerals & Chems. Co. v. Mahan*,
  53 F. App'x 201 (3d Cir. 2002) ............................................................16

*Flip Mortg. Corp. v. McElhone*,
  841 F.2d 531 (4th Cir. 1988) ................................................................12

*Fuce v. West*,
  2012 WL 3046235 (E.D. Pa. July 26, 2012) ........................................12

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...................................................................6

*In re U.S. Foodservice Inc. Pricing Litig.*,
  2009 WL 5064468 (D. Conn. Dec. 15, 2009) ................................... 8, 15

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .....................................................................8

*Kaiser v. Stewart*,
  965 F. Supp. 684 (E.D. Pa. 1997) ...........................................................6

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
  926 F.2d 1406 (3d Cir. 1991) ...................................................... passim

*Kolar v. Preferred Real Estate Invs., Inc.*,
  361 F. App'x 354 (3d Cir. 2010) .................................................. passim

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993) .....................................................................18

*Lum v. Bank of Am.*,
  361 F.3d 217 (3d Cir. 2004) ...................................................................13

*Nw. Human Servs., Inc. v. Panaccio*,
  2005 WL 1353609 (E.D. Pa. June 6, 2005) ...........................................19

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) ................................................................... 15, 16, 17

*Schroeder v. Acceleration Life Ins. Co. of Pa.*,
  972 F.2d 41 (3d Cir. 1992) .......................................................................9

*Sunlight Elec. Contracting Co. v. Turchi*,
  918 F. Supp. 2d 392 (E.D. Pa. 2013) .....................................................11

*Tabas v. Tabas*,
  47 F.3d 1280 (3d Cir. 1995) ...................................................................12

*Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*,
  996 F.2d 1534 (3d Cir. 1993) .................................................................16

*Villoresi v. Femminella,*
   856 A.2d 78 (Pa. Super. Ct. 2004)................................................................20

*York Grp., Inc. v. Pontone,*
   2014 WL 896632 (W.D. Pa. Mar. 6, 2014) .......................................................20

**Statutes**

18 U.S.C. § 1341 .............................................................................................10

18 U.S.C. § 1343 .............................................................................................10

18 U.S.C. § 1962(c) ....................................................................... 15, 16, 17, 18

18 U.S.C. § 1962(d) .........................................................................................18

18 U.S.C. § 1964(c) ...........................................................................................4

## INTRODUCTION

Plaintiffs' RICO claims are fatally deficient and cannot be maintained under settled Third Circuit precedent.    Before detailing the fundamental flaws in Plaintiffs' pleading on each element of its RICO claim, it bears emphasis that Plaintiffs' entire theory of wrongdoing is contradicted by the very documents attached to the Complaint.[1]  Plaintiffs' own royalty statements make clear that they did not experience the alleged injury forming the basis of both the RICO theory set forth in the Complaint and the inaccurate statements in the *ProPublica* article upon which Plaintiffs so heavily rely.  Plaintiffs thus lack "RICO standing" and their case must be dismissed.

The crux of the Complaint is that Defendants conspired to effectuate a gas gathering agreement in December 2012 between Chesapeake Appalachia and Access Midstream that allegedly caused "increasing" and "wrongful" deductions on Plaintiffs' royalty statements.[2]  *E.g.*, Compl. ¶¶ 2, 4, 39-43.  But here, the gathering charges attributed to Plaintiffs James Brown and Alice Brown ***decreased*** after the gas gathering agreement allegedly went into effect in December 2012.  In

---

[1]    "Chesapeake Energy" refers to Chesapeake Energy Corporation, "Chesapeake Appalachia" refers to Chesapeake Appalachia, L.L.C., and "Access" refers to Access Midstream Partners, L.P.  "Leases" refers to the leases attached as Exhibits E and G to the Complaint.  "Complaint" refers to the Amended Complaint filed on August 22, 2014 (ECF No. 57).

[2]    As previously noted, the gathering agreement governing Plaintiffs' wells was entered into in 2011 and effective January 1, 2012, not in December 2012.  *See* Chesapeake's Mem. in Supp. of Mot. to Dismiss ("Mem") at 8, ECF No. 71.

other words, at the very time Plaintiffs claim an alleged conspiracy resulted in a gathering agreement with Access that caused them to incur increased gathering charges and deductions, their gathering charges actually *decreased*.  Specifically, Plaintiffs' effective gathering rates dropped from $0.55/mcf (or more) before December 2012, and then averaged $0.51/mcf in 2013 and then $0.51/mcf again in 2014.  Thus, Plaintiffs' counsel are now in the untenable position of asking the Court to let them proceed with a putative class action claiming increased gathering charges when Plaintiffs' own gathering charges *decreased*.  That is a fatal flaw warranting dismissal.

In an effort to skirt this fatal flaw in their Complaint, Plaintiffs baldly conclude "on information and belief" that "transportation" and "third party" charges on their royalty statements are also attributable to Access and governed by the gathering agreement with Access.  Compl. ¶¶ 39, 40 n.14, 41; Pls.' Br. in Opp'n to Chesapeake's Mot. to Dismiss ("Opp.") at 38-39, ECF No. 75.  But Plaintiffs plead no factual support whatsoever for that conclusory allegation.  Nor can they.  The fact is that such transportation and third party costs are not attributable to Access—and critically on a motion to dismiss, Plaintiffs do not (and cannot) plausibly allege they are attributable to Access.  Those third party, interstate transportation charges are not governed by the gathering agreement with Access that forms the basis of Plaintiffs' Complaint.

2

Moreover, Plaintiffs cannot establish that injury was "proximately caused" by the alleged predicate acts—*i.e.*, Chesapeake Appalachia's mailing of royalty statements.  The royalty statements have nothing to do with Plaintiffs' alleged harm.  Under Plaintiffs' theory, they would have suffered their alleged injury ***whether or not*** royalty statements were ever mailed.  There simply is no connection between the alleged predicate acts and Plaintiffs' alleged harm.  Plaintiffs' failure to allege injury proximately caused by the predicate acts alleged in the Complaint is fatal to their RICO claim.

Additionally, Third Circuit law precludes Plaintiffs from converting their royalty calculation dispute under the Leases into a RICO claim.  Plaintiffs are not the first to try to make a RICO case out of a contract dispute in hopes of recovering treble damages.  Courts—especially the Third Circuit—have repeatedly held that one cannot criminalize contract claims through RICO simply by calling an alleged breach "fraud."  *See Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 363-64 (3d Cir. 2010); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1412-19 (3d Cir. 1991).  Indeed, *Kolar* addressed the same question—whether withholding a portion of a contractual payment can state a RICO claim—and affirmed dismissal.  361 F. App'x at 363-66.[3]

---

[3]    Plaintiffs erect and then attack a straw-man—that Chesapeake Energy is arguing that contracts and RICO violations can never co-exist.  But that misstates Chesapeake Energy's argument.  Chesapeake Energy pointed

Finally, Plaintiffs cannot plausibly allege the other required elements of a RICO claim:

- Plaintiffs have not pleaded a scheme to defraud under the Third Circuit's *Kolar* decision;

- Plaintiffs have not pleaded RICO's "pattern" requirement under the Third Circuit's *Kehr* decision; and

- Plaintiffs have not satisfied RICO's requirement that Chesapeake Energy "directed" a RICO enterprise "through" a pattern of racketeering.

Plaintiffs' unjust enrichment claim fails as a matter of law as well because their claims arise under the Leases.

Despite Plaintiffs' attempt to characterize a legitimate business transaction as a RICO violation, Third Circuit law squarely forecloses their claims. The Complaint should be dismissed in its entirety.

## ARGUMENT

## I.    PLAINTIFFS CANNOT PLEAD INJURY PROXIMATELY CAUSED BY A RICO VIOLATION.

Plaintiffs do not—and cannot—allege injury proximately caused by a RICO violation, as required. *See* 18 U.S.C. § 1964(c); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

---

out that *Kolar* holds that a plaintiff cannot convert a breach-of-contract claim into a RICO claim simply by calling alleged contractual underpayments a "fraud" and invoking the mail and wire fraud statutes.

**A.    Plaintiffs Fail to Plead "Injury."**

The entire theory of the Complaint is that Chesapeake Appalachia entered into an above-market gathering agreement with Access in December 2012, which lead to above-market gathering rates, and in turn caused Plaintiffs' gathering deductions to increase. *See* Compl. ¶¶ 39-44; Opp at 38-40. As Chesapeake explained, however, the problem is that Plaintiffs' royalty statements (attached to the Complaint) contradict that allegation and establish that gathering costs ***decreased*** after the December 2012 gathering agreement took effect. *See* Chesapeake's Mem. in Supp. of Mot. to Dismiss ("Mem") at 14–15, ECF No. 71.

*First*, Plaintiffs cannot show injury beginning in 2012 because their gathering rates indisputably ***went down*** after the December 2012 gathering agreement took effect: they dropped from $0.55/mcf (or more) to an average of $0.51/mcf. *See id*. Plaintiffs recognize that they have no facts to support injury, so they pivot: they claim that ***other*** post-production costs—"transportation" and "third party" costs—increased. Opp. at 38. But the Complaint is not about "transportation" costs or "third-party" costs, because those costs do not relate to the "new gas gathering agreements" between Access and Chesapeake Appalachia that form the basis of Plaintiffs' pleading. Compl. ¶ 4. In desperation, Plaintiffs assert that their gathering rate is "an issue of fact," Opp. at 39, but that misses the key point that Plaintiffs must plead the facts necessary to establish injury. Nor are

Plaintiffs permitted to plead facts in conflict with the "document[s] integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis, citation, and internal quotation marks omitted); *see also ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 & n.8 (3d Cir. 1994).

*Second*, Plaintiffs' attempt to pivot to 2014 as the beginning of the injury fails because gathering rates indisputably ***stayed the same*** from 2013 to 2014. *See* Mem. at 15. The fact that a fee recalculation may have taken place on January 1, 2014, Opp. at 39-40 (citing Compl. ¶¶ 34, 41), is irrelevant. As Chesapeake Energy already explained, the alleged "doubling" of rates, *see id*., had nothing to do with ***gathering*** rates challenged in the Complaint. The increase in overall costs resulted entirely from ***interstate*** transportation costs that have nothing to do with the gathering agreement with Access, *see* Mem. at 15, and that were incurred to obtain a higher net price—which ***benefited*** Plaintiffs, *see id*. n.7.

### B. Plaintiffs Fail to Plead Causation.

Plaintiffs also fail to plausibly allege that the "pattern of racketeering activity" proximately caused them injury. *See Anza*, 547 U.S. at 457; *Kaiser v. Stewart*, 965 F. Supp. 684, 688-90 (E.D. Pa. 1997). The key point is this: the royalty statements mailed to Plaintiffs (Plaintiffs' "predicate acts" for RICO purposes) have nothing whatsoever to do with Plaintiffs' alleged harm (above-

market gathering rates that lowered their royalties).  *See Anza*, 547 U.S. at 457.
Under Plaintiffs' own theory, they would not have received greater royalty
payments whether or not the royalty statements were mailed because the alleged
harm flows from Chesapeake Appalachia's entry into an alleged above-market
gathering agreement with Access, **not** the royalty statements Plaintiffs received.[4]

Under RICO, the legal question is whether the underlying **predicate acts**—
here, mailing royalty statements to Plaintiffs—"directly harmed" the plaintiff.  In
their Opposition, Plaintiffs assert that "predicate mailings and wires were the direct
source of Plaintiffs' financial harm" because "the predicate mailings and wires
transmitted the fraudulent royalty statements, as well as the royalty underpayments
which were based on these statements."  Opp. at 40.  But that is legally
meaningless because Plaintiffs fail to explain **how** these allegedly "fraudulent"
mailings and wires caused their alleged injuries, as they do not refute that the
statements disclosed the deductions being taken and accurately reflected a share of
the gathering charges.[5]

---

[4]    The same goes for Plaintiffs' allegations regarding wire transfers.  *See* Opp. at 22-23.  The fact that Defendants allegedly "transferred payments between themselves by wire," *id.* at 22, has no plausible causal connection to Plaintiffs' alleged injuries.  Nor does Defendants' alleged "wiring [of] royalty statements and royalty payments . . . which fraudulently pretended and represented that deductions . . . were legitimately incurred," *id.*, since as explained below, Plaintiffs have not alleged that **anyone** relied on these supposedly fraudulent representations.

[5]    Indeed, as Plaintiffs' royalty statements show, Chesapeake Appalachia disclosed all post-production cost deductions both before and after the alleged fraudulent scheme.

Plaintiffs cannot offer any causal explanation. But the Supreme Court has made it unmistakably clear that "a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud [cannot] prevail without showing that ***someone*** relied on the defendant's misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008).[6] Here, Plaintiffs cannot muster any allegation that they, or anyone else, relied on the royalty statements or caused them to take (or not to take) any action.

Plaintiffs' invocation of *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108 (2d Cir. 2013), does not save them—it only confirms the lack of proximate causation here. *Foodservice* was a class-certification case in which the district court had allowed RICO and contract claims to proceed beyond the pleadings stage. *In re U.S. Foodservice Inc. Pricing Litig.*, 2009 WL 5064468 (D. Conn. Dec. 15, 2009). At the motion-to-dismiss stage, the court noted that, unlike here, the *Foodservice* plaintiffs alleged that the defendant had "***induced*** [plaintiffs] to rely on [the defendant]'s material representations." *Id.* at *3-4. The Second Circuit, in its class-certification opinion, again emphasized the importance of causation, noting that the plaintiffs' payment of allegedly-fraudulent invoices implicitly showed the plaintiffs' reliance on the invoices. 729 F.3d at 119-20. This inference of reliance—based on the *Foodservice* plaintiffs' payments to the

---

[6] All emphasis added unless otherwise indicated.

defendant—does not translate to this case where (as in *Kolar*) Plaintiffs **received** payments from Chesapeake Appalachia. Plaintiffs cannot plausibly establish reliance based only on passive receipt of royalty payments.

Nor do Plaintiffs' other cases help them. In *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882 (6th Cir. 1990), the court explained that "[a] scheme to defraud must involve … deception **intentionally** practiced to **induce** another to part with property or to surrender some legal right, and which accomplishes the designed end," *id.* at 886 (first emphasis in original) (citation and internal quotation marks omitted), a standard met under the facts of that case. And in *Schroeder v. Acceleration Life Insurance Co. of Pennsylvania*, 972 F.2d 41 (3d Cir. 1992)—the sole Third Circuit decision Plaintiffs cite—the plaintiffs alleged that the defendant had induced them into entering contracts "by promising them benefits it never intended to pay." *Id.* at 47.

Thus, Plaintiffs do not—and cannot—allege that the mailings or wires on which their RICO allegations depend caused them to do (or not do) anything. There is thus a fundamental disconnect between the harm Plaintiffs allege (gathering charges that were too high) and the predicate acts they allege (mailing royalty statements and wiring payments). In reality, Plaintiffs claim they were harmed by the Gathering Agreement—not the mailings or wires that followed.

9

Under Plaintiffs' own theory, they would have been harmed even if the allegedly fraudulent transmissions were ***never sent***—underscoring that there simply is no connection between the predicates alleged and Plaintiffs' theory of injury.

## II.   PLAINTIFFS FAIL TO PLEAD THE ELEMENTS OF RICO.

The Complaint fails to allege essential elements of a RICO claim, including: a scheme to defraud; a pattern of racketeering activity; and control of an enterprise through a pattern of racketeering activity.

### A.   *Kolar* Precludes Plaintiffs' Scheme to Defraud.

Where a RICO claim rests on mail and wire fraud, a plaintiff must plausibly allege a scheme to defraud.  *See Kehr*, 926 F.2d at 1412-19; 18 U.S.C. §§ 1341, 1343.   As noted, the Third Circuit squarely rejects schemes just like the one alleged here.  The *Kolar* Court held that plaintiffs could not "transmute" a contract claim into a RICO action "by simply appending the terms 'false' and 'fraudulent'" to their allegations.  361 F. App'x at 363-64.  Both here and in *Kolar*, the alleged scheme is that the defendant "falsely" or "fraudulently" withheld a portion of a payment due under a contract.  *Compare id.* at 363 (alleging defendants "falsely asserted their entitlement to withhold [plaintiff's] distributions and falsely asserted that [plaintiff] has an obligation to fund capital shortfalls") (alterations, emphasis, and internal quotation marks omitted), *with* Compl. ¶ 69 ("[T]hese statements and payments fraudulently pretended and represented that deductions for gas gathering

10

and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases."). As the Third Circuit explained, "[t]hese allegations set forth disputes sounding in contract," not RICO. *Kolar*, 361 F. App'x at 363-34. Statements are not "false" or "fraudulent" just because one party claims they breached a contract.[7]

Lacking any meaningful response to *Kolar*, Plaintiffs devote pages to a straw-man: whether a breach-of-contract claim and a RICO claim can ever co-exist. *See* Opp. at 12-16. But Plaintiffs misstate Chesapeake Energy's arguments and Third Circuit law. *Kolar* does not profess to banish contracts from the realm of RICO. It does, however, foreclose Plaintiffs' argument that a plaintiff can end-run a breach-of-contract claim in favor of a RICO claim merely by calling monthly mailings "false" or "fraudulent" (or part of a broader "scheme to defraud"). *See* 361 F. App'x at 363-64; *cf.* Opp. at 33 (arguing that the royalty statements were "fraudulent" because "the inflated charges … were embedded in [them]"). *Kolar* is not unique: the case law is replete with examples of courts rejecting efforts to do just what Plaintiffs seek to do here. *See, e.g.*, *Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392, 404 (E.D. Pa. 2013) (dismissing RICO claim related to construction contract because "[c]ourts have repeatedly found the element of

---

[7]    Plaintiffs also assert that leases are "practically uniform throughout the Marcellus basin." Opp. at 5. That statement is contrary to their prior representations to the Court in which they argued there are "material differences in the relevant leases" when they were seeking to avoid consolidation. *See, e.g.*, ECF No. 52 at 6-11.

deceit missing in breach of contract claims"); *Fuce v. West*, 2012 WL 3046235, at *3 (E.D. Pa. July 26, 2012) ("Despite [plaintiff]'s efforts to transform [defendant]'s conduct into criminal offenses, it is clear that he alleges a breach of contract cause of action …. which is not actionable under RICO."); *see also Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 537-38 (4th Cir. 1988).

Plaintiffs' remaining arguments fail as well. Plaintiffs argue that a mailing does not have to be fraudulent itself if sent in furtherance of a fraudulent scheme, *see* Opp. at 33 (quotation omitted), but a fraudulent scheme still requires **some** reliance by **someone**. *See, e.g.*, *Kehr*, 926 F.2d at 1415–17 (dismissing RICO claims against defendant as to whom plaintiff identified no fraudulent statements); *Bridge*, 553 U.S. at 658-59.[8] Plaintiffs also argue that the fact that all terms of the gathering agreement with Access are not public constitutes a fraudulent scheme. *See* Opp. at 27. But Plaintiffs fail to identify any obligation to publicly disclose such confidential business information. It is in fact normal course for such competitively sensitive business information not to be publicly disclosed, which is why such agreements contain confidentiality agreements and the SEC has a rule to

---

[8] Plaintiffs invoke *Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995) (en banc), for the proposition that RICO should be read broadly. *See* Opp. at 16. But the *Kolar* Court was well-aware of *Tabas* when it held that RICO claims must be dismissed where "the essence of [a] complaint alleges that defendants have diverted and/or misappropriated monies due and payable to him under purported claims of contractual right." 361 F. App'x at 363-64 (ellipsis and internal quotation marks omitted).

ensure that each and every detail need not be disclosed publicly—as Plaintiffs acknowledge, *see* Opp. at 6. Moreover, Plaintiffs concede, as they must, that the fact of (and key terms of) the gathering agreement were disclosed. *See id.* at 30; *see also* Access Midstream Partners, L.P., Current Report (Form 8-K) at 5 (Dec. 26, 2012), *available at* http://www.accessmidstream.com/Investors/Pages/ SECFilings.aspx (disclosing that the gathering agreement involves a "calculation that provides [Access] a specified pre-income tax rate of return on invested capital,", which Plaintiffs characterize as "the key point"). Opp. at 30. Thus, the Third Circuit's holding in *Lum v. Bank of America*, 361 F.3d 217, 227 (3d Cir. 2004)—that disclosure of material fact by "one member of the RICO association-in-fact" undermines the allegation of a scheme to defraud—applies directly here to defeat Plaintiffs' claim.

## B.    *Kehr* Precludes Plaintiffs' "Pattern of Racketeering Activity."

Just as *Kolar* forecloses Plaintiffs' attempt to plead a RICO scheme on a breach-of-contract theory, *Kehr* forecloses Plaintiffs' attempt to create a "pattern of racketeering activity" out of recurring mailings and wires that stem from a single alleged scheme. 926 F.2d at 1412-19. Plaintiffs allege a scheme related to the 2012 sale of midstream assets to Access and the gathering agreement from late 2012, and then argue that a "pattern of racketeering activity" arose from the mailing of royalty statements and the wiring of payments in the following years.

13

*See* Compl. ¶¶ 68-72.  But *Kehr* and numerous other decisions reject the notion that recurring mailings or wires flowing from a single transaction can establish a "pattern of racketeering" under RICO, even if they qualify as mail and wire fraud. *See* Mem. at 21-23.

Plaintiffs have no meaningful response to this line of authority, *see* Opp. at 24-25, which requires dismissal here.  *Kehr* specifically held that, "[i]n cases involving allegations of mail fraud," "[t]he mailing element is not very helpful in examining the sufficiency of a RICO pattern allegation," so the Court instead must "look beyond the mailings and examine the underlying scheme or artifice."  926 F.2d at 1413-14.  Here, examination of the underlying scheme is fatal to Plaintiffs' claim.  The scheme Plaintiffs allege is that Defendants entered into "a scheme [for Chesapeake] to raise much-needed capital [by selling] its natural gas gathering and intrastate transportation assets to its former subsidiary."  Opp. at 2.  That is not a "pattern": Plaintiffs have not alleged that Defendants are likely to engage in similar future transactions, and a one-time transaction "cannot by itself underpin a pattern of racketeering activity."  *Kolar*, 361 F. App'x at 365.

Plaintiffs' attempts to distinguish *Kehr* fail.  First, Plaintiffs say *Kehr* involved "fraudulent oral promises made over an eight-month period which had ended … despite the fact that the mailing of 'innocent' loan invoices might continue for years," while here, the Gathering Agreement will continue in effect

14

over the course of 15 years. *See* Opp. at 24-25 (quoting *Kehr*, 926 F.2d at 1417-18). But that improperly conflates the duration of the ***effects*** of the alleged scheme with the duration of the scheme itself. Plaintiffs' argument, based on a long-term pattern of mailings and wires flowing from a single alleged scheme, is precisely what *Kehr* rejected. 926 F.2d at 1413-14. Second, Plaintiffs argue that the mailings and wires here are not "innocent." Opp. at 25. But that contention cannot be squared with *Kolar*, which involved materially indistinguishable mailings. Third, Plaintiffs' again invoke *Foodservice*, *see id*., but the *Foodservice* court did not separately address the "pattern" requirement. *See* 2009 WL 5064468, at *14-22. *Foodservice* in no way suggests that Plaintiffs can use mailings and wires flowing from a one-time transaction in 2012 to build a RICO pattern.

## C.    Plaintiffs Fail to Plead that Chesapeake Energy Directed an Enterprise Through a Pattern of Racketeering.

Plaintiffs also fail to allege that Chesapeake Energy "direct[ed]" the alleged enterprise "through a pattern of racketeering." 18 U.S.C. § 1962(c); *Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993).[9]

*First*, Plaintiffs fail to plausibly allege that Chesapeake Energy "knowingly engage[d] in '***directing*** the enterprise's affairs' through a pattern of racketeering activity." *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534,

---

[9] Plaintiffs inexplicably devote more than three pages to arguing that they have alleged two enterprises. *See* Opp. at 17-21. This is non-responsive to Chesapeake Energy's opening brief.

1539 (3d Cir. 1993) (quoting *Reves*, 507 U.S. at 179).  Plaintiffs do not even allege that the central act of the alleged conspiracy—executing the gathering agreement between Access and Chesapeake Appalachia—involved Chesapeake Energy at all. Instead, they conflate two distinct corporate entities—Chesapeake Energy and Chesapeake Appalachia.  *See* Opp. at 34-37.  But in the RICO context, as generally, a subsidiary's conduct is not imputed to its corporate parent absent allegations sufficient to establish an "alter ego" or to "pierc[e] the corporate veil." *E. Minerals & Chems. Co. v. Mahan*, 53 F. App'x 201, 201-02 (3d Cir. 2002). Plaintiffs allege no such theory here, nor could they.  And Chesapeake Energy previously explained that allegations about board-of-directors participation do not establish management under § 1962(c), *see* Mem. at 25, to which Plaintiffs offer no response.

Plaintiffs also insist that "the 'operation and management' standard … is still good law."  Opp. at 36 (citing *Reves*, 507 U.S. at 185).  But this insistence is curious both because the standard is undisputedly good law and because it is fatal to Plaintiffs' claims.  Under the "operation or management" standard, "not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise."  *Univ. of Maryland*, 996 F.2d at 1538-39.  A much higher showing is required:  that the defendant "knowingly engage in '***directing*** the enterprise's affairs' through a pattern of racketeering activity," *id.* at 1539 (quoting

*Reves*, 507 U.S. at 179).  Plaintiffs fail to identify facts showing that Chesapeake Energy knowingly directed the affairs of Access or the alleged association-in-fact enterprise.[10]

*Second*, even if Plaintiffs adequately alleged that Chesapeake Energy directed the enterprise, they fail to satisfy the additional "nexus" requirement that the enterprise be managed "***through*** a pattern of racketeering activity."  18 U.S.C. § 1962(c) ; *see also* Mem. at 24-26.  Put simply, it is not plausible that Chesapeake Energy "directed" an enterprise "through" its subsidiary's mailing of royalty statements where the mailings were already required by the Leases and had nothing to do with the relationship between Chesapeake Energy and Access.

Plaintiffs' responses miss the mark.  They first take *Kehr* out of context, arguing that the Court should ask merely whether Chesapeake Energy directed the enterprise's affairs through a scheme to defraud, not through predicate acts of racketeering.  *See* Opp. at 37.  But *Kehr* does not stand for the proposition that a scheme to defraud and a pattern can be conflated.  *See* 926 F.2d at 1412.  Indeed, the statute itself holds that the enterprise must be managed through a pattern of racketeering activity, not merely through a scheme to defraud.   18 U.S.C. § 1962(c).

---

[10]    Indeed, Chesapeake Energy's midstream assets were already 50% owned by a third party in 2012 before being sold to Access, which has since been wholly owned by third parties—most recently owned 100% by Williams, a public company.  *See* Access Midstream Partners, L.P., Current Report (Form 8-K) at 7 (Dec. 26, 2012).

Plaintiffs next suggest that "Chesapeake *did* participate in and exercise direction over the predicate acts of mailings and wires to lessors, by directing its subsidiary Chesapeake Appalachia to assess inflated charges against lessors through these mailings and wires." Opp. at 37. But that allegation appears nowhere in the Complaint, and Plaintiffs cannot make it now in their brief in opposition. *See Bartello v. City of Sunbury*, 2014 WL 220789, at *7 (M.D. Pa. Jan. 21, 2014) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting *Commw. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)).[11]

### D.    Plaintiffs' RICO Conspiracy Claim Fails Too.

Plaintiffs accept, as they must, that if their RICO claim fails, their RICO conspiracy claim fails too. Opp. at 42-43; s*ee Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993). That principle dooms their conspiracy claim because Plaintiffs have failed to state a substantive RICO claim.

Plaintiffs also still fail to allege the requisite agreement. As previously explained, *see* Mem. at 27-28, § 1962(d) requires a conspiracy to commit a full RICO violation—*i.e.*, an agreement covering every element of the underlying claim. Plaintiffs allege that Defendants conspired to "pass[] along" "inflated

---

[11]    Moreover, particularly to the extent the relevant enterprise is Access, Plaintiffs would not plead a violation of § 1962(c) simply by alleging (a) that Chesapeake Energy conducted the affairs of the enterprise and (b) that Chesapeake Energy directed Chesapeake Appalachia to mail the royalty statements (which Chesapeake Appalachia was already going to do anyway), since there would be no necessary connection between to the two.

charges," "to keep secret the Marcellus Gas Gathering Agreement," and to "classif[y] … payments to Access as off-balance sheet obligations."  Opp. at 42. But even if that were true, it would not suffice because it does not show that Defendants "agreed to the commission of a 'pattern of racketeering activity,'" *Breslin v. Brainard*, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003), or "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise," *Northwestern Human Services, Inc. v. Panaccio*, 2005 WL 1353609, at *3 (E.D. Pa. June 6, 2005) (alteration in original) (citation and internal quotation marks omitted).

## III.   PLAINTIFFS DO NOT STATE AN UNJUST ENRICHMENT CLAIM.

Plaintiffs' unjust enrichment claim fails as a matter of law because the Leases define the parties' rights and obligations.  *See, e.g.*, Compl. ¶ 57(b). Plaintiffs do not dispute that the Leases specify how Chesapeake Appalachia is to calculate and pay royalties, including post-production-cost deductions.  If Plaintiffs believe they are due larger royalties, they may bring a contract action against Chesapeake Appalachia.  Indeed, one Plaintiff has done so in arbitration.  *See* Mem. at 8.  The law does not permit Plaintiffs to evade that contract action by asserting unjust enrichment.

Plaintiffs completely ignore the Pennsylvania law Chesapeake cited, *see id*. at 28-30, which holds that a party cannot claim unjust enrichment when the

underlying transaction is "governed by an express contract," *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa. Super. Ct. 2004), even where the defendant is not a direct party to the contract, *see D.A. Hill Co. v. Clevetrust Realty Investors*, 573 A.2 1005, 1009-104 (Pa. 1990).

Plaintiffs instead cite *York Group, Inc. v. Pontone*, 2014 WL 896632 (W.D. Pa. Mar. 6, 2014), and mischaracterize its holding as "[a] claim for unjust enrichment is properly brought where defendants are not parties to a contract and cannot be liable for a breach of contract." Opp. at 45. *York Group*, however, applies only in the narrow context where a defendant "profited from alleged breaches of [another party]'s ***fiduciary obligations***." 2014 WL 896632, at *21. Where a fiduciary duty did not apply, the court dismissed the unjust enrichment claim against a third party. *See id*. at *20-21. *York Group* thus only further supports dismissal, as there is no fiduciary duty at issue here.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated:  November 14, 2014

Respectfully submitted,

*/s/ Daniel T. Donovan*

Daniel T. Brier
Myers, Brier & Kelly LLP
425 Spruce St. Suite 200
Scranton, PA 18501
Tel: (570) 342-6100
Fax: (570) 342-6147

Daniel T. Donovan (*pro hac vice*)
Peter A. Farrell (*pro hac vice*)
Ragan Naresh (*pro hac vice*)
Kirkland & Ellis LLP
655 Fifteenth Street, NW
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for Chesapeake Energy Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties who have appeared in this action via the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Daniel T. Donovan*
Counsel

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to L.R. 7.8(b)(2) that the text of this filing contains 4,781 words, excluding the caption, Table of Contents, Table of Authorities, and signature blocks, which is within the limit of 5,000 words as permitted by Local Rule 7.8.

*/s/ Daniel T. Donovan*
Counsel