## APPENDIX OF UNPUBLISHED OPINIONS

A.    *Bartello v. City of Sunbury*,
  2014 WL 220789 (M.D. Pa. Jan. 21, 2014)

B.    *Breslin v. Brainard*,
  2003 WL 22351297 (E.D. Pa. Oct. 14, 2003)

C.    *Fuce v. West*,
  2012 WL 3046235 (E.D. Pa. July 26, 2012)

D.    *In re U.S. Foodservice Inc. Pricing Litig.*,
  2009 WL 5064468 (D. Conn. Dec. 15, 2009)

E.    *Nw. Human Servs., Inc. v. Panaccio*,
  2005 WL 1353609 (E.D. Pa. June 6, 2005)

F.    *York Grp., Inc. v. Pontone*,
  2014 WL 896632 (W.D. Pa. Mar. 6, 2014)



2014 WL 220789
Only the Westlaw citation is currently available.
United States District Court,
M.D. Pennsylvania.

Joseph BARTELLO, Plaintiff,
v.
CITY OF SUNBURY, Defendants.

No. 4:13–CV–01340.    |    Jan. 21, 2014.

**Attorneys and Law Firms**

Timothy A. Bowers, Tim Bowers Law Office, Subury, PA, for Plaintiff.

Joseph J. Santarone, Jr., Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for Defendants.

### ORDER

MATTHEW W. BRANN, District Judge.

 **\*1** The undersigned has given full and independent consideration to the September 25, 2013 report and recommendation of Magistrate Judge Thomas M. Blewitt. ECF No. 9. The Plaintiff and Defendants both filed responses to the report and recommendation.

Because this Court agrees with Magistrate Judge Blewitt's recommendation that the Plaintiff's federal claims and Pennsylvania constitutional claims should be dismissed and that the case should be remanded to state court for resolution of the remaining state law claims, the Court will not rehash the sound reasoning of the Magistrate Judge and will adopt the report and recommendation in its entirety.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1. United States Magistrate Judge Thomas M. Blewitt's September 25, 2013 Report and Recommendation (ECF No. 9) is ADOPTED in full.

2. The Defendants Motion to Dismiss (ECF No. 5) is GRANTED in part, with respect to counts III and IV of the Plaintiff's Amended Complaint (ECF No. 4) and Plaintiff's claims under the Pennsylvania Constitution.

3. Counts III and IV of the Plaintiff's Amended Complaint (ECF No. 4), as well as Plaintiff's claims under the Pennsylvania Constitution, are DISMISSED with prejudice.

4. The case is remanded to the Court of Common Pleas of Northumberland County for resolution of the Plaintiff's remaining state law claims.

5. The clerk is directed to close the file.

### REPORT AND RECOMMENDATION

THOMAS M. BLEWITT, United States Magistrate Judge.

**I. BACKGROUND.**

On April 15, 2013, Plaintiff Joseph Bartello, an elected member of Sunbury City Council, filed, through counsel, this instant civil rights action, pursuant to 42 U.S.C. § 1983, in the Court of Common Pleas of Northumberland County, Pennsylvania. Plaintiff also raised Pennsylvania state law claims. On May 15, 2013, Defendants Sunbury City, a Pennsylvania third class city, and David Persing, elected Mayor of Sunbury City, filed a Notice of Removal and removed this case to this federal court. (Doc. 1). Defendants then filed a Motion to Dismiss Plaintiff's original Complaint on May 22, 2013. (Doc. 2). Plaintiff filed his First Amended Complaint in response to Defendants' Motion. (Doc. 4). Plaintiff attached one Exhibit to his amended pleading, Doc. 4–1. As such, Defendants' Doc. 2 Motion to Dismiss was deemed moot. (Doc. 6). On July 1, 2013, Defendants filed a Motion to Dismiss Plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6). **(Doc. 5).** Defendants' Motion has been briefed and it is ripe for disposition. (Docs. 7 & 8).

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and § 1343, and it can exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

In his Amended Complaint, Plaintiff alleges that on April 8, 2013, Sunbury City Council held a public meeting and Defendant Persing presided over it. The agenda for the meeting provided that an Audience Comment would be permitted at the conclusion of the meeting. Plaintiff avers that Sunbury City Council and Defendant Persing conducted all of their business and decided official actions before the Audience Comment was held.

**\*2** In Count I of his Amended Complaint, Plaintiff asserts that Defendants violated the Pennsylvania Sunshine Act ("PSA"), 65 Pa.C .S.A. §§ 701, *et seq.* Plaintiff specifically alleges that "at no time prior to taking official action did Persing call for public comment" and that that "Persing has violated the [PSA] by failing to provide a reasonable opportunity for public comment prior to taking official action." (Doc. 4, ¶ 's 15–16). Thus, Plaintiff contends that the official action taken at the April 8, 2013 meeting is voidable. (*Id.,* ¶ 17).

Plaintiff further alleges in Count I that on April 9, 2013, Defendant Persing issued a Memo to Council Members and "called for a meeting of [the Mayor and] three counsel (sic) members [on April 17, 2013] to discuss permits surrounding the former Celotex site." (*Id.,* ¶ 18). Plaintiff attached a copy of Defendant Persing's Memo as Exhibit 1 to his Amended Complaint, Doc. 4–1. Plaintiff basically alleges that Defendant Persing willfully violated the PSA by scheduling a closed private meeting to discuss agency business regarding the Celotex property without advertisement and public notice. Plaintiff avers that "the meeting is a prearranged gather of a quorum of the council" and was to be held "for the purpsoe of discussion of agency business." (*Id.,* ¶ 's 20–21).

Plaintiff seeks declaratory relief in Count I as well as an order directing Defendants to pay his attorney's fees.

In Count II of his Amended Complaint, Plaintiff alleges Defendant Persing violated the Pennsylvania Third Class City Code, 53 P.S. 35701, 35901, and 36205,[1] and the Pennsylvania Right to Know Law ("RTKL"), 65 P.S. 67.701, and he seeks Declaratory Judgment that Persing violated the Third Class City Code, the Pennsylvania Constitution and the RTKL. (Doc. 4, pp. 4–7). Plaintiff also alleges that Defendant Persing initiated an investigation of him and that Persing threatened council members with legal action if they exercised their right to speak on matters of public concern. (*Id.,* ¶ 's 33–34). Plaintiff cites to the Ex. 1 Persing Memo. Plaintiff alleges that Persing had no power to conduct an investigation of him and to take legal action against council, and that Persing was violating the Third Class City Code and the Pennsylvania Constitution. Plaintiff also alleged that Persing ordered, *sans* authority, him to surrender his city issued computer to the police or face prosecution, and that Persing was going to allow third parties to inspect his computer. Additionally, Plaintiff avers that Persing violated

the RTKL by ordering access to his city issued computer. (*Id.,* ¶ 's 35–44).

1    Plaintiff cites to the Pennsylvania Third Class City Code as both "53 P.S." and "35 P.S." (Doc. 4, pp. 4–5). The correct citation for the Third Class City Code is 53 P.S.

Further, in Count II, Plaintiff contends that he is entitled to relief under the Pennsylvania Declaratory Judgment Act, 42 Pa.C.S.A. § 7533, since he is interested under legal relations affected by the Third Class City Code and the RTKL. (Doc. 4, p. 6).

Plaintiff seeks declaratory relief in Count II as well as an order directing Defendant Persing to pay his attorney's fees.

**\*3** In Count III of his Amended Complaint, Plaintiff raises First Amendment claims under the United States Constitution against Defendant Persing, under § 1983, alleging that Persing instituted an illegal investigation into him in retaliation due to his exercising of his free speech right at the April 8, 2013 public meeting by "indicating his belief that there are code violations with respect to the Celotex property." Plaintiff alleges that "Persing has imposed upon the members of the council a content-based, prior restraint on political speech under threat of legal action." (*Id.,* ¶ 's 52–55). Thus, Plaintiff asserts First Amendment retaliation and prior restraint claims against Defendant Persing in Count III.

Plaintiff seeks declaratory and injunctive relief in Count III as well as compensatory and punitive damages against Defendant Persing.[2] Plaintiff also seeks an order directing Defendant Persing to pay his attorney's fees. (Doc. 4, pp. 7–8).

2    Plaintiff does not state in his Amended Complaint if he is suing Defendant Persing in both his individual and his official capacities. To the extent that Plaintiff seeks monetary damages (*i.e.,* both compensatory and punitive) from Defendant Persing, he can only sue the state actor Defendant in his individual or personal capacity. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Meekins v. Beard,* 2007 WL 675358, *3 (M.D.Pa.); *Atwell v. Schweiker,* 2007 WL 2900565 (3d Cir.2007) (Non–Precedential). Thus, we will recommend that Plaintiff's damages claims against Defendant Persing in his official capacity be dismissed with prejudice. We find that it would be futile for the Court to allow Plaintiff to amend his damages claims against Defendant Persing in

his official capacity. *See Will v. Michigan Dept. of State Police, supra.*

In his final Count IV of his Amended Complaint, Plaintiff raises a Fourth Amendment unreasonable search and seizure claim under the United States Constitution against Defendant Persing, under § 1983, alleging that Persing violated his constitutional rights when Persing ordered him to return his city owned computer since, as an elected official, he had a reasonable expectation of privacy in the computer. (Doc. 4, p. 8). Plaintiff seeks declaratory and injunctive relief in Count IV as well as compensatory and punitive damages against Defendant Perisng. Plaintiff also seeks an order directing Defendant Persing to pay his attorney's fees. (Doc. 4, pp. 8–9).

## II. STANDARDS OF REVIEW.

### A. MOTION TO DISMISS

In *Reisinger v. Luzerne County,* 712 F.Supp.2d 332, 343–344 (M.D.Pa.2010), the Court stated:

The Third Circuit Court of Appeals recently set out the appropriate standard applicable to a motion to dismiss in light of the United States Supreme Court's decisions *Bell Atlantic Corp. v. Twombly,* 550 U.S. 433 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim that relief is plausible on its face.' " *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 570). The Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. Moreover, it continued, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). *McTernan v. City of York,* 577 F.3d 521, 530 (3d Cir.2009). The Circuit Court discussed the effects of *Twombly* and *Iqbal* in detail and provided a road map for district courts presented with a motion to dismiss for failure to state a claim in a case filed just a week before *McTernan, Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009).

**\*4** [D]istrict courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,* 129 S .Ct. at 1949.] Second, a District Court must then determine whether the facts

alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege a plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Philips [v. Co. of Allegheny],* 515 F.3d [224,] 234–35 [ (3d Cir.2008) ]. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]"that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1949. This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id. Fowler,* 578 F.3d at 210–11.

The Circuit Court's guidance makes clear that legal conclusions are not entitled to the same deference as well-pled facts. In other words, "the court is 'not bound to accept as true a legal conclusion couched as a factual allegation.' " *Guirguis v. Movers Specialty Services, Inc.,* No. 09–1104, 2009 WL 3041992, at \*2 (3d Cir. Sept.24, 2009) (*quoting Twombly,* 550 U.S. at 555) (not precedential).

### B. SECTION 1983 STANDARD

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Kost v. Kozakiewicz,* 1 F.3d 176, 184 (3d Cir.1993); *Beattie v. Dept. of Corrections SCI–Mahanoy,* 2009 WL 533051, \*3 (M.D.Pa.). Further, Section 1983 is not a source of substantive rights. Rather, it is a means to redress violations of federal law by state actors. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). *See also Holocheck v. Luzerne County Head Start, Inc.,* 385 F.Supp.2d 491, 498–499 (M.D.Pa.2005); *Phillips v. Miller,* 2010 WL 771793, \*2 (M.D.Pa.).

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Hampton v. Holmesburg Prison Officials,* 1546 F.2d 1077, 1082 (3d Cir.1976); *Parratt, supra.* It is also well settled in the Third Circuit that personal involvement of defendants in alleged

constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. *Id.* Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based. *Id.* As the Court stated in *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1998):

> **\*5** A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. (Citations omitted).

*See also Beattie v. Dept. of Corrections SCI–Mahanoy,* 2009 WL 533051,*3 ("a prerequisite for a viable civil rights claim is that a Defendant directed, or knew of and acquiesced in, the deprivation of a Plaintiff's constitutional rights.") (citing *Rode, supra* ).

## III. DISCUSSION.

At the outset, Plaintiff has agreed to voluntarily dismiss Count IV of his Amended Complaint, namely his Fourth Amendment illegal search and seizure claim against Defendant Persing, as well as his claims under the Pennsylvania Constitution.[3] Plaintiff also states that he has not asserted a constitutional claim against Defendant Sunbury City under *Monell.*[4] (Doc. 8, pp. 5 & 7). As such, we will recommend that the Court dismiss with prejudice Count IV of Plaintiff's Amended Complaint as well as Plaintiff's claims under the Pennsylvania Constitution. We also find that Plaintiff's remaining constitutional claim raised in Count III is only asserted against Defendant Persing. Further, as noted above, we find that Plaintiff's constitutional claims in Count III seeking money damages against Defendant Persing (Doc. 4, p. 8), to the extent it does so in Persing's official capacity, should be dismissed with prejudice. *See Van Tassel v. Lawrence County Domestic Relations Section,* 659 F.Supp.2d 672, 696 (W.D.Pa.2009); *Mitchell v. Luckenbill,* 680 F.Supp.2d 672, 681 (M.D.Pa.2010); *Gale v. Stori,* 608 F.Supp.2d 629, 636 (E.D.Pa.2009).

3    As Defendants recognize (Doc. 7, p. 9), the law is clear that any claims for damages that Plaintiff was making under the Pennsylvania Constitution would be subject to dismissal with prejudice as a matter of law. *See Moeller v. Bradford Co.,* 444 F.Supp.2d 316, 327 n. 13 (M.D.Pa.2011) ("Pennsylvania has no statutory equivalent to 42 U.S.C. § 1983, which provides a private right of action for a federal constitutional violation.") (citations omitted).

4    Plaintiff states that he has not attempted to state a *Monell* claim against Defendant Sunbury City in his Amended Complaint. (Doc. 8, p. 6). We note Plaintiff could only state a constitutional claim against Defendant Sunbury City under *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Since Defendant Sunbury City is a municipal agency, the standards annunciated in *Monell* would apply to it. *See Malles v. Lehigh County,* 639 F.Supp.2d 566 (E.D.Pa.2009); *Spiess v. Pocono Mountain Regional Police Department,* 2010 WL 2985959, *7–*8. We agree with Plaintiff and find that he has not stated a constitutional claim under *Monell* against Defendant Sunbury City.

Thus, we find that Plaintiff raises only a state law PSA claim against Defendant Sunbury City in Count I. We do not find that Plaintiff's Count II, state law Third Class City Code and RTKL claims, is raised against Defendant Sunbury City since this Count only mentions Defendant Persing. (Doc. 4, pp. 4–7). Plaintiff's remaining claims against Defendant Persing are his Count I, state law PSA claim, his Count II, state law Third Class City Code and RTKL claims, and his Count III, First Amendment claims under § 1983.

Insofar as Plaintiff seeks declaratory judgment in his § 1983 claim raised in Count III of his Amended Complaint, and requests the Court to declare that Defendant Persing violated his constitutional rights under the First Amendment due to the above stated alleged past actions of Persing, Doc. 4, p. 7, we will recommend that this request for relief be dismissed with prejudice.

Plaintiff asks the Court to enter Judgment "Declaring that Persing has violated [his] rights under the First Amendment...." (Doc. 4, p. 7, WHEREFORE Clause, ¶ A). Plaintiff lacks standing to have the Court declare the past conduct of Defendant Persing unconstitutional.

**\*6** In *Blakeney v. Marsico,* 340 Fed.Appx. 778, 780 (3d Cir.2009), the Third Circuit Court stated:

To satisfy the standing and "case or controversy" requirements of Article III, a party seeking a declaratory judgment "must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir.2003) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 102–03, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Here, Blakeney seeks a declaration merely that defendants' "acts" and "policies" violate the United States and Pennsylvania Constitutions. He does not allege that he will be subjected to that alleged conduct in the future. Moreover, even if defendants violated Blakeney's rights in the past as he alleges, he is not entitled to a declaration to that effect. *See Brown v. Fauver,* 819 F.2d 395, 399–400 (3d Cir.1987) (directing District Court to dismiss prisoner's Section 1983 claim for prospective relief where appellant "has done nothing more than allege past exposure to unconstitutional state action").

Plaintiff fails to state that he will be subjected to the alleged violation of his First Amendment rights by Defendant Persing in the future. Moreover, even if Defendant Persing violated Plaintiff's rights in the past as he alleges, he is not entitled to a declaration to that effect. *See Blakeney, supra.* Therefore, we will recommend that Plaintiff's request for declaratory relief in his § 1983 claim raised in Count III of his Amended Complaint be dismissed with prejudice. Based on the above discussion, we find that it would be futile for the Court to allow Plaintiff to amend his Amended Complaint with respect to his stated request for declaratory relief. *See Blakeney, supra.*

In his Amended Complaint, Plaintiff asserts a First Amendment retaliation claim against Defendant Persing. As mentioned, Plaintiff alleges that Defendant Persing instituted an illegal investigation of him in retaliation to his exercising of his free speech right at the April 8, 2013 public meeting where Plaintiff stated "his belief that there are code violations with respect to the Celotex property." Plaintiff alleges that "Persing has imposed upon the members of the council a content-based, prior restraint on political speech under threat of legal action." (Doc. 4, ¶ 's 52–55).

Defendant Persing argues that Plaintiff's First Amendment retaliation claim against him should be dismissed since Plaintiff is a public employee and he fails to meet the required three step test to assert such a claim. Defendant Persing states that Plaintiff was speaking at the April 8, 2013 meeting as a councilman pursuant to his official duties and, that the sole

purposes of the investigation he (Persing) instituted "was to address the accusations and the misinformation regarding the Celotex property." (Doc. 7, pp. 10–11). Thus, Defendant Persing contends that Plaintiff's First Amendment claim fails as a matter of law.

**\*7** Further, Defendant Persing states that insofar as Plaintiff raises a First Amendment claim under the doctrine of prior restraint it also fails. Defendants cite to a three-part test with respect to prior restraint claims stated by the Court in *Dowling v. Township of Woodbridge,* 2005 U.S. Dist LEXIS 38630, 2005 WL 419734 (USDC N.J.2005). Defendant Persing states that Plaintiff was speaking as a public employee at the relevant time and that the government may impose reasonable restrictions on the time, place or manner of protected speech. Defendant Persing states that he "was not attempting to quiet the Plaintiff but wanted to ensure there was an official timeline of events provided to city council. This was done in an effort to quell the accusations and misinformation passed onto the public. Plaintiff would have the opportunity to speak on the issue after completion of the timeline." (Doc. 7, pp. 11–12).

In his Brief in Opposition (Doc. 8, pp. 8–9), Plaintiff argues that as an elected council member, he expressed his opinion at the April 8, 2013 public meeting of the City Council that there were code violations at the Celotex property and that such violations were a matter of public safety and concern. Thus, Plaintiff states that his speech was protected under the First Amendment.

Plaintiff then states that on April 9, 2013, he "was subjected to an illegal investigation by Defendant Persing and to a gag order" due to his (Plaintiff's) earlier expressions of his opinions about the code violations on the Celotex property. Plaintiff cites to Defendant Persing's Memo dated April 9, 2013, attached as Exhibit 1 to his Amended Complaint, and states that the Memo "appears to directly reference Plaintiff's comments when it refers to 'accusations and misinformation.' " Plaintiff also states that Defendant Persing's Memo makes reference to examination of complaints against a councilman. We consider Plaintiff's Exhibit 1 for present purposes since the court can consider a document integral to or explicitly relied upon in the Complaint and since Plaintiff's claims are based, in part, on Defendant Persing's Memo. *See Pension Benefit Guarantee Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993); *Reisinger, supra.* Additionally, Plaintiff states during the litigation of his instant civil rights case, "Defendants have further retaliated against [him] by

removing him from his former supervisory position over the City's Code Office ." (*Id.*). To the extent Plaintiff is attempting to re-draft his Amended Complaint in his opposition brief and to add new allegations regarding his First Amendment retaliation claim, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss. *Ex rel. Zimmerman,* 836 F.2d at 181." *Sung Tran v. Delavau, LLC,* 2008 WL 2051992, *11 (E.D.Pa.5–13–08).

Plaintiff concludes that "[g]iven the totality of the alleged circumstances, [he] had plead sufficient facts concerning the nexus between his speech and retaliatory action." (*Id.*). Thus, Plaintiff states that the Court should deny Defendants' Motion to Dismiss his First Amendment retaliation claim.

**\*8** Plaintiff (Doc. 8, p. 10) agrees with Defendants that insofar as he asserts a First Amendment claim under the doctrine of prior restraint it is subject to the three-part test identified by Defendants at Doc. 7, pp. 11–12, namely, justification without reference to content, narrow tailoring and significant government interest, and ample alternative channels. However, Plaintiff concludes that he has met the three prong test regarding his First Amendment prior restraint claim.

Thus, Plaintiff contends that his statements regarding the code violations on the Celotex property was a protected activity, and that the actions taken against him by Defendant Persing in the April 9, 2013 Memo, in response to his statements constituted unlawful prior restraint banning him from making his protected speech. Both Plaintiff and Defendants cite to *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Plaintiff argues that the comments he made, as an elected official, about the Celotex property is the type of activity that constitutes protected activity under any formulation of the *Pickering* framework.

In order to proceed on his First Amendment retaliation claim under § 1983, Plaintiff must show that: (1) Plaintiff engaged in activity protected by the First Amendment; (2) the government responded with retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) the protected activity was the cause of the retaliatory action. *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir.2007); *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir.2006).

Sepcifically, in *Mincy v. Chmielewski,* 2007 WL 707344, *5–*6 (M.D.Pa.), the Court stated:

> Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling,* 229 F.3d 220, 224–25 (3d Cir.2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn,* 241 F.3d 330 (3d Cir.2001) (quoting *Allah,* 229 F.3d at 225).

"As a threshold matter, a [plaintiff] in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." *Rauser,* 241 F.3d at 333; *see also, Jerry v. Williamson,* 2006 WL 3741840, 1 (3d Cir.2006).

In *O'Connell v. Sobina,* 2008 WL 144199, *11 (W.D.Pa.), the Court stated "merely alleging the fact of retaliation is insufficient."

The *O'Connell* Court also stated:

> If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors. *Mt. Healthy,* 429 U.S. at 287.

**\*9** *Id.; see also Fortune v. Basemore,* 2008 WL 4525373, *4–*5 (W.D.Pa.) ("It is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution."); *Sims v. Piazza,* 2009 WL 3147800, *24 (M.D.Pa.) (citing *Rauser v. Horn,* 241 F.3d 333–34 (3d Cir.2001)).

Thus, Plaintiff must show that the alleged retaliatory conduct by Defendant Persing, i.e., "Plaintiff was subjected to an illegal investigation by Defendant Persing and to a gag order," was related to him engaging in constitutionally-protected conduct, *i.e.,* "expressing his opinions on the Celotex property." (Doc. 8, p. 9).

In *Alexander v. Forr,* 2006 WL 2796412 at *22 (M.D.Pa.), the Court stated:

[I]n establishing the elements of a First Amendment claim of retaliation, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. *Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal citations omitted).

Moreover, as the *Mincy* Court stated, to succeed on a First Amendment retaliation claim, a Plaintiff must show that the action by state officials was sufficiently "adverse," that is "they would be 'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.' " 2007 WL 707344,*6.

It is not disputed that Plaintiff, as an elected Sunbury City Council member, was a public official during all relevant times of this case. In *Cindrich v. Fisher,* 341 Fed. Appx. 780, 786 (3d Cir.2009), the Court stated:

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir.2001). To prevail on a First Amendment retaliation claim, a public employee must first show that her activity was protected by the First Amendment. This is an issue of law. To warrant First Amendment protection, an employee must speak "as a citizen upon matters of public concern," not "as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see Sanguigni v. Pittsburgh Bd. of Pub. Educ.,* 968 F.2d 393, 399–400 (3d Cir.1992). In *Garcetti,* the Court clarified that, even if an employee's speech touches on a matter of public concern, it is not protected speech "as a citizen" if it was made pursuant to the employee's official duties. 547 U.S. at 421, 126 S.Ct. 1951, 164 L.Ed.2d 689; *see Gorum v. Sessoms,* 561 F.3d 179, 185 (3d Cir.2009); *Foraker v. Chaffinch,* 501 F.3d 231, 239 (3d Cir.2007); *Hill v. Borough of Kutztown,* 455 F.3d 225, 242 (3d Cir.2006). It may, of course, be protected by whistleblower or employment discrimination statutes.

**\*10** The Court in *Wise v. PA. Dept. of Transp.,* 2010 WL 3809858, *7–*8 (W.D.Pa.9–23–10), further elaborated as follows:

In *Connick v. Meyers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court acknowledged the government's interest in regulating speech of its employees in order to promote "efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service." *Connick,* 461 U.S. at 150–51. Given the significant competing interests, courts must balance the public employee's constitutionally protected interest to speak about matters of public concern against the interests of the government employer. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

To determine whether a public employee's protected speech outweighs the government's interest in regulating such speech, the Court of Appeals for the Third Circuit adheres to a three-part balancing test: (1) the employee must show his speech was constitutionally protected; (2) the plaintiff must show the protected activity was a substantial or motivating factor in the alleged retaliatory action; and (3) the defendant may defeat the plaintiff's claim by demonstrating by a preponderance of the evidence that the same retaliatory action would have been taken absent the protected conduct. *Watters v. City of Phila.,* 55 F.3d 886, 892 (3d Cir.1995).

Whether the speech was constitutionally protected turns on two requirements. The speech must relate to a matter of public concern. *Watters,* 55 F.3d t 892. Determining whether speech is a matter of public concern is a question of law which requires examination of the record in total-considering the content, form, and context of the speech. *See Connick,* 461 U.S. at 147–48 n. 7. Public concerns relate to any matter of political, social, or other concern to the community. *Brennan v. Norton,* 350 F.3d 399, 412 (3d Cir.2003). Speech involving matters of public concern must enrich or provide some value to the community. *Id.* at 413. Furthermore, speech of a purely personal nature will not qualify as a matter of public concern. *Connick,* 461 U.S. at 147; *Brennan,* 350 F.3d at 412. The Supreme Court has recognized speech motivated by a private concern may qualify as protected speech if it also addresses a matter of public concern. *Rankin,* 483 U.S. at 387 n. 11. If the speech related to a matter of public concern, the plaintiff must show the public interest advanced by the speech was not outweighed by any injury the speech could cause to the

interest of the state employer in promoting the efficiency of public services. *Watters,* 55 F.3d at 892; *Waters v. Churchill,* 511 U.S. 661, 686, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

The second prong is composed of two separate elements. *Wardle v. Cnty. of Montgomery,* No. 05–3808, 2006 WL 2171976, at *6 (E.D.Pa. July 28, 2006). First, the threshold deterrence test requires the fact-finder to determine that the alleged retaliatory action was punitive, such that it would deter a person of ordinary firmness from engaging in protected speech. *See McKee v. Hart,* 436 F.3d 165, 170 (3d Cir.2006); *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000); *Wardle,* 2006 WL 2171976, at *6. Second, the fact-finder must be persuaded a causal connection exists between the protected speech and the alleged punitive action. *Wardle,* 2006 WL 2171976, at *6; *see McKee,* 436 F.3d at 169–71. The alleged retaliation must be more than de minimis. *McKee,* 436 F.3d at 170. The Supreme Court noted that failing to hold a birthday party for a public employee as punishment for exercising protected speech could be considered a retaliatory act for purposes of satisfying the second prong. *Ratan,* 497 U.S. at 76 n. 8 (citing *Ratan v. Republican Party of Illinois,* 868 F.2d 943, 954 n. 4 (7th Cir.1989)). The Court of Appeals for the Third Circuit has acknowledged acts which are de minimis individually may be sufficiently actionable when viewed as a whole. *Suppan,* 203 F.3d at 235.

**\*11** *See also Schlarp v. Dern,* 610 F.Supp.2d 450, 464–65 (W.D.Pa.2009).

Further, Plaintiff must "identify specific matters of public concern addressed by specific speech." *Cindrich,* 341 Fed. Appx. at 787. In *Cindrich,* the Court relying on *Connick,* stated that the Supreme Court separated "speech on matters of public concern from speech relating to the employee's private interests." *Id.* In *Schlarp v. Dern,* 610 F.Supp.2d at 465, the Court stated that the " 'as a citizen' inquiry presents a mixed question of law and fact. The 'public concern' and 'balancing tests' present questions of law for the court to decide." (Citations omitted).

In *Beckinger v. Twp. of Elizabeth,* 697 F.Supp.2d 610, 627 (W.D.Pa.2010), the Court stated:

In *Garcetti [Garcetti v. Cebalos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) ], the Supreme Court clarified the standard that a court should use to determine whether speech of a public employee is protected under the First Amendment. First the court must determine whether the employee spoke both (1) as a citizen; and (2) on a matter of public concern. *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731, 20 L.Ed.2d 811, 88 S.Ct. 1731). If the answer to either question is no, the employee has no First Amendment claim. *Id.* If the answer to both questions is yes, then the possibility of a First Amendment claim arises. *Id.* The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *Id.* "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* The Court in *Garcetti* made clear that speech made "pursuant to official duties" does not warrant the constitutional protection of speech made pursuant to an individual's status "as a citizen." *Id.* at 421, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created. *Id.* at 421–22, 126 S.Ct. 19.

In *Wise,* the Court noted:

In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held even when a public employee's speech relates to a matter of public concern, the speech may not be constitutionally protected if it was made in furtherance of the public employee's official duties. *Id.* at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

2010 WL 3809858, \*9 n. 2.

Recently, in *Borough of Duryea, Pa. v. Guarnieri,* ––– U.S.. –––, 131 S.Ct. 2488, 180 L.Ed.2d 408, 2011 WL 2437008, \*5 (June 20, 2011), the Supreme Court stated:

**\*12** When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If an employee does not speak as a citizen, or does not

address a matter of public concern, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Ibid.* Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. Courts balance the First Amendment interest of the employee against "the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

This framework "reconcile[s] the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (*per curiam* ). There are some rights and freedoms so fundamental to liberty that they cannot be bargained away in a contract for public employment. "Our responsibility is to ensure that citizens are not deprived of [these] fundamental rights by virtue of working for the government." *Connick, supra,* at 147; *see also Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Nevertheless, a citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). The government has a substantial interest in ensuring that all of its operations are efficient and effective. That interest may require broad authority to supervise the conduct of public employees. "When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." *Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). Restraints are justified by the consensual nature of the employment relationship and by the unique nature of the government's interest.

In *Karchnak v. Swatara Twp.,* 2009 WL 2139280, *15 (M.D.Pa.7–10–09), the Court stated, "[i]t is clear from *[Reilly v. City of Atlantic City,* 532 F.3d 216 (2008) ] that where a claimant's speech relates to 'specialized knowledge' or 'experience' acquired through the claimant's job that speech falls within the claimant's official duties, and is thus not protected under *Garcett* i." The *Karchnak* Court also stated:

**\*13** To meet the first prong of the *prima facie* case for retaliation, a statement made by a government employee is protected when: (1) is made by the employee in her capacity as a citizen; (2) the statement involved a matter of public concern; and (3) the government did not have an adequate justification for treating the speaker differently than a member of the general public. *Hill,* 455 F.3d at 242. The landscape for public employees making First Amendment retaliation claims has been significantly altered since the United States Supreme Court's decision in *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As the United States Court of Appeal for the Third Circuit recently observed, "*Garcetti* simply 'narrowed the Court's jurisprudence in the area of employee speech' by further restricting the speech activity that is protected." *Reilly v. City of Atlantic City,* 532 F.3d 216, 228 (3d Cir.2008) (*quoting Foraker v. Chaffinch,* 501 F.3d 231, 241 (3d Cir.2007)). After *Garcetti,* a court analyzing a public employee's First Amendment retaliation claims must first consider whether the employee's speech is made pursuant to the employee's official duties. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti,* 547 U.S. at 424.

*Id.,* * 6.

In *Moore v. Darlington Twp.,* 690 F.Supp.2d 378, 388 (W.D.Pa.2010), the Court stated:

As far as speech, in order to pass the first step of the inquiry, Plaintiff must show that he "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). To do so, he must navigate between the precedential Scylla and Charybdis of *Connick* and *Garcetti* by showing both that his speech was not on a matter of purely personal interest, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and that it was not made pursuant to his official duties, (*Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)).

"The standard for guiding this inquiry is whether the speech in question was made pursuant to the 'practically understood or expected duties of a Plaintiff's employment.'" *Id.* at 389. "An employee's speech involves a matter of public concern if it is fairly related to political, social, or other community concerns." *Eddy v. Corbett,* 2009 WL 2982643, *4 (W.D.Pa.9–14–09) (citation omitted), affirmed

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1999017, 381 Fed.Appx. 237 (3d Cir.2010) (Non–Precedential).

As stated, Plaintiff bases his retaliation claim on Defendant Persing's April 9, 2013 decision, one day after Plaintiff made his comments at a public meeting about code violations at the Celotex property, to conduct an investigation regarding the Celotex property and a time-line was to when the Celotex building was demolished and when Moran Industries purchased the property. (*See* Doc. 4–1). We agree with Defendants that Plaintiff's comments about code violations at the Celotex property made at the April 8, 2013, public meeting were made pursuant to Plaintiff's official duties as a Sunbury City Councilman. (Doc. 7, p. 11). As Defendants point out, "Plaintiff was speaking as a councilman and not as a citizen for First Amendment purposes" and that "the sole purposes of [Defendant Persing's] investigation was to address the accusations and misinformation regarding the Celotex property." (*Id.*). Based on the allegations of Plaintiff's Amended Complaint detailed above and based on the above case law, we concur with Defendants. We find that Plaintiff's April 8, 2013, comments about the Celotex property were made pursuant to his official duties as a Sunbury City Councilman. Thus, we will recommend that Plaintiff's First Amendment retaliation claim under § 1983 be dismissed. "A Plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federally protected right." *Beckinger v. Township of Elizabeth,* 697 F.Supp.2d 610, 632 (W.D.Pa.2010) (citation omitted).

 **\*14** Defendants also maintain that the Court should dismiss Plaintiff's First Amendment prior restraint claim against Defendant Persing since plaintiff was speaking as a public official and the government may impose reasonable restrictions on the time, place and manner of protected speech. (Doc. 7, p. 12). The Court in *Stilp v. Contino,* 629 F.supp.2d 449, 458 stated, "[g]overnment restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny." (citations omitted). "Strict scrutiny requires that the contested speech restriction is 'narrowly tailored to serve a compelling government interest.' " *Id.* (citations omitted). In *American Civil Liberties Union v. Ashcroft,* 322 F.3d 240, 251 (3d Cir.2003), the Third Circuit Court stated that "[s]trict scrutiny requires that a statute (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest." (Citation omitted). Thus, "prior restraints [on speech] are generally presumed unconstitutional". *U.S. v. Bell,* 414 F.3d 474, 478 (3d Cir.2005) (citation omitted).

"Prior restraints, however, are not unconstitutional *per se,* and may be permissible depending on the type of speech at issue." *Id.* (citations omitted).

Since we have found that Plaintiff's statements at the April 8, 2013 public meeting about the Celotex property were made pursuant to his official duties as a councilman, we find that Defendant Persing's April 9, 2013 Memo restraining discussion about the property until the investigation regarding the property was completed applied to speech that was not protected by the First Amendment. *See Milwaukee Deputy Sheriff's Ass 'n v. Clarke,* 574 F.3d 370,383 (7th Cir.2009) (Court held that government employer's directive which restrained speech of public employees "is not an unlawful prior restraint because it does not apply to speech protected by the First Amendment."). Thus, since the restraint on speech regarding the Celotex property imposed by Defendant Persing until the investigation regarding the property was completed related only to speech that Plaintiff would be making pursuant to his official duties the restraint was not an unlawful prior restraint.

As discussed above, we have concurred with Defendants that Plaintiff's comments about the Celotex property were made pursuant to his official duties and that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos,* 547 U.S. at 421. We also agree with Defendants that Persing's April 9, 2013 Memo shows that Persing only stated that no discussion of the information gathered about the Celotex property from the investigation he ordered will be allowed "until we have established the time-line and release the information to city council." (Doc. 4–1). As such, we find that Defendant Persing's ban on discussing the information gathered regarding the investigation he ordered into the Celotex property until all the facts and time-lines were ascertained and until the information was released to city council, is not an unconstitutional prior restraint on Plaintiff's speech since Plaintiff's April 8, 2013 comments about the property were not constitutionally protected and Persing only imposed reasonable restrictions on the time for discussing the Celotex property.

 **\*15** Therefore, we will recommend that Defendants' Motion to Dismiss Plaintiff's First Amendment retaliation and prior restraint claims (Count III) be granted, and that Plaintiff's First Amendment claims be dismissed with prejudice. Based on the above detailed analysis, we find futility in allowing

Plaintiff to amend his Amended Complaint regarding First Amendment claims against Defendant Persing. *See Grayson v. Mayview State Hospital,* 293 F.3d 103, 111 (3d Cir.2002); *Alston v. Parker,* 363 F.3d 229, 235–236 (3d Cir.2004).

Since there will be no further federal claims in this case if the Court dismisses Count III of Plaintiff's Amended Complaint, we will recommend that the Court decline to exercise pendent jurisdiction over Plaintiff 's remaining state law claims against Defendants contained in Counts I and II of his Amended Complaint. Thus, with respect to Plaintiff's state law PSA, Third Class City Code and RTKL claims, Counts I & II, since Plaintiff conceded to the dismissal his federal claim in Count IV and since we shall recommend that Plaintiff's remaining federal claim over which this Court has original jurisdiction (*i.e.,* Count III, First Amendment claims under § 1983) be dismissed with prejudice, we shall also recommend that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendants. 28 U.S.C. § 1367(c) (3); *see also Verdecchia v. Prozan,* 274 F.Supp.2d 712, 728 (W.D.Pa.2003); *Beckinger v. Township of Elizabeth,* 697 F.Supp.2d 610, 632 (W.D.Pa.2010).

Accordingly, we will recommend that Defendants' Motion to Dismiss **(Doc. 5)** Plaintiff's Amended Complaint be granted as to Plaintiff's remaining federal claims (Count III) and, that the Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims (Counts I & II) and remand them to the Court of Common Pleas of Northumberland County.

## IV. RECOMMENDATION.

Based on the above, it is respectfully recommended as follows:

1. Defendants' Motion to Dismiss **(Doc. 5)** be granted with respect to Count IV of Plaintiff's Amended Complaint (Doc. 4) and with respect to Plaintiff's claims under the Pennsylvania Constitution and, that the Court dismiss Count IV and the claims under the Pennsylvania Constitution with prejudice.

2. Plaintiff's First Amendment claims under § 1983 in Count III seeking money damages against Defendant Persing in his official capacity (Doc. 4, p. 8) be dismissed with prejudice.

3. Plaintiff's request for declaratory relief against Defendant Persing in his First Amendment claims raised in Count III of his Amended Complaint be dismissed with prejudice.

4. Defendants' Motion to Dismiss **(Doc. 5)** be granted with respect to Plaintiff's First Amendment claims under § 1983 in Count III of his Amended Complaint against Defendant Persing, and that these claims be dismissed with prejudice.

5. The Court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, Counts I & II of his Amended Complaint, and remand them to the Court of Common Pleas of Northumberland County.

**\*16** 6. The Court close this case.

---

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext© 2014 Thomson Reuters. No claim to original U.S. Government Works.   11

**B**

2003 WL 22351297

United States District Court,
E.D. Pennsylvania.

Michael T. BRESLIN Plaintiff

v.

Norton BRAINARD, et al. Defendants.

No. 01–CA–7269.   |   Oct. 14, 2003.

Union member brought action against multiple union officers alleging state law conspiracy, and violations of the Racketeering Influenced and Corrupt Organizations Act (RICO). Defendants moved for summary judgment. The District Court, Yohn, J., held that: (1) alleged conduct by union officers of attempted extortion and tampering with a federal witness was not sufficiently continuous to establish a pattern of racketeering activity, and (2) alleged conduct was insufficient to establish claim under conspiracy provision of RICO.

So ordered.

**Attorneys and Law Firms**

John F. Innelli, Michael J. Molder, Innelli And Molder, Philadelphia, PA, for Plaintiff.

Samuel L. Spear, Spear Wilderman Borish Endy Spear & Runckel, Philadelphia, PA, Andrew C. White Law Offices Of Andrew C. White, LLC, Charles Gilman, Silverman & Thompson, Baltimore, MD, Susan Boyle, Robert M. Baptiste, Baptiste And Wilder P.C., Washington, DC, Thomas Herman Kohn, Markowitz & Richman, Philadelphia, PA, for Defendants.

John M. Corcoran, Philadelphia, PA, for Respondent.

***MEMORANDUM AND ORDER***

YOHN, J.

 **\*1** Plaintiff Michael Breslin brings an action against numerous defendants, alleging a deprivation of his federal civil rights under 42 U.S.C. § 1983 (Count I),[1] a state law conspiracy claim (Count II); a substantive violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962(c)

(Count III), and a RICO conspiracy claim under 18 U.S.C. § 1962(d) (Count IV). The named defendants in Count II include Norton Brainard ("Brainard"), Gerald McNamara ("McNamara"), William Oswald ("Oswald"), James Smith ("Smith"), and Edward F. Keyser ("Keyser").[2] The named defendants in Count III include Brainard, McNamara, Smith, Keyser, Charles Argeros ("Argeros"), Sean Heim ("Heim"), Paul Vanderwoude ("Vanderwoude") and Leo Reilly ("Reilly"). The named defendants in Count IV include Brainard, McNamara, Oswald, Smith, Keyser, Argeros, Heim, Vanderwoude, Reilly, James P. Hoffa ("Hoffa"), as well as the International Brotherhood of Teamsters.

[1]     The court addressed Count I of plaintiff's complaint in a separate memorandum and order. Because none of the named defendants in that count is involved in the pending motions to dismiss, the court's decision as to Count I has no bearing on the outcome of these motions.

[2]     The plaintiff also named David Knorr ("Knorr") as a defendant in Count II. The court, however, granted summary judgment in Knorr's favor on that count in a separate memorandum and order.

Presently before the court are the following: (1) the motion of defendant McNamara for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as to Counts II, III, and IV; (2) the combined motion of defendants Brainard, Reilly, Oswald, Argeros, Heim and Vanderwoude for summary judgment pursuant to Rule 56(c) as to Counts II, III, and IV; and (3) the combined motion of defendants IBT, Hoffa, Smith and Keyser for summary judgment pursuant to Rule 56(c) as to Counts II, III, and IV.

**BACKGROUND**

The instant case involves allegations of a conspiracy among defendants to violate the substantive and conspiracy provisions of the civil RICO statute and the state's civil conspiracy law. The plaintiff, a union member, asserts that defendants plotted to harm him after he refused to support an opposition candidate during a battle for control of a local union. The undisputed facts of record are forth below; where a fact is in dispute, the court will recite the plaintiff's version.[3]

[3]     On a motion for summary judgment, where a fact is in dispute, the court must apply the non-moving party's version as true. See *infra* Standard of Review.

At all times relevant, plaintiff was serving parole as the result of a state court conviction for aggravated assault. (Depo. of Michael Breslin at 36); [4] Def. Knorr's Mot. for Summ. J., Exh. 2, at 1 (Pa.Commw.Ct.Opinion). [5] One of the conditions of parole was that plaintiff "refrain from any assaultive behavior." Def. Knorr's Mot. for Summ. J., Exh. 4, Knorr Exh. 1, at 1 (form entitled "Conditions Governing Parole/Reparole"); *see also* Def. Knorr's Mot. for Summ. J., Exh. 1, at 6 (Depo. of Michael Breslin). The "Conditions Governing Parole/Reparole" form contained other conditions, including that plaintiff "not leave the district [of Philadelphia] without prior written permission of the parole supervision staff" and that plaintiff "refrain from owning or possessing any firearms or other weapons." Def. Knorr's Mot. for Summ. J., Exh. 4, Knorr Exh. 1, at 1 (form entitled "Conditions Governing Parole/Reparole"). Furthermore, in consideration of being granted the privilege of parole, plaintiff "expressly consent[ed] to the search of [his] person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole." *Id.* "Any items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process." *Id.*

[4]    Where a reference to the record is titled "Depo. of ___" that deposition can be found in a document labeled "Deposition References" and attached to Doc. 118.

[5]    He was also on supervised release at the time resulting from a separate federal offense.

**\*2** Upon release from prison, plaintiff joined the Teamsters Local 115 as a member on February 28, 1999, and began working for the Huff Paper Co. on August 30, 1999. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, [6] at ¶ 6. When plaintiff joined Local 115, Johnny Morris ("Morris") was the Secretary–Treasurer and principal officer of the local. *Id.* ¶ 7. Plaintiff, however, alleges that efforts were underway to oust Morris from certain leadership positions. Amend. Compl. at ¶ 19. More specifically, plaintiff alleges that certain individuals within the local union struck a deal with Hoffa, the president of the International Brotherhood of Teamsters ("IBT"). *Id.* Under the arrangement, if Hoffa imposed an emergency trusteeship on Local 115, and thus enabled local union members and officers to oust Morris from his leadership positions, then Hoffa would be allowed to fill vacancies on the Philadelphia Regional Port Authority, the IBT Joint Council 53, and the IBT Pennsylvania Council with "his people." *Id.* Plaintiff was informed of the arrangement between Hoffa and certain union members shortly after he joined the union in

February 1999. *Id.* He was asked to support the imposition of the emergency trusteeship, but declined to do so. *Id.* at ¶¶ 19, 20. Plaintiff's refusal to offer his support, however, did not thwart the plan. On November 15, 1999, the IBT imposed an emergency trusteeship on Local 115 and removed Johnny Morris from his position as Secretary–Treasurer and principal officer. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at ¶ 7.

[6]    In the document entitled "Joint Statement of Material Facts Not in Dispute of Defendants Brainard, Oswald, Argeros, Heim, Vanderwoude, Reilly, IBT, Hoffa, Smith and Keyser," the defendants present their summary of the relevant facts. In response, plaintiff filed a document entitled "Plaintiff's Opposition to the Joint Statement of Material Facts Not in Dispute of Defendants Brainard, Oswald, Argeros, Heim, Vanderwoude, Reilly, IBT, Hoffa, Smith and Keyser." In that document, plaintiff offers statement by statement admissions or denials to the facts presented by the defendants. For the sake of clarity and simplicity, the court will use this document in any instance where the plaintiff admits to the facts as presented by defendants.

One week after the change in leadership, on November 22, 1999, Heim, Argeros, Vanderwoude, and Reilly went to the Huff Paper Co., where plaintiff worked, to tell members about the trusteeship and to hand out papers. (Depo. of Michael Breslin at 143–144); Def.'s Joint Stmt. of Mat. Facts, at ¶ 13 (stating that on November 22, 1999, Heim, Argeros, Vanderwoude, and Reilly went to the Huff Paper Co. to tell members about the trusteeship and to hand out papers). In response, the Huff Paper employees, including plaintiff, voiced their opposition to the trusteeship. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at ¶ 13. Plaintiff and others told them: "Hey, we don't want you's down here. We don't want nothing to do with you. As far as we're concerned, what has happened is wrong." (Depo. of Michael Breslin at 144). Plaintiff alleges that Argeros responded by informing the Local 115 members who supported Morris that if they did not cooperate with the new IBT leadership they would "not get any representation whatsoever." Amend. Compl. at ¶ 22. In addition, plaintiff alleges that Heim told Paul Bruhns, the grandson of Morris: "your grandfather f —— up some friends of mine, I been waiting a long time to f —— you up." *Id.*

Two days later, on November 24, 1999, plaintiff and six other Local 115 members filed a grievance at the Local 115 Union Hall based on the above conduct. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at ¶ 14. They presented their grievance to Smith, Brainard and a union attorney. *Id.*. One week later, on

December 1, 1999, plaintiff and two other Local 115 union members went to the Union Hall to ask Smith what was being done about the grievance they had filed on November 24, 1999. *Id.* at ¶ 16. They were told by Smith that nothing further would be done with regard to their grievance. *Id.*.

 **\*3** On March 13, 2000, in response to the preceding events, plaintiff filed charges with the National Labor Relations Board ("NLRB"). Pl .'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at ¶ 17. The charges asserted that threats not to represent Huff Paper employees and a threat of bodily harm were made on November 22, 1999. *Id.* At the end of April 2000, plaintiff was told that the NLRB wanted plaintiff to appear in its office on May 5, 2000 at 9:00 a.m. to give a sworn statement in connection with the charges he had filed on March 13, 2000. Doc. 135, at 21.

After the trusteeship was imposed, plaintiff and others began demonstrating outside the local union hall. (Depo. of Michael Breslin at 85–86); Amend. Compl. at ¶ 27. During the spring, the demonstrators and officers of the trusteeship would often yell at each other through a wire fence. (Video tapes). Plaintiff even admits making certain statements to Brainard: "I know where you go to church and I am going to come up there and visit you." Def. Knorr's Mot. for Summ. J., Exh. 1, at 21 (Depo. of Michael Breslin). He also admits telling Brainard: "I hope [your daughter] doesn't become a lying scumbag lawyer like you." Def. Knorr's Mot. for Summ. J., Exh. 1, at 11. (Depo. of Michael Breslin). In addition, plaintiff admits saying to McNamara: "How's [your daughter] doing?" and "I had [your daughter] when she was good." Def. Knorr's Mot. for Summ. J., Exh. 1, at 20–21 (Depo. of Michael Breslin).

As noted earlier, plaintiff was on federal supervised release and state parole for the time over which these events took place. Knowing that plaintiff was on supervised release and parole and believing that plaintiff was engaging in behavior in violation of such status, Brainard and McNamara sent several letters to plaintiff's federal probation officer. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal probation officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara). Those letters described Brainard and McNamara's concern for the safety of their family members based on the statements made to them by plaintiff. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal probation officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara); Pl. Exh. 2, at 114–115 (Depo. of Norton

Brainard) (admitting contacting plaintiff's federal probation officer to discuss his belief that plaintiff's conduct on the picket line outside the union hall was assaultive, and admitting sending letters to plaintiff's federal probation officer); Def. Knorr's Mot. for Summ. J., Exh. 4, at 45–46 (Depo. of David Knorr) (stating that he received telephone call from Brainard in which Brainard told Knorr his belief that plaintiff's conduct on the picket line outside the union hall was assaultive)

On May 3, 2000, plaintiff attended his regularly scheduled meeting with his federal probation officer, Magdelyn Baez ("Baez"). Amend. Compl. at ¶ 31. At the meeting, Baez informed plaintiff that Brainard sent her a videotape of him on the picket line and that Brainard claimed that this behavior was a violation of plaintiff's federal supervised release. *Id.* Although Baez told plaintiff that she did not believe that plaintiff had violated the terms of his federal supervised release by picketing, she did caution him to be careful about what he said and did on the picket line. *Id.* She also stated to plaintiff that Brainard and McNamara had been seeking his arrest for the past six months. *Id.*

 **\*4** Also on May 3, 2000, plaintiff's state parole officer, Knorr, received information that plaintiff was harassing and threatening certain members of the union trusteeship. Knorr received a phone call from Brainard on May 3, 2000. Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, ¶ 10 (plaintiff's acceptance of Knorr's version of facts). While the content of the conversation is in dispute, both sides agree that whatever was said caused Knorr to come to the Local 115 Union Hall on the following day. Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, ¶ 15 (plaintiff's acceptance of Knorr's version of facts).

On May 4, 2000, Knorr came to the Local 115 Union Hall. He observed Breslin on the picket line and while it is undisputed that Breslin was engaged in the picket line on that day, Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, ¶ 16 (plaintiff's acceptance of Knorr's version of facts), any characterization of Breslin's activities, either as threatening or assaultive or innocuous, is in dispute. Knorr then went into the union hall where he met with Brainard and Keyser as well as other members of the union trusteeship leadership group. Amend, Compl. ¶ 32. While there, Knorr viewed a videotape of Breslin and others on the picket/demonstration line. *Id.* He then told Brainard and McNamara to prepare affidavits describing their complaints against Breslin. *Id.*

Later that afternoon, Knorr received and reviewed the affidavits of Brainard and McNamara. Def. Knorr's Mot. for Summ. J., Exh. 4, at 74 (Depo. of David Knorr); Def.'s Knorr's Stmt. of Mat. Facts, at ¶ 22 (stating that Knorr received via fax the written affidavits of Brainard and McNamara); Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, ¶ 22 (disputing when Knorr received McNamara's affidavit but stating that Knorr did have possession of the affidavit when he left the union hall); Pl.'s Memo. in Opp. to Def. Knorr's Mot. for Summ. J., at 6 (stating that Knorr "received affidavits prepared by Brainard and signed by Brainard and McNamara)." [7] Later that same day, May 4, 2000, Knorr left a citation at plaintiff's home directing him to appear at Knorr's office on the following day, May 5, 2000, which also happened to be the day that plaintiff was scheduled to provide testimony at the NLRB meeting. Amend. Compl. at ¶ 32.

[7]    It is undisputed that Knorr received the affidavits. While plaintiff contests the timing of the preparation and delivery of one of the affidavits, Pl.'s Opp. to Def. Knorr's Stmt. of Mat. Facts, ¶ 22 (asserting that Brainard prepared McNamara's affidavit while Knorr waited and that Knorr took the affidavit with him when he left the union hall), such a dispute is not material to the resolution of whether the content of the affidavits provided Knorr with reasonable suspicion to believe that plaintiff had violated a condition of his parole.

When plaintiff arrived at Knorr's office on May 5, 2000, he was arrested and put in a holding cell. *Id.* at ¶ 33. Approximately ten minutes after plaintiff was placed in the holding cell, Knorr arrived and said: "You don't have a clue why I'm arresting you.... * * * Because you are a f——— goon and thug for Johnny Morris and you're ais going to jail." *Id.* at ¶ 34; Def.'s Knorr's Answer to Pl.'s Amend. Compl. at ¶ 34. While plaintiff was in the holding cell, Knorr searched plaintiff's car. *Id.* at ¶ 35. During that search, three utility knives and a cell phone were found. *Id.* At 2:00 p.m., Knorr and four parole officers took plaintiff to his home where they conducted a search of his house. *Id.* at ¶ 36. Nothing was found during the search of plaintiff's home. *Id.* Plaintiff was then sent to Graterford Prison, where he remained for one week while Knorr prepared the parole violation charges against him. *Id.* at ¶ 37. As a result of his re-incarceration, plaintiff lost his job with the Huff Paper Co. Amend. Compl. at ¶ 40.

**\*5** Plaintiff was subsequently charged with four violations of his state parole. *Id.* More specifically, he was charged with violation of the following conditions: (1) leaving the

district of Philadelphia without the prior written permission of the parole supervision staff (Condition 1 [8] ); (2) owning or possessing any firearms or other weapons (Condition 5B); (3) engaging in assaultive behavior (Condition 5C); and (4) possessing a cell phone (Condition 7). Def. Knorr's Mot. for Summ. J., Exh. 3 (form entitled "Notice of Charges and Hearing") (attached to end of parole revocation hearing transcript).

[8]    The term "Condition __" refers to the conditions listed on the form entitled Conditions Governing Parole/Reparole. Def. Knorr's Mot. for Summ. J., Exh. 4 (Depo. of Knorr), Knorr Exh. 1, at 1 (form entitled "Conditions Governing Parole/Reparole").

Upon being informed of the charges, plaintiff requested a full parole panel hearing, which was granted and set for June 6, 2000. Amend. Compl. at ¶ 38; *see also* Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). Shortly before the hearing date, an additional count was added to the charge that plaintiff had violated Condition 5C by engaging in assaultive behavior. Def. Knorr's Mot. for Summ. J., Exh. 3 (form entitled "Notice of Charges and Hearing *Amended"* ) (attached to end of parole revocation hearing transcript). The count was based on an allegation by William Oswald ("Oswald"), a member of Local 115, that plaintiff had threatened and harassed Oswald at work. *Id.;* Amend. Compl. at ¶ 38.

At the June 6, 2000 parole hearing, Knorr offered the testimony of Brainard, McNamara and Oswald in support of the charge that plaintiff engaged in assaultive behavior. *Id.* at ¶ 39. [9] Knorr also offered his own testimony and documentary evidence in support of the other charges against plaintiff. Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). Plaintiff, who was represented by counsel, had the opportunity to cross-examine Knorr's witnesses and to present his case, which included testifying on his own behalf and calling several witnesses. Def. Knorr's Mot. for Summ. J., Exh. 3 (transcript of parole revocation hearing). After allowing each side to present its case, and upon review of the evidence presented, the Pennsylvania Board of Probation and Parole concluded that plaintiff had violated the conditions of his parole by: (1) leaving the district of Philadelphia without the prior written permission of the parole supervision staff (Condition 1); (2) owning or possessing any firearms or other weapons (Condition 5B); (3) engaging in assaultive behavior (Condition 5C); and (4) possessing a cell phone (Condition 7). Def. Knorr's Mot. for

Summ. J., Exh. 2, at 1 (Pa.Commw.Ct.Opinion). The Board revoked plaintiff's parole and recommitted him for one year and twenty-nine days. Def. Knorr's Mot. for Summ. J., Exh 2, at 1, 2 (Pa.Commw.Ct.Opinion). Plaintiff then filed a petition for administrative relief from the Board's decision, which the Board denied. *Id.* at 2. Upon denial, plaintiff filed a petition for review with the Commonwealth Court of Pennsylvania, which affirmed the Board's decision. *Id.* at 2, 11.

9    In his response to plaintiff's amended complaint, Knorr appears to admit that Oswald provided false testimony at the hearing. Amend. Compl. at ¶ 40; Def. Knorr's Answer to Pl.'s Amend. Compl. at ¶ 40. There is nothing in the record, however, to confirm this admission.

**\*6** While the above events were occurring, other developments were taking place in the court system. On November 18, 1999, John Morris and others filed a complaint in the United States District Court for the Eastern District of Pennsylvania challenging the emergency trusteeship. *Morris v. Hoffa,* 2001 1231741, at \*1 (E.D.Pa. Oct. 12, 2001). On December 28, 1999, the court granted the plaintiff's motion for a preliminary injunction to enjoin the defendants from exercising the emergency trusteeship. *Id.* Two days later, on December 30, 1999, the Third Circuit stayed the injunction order pending appeal. *Id.* During the pendency of the appeal, the IBT conducted internal hearings during January, February and March of 2000, and based on those hearings, the president of the international union, Hoffa, issued a decision to continue the trusteeship. *Id.* [10] On June 12, 2000, the Third Circuit dismissed the appeal as moot and vacated the preliminary injunction order. *Id.* Defendants in the matter then filed a motion for summary judgment. *Id.* While the motion was pending, the international union conducted elections for officers of Local 115. *Id.* In the election, the membership had the opportunity to nominate candidates and vote in a secret ballot election. Pl.'s Opp. to Def.'s Joint Stmt. of Mat. Facts, at ¶ 10. As a result of that election, Smith was elected Secretary–Treasurer and Business Manager and Argeros was elected Trustee. *Id.* After the election, on June 13, 2001, the international union dissolved the trusteeship. *Morris,* 2001 WL 1231741, at \*1. Finally, on October 12, 2001, the district court refused Morris' request to overturn the trusteeship, holding that the post-hearing trusteeship "meets the requirements" of federal law and is entitled to a presumption of validity. *Id.* at \*6.

10    These hearings were held in order to meet the IBT's requirements for imposing an emergency trusteeship. *Id.* ¶ 26. During the pendency of these hearings, plaintiff

and other Local 115 members, believing the trusteeship was imposed for inappropriate reasons and that the IBT hearings were "a kangaroo court," picketed outside the Local 115 Union Hall. *Id.* ¶ 27.

Based on the aforementioned events, on December 31, 2001, the plaintiff in the instant case, Breslin, filed a complaint against the defendants. On November 1, 2002, the court, upon defendants' various motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, dismissed plaintiff's substantive and conspiracy claims under the RICO statute without prejudice to plaintiff's right to file an amended complaint and directed plaintiff to submit a RICO Case Statement. Plaintiff filed an amended complaint on November 25, 2002. In it, plaintiff alleges that the defendants violated §§ 1962(c) and 1962(d) of the civil RICO statute as well as the state civil conspiracy law. Presently before the court are the defendants' motions for summary judgment pursuant to Rule 56(c) as to Counts II, III and IV of plaintiff's complaint.

## STANDARD OF REVIEW

Either party to a lawsuit may file a motion for summary judgment, and it will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Facts that could alter the outcome are "material", and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, LTD.,* 90 F.3d 737, 743 (3d Cir.1996) (citation omitted).

**\*7** While the moving party bears the initial burden of showing that there is no genuine issue of material fact, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Id.* at 322.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, "all justifiable

inferences are to be drawn in [the non-movant's] favor." *Id.* Moreover, " '[s]ummary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." ' *Ideal Dairy,* 90 F.3d at 744 (citation omitted). At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 382 n. 12 (3d Cir.1990). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. *Anderson,* 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." ' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

## DISCUSSION

### I. 18 U.S.C. § 1962(c) Claim (Count III)

Count III of plaintiff's complaint alleges a civil cause of action under § 1962(c) of the RICO statute. Amend. Compl at ¶ 55–59. That section prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity. *Tabas,* 47 F.3d at 1289.

Plaintiff asserts that he suffered injury to the extent that he lost his job at the Huff Paper Co. and suffered the loss of a corruption-free union. "The RICO statute defines a 'pattern' of racketeering activity as requiring 'at least two acts of racketeering activity' within a ten year period. *Id.* at 1290 (citing 18 U.S.C. § 1961(5)). Courts have since coined the two acts of racketeering activity the "predicate acts." In the instant case, plaintiff alleges that defendants committed the predicate acts of (1) witness tampering in violation of 18 U.S.C. § 1512(b)(3), and (2) attempted extortion in violation 18 U.S.C. § 1951(b)(2). Amend. Compl. at ¶¶ 57 and 58; Rico Case Stmt. at ¶ 2. [11] "Racketeering activity," [12] as defined in the statute, includes both witness tampering and extortion.

[11]    Before assessing the validity of plaintiff's § 1962(c) claim, the court notes that it will not treat plaintiff's mention of certain conduct in violation of 18 U.S.C. § 2341–2346 (relating to the illegal trafficking of contraband cigarettes) or 18 U.S.C. § 1955 (relating

to the operation of an illegal gambling business) as predicate acts for purposes of his claim under § 1962(c). The court comes to this conclusion for several reasons.

First, plaintiff did not initially pled these acts as predicate acts in his amended complaint. When describing his claim under 18 U.S.C. § 1962(c), plaintiff listed only the witness tampering and extortion acts as predicate acts. Amend. Compl. at ¶¶ 57, 58. There was no mention of the illegal trafficking in contraband cigarettes or the operation of an illegal gambling business under Count III of the amended complaint. Amend. Compl. at ¶¶ 55–59. Rather, the only mention of the cigarette and gambling acts is in plaintiff's Rico Case Statement and that mention does not make it clear that plaintiff is asserting these acts as predicate acts for purposes of his § 1962(c) claim. When asked to described the predicate acts underlying his claim, plaintiff states "[t]he predicate acts as they relate to plaintiff include witness intimidation and economic coercion," which the court assumes to be a reference to 18 U.S.C. § 1512 (relating to witness tampering) and 18 U.S.C. § 1951 (relating to extortion). Rico. Case Stmt. at 11. In describing the predicate acts of witness tampering and extortion, plaintiff mentions for the first time the cigarette and gambling acts:

> The purpose of these predicate acts [meaning the witness tampering and extortion acts] was to ensure plaintiff would not reveal the existence of the pre-Local 115 trusteeship agreement, the existence of which would cast into doubt the validity of the "emergency" trusteeship and possibly lead to the discovery of the predicate acts of trafficking in contraband cigarettes, in violation of 18 U.S.C. § 2341–2346, operating illegal gambling businesses, in violation of 18 U.S.C. § 1955, and submitting false claims to the Local 115 health and welfare fund, in violation of 18 U.S.C. § 664.

Rico Case Stmt. at 11. Thus, the court finds that plaintiff never expressly listed the cigarette and gambling act violations as predicate acts in his amended complaint or RICO Case Statement.

There is a second problem with plaintiff's attempt to identify the cigarette and gambling violations as predicate acts. He offers no evidence that such acts in any way caused his injury. In order for a plaintiff to demonstrate a compensable injury under RICO, he must prove a causal connection between his injury and the criminal RICO violations—the predicate acts. *Sedima v. Imrex Co.,* 473 U .S. 479, 497 (1985). In other words, the act which allegedly caused the injury to the plaintiff must itself be an overt act of racketeering that RICO defines as wrongful. *Beck*

*v. Prupis,* 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). It follows, therefore, that if a plaintiff cannot demonstrate a causal nexus between the predicate acts and his injury, he lacks standing to sue under RICO for that act. *Kramer v.. Bachan Aerospace Corp.,* 912 F.2d 151, 154 (6th Cir.1990).

In his amended complaint, plaintiff alleges that the defendants' RICO violations caused injury to the extent that he lost his job at the Huff Paper Co. Rico Case Stmt. at p15. Plaintiff has not, however, alleged nor can any reasonable inferences be drawn from the facts presented that violations of either the cigarette or gambling statutes caused plaintiff to lose his job. There is simply no basis upon which these two acts may be linked to the subsequent loss of plaintiff's job with the Huff Paper Co. Even the most generous reading of the record does not allow a reasonable inference that the decision of the Huff Paper Co. to terminate plaintiff's employment was caused by the acts of some of the defendants who allegedly engaged in cigarette trafficking and illegal gambling. Nor does plaintiff offer any facts in support of an allegation that these acts caused him to lose his job. Because plaintiff cannot demonstrate a causal nexus between the defendants' conduct in allegedly violating the cigarette and gambling statutes and the loss of his job, the court finds that plaintiff lacks standing to sue under RICO for these acts. *Kramer v. Bachan Aerospace Corp.,* 912 F.2d 151, 154 (6th Cir.1990).

12   "Racketeering activity," as defined in the statute, includes "any act which is indictable under .... section 1512 (relating to tampering with a witness, victim, or an informant) [and] ... section 1951 (relating to interference with commerce, robbery, or extortion) ." 18 U.S.C. § 1961(1)(B).

In order to prove a pattern of racketeering activity, a plaintiff must show more than the mere existence of the two predicate acts. *H.J. Inc.,* 492 U.S. at 237 (noting that Congress intended showing of a pattern of racketeering activity to have a more stringent requirement than proof simply of two predicates acts). In addition, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. The courts subsequently labeled these requirements the relatedness and continuity prongs. As the defendants assert that plaintiff is unable to satisfy either prong, the court will address each one separately.

## A. Relatedness

**\*8** Under the relatedness prong, "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." ' *Tabas,* 47 F.3d at 1292 (quoting *H.J. Inc.,* 492 U.S. at 240).

**[1]**   Moving defendants argue that Breslin's alleged predicate acts, extortion and tampering with a federal witness, are not related because each act involves different defendants. Doc. 118, at 26. Plaintiff's response is that all of the acts occurred at the direction of defendant Smith. Doc. 134. at 6–7. Although only two of the factors were in the plaintiff's favor, namely that the acts seemed to target the same victim and both acts were arguably aimed at preventing union members and plaintiff specifically from exercising their rights to challenge the trusteeship, the court finds this sufficient to satisfy the relatedness requirement. It is certainly reasonable to infer that the acts of Argeros, Heim, Vanderwoude and Reilly to threaten plaintiff had the same underlying purpose as the acts of Brainard and McNamara to have plaintiff arrested. Both predicate acts were intended for a similar purpose—to scare plaintiff into submission so that the transition in Local 115's leadership would be unchallenged.

## B. Continuity

Under the continuity prong, a plaintiff must show that the "predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc.,* 492 U.S. at 240. In describing the concept, the Court offered the following description:

> 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements.

*H.J. Inc.,* 492 U.S. at 241 (citation omitted). From this description, courts have further developed the concepts of closed- and open-ended continuity.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## 1. Closed-ended Continuity

A party may establish continuity as a closed-ended concept by "proving a series of related predicates extending over a *substantial* period of time." *Tabas,* 47 F.3d at 1292 (citing *H.J. Inc.,* at 242). Although the Supreme Court has not explicitly defined what length of time qualifies as "substantial," it has stated that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.,* at 241. Moreover, the Third Circuit has held that "conduct lasting no more than twelve months d[oes] not meet the standard for closed-ended continuity." *Tabas,* 47 F.3d at 1293 (citing numerous Third Circuit cases for same proposition) (citations omitted).[13]

13    Plaintiff does not contest the law as stated herein with reference to continuity, but rather belatedly adds the allegations of cigarette trafficking and illegal gambling to attempt to extend the period of time.

**\*9** Defendants assert that plaintiff cannot establish the concept of closed-ended continuity as the acts alleged by plaintiff occurred over the course of less than six months, from November 22, 1999 (date of the alleged attempted extortion act at the Huff Paper Co.) until May 5, 2000 (date of the culmination of the alleged witness tampering act). Doc. 118, at 26; Doc. 119, at 20. Plaintiff asserts that the record shows predicate acts began in 1995 and continued through 2001. Doc. 134, at 6. Plaintiff makes this statement, however, in reliance on the conduct constituting the violations of the cigarette and gambling statutes, which allegedly both began in 1995. Pl. Exh. 12, at ¶ 1–4 (aff. of Arlene Johnson). His reliance on these acts, however, is misplaced as the court has already decided that these acts do not constitute predicate acts for the purposes of plaintiff's § 1962(c) claim. *See supra* pp. 16–17.

Thus, considering only the acts of attempted extortion and witness tampering, it is clear that the time between the acts was less than one year. There is no dispute that the alleged extortion conduct occurred on November 22, 1999. Pl. Exh. 17, at 54–59 (Depo. of Michael Breslin) (asserting that Argeros, Heim, Vanderwoude and Reilly went to Huff Paper Co. on November 22, 1999); Defs.' Joint Stmt. of Mat. Facts Not in Dispute (admitting that Argeros, Heim, Vanderwoude and Reilly went to Huff Paper Co. on November 22, 1999). Nor is there any dispute that the conduct constituting a violation of the witness tampering statute started in early 2000

and concluded on May 5, 2000 with the arrest of plaintiff for a violation of the conditions of his parole. Pl. Exh. 22, Brainard Exh. 1, 2, 4, 5, 6 (letters to plaintiff's federal parole officer and the United States Attorney for the Eastern District of Pennsylvania from Brainard and McNamara seeking to having plaintiff arrested); Pl. Exh. 2, at 114–115 (Depo. of Norton Brainard) (admitting contacting plaintiff's federal parole officer to discuss his belief that plaintiff's conduct on the picket line outside the union hall was assaultive, and admitting sending letters to plaintiff's federal parole officer); Def. Knorr's Mot. for Summ. J., Exh. 4, at 45–46 (Depo. of David Knorr) (stating that he received telephone call from Brainard in which Brainard told Knorr his belief that plaintiff's conduct on the picket line outside the union hall was assaultive). There are no additional assertions or factual evidence indicating that any other acts occurred beyond this time frame. Thus, the period of time across which the predicate acts occurred constituted only a six-month period of time. As noted previously, the Third Circuit has repeatedly held that acts occurring during a time period of less than a one year period are insufficient to qualify for purposes of closed-ended continuity under RICO. *Tabas,* 47 F.3d at 1293 (suggesting that the period must be at least one year). Accordingly, the court concludes that plaintiff does not satisfy the requirements of closed-ended continuity, and thus plaintiff's only possible argument to save his claim under § 1962(c) is that open-ended continuity exists.

## 2. Open–Ended Continuity

**\*10** Noting that "[o]ften a RICO action will be brought before continuity can be established in [a closed-ended] way," the Supreme Court stated that "[i]n such cases, liability depends on whether the *threat* of continuity is demonstrated." *H.J. Inc.,* at 241. The open-ended concept of continuity refers to "conduct that by its very nature projects into the future with a threat of repetition." *Tabas,* 47 F.3d at 1292; *see also H.J. Inc.,* at 242 (noting that the continuity prong may still be met if a plaintiff can prove a threat of continued racketeering activity). "Whether the predicate acts constitute a threat of continued racketeering activity depends on 'the specific facts of each case.' " *Tabas,* 47 F.3d at 1296 (quoting *H.J. Inc.,* at 242). "Open-ended continuity may be satisfied 'where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO "enterprise." ' " *Tabas,* 47 F.3d at 1296 (quoting *H.J. Inc.,* at 2423).

Defendants assert plaintiff is unable to satisfy the requirements of open-ended continuity. Doc. 118, at 27; Doc.

119, at 20. Believing that he has satisfied the requirements of closed-ended continuity, plaintiff provides no argument as to whether open-ended continuity exists. He suggests no allegations or supporting evidence in the record from which to conclude that there was a threat of repeated criminal conduct. The conduct constituting a violation of the witness tampering statute ceased upon plaintiff's arrest on May 5, 2000. Nor does plaintiff assert that it has continued. The alleged violation of 18 U.S.C. § 1512(b)(1) related only to plaintiff's role as a witness in May 5, 2000 NLRB hearing and there are no allegations that plaintiff continues to be or intends to be a witness in any further NLRB hearing or other federal proceeding. Moreover, plaintiff's NLRB complaint, for which he was supposed to testify, has been resolved in favor of the defendants and against plaintiff. Pl. Exh. 22, Brainard Exh. 15 (letter from NLRB to plaintiff stating that the charge filed by plaintiff on March 13, 2000 "lacks merit" and thus will not be pursued by the NLRB). Thus, the court simply cannot find a basis in plaintiff's pleading or the record for the argument that defendants intended to interfere with his ability to act as a federal witness in the future and plaintiff has asserted none. Likewise, there is no assertion or evidence that the conduct constituting the attempted extortion occurred after November 22, 2000. Moreover, considering that the alleged purpose of both acts, the witness tampering and the extortion, was to ensure that the change in leadership of Local 115 went smoothly and without challenge, it is simply illogical to infer that the named defendants' racketeering activities continue to this day, given that the validity of the trusteeship is no longer in question. [14]

[14]    The complaint fails to mention that on December 30, 1999, two days after the preliminary injunction was issued, the Third Circuit stayed the injunction order pending appeal, and that on June 12, 2000, the Third Circuit dismissed the appeal as moot and vacated the preliminary injunction order. *Morris v. Hoffa,* 2001 WL 1231741 (E.D.Pa. Oct.12, 2001). The trusteeship was dissolved by IBT on June 13, 2001 and on October 12, 2001, the District Court refused Morris' request to overturn the trusteeship, holding that the post-hearing trusteeship "meets the requirements" of the federal law and is entitled to a presumption of validity. *Id.* at *6.

 **\*11**  Nor does plaintiff make any assertions or point to any evidence in the record from which the court could conclude that witness tampering and extortion are a regular way of conducting the defendants' ongoing legitimate businesses or of conducting or participating in an ongoing and legitimate RICO enterprise. Plaintiff made no allegation

that racketeering activity, in the form of witness tampering or extortion, was currently occurring at the enterprise.

Rather, the predicate acts alleged by plaintiff were part of a single-victim, single-injury, short-lived scheme with a distinct and finite purpose and no threat of continuation. *See Tarr v. Credit Suisse Asset Management, Inc.,* 958 F.Supp. 785, 800 (E.D.N.Y.1997) ("[A] series of predicate acts that, together, constitute a single scheme to accomplish 'one discrete goal' and are 'directed at one individual with no potential to extend to other persons or entities' does not satisfy the continuity requirement where there is no genuine threat of continuing illegal activity.") (citations omitted). Once achieved, the scheme would necessarily come to an end. Having failed to meet either test of continuity, plaintiff cannot support his claim that defendants engaged in the requisite pattern of racketeering activity. As such, the court will grant summary judgment in favor of the defendants as to claim stated in Count III of plaintiff's amended complaint under § 1962(c). [15]

[15]    Defendants provided numerous other challenges to plaintiff's substantive RICO claim under § 1962(c) in their motions for summary judgment. Because plaintiff failed to establish sufficient evidence to support the continuity element, the court finds it unnecessary to address the defendants' additional arguments or to parse the evidence as to each defendant. However, I do note that a number of these additional arguments have considerable force.

## II. 18 U.S.C. § 1962(d) (Count IV)

In Count IV of his amended complaint, plaintiff asserts a claim under § 1962(d) which states "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

Plaintiff cites *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) and *Smith v. Berg,* 247 F.3d 532 (3d Cir.2001) for the proposition that a plaintiff may still bring a claim under § 1962(d) absent any claim under one of the substantive provisions of the statute, § 1962(a), (b) or (c). The cases plaintiff cites do not support this conclusion because they do not reach the issue of whether substantive violations are required for a conspiracy claim under § 1962(d). [16]

[16]    Rather than supporting plaintiff's proposition, the cases stand for the rule that an individual defendant need not

RICO Bus.Disp.Guide 10,572

be found liable under one of the substantive provisions in order for that same defendant to be found liable for conspiracy under § 1962(d). The courts did not address the question whether there must be a violation of one of the substantive provisions by someone; they simply held that a particular defendant need not have violated the substantive provision in order to be liable himself or herself under the conspiracy provision so long as some other defendant is liable under the substantive provision. Thus, a plaintiff could bring a claim against defendant X for violating one of the statute's substantive provisions in Count I of his complaint, and could still bring a claim against defendants X and Y for conspiring to violate that substantive provision, in violation of § 1962(d) under Count II of his complaint without naming defendant Y in Count I. However, in order to prevail on his conspiracy claim against defendant Y, plaintiff must still prove that defendant X violated one of the statute's substantive provisions.

A detailed review of the facts in the cases proves this to be true. In *Salinas,* the initial complaint was brought against Salinas and another defendant named Marmolejo; it alleged that Salinas and Marmolejo violated § 1962(c) and § 1962(d). *United States v. Marmolejo,* 89 F.3d 1185, 1187 (5th Cir.1996) (recounting the facts of the case). The jury convicted Marmolejo of violating both § 1962(c) and § 1962(d) but it convicted Salinas only for violating § 1962(d). *Id.* Salinas appealed his conviction, and eventually reached the Supreme Court which held that a defendant need not personally commit the two predicate acts of racketeering activity required by § 1962(c) in order to be held liable for conspiracy under § 1962(d). In its opinion, the Court specifically noted that only the conviction of Salinas was before it and that Marmolejo had been convicted of violating one of the substantive provisions. *Salinas,* 522 U.S. at 56, 66. Thus, because there was a conviction of a defendant under one of the substantive provisions of the statute, this opinion cannot stand for the proposition that a § 1962(d) conspiracy claim can be brought without any substantive claim at all.

Similarly, in *Berg,* there was a substantive RICO violation. The district court denied defendant's motion to dismiss plaintiff's claim pursuant to § 1962(c), and thus allowed that claim to go forward. *Smith v. Berg,* 2000 WL 365949, at * 2 (E.D.Pa. Apr.10, 2000). The court identified the issue presented as whether "a RICO conspiracy defendant need not *himself* commit or agree to commit predicate acts." *Berg,* 247 F.3d at 537 (emphasis added). Moreover, in describing the standard set forth in *Salinas,* the court stated:

> The plain implication of the standard set forth in *Salinas* is that *one* who opts into or participates in a conspiracy is liable for the acts of *his co-conspirators* which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element.

*Id.* (footnote omitted) (underlined emphasis added). As such, when the case reached the Third Circuit, there was a pending claim under one of the statute's substantive provisions, making it improbable, if not impossible, for the case to stand for the proposition that a plaintiff may still bring a claim under § 1962(d) absent any viable claim against anyone under either §§ 1962(a), (b) or (c).

**[2]** Language from the Third Circuit initially suggested that a § 1962 substantive violation is a prerequisite for stating a conspiracy claim. In *Kehr Packages,* the Third Circuit stated without further analysis that "[b]ecause we hold that plaintiffs did not state a valid claim under § 1962(c) ... we need not consider whether the dependent § 1962(d) claim has been properly alleged." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 n. 1 (3d Cir.1991). The court also noted briefly in *Lightning Lube* that "[a]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993). These statements have been cited repeatedly verbatim by our district courts for the proposition that a conspiracy count cannot stand without successfully bringing a claim under one of the § 1962 substantive provisions. *See e.g., Nanya–Nashut ex rel. Hand v. BankOne,* 2003 U.S. Dist. LEXIS 15653 at *15; *Dianese, Inc. v. Pennsylvania,* 2002 U.S. Dist. LEXIS 10917 at *38; *Morris v. First Union Nat'l Bank,* 2002 U.S. Dist. LEXIS 418 at *17; *Teti v.. Towamencin Twp.,* 2001 U.S. Dist. LEXIS 15600 at *29.

**\*12** This language, however, is not dispositive of Breslin's case. In *Rehkop,* the Third Circuit limited the sweep of the language of *Lightning Lube,* when it noted that "[t]he problem in *Lightning Lube* was that "the actions alleged to constitute violations of subsections 1962(a), (b), and (c) were not violations of these subsections." *Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 290 (3d Cir.1996). The *Rehkop* court noted that because the actions alleged in *Lightning Lube* could not constitute a substantive violation, they "failed to serve as the object of a section 1962(d) conspiracy." *Id.*

In *Rehkop,* the Third Circuit distinguished the facts before it from those of *Lightning Lube.* The *Rehkop* court explained that unlike *Lightning Lube,* Rehkop's allegations constituted a substantive violation under § 1962(c) because they alleged one of the specific racketeering acts enumerated in § 1961(1) of the act. However, Rehkop could not pursue such a claim because he could not show that he was harmed by the § 1962(c) violation. *Id.* Nonetheless, the *Rehkop* court allowed the acts alleged in violation of § 1962(c), which were racketeering acts as defined in the statute, to serve as the object of a § 1962(d) conspiracy claim, and permitted the conspiracy claim to go forward even though the substantive RICO charges had been dismissed. The predicate acts of witness tampering and attempted extortion alleged in *Breslin* do constitute substantive violations of § 1962. Thus, under *Rehkop,* defendants' alleged actions here may also serve as the object of a § 1962(d) conspiracy claim. Even after it has been established that Breslin is unable to bring a successful claim under § 1962(c), the Third Circuit has found that a plaintiff may pursue his conspiracy claim so long as he can show that harm ensued from the conspiracy. *Id.*

After *Rehkop,* the Supreme Court resolved any doubt that even after the dismissal of all substantive claims, a plaintiff may bring a § 1962(d) claim if plaintiff establishes that injury was caused by an act of racketeering under § 1961(1). *Beck v. Prupis,* 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). [17] "[An] injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO ... is not sufficient to give rise to a cause of action ... for a violation of § 1962(d)." *Id.* In *Beck,* the court found that termination of employment was not racketeering activity done in furtherance of respondents' conspiracy. *Id.* at 499. It is not within the statutory definition of racketeering activity at § 1961(1). The Court also found that "a RICO conspiracy plaintiff must allege injury from an act that is analogous to an 'act of tortious character,' ... meaning an act that is independently wrongful under RICO." *Id.* at 505. The court noted that a plaintiff can bring a suit for civil conspiracy "only if he [has] been injured by an act that was itself tortious." [18] *Id.* at 501. Unlike termination of employment, acts of witness tampering and attempted extortion, as alleged by Breslin, are "racketeering acts" under the statute.

[17]  In *Beck,* the claims under 1962(a), (b), (c) had been decided in favor of the defendants and were not at issue.

[18]  The agreement itself is not enough for liability and there must be acts of a tortious character in carrying it into execution.

**\*13**  Thus, where racketeering acts are alleged, the plaintiff may pursue a § 1962(d) conspiracy claim where injury from the acts of racketeering may be shown. This seems to be the case in *Breslin,* where the predicate acts are based on witness tampering and attempted extortion–both violations of the designated predicate acts in the statute.

This, however, does not end our inquiry. The question remains whether plaintiff has met all of the requirements for establishing a § 1962(d) conspiracy count, which makes it unlawful to "conspire to violate any of the provisions of subsections (a), (b) or (c)." As mentioned above, section 1962(c) makes it unlawful for certain persons "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity.*" 18 U.S.C. § 1962 (2000) (emphasis added). Even though a 1962(d) conspiracy claim is not dependent upon successfully bringing a substantive claim under 1962(a), (b), or (c), plaintiff's claim still fails because he cannot establish a *pattern* of racketeering activity due to lack of continuity.

"To plead conspiracy adequately, a plaintiff must set forth allegations that address the *period of the conspiracy,* the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166–67 (3d Cir.1989)(emphasis added)(wherein the alleged scheme took place within a two-year time frame). [19] Underlying a § 1962(d) claim is the requirement that plaintiff must show that defendants agreed to the commission of a "pattern of racketeering." *Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990). Continuity is a necessary element to establish a "pattern" as noted earlier. Because the Third Circuit has repeatedly held that conduct must last over one year to meet the standard for continuity, and the alleged conspiracy and its resulting actions did not, I find that the plaintiff, as discussed *supra* pp. 16–21, has not met the continuity requirement.

[19]  The Supreme Court did not affect this standard with its decision in *Beck v. Prupis,* which called *Shearin* into question on other grounds. 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

Thus, even if liability under § 1962(d) is not dependent upon the successful showing of liability under one of the statute's substantive provisions, but only upon the allegation of a

predicate act under this statute, the court must reject plaintiff's conspiracy claim pursuant to § 1962(d) because the plaintiff has failed to demonstrate continuity. Accordingly, summary judgment in favor of the defendants will be granted as to Count IV.

## III. State Law Conspiracy Claim (Count II)

In Count II of plaintiff's amended complaint, he asserts a state law claim [20] for civil conspiracy against certain defendants. The court, however, will not reach the merits of this claim because it declines to exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Where a court rules against a plaintiff as to his federal claims prior to trial, the court has discretion to dismiss the non-federal claims over which it only has jurisdiction pursuant to the doctrine of supplemental jurisdiction. WILLIAM W. SCHWARZER, A. WALLACE TASHIMA & JAMES M. WAGSTAFFE, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 2.91.1 (1999). "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (3). This is precisely the circumstance in the instant case. Here, subject matter jurisdiction rested initially on a federal question pursuant to 28 U.S.C. § 1331, namely plaintiff's claims under the federal RICO statute. However, as set forth previously, summary judgment in favor of defendants will be granted as to both federal claims, thus removing the federal claims. Thus, because this court has dismissed the claims over which it had original jurisdiction, *i.e.,* plaintiff's federal claims, [21] the court will, in its discretion, decline to exercise supplemental jurisdiction over plaintiff's state law claim. It will be dismissed without prejudice to the right of the plaintiff to bring it in another forum.

[20]     The court concludes that this is a state law claim for two reasons. First, because plaintiff labels it as such in his amended complaint. *See* Amend. Compl. at 13 (labeling Count II "As to defendants Brainard, McNamara, Oswald, Smith, Keyser and Knorr For Conspiracy Under Pennsylvania Law"). Second, because the case cited by plaintiff in support of this count—*Progress Federal Savings Bank v. Lenders Assoc., Inc.,* 1995 WL 464320 (E.D.Pa. Jul.31, 1995)—describes a state law civil conspiracy claim and recognizes that its subject matter jurisdiction is based on diversity. *Progress,* 1995 WL 464320, at *3, 4; Doc. 134, at 23.

[21]     No diversity jurisdiction has been alleged nor could it be established as plaintiff and a number of defendants are both located in Pennsylvania. Thus, without the federal claims, the court is without subject matter jurisdiction.

## CONCLUSION

 **\*14** For the reasons set forth above, the court will grant the defendants' motions for summary judgment as to the substantive RICO claim and the conspiracy RICO claim and decline to exercise jurisdiction over the state law civil conspiracy claim. An appropriate order follows.

## ORDER

And now, this _____ day of October, 2003, upon consideration of the combined motion of defendants the International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith for summary judgment as to Counts II, III, and IV pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (Doc. 118); the combined motion of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly for summary judgment as to Counts II, III, and IV pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (Doc. 119); the motion of defendant Gerald McNamara for summary judgment as to Counts II, III, and IV pursuant to Rule 56(c) of the Federal Rules of Civil Procedure (Doc. 120); the response of plaintiff thereto; the combined reply thereto of defendants International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith; the combined reply thereto of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly; and the sur-reply of plaintiff thereto, it is hereby ORDERED that the combined motion of defendants International Brotherhood of Teamsters, James Hoffa, Edward Keyser and James Smith for summary judgment as to Counts III and IV pursuant to Rule 56(c) of the Federal Rules of Civil Procedure is GRANTED; that the combined motion of defendants Norton Brainard, William Oswald, Charles Argeros, Sean Heim, Paul Vanderwoude, and Leo Reilly for summary judgment as to Counts III and IV pursuant to Rule 56(c) of the Federal Rules of Civil Procedure is GRANTED; and that the motion of defendant Gerald McNamara for summary judgment as to Counts III and IV pursuant to Rule 56(c) is GRANTED and judgment is entered in favor of those defendants on Counts III and IV of the complaint and against plaintiff. It is further

**Breslin v. Brainard, Not Reported in F.Supp.2d (2003)**
Case 3:14-cv-00591-KM    Document 83-1    Filed 11/14/14    Page 27 of 98
RICO Bus.Disp.Guide 10,572

ordered that Count II of the complaint is dismissed without prejudice. It is further ordered that the Clerk is directed to mark this case closed for statistical purposes.

**Parallel Citations**

RICO Bus.Disp.Guide 10,572

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

C

2012 WL 3046235
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Joseph FUCE, II
v.
William WEST.

Civil Action No. 12−0874.    |    July 26, 2012.

**Attorneys and Law Firms**

Joseph Fuce, II, Philadelphia, PA, pro se.

William West, Philadelphia, PA, pro se.

### *MEMORANDUM OPINION*

SAVAGE, District Judge.

***1** In this *pro se* [1] action brought under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–1968, Joseph Fuce II, alleges that his former employer's general manager, William West, engaged in unlawful racketeering activity by conspiring with an unidentified accountant and Sovereign Bank to steal money from Fuce's paycheck. West has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing Fuce has failed to state a RICO claim. West asserts that no racketeering activity occurred because the money deducted from Fuce's paychecks was withheld for federal, state, and local taxes. [2]

[1]    Both the plaintiff and defendant are acting *pro se* in this action.

[2]    Fuce brought two prior actions against two different employers citing various federal statutes and regulations. The thrust of each claim was that the employers are illegally deducting tax withholdings from his pay. Both cases were dismissed for failure to state a claim. *See Fuce v. Gen. Sec. Sys.,* Inc., No. 04–5481, 2005 W L 139084 (E.D.Pa. Jan.21, 2005); *Fuce v. Hoffman,* No. 09–4916, 2010 W L 363836 (E.D.Pa. Jan.28, 2010). Fuce makes no reference to taxes in his complaint or RICO Case Statement in this action.

Although he characterizes West's actions as "robbery" and "embezzlement," Fuce actually alleges a breach of contract, which is not racketeering activity actionable under RICO. Because Fuce has failed to state a RICO claim, we shall grant West's motion to dismiss.

### Standard of Review

When considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), all well-pleaded allegations in the complaint are accepted as true and viewed in the light most favorable to the plaintiff. *Holk v. Snapple Beverage Corp.,* 575 F.3d 329, 334 (3d Cir.2009) (quoting *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008)). We may also consider documents attached to the complaint. *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir.2006) (citation omitted). Additionally, the *pro se* plaintiff's pleadings must be considered deferentially, affording him the benefit of the doubt where one exists. *Dluhos v. Strasberg,* 321 F.3d 365, 369 (3d Cir .2003) (citing *Higgins v. Beyer,* 293 F.3d 683, 688 (3d Cir.002)). With these standards in mind, we shall accept as true Fuce's factual allegations and draw all possible inferences from these facts in his favor.

### Discussion [3]

[3]    The facts are from the allegations in the complaint, the exhibits attached to the complaint and Fuce's RICO Case Statement. The allegations in the RICO Case Statement are deemed amendments to the complaint. Order, March 15, 2012 (Doc. No. 4).

On June 23, 2011, Fuce was hired to work as a service technician for the New Life Services Company ("NLS"). He entered into a verbal employment contract to work twenty-five hours per week at an initial pay rate of $8.00 per hour. Although the exhibits to his complaint indicate that he worked for and was paid by NLS, [4] Fuce alleges that his employment contract was with West. [5]

[4]    *See* Pl.'s Exs. A–C (paychecks to Fuce drawn on NLS's bank account), Ex. F (Fuce's NLS timecard report).

[5]    Pl.'s Com pl. ¶¶ 9–15.

Fuce worked with NLS from June 24, 2011 to December 31, 2011, logging a total of 605 hours. The amount of each paycheck was less than the gross amount of his earnings.

On September 29, 2011, Fuce sent a letter to West requesting a one-dollar pay raise and production of all documents he had signed with NLS. West did not respond to this requests. [6] Fuce sent a second letter to West on October 10, 2011 inquiring about the status of his previous requests. [7] He wrote that he was owed $419.68 in back pay and would be imposing $100 "penalty" for each day West failed to respond to his letters. [8] Fuce sent a third letter to West on December 15, 2011, reiterating his previous request and his intention to impose a $100 per diem penalty. [9] On December 31, 2011, Fuce ceased working at NLS. Three days later he attempted to hand-deliver a bill to West for $2,252.71, including back pay and penalties. West refused to accept the letter. [10]

6    Pl.'s Ex. G.

7    Pl.'s Ex. H. Fuce's paychecks show that as of the October 1, 2011 pay period his pay rate was increased by $1.00 to $9.00 per hour. *See* Pl.'s Exs. C, E.

8    Pl.'s Ex. H.

9    Pl.'s Ex. I.

10   Pl.'s Ex. E.

**\*2** Fuce alleges that West conspired with an unnamed accountant and Sovereign Bank to steal money from his earnings. He identifies the accountant only as one who "engages in accounting of the collection of the unlawful debts." [11] He contends that Sovereign Bank participated in this unlawful enterprise by "supply[ing] the account(s) for the unlawful debts collected." [12]

11   Pl.'s RICO Case Statement ¶ 6(a), (b).

12   *Id.* ¶ 6(b).

To state a civil RICO claim, the plaintiff must allege that the defendant engaged in one of the four "Prohibited activities" listed at 18 U.S.C. § 1962(a)-(d) (2006). [13] *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 482–83 (1985). Fuce alleges that West violated § 1962(d), which prohibits conspiring to commit one of the three object offenses defined in subsections (a), (b) or (c).

13   RICO provides a civil remedy "for any person injured in his business or property by a violation of one of RICO's substantive provisions. *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action,* 678 F.3d 235,

245 (3d Cir.2012) (quoting 18 U.S.C. § 1964(c) (internal quotation omitted)).

To state a claim under subsection (d), Fuce must first allege that the object of the conspiracy was a violation of either subsection (a), (b) or (c). *See In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 373 (3d Cir.2010) (quoting *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993). Absent that allegation, a § 1962(d) claim fails. *Ins. Brokerage Antitrust Litig.,* 618 F.3d at 373 (quoting *Salinas,* 522 U.S. at 65).

Fuce does not identify whether West conspired to violate (a), (b) or (c). Each of these three subsections require him to allege West's involvement in "racketeering activity" as defined in the RICO statute. *See* 18 U.S.C. § 1962(a)-(c). Fuce fails to meet that requirement. He cannot state a claim under any of the three.

RICO defines racketeering activity as comprising one of the offenses listed at § 1961(1), commonly referred to as "predicate offenses." *See In re Schering Plough Corp. Intron/ Temodar Consumer Class Action,* 678 F.3d 235, 245 (3d Cir.2012). The list includes specific federal crimes codified in the United States Code, such as bribery, embezzlement and fraud, and several types of state felonies that are punishable by imprisonment for more than one year, such as murder, kidnapping, robbery, bribery and extortion. 18 U.S.C. § 1961(1); *Schering,* 678 F.3d at 245. The list of predicate offenses is complete. *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999), *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); *see also Beck v. Prupis,* 529 U.S. 494, 497 n. 2, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000); *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir.2008) ("The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1)...."). Thus, to state a RICO cause of action, Fuce must allege that West violated one of the predicate offenses listed in § 1961(1).

Fuce alleges that West committed two specific federal offenses—"neglect to prevent the collection of unlawful debt" in violation of 18 U.S.C. § 1986 [14] and "conspiracy against rights" in violation of 18 U.S.C. § 241. He also alleges that West committed "robbery" and "embezzlement." [15]

14     There is no § 1986 in Title 18. Fuce may be referring to 42 U .S.C. § 1986, a civil rights provision. However, Fuce alleges no facts to support a claim of a civil rights violation.

15     Pl.'s RICO Case Statement ¶ 2(b).

**\*3** Neither of the federal statutes Fuce cites is listed in § 1961(1). Hence, he cannot rely on violations of those provisions as predicate offenses for a RICO claim. *See Annulli,* 200 F.3d at 200.

Robbery in violation of 18 U.S.C. § 1951 is a predicate offense listed in § 1961(1). Section 1951 defines "robbery" as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury...." 18 U.S.C. § 1951(b)(1). Robbery punishable by imprisonment for more than one year under state law is also a predicate offense under § 1961(1). In Pennsylvania, an essential element of the crime of robbery is intentional infliction or threat of bodily harm. 18 Pa. Cons.Stat. Ann. § 3701 (West 2012). [16] There are no facts alleged that West inflicted or threatened to inflict bodily harm. Nor can one infer actual or threatened physical injury. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Therefore, the conclusory allegation of "robbery" does not make out a predicate offense for racketeering activity.

16     Based on Fuce's allegations that both parties live and work in Pennsylvania and that all relevant events took place in Pennsylvania, we assume that Fuce intends to reference the Pennsylvania Crimes Code.

Embezzlement in violation of 29 U.S.C. § 501(c) or 18 U.S.C. § 664 is a predicate act. 18 U.S.C. § 1961(1). Section 501(c) prohibits embezzlement from union funds and § 664 prohibits embezzlement from pension and welfare funds. Fuce has not alleged that West committed either of these crimes.

State-law embezzlement, which is a form of theft, is not a predicate offense because it is not listed in § 1961(1). *See Annulli,* 200 F.3d at 199–200 (the state law crime of theft is not a predicate offense under § 1961(1)); *Weizman Inst. of Sci. v. Neschis,* 229 F.Supp.2d 234, 255 (S.D.N.Y.2002) (larceny by embezzlement under New York law is not a predicate offense); *Toms v. Pizzo,* 4 F.Supp.2d 178, 183 (W.D.N.Y.1998) (embezzlement is only a predicate offense when it violates 29 U.S.C. § 501(c) or 18 U .S.C. § 664), *aff'd*

172 F.3d 38, at \*2 (2d Cir.1998) (unpublished table decision). Fuce's bald allegation of embezzlement does not support a claim of racketeering activity.

Despite Fuce's efforts to transform West's conduct into criminal offenses, it is clear that he alleges a breach of contract cause of action. Fuce claims that West agreed to pay him a specific amount in exchange for his work as a service technician. He alleges that West paid him less than the agreed-upon amount. [17] Failing to honor the terms of an employment agreement is a breach of contract, which is not actionable under RICO. [18] *Annulli,* 200 F.3d at 199; *Flip Mortg. Corp. v. McElhone,* 841 F.2d 531, 538 (4th Cir.1988); *Blount Fin. Serv. Inc. v. Walter E. Heller and Co.,* 819 F.2d 151, 152 (6th Cir.1987) (affirming the district court's dismissal of a RICO claim in part because "[t]he fact that the parties take different positions under the contract ... does not give rise to a valid claim for fraud.").

17     West signed Fuce's paychecks.

18     We do not have diversity jurisdiction over Fuce's breach of contract claim because both parties are citizens of Pennsylvania. Even if we had jurisdiction, Fuce cannot state a breach of contract claim against West. Fuce's exhibits indicate that his employment contract was with NLS, not West. *See supra,* note 4. As a disclosed agent of NLS, West cannot be liable for NLS's alleged breach of contract. *See Freedom Props., L.P. v. Lansdale Warehouses Co.,* No. 06–5469, 2007 W L 1683850, at \*4 (E.D.Pa. June 7, 2007) ("General agency theory and Pennsylvania law counsels that an agent who discloses that he is working for a principal is not a party to a contract and therefore, the principal alone is liable for any breach." (citing *Perlman v. Pittsburgh Cabinets & Builders Supplies, Inc.* 191 Pa.Super. 234, 156 A.2d 373, 375 (Pa.Super.Ct.1959); *Merit Motors, Inc. v. Bartholomew,* 179 Pa.Super. 576, 118 A.2d 277, 279 (Pa.Super.Ct.1955))); *see also* Restatement (Third) of Agency § 6 .01 (2006).

## Conclusion

**\*4** In sum, because Fuce has failed to plead that West was involved in a predicate offense of "racketeering activity" under 18 U.S.C. § 1961(1), he has failed to state a claim under § 1962(d) on which relief can be granted. Therefore, we shall grant West's motion to dismiss.

It is clear from Fuce's allegations that no racketeering activity actionable under RICO occurred. Accordingly, we shall not grant Fuce leave to amend because amendment would be futile.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# D

75 Fed.R.Serv.3d 721

2009 WL 5064468
United States District Court,
D. Connecticut.

In re U.S. FOODSERVICE
INC. PRICING LITIGATION
Waterbury Hospital, et al., Plaintiffs,
v.
U.S. Foodservice, Inc., Defendant.
Catholic Healthcare West, Plaintiff,
v.
Koninklijke Ahold N.V., et al., Defendants.
Thomas & King, Inc., Plaintiff,
v.
Koninklijke Ahold N.V., et al, Defendants.

Nos. 3:07 MD 1894(CFD), 3:06 CV 1657(CFD), 3:08
CV 4(CFD), 3:08 CV 5(CFD).   |   Dec. 15, 2009.

**Attorneys and Law Firms**

Charles S. Hellman, Drubner & Hartley, New York, NY,
Deborah Clark-Weintraub, Edith M. Kallas, Joe R. Whatley,
Jr., Whatley Drake & Kallas, New York, NY, Doris A. Kim,
Mark K. Gray, Franklin Gray & White, Louisville, KY, J.
Preston Strom, Jr., Mario A. Pacella, Robert E. Hood, Strom
Law Firm, L.L.C., Columbia, SC, James E. Hartley, Jr.,
Drubner & Hartley, Waterbury, CT, Jeven R. Sloan, Whatley
Drake & Kallas, Birmingham, AL, Robert M. Foote, Foote
Meyers Mielke And Flowers, LLC, Geneva, IL, for Plaintiffs.

Douglas P. Baumstein, New York, NY, Glenn M. Kurtz,
White & Case, New York, NY, Michael P. Shea, Erick M.
Sandler, Day Pitney LLP, Hartford, CT, for Defendant.

### *RULING ON MOTIONS TO DISMISS*

CHRISTOPHER F. DRONEY, District Judge.

 **\*1**  The plaintiffs, Waterbury Hospital, Cason, Inc., Frankie's
Franchise Systems Inc., Catholic Healthcare West, and
Thomas & King, Inc., bring this class action against
U.S. Foodservice, Inc. ("USF"), Koninklijke Ahold N.V.
("Ahold"), and Gordon Redgate. Against USF, the plaintiffs
assert violations of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"),
breach of contract, and violations of California Business and
Professions Code §§ 17200 *et seq.* ("the California statute").

Against Ahold, the plaintiffs allege RICO violations,
violations of the California statute, unjust enrichment, and
constructive trust. Against Redgate, the plaintiffs allege
RICO violations and violations of the California statute.
Ahold moves to dismiss arguing that the Court does not have
personal jurisdiction over it, and that the complaint fails to
state a claim upon which relief can be granted. USF separately
moves to dismiss for failure to state a claim, and alternatively,
it moves to strike several allegations of the complaint. For
the reasons that follow, Ahold's motion to dismiss is granted,
USF's motion to dismiss is granted in part and denied in part,
and USF's motion to strike is granted.

### I. *Procedural Background*

The plaintiffs filed a Consolidated and Amended Class Action
Complaint ("Complaint") in this multidistrict litigation
("MDL") proceeding. The MDL involves three previously
filed cases: *Catholic Healthcare West v. Koninklijke Ahold
N.V., et al.,* filed in the Northern District of California;
*Thomas & King, Inc. v. Koninklijke Ahold N.V., et al.,* filed
in the Southern District of Illinois; and *Waterbury Hospital
et al. v. U.S. Foodservice, Inc.,* filed in the District of
Connecticut. The United States Judicial Panel on Multidistrict
Litigation previously found that the "three actions involve
common questions of fact, and that centralization under [28
U.S.C. § 1407] in the District of Connecticut will serve
the convenience of the parties and witnesses and promote
the just and efficient conduct of this litigation." *In re: U.S.
Foodservice, Inc., Pricing Litigation,* 528 F.Supp.2d 1370,
1371 (J.P.M.L.2007).

In multidistrict litigation, the transferee court applies the law
of the transferee forum when interpreting federal law, and
applies the laws of the transferor forums when interpreting
state law. *Desiano v. Warner–Lambert & Co.,* 467 F.3d 85,
89–92 (2d Cir.2006); *Menowitz v. Brown,* 991 F.2d 36, 40 (2d
Cir.1993).

### II. *Factual Allegations of the Consolidated and Amended
Class Action Complaint* [1]

[1]     Unless cited otherwise, the following is drawn from the
allegations of that Complaint.

#### A. *Cost–Plus Arrangements Generally*

USF is the second largest food distributor in the United
States, providing food products and services to approximately
250,000 customers. Ahold owns directly or indirectly

75 Fed.R.Serv.3d 721

subsidiaries and affiliates that operate food retail stores in the United States and Europe. Boerboom Decl. ¶ 4. On April 10, 2000, Ahold's indirectly wholly-owned subsidiary, Giant Food Inc., acquired one-hundred percent of the outstanding common shares of USF. *Id.* at ¶ 6. Ahold never directly owned USF. *Id.*

**\*2** About half of USF's sales were made to customers who purchased products pursuant to "cost-plus arrangements," whereby USF sold to its cost-plus customers products in amounts and at times specified by the customers. The price USF charged its cost-plus customers equaled: (1) a cost component based on the prices charged to USF by USF's suppliers, (2) plus an agreed upon mark-up of either a fixed percentage or a set dollar amount.[2] The cost-plus arrangements provided that certain contingent payments and other incentives USF received from its suppliers would not reduce the cost component used to calculate the price charged to USF's cost-plus customers, even though such amounts had the effect of reducing the prices charged to USF by its suppliers. These excepted amounts are generally referred to as "promotional allowances." Promotional allowances are rebates, discounts, credits, or similar consideration that suppliers provide to customers to promote the sale of their goods.

2    The Complaint provides two examples of the pricing terms of "invoice cost" or "landed cost" of a "typical" USF cost-plus arrangement. The first provides:

The price of product to Customer shall equal USF's invoice cost (as hereinafter defined) plus the agreed upon fee per case on cost as outlined below. USF's invoice cost is defined as the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to USF's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice discounts or off-invoice allowances to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice). Invoice cost shall not be adjusted for, and Customer shall not be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by USF.

Compl. ¶ 33. The second provides:

The price to Participating Members for all Products sold under this Agreement (the "Price") will be calculated on the basis of Landed Cost. For the

purposes of this agreement, "Landed Cost" is defined as follows:

(In the case of Non-contract product) the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to Approved Distributor's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice [discounts] to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically related on the invoice).

Participating members shall in no event be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by [USF].

*Id.* at ¶ 34 (omissions and alterations in the Complaint). In a February 2, 2006 arrangement between USF and Frankie's, USF represented that "it would charge its cost-plus customers an amount equal to the 'local market replacement cost or current market average cost of procured products' plus inbound freight and an agreed upon mark-up percentage. As with the other typical USF cost-plus arrangements, this arrangement provided that USF would be entitled to retain 'supplier incentives.' " *Id.* at ¶ 3 6. Finally, the plaintiffs point to language USF used in invoices sent to the plaintiffs, as follows:

Promotional allowances, cash discounts, prompt pay discounts, growth programs and all other incentives are retained by U.S. Foodservice and do not reduce product cost. Product cost is defined as the supplier, packer or any other vendor delivered cost or f.o.b. unit price plus standard freight less off-invoice discounts or off-invoice allowances (i.e., manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice).

*Id.* at ¶ 37.

## B. *Parties*

Plaintiff Waterbury Hospital is a public hospital located in Waterbury, Connecticut. As part of its operations, Waterbury Hospital offers meals and other food services to its patients, employees, and visitors. The hospital is party to a cost-plus arrangement originally entered into with Alliant Exchange ("Alliant"), which USF acquired in 2001. Following USF's acquisition of Alliant, Waterbury Hospital continued to purchase products from USF pursuant to its cost-plus arrangement.

Plaintiff Cason, Inc. ("Cason") is an Illinois corporation located in Rockford, Illinois. Cason has operated a family-owned restaurant under the name "Maria's Italian Cafe" since the early 1960s. Since at least 2000, USF has invoiced Cason on a weekly basis for products Cason purchased on a cost-plus basis.

Plaintiff Frankie's Franchise Systems, Inc. ("Frankie's") is a Connecticut corporation located in Waterbury, Connecticut. Frankie's operates a chain of franchised restaurants in Connecticut. Frankie's is party to a cost-plus arrangement with USF, pursuant to which Frankie's and its franchisees have purchased products from USF.

Plaintiff Catholic Healthcare West ("CHW") is a non-profit corporation with its principal place of business in California. CHW is a system of dozens of hospitals and medical centers in California, Arizona, and Nevada. In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a "Group Purchasing Organization" engaged in contracting services for its members to help them manage and reduce supply costs. CHW has purchased products from USF pursuant to a cost-plus arrangement between Premier and USF's predecessor, Alliant.

Plaintiff Thomas & King, Inc. ("T & K") is a corporation with its principal place of business in Kentucky. T & K owns and operates eighty-eight "Applebee's Neighborhood Grill & Bar" restaurants and seven "Carino's Italian Grill" restaurants in several states. T & K purchased products from USF pursuant to a cost-plus arrangement it entered into with Alliant effective July 1, 2001.

**\*3** The defendant USF is based in Maryland. From April 10, 2000 through July 3, 2007, USF was an indirect, wholly-owned subsidiary of defendant Ahold. Following its acquisition by Ahold, USF expanded its operations through a series of acquisitions, including acquiring Alliant in November 2001.

The defendant Ahold is a public holding company in The Netherlands with its principal place of business in Amsterdam. As part of its operations, Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates. On July 3, 2007, Ahold sold USF to a consortium of Clayton, Dubilier & Rice Fund VII, L.P. ("CD & R") and Kohlberg Kravis Roberts & Co L.P. ("KKR") for a purchase price of $7.1 billion.

The defendant Gordon Redgate is an individual who was the president and principal owner of Commodity Management Systems, Inc. and Private Label Distribution, Inc. Both companies are organized under the laws of New Jersey and have their principal places of business in New Jersey.

Non-party Brady Schofield was the principal owner of Frozen Farms, Inc., Produce Solutions, Inc., Seafood Marketing Specialities, Inc., and Specialty Supply & Marketing, Inc. Those four companies have their principal places of business in Rhode Island or Massachusetts.

### C. *VASP System*

Plaintiffs allege that USF defrauded cost-plus customers through the use of sham transactions, phony invoices, and shell companies known as "Value Added Service Providers" ("VASPs"). The six VASPs were the following companies owned by defendant Redgate and non-party Brady Schofield: Commodity Management Systems, Inc., Private Label Distribution, Inc., Frozen Farms, Inc., Produce Solutions, Inc., Seafood Marketing Specialities, Inc., and Specialty Supply & Marketing, Inc. The plaintiffs allege that USF conspired with Redgate and Schofield for the VASPs to purchase products that plaintiffs required, sell them at a higher price to USF, and for USF to then pass the extra cost along to plaintiffs pursuant to the cost-plus arrangements. Plaintiffs further allege that after receiving payment from USF, the VASPs would secretly kick back the falsely inflated amount of cost to USF. Specifically, after USF paid the VASPs for the products, the difference between the VASPs' actual costs and the prices the VASPs charged to USF, referred to as the "bucket," minus the nominal transaction fee retained by the VASPs, would be kicked back to USF and recorded as income by USF. The plaintiffs allege that this money sent from the VASPs to USF was structured to hide the "cost" falsely added by the VASPs and was concealed from USF's cost-plus customers. Moreover, the plaintiffs claim that the money kicked back to USF cannot be categorized as legitimate "promotional allowances" or any other bona fide incentive that USF sometimes received from its suppliers because the kickbacks were self-generated and not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs.

**\*4** Although the VASPs were "nominally independent," the Complaint alleges that USF controlled the day-to-day operations of the VASPs and the VASPs had no commercial purpose except to serve as a pass-through vehicle for USF

to increase its profits. The Complaint alleges that the VASPs did not manufacture or process any products, but would simply purchase products from other suppliers at USF's direction. The Complaint also alleges that although the orders were technically placed through the VASPs, USF would communicate directly with the actual suppliers to determine price, specifications of products and other information related to the orders; the amount the VASPs charged USF for the products—which later became the price component of plaintiffs' cost-plus arrangements—was dictated by USF rather than by the VASPs.

Additionally, the plaintiffs allege that all or most of the VASPs' purchases were funded by interest free advances from and financial guarantees by USF, and that one-hundred percent of the VASPs' shares were assigned and irrevocably transferred to USF as collateral for these advances. The plaintiffs allege that the VASPs were not provided with any owner-supplied funding and the "transaction fees" paid to the VASPs, which were approximately $27 .50 per invoice regardless of the amount of product involved, were intentionally structured to cover the VASPs' operating costs and enable the VASPs to "break even." USF retained the risk of loss on the products that were routed through the VASPs. The written agreements between USF and the VASPs allegedly prohibited the VASPs from disclosing the existence and operation of the "VASP System."

The plaintiffs argue that USF deceived its cost-plus customers into believing that USF's cost component was calculated based on transactions with "legitimate suppliers." The VASP System, they contend, induced USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF, and that such reliance was reasonable given that the defendants intentionally concealed the VASP System from its cost-plus customers.

Schofield, Redgate, and a USF executive who supervised the VASPs on a day-to-day basis were sometimes referred to around USF's offices as "the Three Musketeers." Redgate allegedly had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs. The VASP System operated independently from any single USF cost-plus arrangement and represented a systematic way of doing business.

### D. *Ahold's Knowledge of and Involvement in the VASP System*

The plaintiffs allege that Ahold had full knowledge of, and in fact helped facilitate and conceal, the existence and purpose of the VASP System as a scheme to defraud USF's cost-plus customers. Ahold learned about the VASP System while conducting due diligence prior to its acquisition of USF. Specifically, a due diligence report dated February 20, 2000 and prepared by Ahold's internal audit staff prior to Ahold's acquisition of USF, which was sent to several Ahold executives, noted the existence of the VASPs and acknowledged that their purpose was to "shelter and earn ... 'rebates' on its private label brands and to hide [promotional allowances] from clients' and auditors." Compl. ¶ 57 (alternation in Complaint). The report continued that USF's use of the VASPs "needs to be researched to assess the tax and legal implications and associated business risks." *Id.*

**\*5** Pursuant to an Agreement and Plan of Merger dated March 13, 2000, Ahold (through a subsidiary) acquired all of the stock of USF. Under the merger agreement and amendments to USF's bylaws following the merger, Ahold exercised its authority to name all of the members of the USF board of directors. Jim Miller, USF's Chief Executive Officer, was appointed to Ahold's Executive Board on September 1, 2001.

An April 12, 2001 memorandum from the then-Chief Financial Officer of USF, Ernie Smith, to Michiel Meurs, Ahold's Chief Financial Officer and a member of its Executive Board, stated:

> In the normal course of business, USF has engaged in setting up friendly third parties, which allow them to establish pads to income. In substance a new legal entity is set up, the entity will take title to goods; mark them up and sale [sic] the product to USF. In turn by contract, the third party will collect a fee for the service and return the USF allowances. It has been common practice for USF to have these entities forward buy and USF to give them a deposit for inventory.

*Id.* at ¶ 58. The plaintiffs allege that Smith sent this memorandum to Meurs in order to bring to the attention of Ahold's Executive Board the serious concerns that Smith had

regarding certain accounting issues at USF, and that Smith stated that he "felt [he] had no alternative other than to exit the business and disclose the issues." *Id.* at ¶ 59. Additionally, the Complaint alleges that according to the minutes of an Ahold Audit Committee meeting held on December 11, 2001, Ahold refused to implement a promotional allowance monitoring system as recommended by its auditors because of the "sensitive nature" of how the system operated. *Id.* at ¶ 60. The plaintiffs allege that Ahold continued to keep the VASP System secret.

Ahold hired PricewaterhouseCoopers ("PwC") to review USF's accounting practices. A report submitted to Ahold's Audit Committee on June 25, 2003 (the "PwC Report") described the VASPs in the following manner: " 'VASPs' (6) —special purpose entities designed to enable mark-up on items for which normal vendor Pas [promotional allowances] do not exist. VASPs create 'pass-back' or 'bucket' earnings, which is essentially the markup between manufacturer cost and what the VASP charges the USF branch, less a transaction fee." *Id.* at ¶ 62–63. The PwC Report further stated:

> In light of the control aspect, significant questions are raised relative to customer contracts where the Company provides product on a "cost-plus" basis. While customer contracts, especially those with commercial customers, appear to address this point by indicating that the customer is not entitled to any rebates or allowances that are not "off-invoice" (i.e. the customer is only entitled to discounts that reduce the original invoice to USF), it is unclear whether such contract language would protect the Company if the fact of USF control of the VASPs were disclosed or otherwise known....

> **\*6** The VASP entities are closely-held businesses whose principals are well-known by Tim Lee and Mark Kaiser. Except for one, these entities are funded entirely by USF advances, and make all of their sales to USF. Generally, USF directs the VASPs' purchase decisions, including quantities and prices, and for five of the six, has audit rights to their books and records. Furthermore, the VASPs shares are irrevocably assigned to USF as collateral for the advances.

*Id.* at ¶ 64.

PwC also noted that USF's outside counsel, White & Case, had issued an opinion letter dated February 11, 2003, which concluded that USF did not face substantial exposure to damages from potential claims by USF's cost-plus customers,

but that White & Case retracted the letter less than a month later allegedly because the letter had relied upon the misrepresentations of management involved in USF's accounting. *Id.* at ¶ 65. The original White & Case opinion letter allegedly cited the following assumptions, which were later claimed to be faulty, as supporting its conclusion that USF did not face exposure to damages from use of the VASP System: (i) there was no affiliation between USF and any of the VASPs; (ii) title to products procured for USF by a VASP passes through the VASP; (iii) in some circumstances, the VASPs compete with USF for sales; (iv) there was no improper motive behind USF's arrangements with the VASPs; (v) USF's customers knew about the nature and purpose of the VASP System; and (vi) the VASPs provide valuable services. *Id.* at ¶ 66.

The existence of the VASPs was first disclosed to Ahold shareholders in October 2003 as part of Ahold's announcements that it would be restating its earnings for fiscal years 2000 and 2001 by more than $800 million.[3] Although USF reportedly phased out the VASP System in late 2003 and early 2004, the Complaint alleges that the defendants continued to actively conceal the VASP System. In October 2003, Ahold included in unspecified public filings with the United States Securities and Exchange Commission a statement that USF had relationships with independently owned companies known as VASPs that "provide varying degrees of support to USF." *Id.* at ¶ 85. Furthermore, the Complaint alleges that in 2006 USF sent correspondence to customers denying any wrongdoing with regard to the VASP System.

---

3    Many of the allegations of the Complaint related to Ahold's restatement of earnings are the subject of USF's motion to strike, which the Court addresses *infra,* in Part V of this Ruling.

### E. *USF Employee Testimony*

Timothy Lee, a former USF executive, testified in 2006[4] that the VASPs "were companies that were set up on the behalf of U.S. Foodservice to procure product and capture the difference in the spread in the cost of goods and send it back to U.S. Foodservice." Compl. ¶ 71. Lee continued: "Mr. Redgate's company is taking title of the product at a lower price, billing U.S. Foodservice at a higher price at U.S. Foodservice's direction. Mr. Redgate's company ... did business solely with U.S. Foodservice.... [T]he difference comes back to U.S. Foodservices [sic] as income." *Id.* at ¶ 73.

4      Details concerning the trial at which Lee testified are also the subject of USF's motion to strike, which the Court addresses *infra*, in Part V of this Ruling.

**\*7** In a different lawsuit, Arthur Tsebetzis, a former senior vice president and divisions president for USF, filed a brief that stated: "USF has inflated its costs to customers via fictitious or USF-controlled middlemen and transport companies. Since USF bills its customers on a 'cost-plus' basis—charging its customers for the cost of goods plus a certain percentage—USF has artificially and fraudulently inflated the prices its customers pay." *Id.* at ¶ 79.

### F. *Ahold as an Entity*

The plaintiffs allege that although Ahold is a separate corporation from USF, it provided direct support to USF, and in doing so conducted business directly with numerous banks, financial institutions, and landowners in the United States. Specifically, the Complaint alleges that Ahold provided financial guarantees for debt issued by its subsidiary, Ahold Finance USA, Inc., which was used to finance the activities of its United States subsidiaries, including USF. According to Ahold's 2002 Form 20–F filed with the SEC, as of December 31, 2002, Ahold had guaranteed more than 2 billion, and an additional $1.7 billion in bonds and loans issued by Ahold Finance USA.

The Complaint also alleges that all or a substantial portion of the United States dollar denominated bonds issued by Ahold Finance USA were sold to investors in the United States and Ahold held itself out to those investors as the ultimate buyer of those bonds when they were being marketed. For example, according to Ahold's 2000 Form 20–F, in July 2000, Ahold Finance USA made a public offering in the United States of $700 million in bonds to refinance and pay down USF's debt. It is alleged that Ahold fully and unconditionally guaranteed those bonds to United States investors who purchased them.

Ahold's 2002 Form 20–F also stated that "the Company," which the 20–F defined to include Ahold, "has guaranteed some of the obligations of the VASPs relating to purchases made on behalf of USF ." USF now denies that Ahold guaranteed obligations of the VASPs. [5] Plaintiffs also allege that on December 4, 2000, USF entered into a Supply Agreement with the Sara Lee Corporation under which Ahold unconditionally guaranteed all of the payments and other obligations which USF owed to Sara Lee under the Agreement. USF then purchased products from Sara Lee that were funneled through the VASP System.

5      Specifically, the Declaration of Hendrickus Boerboom, the corporate secretary of Ahold, states:

> Ahold, in its 2002 Annual Report ..., described USF's guarantees of the VASPs by stating "the company has guaranteed some of the" obligations of the VASPs relating to purchases made on behalf of USF." Although the word "Company" had been defined to mean Ahold, in at least this circumstances the word "Company" was meant to mean the consolidated reporting entity, and not merely the legal entity, Ahold. In Ahold's 2002 20–F, filed with the United States Securities and Exchange Commission, Ahold clarified that its indirect subsidiary USF, not Ahold, had issued the guarantees, stating that "USF has guaranteed some of the obligations of the VASPs to vendors relating to purchases made on behalf of USF."

Boerboom Decl. ¶ 10. The Boerboom Declaration creates a factual dispute that, in the context of this motion to dismiss, the Court must resolve in the favor of the plaintiffs. *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993) ("[A]ll factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.").

The Complaint additionally alleges that Ahold routinely entered into capital investment commitments for fixed assets such as land and buildings that were used by its U.S. subsidiaries, including, "on information and belief," by USF in the regular operation of USF's business. According to its 2002 Form 20–F, as of the end of 2002, Ahold had $214 million in such investment commitments for fixed assets in various locations in the United States.

The 2002 Form 20–F also states that Ahold regularly provided other corporate guarantees, in the form of "letters of assurance, comfort letters, real estate guarantees, and buy-back guarantees" given directly to suppliers and banks doing business with its U.S. subsidiaries, including USF. Compl. ¶ 95. For example, when USF entered into an operating lease agreement to finance the acquisition and construction of two distribution centers and an office building, the Complaint alleges that Ahold guaranteed the debt. In 2003, Ahold was required to purchase the trust that owned those leased properties for $42 million. In Note 30 to its financial

75 Fed.R.Serv.3d 721

statements contained in its 2002 Form 20–F, Ahold stated that it provided these guarantees to

> **\*8** acknowledge the Company's awareness and support of the transactions and relationship entered into by its subsidiaries and franchisees.... [B]uy-back guarantees have been granted by Ahold to facilitate external financing for franchisees or subsidiaries. The liability under these guarantees is secured by the value of the related assets that the Company could obtain and liquidate in the event Ahold has to perform under the guarantees.

*Id.* at ¶ 96.

### III. *Personal Jurisdiction Over Defendant Ahold*

Ahold moves to dismiss arguing that the Court does not have personal jurisdiction over it. Specifically, Ahold claims that it is not licensed to, and does not, conduct business in the transferor forums of California, Connecticut, and Illinois, or anywhere else in the United States; has no operations and owns and leases no property in the United States; and has no other contacts to support the exercise of general jurisdiction. Ahold also claims it has no contacts relevant to the claims in this case that could support the exercise of specific jurisdiction.

In a diversity or federal question case, personal jurisdiction is determined by the law of the state in which the district court sits. *See Bensusan Rest. Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997). In multidistrict litigation, however, the transferee court must apply the law of the transferor forum to determine issues of personal jurisdiction, and may exercise personal jurisdiction only to the same extent as the transferor court. *In re Sterling Foster & Co., Inc. Sec. Litig.,* 222 F.Supp.2d 289, 300 (E.D.N.Y.2002) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 639–40, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 163 (2d Cir.1987)). Therefore, in determining whether the Court has personal jurisdiction over Ahold, it must apply the law of California, Illinois, and Connecticut.

The plaintiff bears the burden of proving that the court has jurisdiction over the defendant. *Amerbelle Corp. v. Hommel,* 272 F.Supp.2d 189, 192 (D.Conn.2003) (citing *Metro. Life*

*Ins. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566–67 (2d Cir.1996)); *Ensign–Bickford Co. v. ICI Explosives USA, Inc.,* 817 F.Supp. 1018, 1026 (D.Conn.1993). "A plaintiff facing a Fed.R.Civ.P. 12(b)(2) motion to dismiss made before any discovery need only allege facts constituting a prima facie showing of personal jurisdiction. Moreover, we construe the pleadings and affidavits in plaintiff's favor at this early stage." *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997) (internal citations omitted); *see also Jarrow Formulas, Inc. v. Int'l Nutrition Co.,* 175 F.Supp.2d 296, 300 (D.Conn.2001).

### A. *Fed.R.Civ.P. 4(k)(1)(A): Specific Jurisdiction in California, Illinois, and Connecticut*

The plaintiffs first argue that the Court has jurisdiction over Ahold pursuant to Fed.R.Civ.P. 4(k)(1)(A), which provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: [ ] who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Id.* The plaintiffs argue that there is specific personal jurisdiction over Ahold in the individual transferor states of California, Illinois, and Connecticut.

**\*9** Under California and Illinois law, courts may exercise specific personal jurisdiction over non-resident defendants to the full extent of due process. *See Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 801–02 (9th Cir.2004) ("Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same."); *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997) (noting the Illinois long-arm statute authorizes personal jurisdiction to the limits of the United States Constitution). Thus, pursuant to both California and Illinois law, for a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotation marks and citation omitted). Connecticut personal jurisdiction law is more stringent, *see* Conn. Gen.Stat. § 33–929(f),[6] but also, of course, requires the traditional due process analysis outlined in *International Shoe. See Knauss v. Ultimate Nutrition, Inc.,* 514 F.Supp.2d 241, 247–48 (D.Conn.2007).

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

6    The statute provides:

> (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen.Stat. § 33–929(f).

"The central minimum contacts inquiry is whether the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *LiButti v. United States,* 178 F.3d 114, 122 (2d Cir.1999) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)) (internal quotation marks omitted). "The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). "In addition to the concept of a defendant purposefully availing itself of the protections of the law of the forum State, the Supreme Court has also found minimum contacts to exist when the defendant 'purposefully directed' the harmful effects of its activities at the forum State." *LiButti,* 178 F.3d at 123 (quoting *Burger King,* 471 U.S. at 472); *see also Calder v. Jones,* 465 U.S. 783, 787 n. 6, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). For example, in *Burger King,* the Supreme Court found that the lower court could exercise jurisdiction over a defendant corporation that sent " 'products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State' and those products subsequently injure forum consumers." 471 U.S. at 473 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In *Libutti,* the Second Circuit held that a New York court did not have personal jurisdiction over a defendant who "did not intend to inflict harm on or commercially effect a resident of New York." 178 F.3d at 123. Under this so-called "effects test," the "person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1341 (2d Cir.1972).

**\*10** Here, the Complaint does not allege that Ahold purposefully availed itself of the protections of California, Illinois, or Connecticut, or that Ahold purposefully directed the harmful effects of its activities at California, Illinois, or Connecticut. In fact, the Complaint does not make any specific allegations with respect to the three states. Rather, the Complaint makes general allegations about Ahold's knowledge of the VASP system and support of USF, which the plaintiffs now argue has effects in California, Illinois, and Connecticut sufficient for the Court's exercise of jurisdiction. The Complaints' allegations of Ahold's knowledge of and failure to intervene in the VASP System is not the same as an allegation that Ahold purposefully targeted the three forum states with knowledge that injury to the plaintiffs was likely to result. Leasco Data, 468 F.2d at 1341.

The plaintiffs' allegations of Ahold's financial guarantees to USF are also insufficient to serve as a basis for specific personal jurisdiction in the transferor forums. In particular, the Complaint alleges that "Ahold routinely provided financial guarantees for debt issued by its subsidiary, Ahold Finance USA, Inc. that was used to finance the activities of its U.S. subsidiaries, including USF," and that Ahold "has guaranteed some of the obligations of the VASPs relating to purchased made on behalf of USF." Compl. ¶ 91, 93. 7 Once again, however, these allegations draw no connection between Ahold's guarantees and the injuries plaintiffs suffered in California, Connecticut, and Illinois. Nor does the Complaint draw a connection between Ahold's Form 20–F and any of the transferor states. Therefore, because the Complaint does not allege that Ahold intended to inflict harm or have a commercial effect on the plaintiffs in California, Illinois, or Connecticut, or that Ahold had good reason to know its conduct would have effects in California, Illinois, or Connecticut, the Court finds it cannot, on the basis

of what the plaintiffs have alleged, exercise jurisdiction over Ahold pursuant to Fed.R.Civ.P. 4(k)(1)(A).

7    Although USF now denies that Ahold guaranteed some obligations of the VASPs, as noted *supra,* note 5, the Court must at this stage resolve this factual dispute in the favor of the plaintiffs.

**B.** *Fed.R.Civ.P. 4(k)(2): General and Specific Jurisdiction in the United States*

In the alternative, the plaintiffs argue that the Court may exercise personal jurisdiction over Ahold pursuant to Fed.R.Civ.P. 4(k)(2), which provides:

(2) Federal Claim Outside State–Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed.R.Civ.P. 4(k)(2). The Rule allows the Court to exercise personal jurisdiction "when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be 'consistent with the United States Constitution and laws.' " *Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122, 127 (2d Cir.2008) (*quoting* Fed.R.Civ.P. 4(k)(2)).

**1.** *Claims Arising Under Federal Law*
 **\*11** In their RICO counts, the plaintiffs have asserted against Ahold claims that arise under federal law. Although Ahold has separately moved to dismiss these claims for failure to state a claim upon which relief can be granted, the Court will assume that the "arise under" prong of the Rule 4(k)(2) test is met as long as the plaintiffs' RICO claims are not frivolous on their face. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1189 (2d. Cir.1996) ("[I]n cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action, we ask only whether-on its face-the complaint is drawn so as to seek recovery under federal law or the Constitution. If so, then we assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits.").

Here, while Ahold has raised significant questions concerning the "conduct" element of the RICO charge, the RICO claims are not frivolous on their face, and the Court will proceed to the next step in the jurisdictional analysis. *See Flag Co. v. Maynard,* 376 F.Supp.2d 849, 853 (N.D.Ill.2005) ( "[T]he complaint in the instant case is not so wholly insubstantial so as to preclude this court from analyzing personal jurisdiction under Rule 4(k)(2).").

**2.** *State Personal Jurisdiction Over Ahold*
Ahold does not argue that it is subject to jurisdiction in any state's courts of general jurisdiction, and the Court will assume that jurisdiction is not proper in any state. *See, e.g., United States v. Swiss Am. Bank, Ltd.,* 191 F.3d 30, 41 (1st Cir.1999) (holding that should the defendant fail to offer evidence that personal jurisdiction is available in any state court of general jurisdiction, the Court may infer that personal jurisdiction is unavailable in any state court); *Ctr. States, Se. and Sw. Areas Pension Fund v. Reimer Express World,* 230 F.3d 934, 940 (7th Cir.2000); *Flag Co.,* 376 F.Supp.2d at 853 ("If the defendant does not name another state where the suit could go forward, the second requirement of Rule 4(k)(2) is satisfied.").

**3.** *Due Process*
The third prong of the Rule 4(k)(2) test requires the Court to determine whether Ahold had adequate contacts with the United States as a whole to support personal jurisdiction. The constitutional requirements for jurisdiction pursuant to Rule 4(k)(2) are the same as the inquiry for individual states except that the Court asks whether Ahold "has sufficient affiliating contacts with the United States in general." *Porina,* 521 F.3d at 127; *see also Swiss Am. Bank,* 191 F.3d at 36 ("When a plaintiff depends upon [Rule 4(k)(2) ] to serve as the necessary statutory authorization for the exercise of specific personal jurisdiction, the constitutional requirements are the same ... but the analytic exercises are performed with reference to the United States as a whole, rather than with reference to a particular state."). The plaintiffs appear to argue the Court has both general and specific jurisdiction over Ahold.

**a. General Jurisdiction**
 **\*12** The Court may exercise general jurisdiction if Ahold has "continuous and systematic business contacts" with the United States. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d

404 (1984). This standard requires plaintiff to prove that Ahold's contacts approximate physical presence in the United States. *See In re Ski Train Fire in Kaprun, Austria,* 257 F.Supp.2d 717, 730 (S.D.N.Y.2003).

Ahold is not licensed to conduct business anywhere in the United States and has no operations or property in the United States. The plaintiffs argue that the Court can exercise general jurisdiction over Ahold based on the following contacts alleged in the Complaint: that Ahold owned grocery store and food service subsidiaries in the United States; that Ahold appointed all the members of the board of directors of USF; that Ahold retained an outside auditor to review USF's accounting; that Ahold provided financial guarantees for debt issued by Ahold Finance USA, Inc.; that Ahold entered into capital investment commitments for fixed assets used by its United States' subsidiaries; and that Ahold guaranteed the payments and obligations that USF owed to Sara Lee.

These contacts, viewed either individually or collectively, are insufficient for the Court's exercise of general jurisdiction over Ahold. The fact that Ahold owned USF and other United States companies is insufficient, as ownership of United States subsidiaries does not establish jurisdiction over the foreign parent company. *See Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925). Relatedly, the other contacts that the plaintiffs allege are actions Ahold took through USF or another of Ahold's United States subsidiaries. In particular, the plaintiffs allege that Ahold guaranteed debts issued by its subsidiary Ahold Finance USA, Inc. and guaranteed USF's obligations. These allegations of actions Ahold took in support of its United States subsidiaries are insufficient to establish jurisdiction. Although an exception does exist in which a parent corporation can be subject to jurisdiction based on its subsidiary's contacts, the exception applies only when it is alleged that the subsidiary was an "agent" or "mere department" of the parent corporation. *Kramer Motors, Inc. v. British Leyland, Ltd.,* 628 F.2d 1175, 1177–78 (9th Cir.1980), cert. denied, 449 U.S. 1062, 101 S.Ct. 785, 66 L.Ed.2d 604 (1980) (holding that the court did not have jurisdiction over a parent corporation even where the parent corporation had guaranteed obligations of the United States subsidiary to United States banks).[8] Plaintiffs here do not allege that USF or Ahold Finance USA were agents or "mere departments" of Ahold, rather than separate corporate entities, and therefore the Court cannot exercise jurisdiction based on Ahold's support of its subsidiary that is subject to general jurisdiction in the United States. *See, e.g., Reingold v. Deloitte Haskins*

*& Sells,* 599 F.Supp. 1241, 1253 (S.D.N.Y.1984) ("A wholly owned subsidiary that continues to control its day-to-day operations cannot be an 'agent' for jurisdictional purposes.") (citing *Kramer,* 628 F.2d 1175); *Stutts v. De Dietrich Group,* 465 F.Supp.2d 156, 168 (E.D.N.Y.2006) (holding it did not have personal jurisdiction over the parent corporation based on the subsidiary's actions where the plaintiff had not alleged an identity between the parent and the subsidiary); *Ctr. States,* 230 F.3d at 943 ("[W]e hold that constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary.").

[8]     In holding that the subsidiary was not merely the agent or alter ego of the parent corporation, the court in *Kramer* viewed as significant that the executives and directors of the parent corporation did not control the United States subsidiary's board or form a board majority. *Id.* at 1177. In the instant case, the plaintiffs do allege that after Ahold acquired all of the stock of USF, "it exercised its authority to name all of the members of the USF board of directors." Compl. ¶ 56. Nevertheless, the plaintiffs do not allege that USF was merely an agent of Ahold or that Ahold and USF did not deal with each other as distinct corporate entities.

**b.** *Specific Jurisdiction*

**\*13** The Court may exercise specific jurisdiction over Ahold if the cause of action arises out of Ahold's minimum contacts with the United States. *See Helicopteros,* 466 U.S. at 414 n. 8. The plaintiffs argue that the Court can exercise specific jurisdiction over Ahold based on Ahold's participation in the VASP System conspiracy and because Ahold "told investors in the United States that USF had relationships with independently owned companies known as VASPs that 'provide varying degrees of support to USF' in the purchase of certain products from suppliers." Compl. ¶ 85.

The Court finds that these allegations are insufficient to establish specific personal jurisdiction over Ahold in the United States. The Complaint's allegations of Ahold's participation in the VASP System are lacking. The Complaint alleges that Ahold "had full knowledge of, and helped facilitate and conceal, the existence and purpose of the VASP System as a scheme to defraud USF's cost-plus customers from the time it acquired USF," and that "[i]nstead of putting a stop to the use of the VASP System following its acquisition of USF, [ ] Ahold approved of it, allowed it to continue

and expand, and reaped the benefits of it." Compl. ¶ 5. The Complaint, however, does not make any allegations of actual Ahold-specific actions, other than knowledge, that relate to the VASP System. The allegations that Ahold had knowledge of its subsidiary's business practices are not allegations of purposeful availment sufficient to invoke the benefits and protections of the United States. The plaintiffs also argue that Ahold's statement in its Form 20–F that USF had relationships with VASPs and that Ahold provided support to USF had the effect in the United States of facilitating the continuance of the VASP System by lending to it the appearance of legitimacy. Even taking this allegation as true, it standing alone is not sufficient to establish specific personal jurisdiction over Ahold under the effects test. In particular, Ahold's Form 20–F, which was directed not at USF's customers or investors, but at Ahold's investors, cannot be interpreted as Ahold intending to inflict harm in the United States. *Libutti,* 178 F.3d at 123. Because the Court does not have personal jurisdiction over it, Ahold is dismissed as a defendant.

### IV. USF's Motion to Dismiss

### A. Motion to Dismiss Standard

When considering a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor. *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009). In accordance with the Supreme Court's decision *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Court must apply a "plausibility standard," which is guided by "[t]wo working principles," *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). First, although "a court must accept as true all of the allegations contained in a complaint," that tenet "is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Well-pleaded factual allegations, on the other hand, are assumed to be true and may plausibly give rise to an entitlement to relief. *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss," and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* at 1949. "To meet this standard, plaintiffs must 'nudge[ ] their claims across

the line from conceivable to plausible.' " *Smartix Intern. Corp. v. MasterCard Intern., LLC,* No. 08–5303–cv, 2009 WL 3449017, *1 (2d Cir. Oct.28, 2009) (*quoting Twombly,* 550 U.S. at 555).

**\*14** Where, as here, a RICO claim's predicate acts include allegations of fraud, the circumstances constituting the alleged fraud must be pled with particularity. See Fed.R.Civ.P. 9(b); *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999). In its review of a 12(b)(6) motion to dismiss, the Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

### B. Count One: 18 U.S.C. § 1962(c)

The Complaint charges USF with violating 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a civil RICO claim pursuant to Section 1962(c), the plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496. The plaintiffs charge that USF [9] was employed by or associated with the "VASP System Enterprise"—which they allege was made up of USF and the six VASPs—to conduct or participate in the enterprise's affairs through a pattern of mail fraud, wire fraud, and money laundering.

---

9  RICO defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." *Id.* § 1961(3). Therefore, corporations can be liable if they conduct an enterprise's affairs through a pattern of racketeering activity.

Plaintiffs' alleged civil RICO claims must also satisfy the standing requirements of 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" has the right to "recover threefold the damages he sustains." 18 U.S.C. § 1964(c). Therefore, under Section 1964(c), a civil RICO claimant only has standing to sue if it shows: "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's 'business or property[ ]'; and (3) that such injury was 'by reason

of' the substantive RICO violation." *City of New York v. SmokesSpirits. com, Inc.,* 541 F.3d 425, 439 (2d Cir.2008).

## 1. *RICO Enterprise*

USF moves to dismiss the Section 1962(c) claim arguing that the Complaint fails to plead a RICO enterprise that is distinct from the alleged predicate acts of racketeering activity. Although an enterprise may be "any union or group of individuals associated in fact," *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), it "must be separate from the pattern of racketeering activity," *First Capital,* 385 F.3d at 173. [10] The "enterprise is an entity," while the "pattern of racketeering activity is ... a series of criminal acts as defined by the statute." *Turkette,* 452 U.S. at 583. (citing 18 U.S.C. § 1961(1)). Nevertheless, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce ." *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 2245, 173 L.Ed.2d 1265 (2009) (*quoting Turkette,* 452 U.S. at 583).

[10]    The enterprise must also be "distinct from the person conducting the affairs of the enterprise." *Id.* There is no dispute that the plaintiffs have sufficiently alleged that the "person," here USF, is distinct from the VASP System Enterprise.

**\*15** Section 1961(4) states than an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583. An enterprise can be broken down into three structural parts: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle,* 129 S.Ct. at 2244.

The alleged VASP System Enterprise [11] consists of USF and the six VASPs—Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands. Compl. ¶ 98. The alleged purpose of the VASP System Enterprise was to "falsely inflate the cost component of the price charged to USF's cost-plus customers." *Id.* at ¶ 4. The Complaint alleges a relationship among USF and the associated VASPs, including that the VASP owners Redgate and Schofield

associated with a USF executive who supervised the VASPs on a day-to-day basis. *Id.* at ¶ 51. The Complaint alleges that the VASPs would buy and mark-up, at USF's direction, goods that USF required, *id.* at ¶ 41, and that "Redgate had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs," *id.* at ¶ 51. Moreover, the Complaint alleges that the "VASP System was a self-contained scheme that operated independently from any single USF cost-plus arrangement." *Id.* at ¶ 52. The Complaint further alleges longevity sufficient to permit these associates to pursue the enterprise's purpose in that it alleges the enterprise existed from 1998 through 2004. *Id.* at ¶ 53. Therefore, the VASP System Enterprise is sufficiently alleged in accordance with Section 1961(4), *Turkette,* and *Boyle.*

[11]    Because the Court finds the VASP System Enterprise is separate and distinct from the alleged pattern of racketeering activity, it does not address the plaintiffs' alternative allegation of the "Individual VASP Enterprises." Compl. ¶ 102.

The Court additionally finds that the alleged VASP System Enterprise is separate and distinct from USF's alleged pattern of racketeering activity. The plaintiffs allege that USF participated in the conduct of the VASP System Enterprise through multiple acts of mail fraud, wire fraud, and money laundering. Specifically, the Complaint alleges that "USF engaged in thousands of separate fraudulent transactions in furtherance of its scheme to falsely inflate the cost component and the mark-up charged to its cost-plus customers," *id.* at ¶ 53, and that the

> [m]ail and wire fraud included: contracts and invoices that intentionally mislead [sic] USF's cost plus customers about the manner in which USF would compute prices charged to them; invoices that falsely and fraudulently misrepresented the amounts that USF's cost-plus customers owed USF under the terms of its cost-plus arrangements; materials that falsely and fraudulently supported the basis of the cost component used by USF to calculate the prices charged to its customers pursuant to its cost-plus

contract; and materials that falsely
and fraudulently described USF's
relationship with the VASPs,

**\*16** *id.* at ¶ 108. Although related in the larger scheme, each allegedly fraudulent invoice, for example, was a racketeering activity separate from the ongoing association of USF and the six VASPs. That the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in this case overlap does not mean the plaintiffs have not separately alleged an enterprise and a pattern of racketeering activity. *Boyle,* 129 S.Ct. at 2245; *Turkette,* 452 U.S. at 583.

### 2. *Pattern of Racketeering Activity*

USF next moves to dismiss the Section 1962(c) count arguing that the plaintiffs have not alleged a pattern of racketeering activity with sufficient particularity. To establish the requisite "pattern of racketeering," a plaintiff must identify "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). " '[R]acketeering activity' consists of no more and no less than commission of a predicate act." *Sedima,* 473 U.S. at 495 (*citing* 18 U.S.C. § 1961(1)). Section 1961(1) sets out an exhaustive list of predicate acts, including those alleged in the Complaint: mail fraud, wire fraud, and money laundering. 18 U.S.C. § 1961(1).

### a. *Mail and Wire Fraud*

Mail fraud occurs "whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.' " *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008) (*quoting* 18 U.S.C. § 1341). "The gravamen" of a mail fraud "offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information." *Id.* (internal quotations and citations omitted). "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996).

"In order to successfully plead this fraud claim, [the] complaint must specify the circumstances constituting fraud 'with particularity.' " *Id.* at 634 (*quoting* Fed.R.Civ.P.

9(b)) . [12] Generally, "Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Moore,* 189 F.3d at 173 (internal quotations and citations omitted). "The plaintiffs must also identify the purpose of the mailing within the defendant's fraudulent scheme." *Id.* (internal quotations and citations omitted). The Complaint must additionally "allege facts that give rise to a strong inference of fraudulent intent ... by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *S.Q.K.F.C., Inc.,* 84 F.3d at 634.

---

[12]    The Rule provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

**\*17** USF argues that the Complaint fails to plead mail and wire fraud with particularity. Specifically, USF argues that the plaintiffs fail to plead the statements with sufficient specificity, to plead reasonable reliance, and to plead scienter.

### i. *Specificity of the Statements*

The plaintiffs allege that USF and the VASPs participated in a scheme to falsely inflate the cost component of the price charged to USF's cost-plus customers. In furtherance of this scheme, the Complaint alleges USF used the wires and mails to send invoices to their cost-plus customers, as follows:

44. Pursuant to USF's arrangements with the VASPs, USF would direct the VASPs to purchase particular products in particular amounts and at particular prices. At USF's direction, the VASPs would then falsely inflate the cost of the products and resell them to USF. USF, in turn, would then sell these products to its customers using the falsely inflated cost component invoiced by the VASP. A fixed percentage or set dollar amount then would be added on to the falsely inflated cost component to arrive at the prices charged by USF to its cost-plus customers.

46. USF deceived its cost-plus customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers. The VASP System was designed to, and did, induce USF's

customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF. Moreover, such reliance was reasonable under the circumstances because Defendants intentionally used the VASP System to hide the scheme from USF's customers and concealed from, and at no time fully disclosed to, USF's cost-plus customers the existence and true purpose of the VASP System.

53. On information and belief, between 1998 and 2004, USF engaged in thousands of separate fraudulent transactions in furtherance of its scheme to falsely inflate the cost component and the mark-up charged to its cost-plus customers. Details regarding the dates, times, products purchased, and the amount by which the cost component was falsely inflated, which occurred on a daily basis for a period of several years from at least 1998 until 2004, remain to be determined through the discovery process.

108. The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate electronic media include, *inter alia:*

a. contracts and invoices that intentionally mislead USF's cost plus customers about the manner in which USF would compute prices charged to them;

b. invoices that falsely and fraudulently misrepresented the amount that USF's cost-plus customers owed USF under the terms of its cost-plus arrangements;

c. materials that falsely and fraudulently supported the basis of the cost component used by USF to calculate the prices charged to its customers pursuant to its cost-plus contracts; and

**\*18**  d. materials that falsely and fraudulently described USF's relationship with the VASPs.

Compl. ¶¶ 44, 46, 53, 108. USF urges that these allegations are insufficient under Fed.R.Civ.P. 9(b) because they do not identify the specific content of the mails or wires, the time or place of specific mails or wires, or who was involved in transmitting those mails or wires.

The Rule 9(b) heightened pleading standard "serves to provide a defendant with fair notice of a plaintiff's claim,

safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007); *see also United States ex rel. Tiesinga v. Dianon Sys., Inc.,* 231 F.R.D. 122, 123 (D.Conn.2005) ("The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response."). In general, for a complaint to be in compliance with Rule 9(b) it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993). However, "courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents." *Tiesinga,* 231 F.R.D. at 123. As one court explained:

> It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.

*In re Cardiac Devices Qui Tam Litig.,* 221 F.R.D. 318, 333 (D.Conn.2004) (internal quotation marks omitted). Thus, "dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice as to the circumstances of the charged misrepresentations." *Harris v. Wells,* 757 F.Supp. 171, 174 (D.Conn.1991); *see also Int'l Motor Sports Group, Inc. v. Gordon,* 98 CIV 5611, 1999 WL 619633, *4 (S.D.N.Y. Aug.16, 1999) (concluding that "Rule 9(b) requires only that a complaint provide adequate information to allow the defendants to frame a response" and that it "does not require that a complaint plead fraud with the detail of a desk calendar or a street map" (internal citations and quotation marks omitted)).

The Complaint does not make allegations of the exact content, date, or sender of specific mail or wire transmissions alleged to be the predicate acts of mail or wire fraud.

Nevertheless, the Court finds that the plaintiffs' allegations are sufficient in the context of this case because they have put the defendants on notice of the circumstances of the alleged fraud. Specifically, USF is on notice that the plaintiffs allege that, in furtherance of the larger scheme to defraud, the purpose and operation of which the plaintiffs plead in great detail, USF sent thousands of invoices on a nearly daily basis from 1998 through 2004 to customers buying products that had been funneled through a VASP. *See, e.g., City of New York v. Joseph L. Balkan, Inc.,* 656 F.Supp. 536, 545 (E.D.N.Y.1987) ("As can be readily inferred from the alleged *modus operandi* of the schemes, there were numerous mailings of standardized documents containing identical false representations.... To burden the complaint with specific allegations of hundreds of such instances would serve little purpose, particularly since defendants seem to be in the best position to provide the details they demand." (internal citation omitted)); *see also In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 456 (S.D.N.Y.1998) ("In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. In such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." (internal citations omitted)). Here, the Complaint describes how the invoices furthered the scheme by forwarding the allegedly falsely inflated cost information to the plaintiffs buying products on a cost-plus basis. The defendants can adequately frame a response to these allegations, and Rule 9(b) requires nothing more.

### ii. *Reliance*

*19  USF next urges that the Complaint does not sufficiently allege reliance. The United States Supreme Court recently held reliance is not an element of a RICO cause of action alleging predicate acts of mail or wire fraud. Bridge, 128 S.Ct. at 2144 ("[N]o showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud."). Even so, the Court finds that the plaintiffs have alleged reliance, as follows:

> USF deceived its cost-plus customers into believing that USF's cost component was calculated based on

using transactions with only legitimate suppliers. The VASP system was designed to, and did, induce USF's customers to rely on USF's material representations, enter into contracts with USF, place orders for products from USF, and make payments to USF. Moreover, such reliance was reasonable under the circumstances because Defendants intentionally used the VASP system to hide the scheme from USF's customers and concealed from, and at no time fully disclosed to, USF's cost-plus customers the existence and true purpose of the VASP System.

Compl. ¶ 46. USF argues that the plaintiffs' characterization of the VASPs as not "legitimate" is a conclusory allegation, and is therefore not entitled to credit on this motion to dismiss. The Court disagrees. The plaintiffs have made numerous factual allegations that the VASPs were not legitimate, including that they were not independent from USF and existed solely to falsely inflate the prices charged to USF's cost-plus customers. USF's argument that this characterization is inaccurate is not a matter the Court may decide on a motion to dismiss.

### iii. *Scienter*

USF also argues that the plaintiffs have failed to plead scienter. In addition to pleading the circumstances constituting fraud with particularity, the plaintiffs must also "allege facts that give rise to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc.,* 84 F.3d at 634. The plaintiffs "can do so by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

The plaintiffs have sufficiently alleged scienter. Although USF attempts to persuade the Court that certain factual allegations in the Complaint should not be viewed as evidence of conscious misbehavior or recklessness, it is not the Court's role on a motion to dismiss to make factual determinations. Rather, the Court notes several factual allegations in the Complaint that give rise to a strong inference of fraudulent intent, including the following: Smith's April 12, 2001 memorandum to Ahold's CFO stating that "USF has engaged in setting up friendly third parties, which allow them to

establish pads to income"; Lee's testimony regarding "self-generated promotional allowances" that served no other purpose than to "have a higher billing cost"; the PwC report's explanation that the VASPs were "designed to enable mark-up on items for which normal vendor Pas do not exist"; and the Tsebetzis affidavit stating that "USF has inflated its cost to customers via fictitious or USF-controlled middlemen and transport companies.... USF has artificially and fraudulently inflated the prices its customers pay." Compl. ¶¶ 58–59, 62–64, 72–78, 79. Finally, that Ahold made certain disclosures concerning the VASPs in 2003 does not negate the plaintiffs' allegations of fraudulent intent from as early as 1998. In conclusion, the plaintiffs have sufficiently alleged the predicate acts of mail and wire fraud.

**b. *Money Laundering***

 **\*20**  The RICO cause of action also alleges the predicate acts of money laundering in violation of 18 U.S.C. §§ 1956 & 1957. "To allege a violation of 18 U.S.C. § 1956, it must be pleaded that (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds." *Bernstein v. Misk,* 948 F.Supp. 228, 236 n. 2 (E.D.N.Y.1997) (internal quotations omitted). "To violate 18 U.S.C. § 1957, a defendant must have (1) knowingly engaged or attempted to engage in a monetary transaction involving criminally derived property, (2) with such property being valued at more than $10,000, and (3) with such money actually being derived from specific criminal activity." *Id.*

The Supreme Court and the Second Circuit have recently provided guidance on the concealment element of the money laundering statute. In *Cuellar v. United States,* 553 U.S. 550, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008), the Supreme Court held that a conviction under the transportation prong of the money laundering statute "requires proof that the purpose-not merely effect-of the transportation was to conceal or disguise [the nature, location, source, ownership, or control of the illegal proceeds]." *Id.* at 2005. Since Cuellar, the Second Circuit has extended the Supreme Court's concealment requirement as to the transportation prong of the money laundering statute to the transaction prong of the statute. *See United States v. Huezo,* 546 F.3d 174, 179 (2d Cir.2008) ("Thus, Cuellar confirms that a conviction for transaction

money laundering, like a conviction for transportation money laundering, requires proof that the purpose or intended aim of the transaction was to conceal or disguise a specified attribute of the funds."). These cases, then, require that the plaintiffs allege that USF conducted some transaction in order to conceal or disguise the nature, location, source, ownership, or control of the funds involved in the transaction.

The Complaint makes the following specific allegations of money laundering:

> 113. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in that, knowing that funds they received from Plaintiffs and other Class members constituted the proceeds of unlawful activity including mail and wire fraud, Defendants conducted and attempted to conduct certain financial transactions affecting interstate commerce involving these proceeds.

> 114. These proceeds were the portions of payments received by USF from Plaintiffs and other Class members as a result of the scheme alleged herein, *i.e.,* payments for the falsely inflated cost components used by USF to calculate the price charged to its customers, and payments for USF's increased mark-ups resulting from USF's use of falsely inflated costs to calculate such mark-ups.

>  **\*21**  115. These financial transactions conducted by Defendants were intended to promote the carrying on of the mail and wire fraud by making the VASPs appear to have a legitimate business purpose, and to hide from Plaintiffs and other Class members the false "cost" added to USF's invoices.

> 116. Defendants further had knowledge that these financial transactions were designed to, and did, conceal and disguise the nature, location, source, ownership or control of the proceeds of the mail and wire fraud, by making it appear that the full invoice amount belonged to the VASPs, when in fact the VASPs kicked back a portion of the invoice price, representing the proceeds of the mail and wire fraud, to USF, and thus hiding the falsely inflated cost component from its clients' auditors.

> 117. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1957 in that they knowingly engaged in and attempted to engage in monetary transactions affecting interstate commerce and involving funds received from Plaintiffs and other Class members, which Defendants knew to be the proceeds of mail

75 Fed.R.Serv.3d 721

and wire fraud and criminally derived property from unlawful activity as described above, of a value greater than $10,000.

Compl. ¶¶ 113–17. Thus, in the Complaint, the funds that the plaintiffs claim the defendants laundered are those that USF received from the plaintiffs in purported fulfillment of the cost-plus arrangements. The plaintiffs allege that USF's receipt of the plaintiffs' payments based on VASP-set cost was designed to hide from the plaintiffs the "false cost" added to USF's invoices. Now, in opposition to the motion to dismiss, however, the plaintiffs claim that the buckets, as opposed to the plaintiffs' payments, were the funds that were laundered. *See* Pls.' Mem. at 29 ("[T]hese 'buckets' of money sent from the VASPs to USF were structured to hide the 'cost' falsely added by the VASP System and were concealed from USF's cost-plus customers."). USF argues that the plaintiffs' money laundering predicate must fail because the Complaint does not sufficiently allege that the transactions were designed to conceal some unlawful transaction.

Although a close question post-*Cuellar,* the Court finds that the plaintiffs have adequately alleged predicate acts of money laundering. The plaintiffs allege that the buckets were designed to conceal the nature and source of the funds, *i.e.,* that the source of the funds was the VASPs' allegedly falsely inflated invoice cost. This is sufficient for the purposes of this motion to dismiss. Of course, if faced with a motion for summary judgment, the plaintiffs will need to produce evidence that the purpose of the buckets was not just to compensate USF, but also to hide the nature or source of that compensation.

USF also argues that the Complaint fails to allege that the predicate acts of money laundering proximately caused the plaintiffs' injuries. Under 18 U.S.C. § 1964(c), the plaintiffs must alleged that their injury was "by reason of" the substantive RICO violation. "Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." *Sedima,* 473 U.S. at 497. Therefore, "the plaintiff's injury must have been proximately caused by a pattern of racketeering activity violating [18 U.S.C. § ] 1962 or by individual RICO predicate acts." *Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir.2003) (internal quotations omitted). RICO patterns or acts are deemed to "proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably

foreseeable or anticipated as a natural consequence." *Hecht,* 897 F.2d at 23.

**\*22** The plaintiffs' alleged injury is the falsely inflated costs they paid pursuant to their cost-plus arrangements as a result of the VASPs' selling USF the products at a marked-up price. The money laundering charges stem from the allegation that after overcharging the plaintiffs for the goods that were funneled through the VASP System, USF conducted a financial transaction in receipt of the buckets, with the knowledge that the buckets represented proceeds from the alleged mail and wire fraud, and the purpose of which was to maintain the appearance that the cost charged to the plaintiffs was the actual cost charged by the VASP to USF. Thus, USF argues that the plaintiffs injury cannot have been proximately caused by the alleged acts of money laundering that occurred after their injury.

The plaintiffs have sufficiently alleged that the pattern of racketeering activity, including money laundering, was the proximate cause of their injuries. Here, the fact that the VASPs would kick back to USF the buckets of marked-up cost is what enabled USF to pay the VASPs the marked-up cost, which in turn enabled USF to charge the plaintiffs the marked-up cost. *See, e.g., Astech–Marmon, Inc. v. Lenoci,* 349 F.Supp.2d 265, 269 (D.Conn.2004) (finding that acts including bribes and kickbacks paid by and to the defendants to direct lucrative city contracts away from the plaintiffs bore a direct relationship to the plaintiffs alleged injury). The cases USF cites are distinguishable; for example, while the Ninth Circuit in *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n,* 298 F.3d 768 (9th Cir.2002) found that the defendant's "role in the Conspiracy, while important, was not a substantial factor in the sequence of responsible causation," *id.* at 774 (internal quotations omitted), here the VASPs' kickback of the buckets to USF was undoubtedly a substantial factor in the sequence of responsible causation of plaintiffs' alleged injury. To conclude, the plaintiffs have sufficiently alleged predicate acts of money laundering.

### 3. Standing

USF argues that plaintiffs Frankie's and Cason do not have standing to assert a RICO claim because first, Cason it is not party to a cost-plus contract, and second, Frankie's has no cost-plus agreement with respect to private label goods and USF has the contractual right to set the cost component of the price under its agreement with Frankie's. Thus, USF argues that Cason and Frankie's cannot allege causation or injury.

A plaintiff must demonstrate the following to satisfy RICO's standing requirements: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan,* 322 F.3d 130 (2d Cir.2003) (internal quotation marks omitted). Here, the Complaint clearly alleges that "Cason has purchased products on a 'cost-plus' basis from USF," and that "Frankie's is a party to a cost-plus arrangement with USF." Compl. ¶¶ 10–11. The Court finds that these allegations, in combination with the balance of the Complaint which alleges that customers who bought products from USF pursuant to cost-plus arrangements suffered injury caused by USF's participation in a pattern of racketeering activities, are sufficient to establish standing under RICO.

### C. Count Two: 18 U.S.C. § 1962(d)

**\*23** The Complaint charges USF with violations of 18 U.S.C. § 1962(d), which makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of Section 1962." 18 U.S.C. § 1962(d). USF does not dispute that the plaintiffs have alleged an agreement to support a Section 1962(d) claim, but rather argue that because the Section 1962(c) claim is insufficiently alleged, the Section 1962(d) conspiracy claim is necessarily insufficient. Because a Section 1962(c) claim is not necessary to state a Section 1962(d) claim, Beck, 529 U.S. at 507, and because the Court found the Section 1962(c) claim to be sufficiently alleged, USF's argument for dismissal of the Section 1962(d) count fails.

### D. Count Three: Breach of Contract

In Count Three, the plaintiffs charge USF with breach of their cost-plus arrangements. The plaintiffs specifically allege the following: (1) that USF breached the plaintiffs' cost-plus arrangements by using VASP invoices to calculate the cost component of their purchases; (2) that USF acted dishonestly and in a commercially unreasonable manner to manipulate the invoice costs used to calculate the cost component of the price; and (3) that USF breached its implied duty of good faith and fair dealing by intentionally directing VASPs to falsely inflate the amounts they invoiced USF and/or purchasing products through the VASPs for the purpose of increasing its cost component. USF argues that the Complaint fails to state a claim for breach of contract.

### 1. Cason's Breach of Contract Claim

USF first argues that Cason's breach of contract claim must be dismissed because it does not allege it is party to a cost-plus contract, but rather that "USF has invoiced Cason on a weekly basis for products Cason purchased on a 'cost-plus' basis since at least 2000." Compl. ¶ 10. Cason argues that the alleged course of conduct with USF as a cost-plus customer is sufficient to support a breach of contract claim.

Cason has alleged it frequently bought products from USF on a cost-plus basis. Although USF argues Cason has not alleged that a term of an agreement was breached, in fact Cason has alleged that the cost-plus term was breached each time it bought products on a cost-plus basis that were funneled through the VASP System. In particular, Cason alleges that USF breached the cost-plus term of those agreements when it used VASP invoices as the cost component of the cost-plus arrangement. While more will be required at a later stage of litigation, this allegation is sufficient to survive a motion to dismiss.

### 2. Breach of Contract

USF next argues that plaintiffs' "theory that USF was required to sell private label products at a loss" is implausible, and should not survive a motion to dismiss under Twombly. USF Mem. at 12–13. Because the Court finds inaccurate USF's characterization of the allegations of the Complaint, it will deny USF's motion to dismiss on that basis.

**\*24** USF also argues that the contracts at issue permitted the VASP System operation. Quoting language from the contracts themselves, USF argues that the plaintiffs' breach of contract claim must as a matter of law fail because none of the contracts contains any limitation on setting invoices prices, and some of the contracts specify USF's right to set invoice costs. Whatever the precise meaning of these contractual terms, it is not at all clear, as a matter of law, that USF had the contractual right to use the VASPs in the manner alleged in the Complaint—that is, that USF has the contractual right to dictate to the VASPs the price the VASPs charged USF. Rather, the contractual language USF cites states that the cost component charged to cost-plus customers will be based on "various nationally published price lists"; "respective USF Foodservice distribution center on a district-wide basis and is intended to reflect the local market replacement cost or current market average cost of procured products"; and "invoice cost ... or local market replacement cost." It is not apparent to the Court that USF's alleged dictating to the VASPs of the invoice cost to be charged to USF is the same as setting that price based on "various nationally

published price lists," or that such collaboration is consistent with invoice cost being "issued by the vendor." The evidence required to determine whether USF's sale of goods to the plaintiffs complied with these contractual terms is not before the Court, nor would it be appropriate for the Court to make this determination on a motion to dismiss. Instead, the Court finds that the plaintiffs have sufficiently alleged a breach of contract in alleging that USF's direction of the VASPs' price-setting, and use of those prices in charging the plaintiffs for goods, was in violation of their cost-plus agreements.

USF additionally argues that the contracts, as a matter of law, permitted USF to retain "all the promotional allowances provided by the VASPs." The Complaint does not claim that USF was not permitted to keep promotional allowances, but instead alleges that the buckets were not legitimate promotional allowances because they were "not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs." Compl. ¶ 47. The Complaint plainly alleges that the buckets the VASPs paid to USF were not supplier incentives, but were rather "self-generated," and therefore were not legitimate promotional allowances. Compl. ¶ 73. Again, the Court will not rule on the merits of the allegations at this time.

Finally, USF argues that the plaintiffs have not stated a claim for breach of the duty of good faith and fair dealing because USF's pricing was consistent with the contract terms. The plaintiffs allege that USF violated its duty of good faith and fair dealing through its deceptive manipulation of the pricing terms of the cost-plus arrangements. Once again, the Court declines to rule on the merits at this time.

### E. Count Four: California Business and Professions Code § § 17200 et seq.

**\*25** In Count Four, on behalf of CHW and the California Subclass, the plaintiffs assert that USF engaged in unlawful, unfair, and fraudulent business practices in violation of the California Unfair Competition Law ("UCL"). CHW alleges that USF used falsely inflated invoices to illegally dispose of CHW's and the California Subclass members' property. USF argues that dismissal is mandated because the contract governing the cost-plus arrangement between USF and CHW contains a choice-of-law provision that dictates Illinois law is applicable.

In 1999, CHW became a member of Premier, a Group Purchasing Organization engaged in contracting services

for its members to help them manage and reduce supply costs. CHW has purchased products from USF pursuant to a cost-plus arrangement entered into by Premier and USF's predecessor, Alliant Foodservice. Premier's contract with Alliant, to which CHW was a third-party beneficiary, was in effect from 2000 through 2005. As to choice of law, the contract states as follows: "This Agreement is being delivered and executed in the State of Illinois. In any action brought by or against [Premier Purchasing Partners, L.P.], the validity, construction and enforcement of this Agreement shall be governed in all respects by the laws of the State of Illinois." Eberhardt Decl. Ex. 3, Premier Contract § 15.1. The contract lists both Premier and Alliant as having their place of business in the state of Illinois. *Id.* at Cover Sheet. USF argues that dismissal of the California UCL is mandated here where the Premier contract to which CHW is a third-party beneficiary is governed by Illinois law. The plaintiffs argue that the contract's choice-of-law provision is limited in scope, and therefore does not apply to their UCL claim, which arises not from the contract, but from USF's racketeering activity, mail fraud, wire fraud, and money laundering in its separate operation of the VASP System.

The parties agree that California law governs the effect of the contract's choice-of-law provision. *See Menowitz,* 991 F.2d at 40 ("[T]ransferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed."). A broadly worded choice of law clause, such as that a contract shall be "governed by" the law of a particular state, applies to "all causes of action arising from or related to" the contract "regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines, B.V. v. Superior Court,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, 1155 (Cal.1992). Applying *Nedlloyd,* the Eastern District of California held that a contract stating the "Agreement shall be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia" required dismissal of a California UCL claim. *Cont'l Airlines, Inc. v. Mundo Travel Corp.,* 412 F.Supp.2d 1059, 1070 (E.D.Cal.2006) ("A valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL."). More specifically, the *Continental Airlines* court held that the plaintiff's unfair competition claim was governed by the contractual choice of law provision because the contract created the relationship between the plaintiff and the defendant, in the course of which the defendant allegedly engaged in improper behavior giving rise

to the unfair competition claim. *Id.* at 1070. Additionally, in *Medimatch, Inc. v. Lucent Tech. Inc.,* 120 F.Supp.2d 842, 862 (N.D.Cal.2000), the contract language at issue was as follows: "construction, interpretation and performance of this Agreement shall be governed by the local laws of the State of New Jersey." *Id.* at 861. The *Medimatch* court held that the choice-of-law provision encompassed the plaintiff's unfair competition claim, and it therefore dismissed the UCL claim. *Id.* at 861–62.

**\*26** Although the choice-of-law provision in the Premier Contract—"the validity, construction and enforcement of this Agreement shall be governed in all respects by the laws of the State of Illinois"—is drawn more narrowly than the language in *Continental Airlines* and *Nedlloyd,* it is substantially similar to the language in *Medimatch.* Moreover, the rationale of *Continental Airlines* is applicable; CHW's unfair competition claim should be governed by the contract's choice-of-law provision because the contract created the relationship between CHW and USF, and in the course of that relationship USF allegedly engaged in improper behavior giving rise to the unfair competition claim. Adjudication of the UCL claim would require the Court to construe the contract. Thus, the Court finds that the UCL claim is encompassed by the choice of law provision.

"When there is a valid, bargained-for choice-of-law provision in a contract, California courts apply the approach outlined in the Restatement Second of Conflict of Laws Section 187." [13] *Van Slyke v. Capital One Bank,* 503 F.Supp.2d 1353, 1360 (N.D.Cal.2007) (*citing Nedlloyd,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148). In summary, the Court

[13]    The relevant portion of the Restatement provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which

has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187.

must first analyze whether the chosen state has a substantial relationship to the parties or their transaction. If the first prong is met, a court must then determine whether the chosen state's law is contrary to a fundamental policy of California. If so, then the court must weigh whether California has a materially greater interest than the chosen state in the determination of a particular issue.

*Id.* (citing *Nedlloyd,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148).

The plaintiffs do not argue that Illinois does not have a substantial relationship to the contract. Moreover, "[t]hat one of the parties resides in a foreign state gives the parties a reasonable ground for choosing that state's law." *Id.* at 594, 11 Cal.Rptr.2d 330, 834 P.2d 1148. Here, it appears that both of the parties to the contract—Premier and Alliant—had their place of business in Illinois at the time they executed the contract. Therefore, Illinois has a substantial relationship to the contract and the parties had a reasonable basis for selecting Illinois law.

The second inquiry is whether application of Illinois law would be contrary to a fundamental public policy of California. *Medimatch,* 120 F.Supp.2d at 862 ("[A] choice of law made by sophisticated commercial parties through arms length negotiation will be enforced unless the chosen law conflicts with a fundamental public policy of California.") (*citing Nedlloyd,* 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148). CHW's only argument as to why application of Illinois law is contrary to California's fundamental public policy is that to "allow Illinois law to displace California's UCL statute would deny CHW, a California citizen, the protection it is afforded by this important California statute." Pls.' Mem. at 46. However, courts in California have clearly stated that "merely because plaintiff's claims might implicate California statutes is not sufficient to establish that application of [another state's] law to the claims would be contrary to any of the policies embodied in the statutes." *Cardonet, Inc. v. IBM Corp.,* No. C–06–06637 RMW, 2007 WL 518909, *4 (N.D.Cal.2007). Indeed, "the mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Medimatch,*

120 F.Supp.2d at 862. Because CHW has not forwarded any fundamental public policy of California that would be contravened by application of the law chosen by the parties to the contract, the Court need not determine whether California or Illinois has a materially greater interest in application of its law. Therefore, the Court will apply Illinois law and dismiss CHW's UCL claim.

## V. USF's Motion to Strike

**\*27** Arguing they are irrelevant and prejudicial, USF moves to strike from the Complaint allegations concerning accounting irregularities unrelated to the VASP System, as well as the resulting civil and criminal investigations, settlements involving Ahold, USF, or their executives, and criminal convictions or guilty pleas of USF executives. The plaintiffs argue that allegations regarding USF's securities fraud are indeed relevant to plaintiffs' claims because "[m]any of the same individuals who were involved in the securities fraud are also alleged to have been involved in the fraudulent conduct at issue in this case. Moreover, both the conduct that gave rise to the securities fraud and the conduct at issue in this case involves the manipulation of income related to sales at USF." Pls.' Mem. Opp'n at 49–50.

Fed.R.Civ.P. 12(f) permits a court to "strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter ." *Id.* When "deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commw. United Corp.,* 551 F.2d 887, 893 (2d Cir.1976). Evidentiary questions "should especially be avoided at [ ] a preliminary stage of the proceedings," as "[u]sually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided." *Id* . Nevertheless, courts do at times strike allegations. *Id.* (upholding the district court's ruling striking allegations of the complaint where such allegations could have no possible bearing on the action); *see also* Corr. *Officers Benevolent Ass'n of Rockland County v. Kralik,* 226 F.R.D. 175, 177 (S.D.N.Y.2005) (striking as irrelevant both allegations referring to a prior settlement involving similar parties and issues and exhibits relating to that settlement); *Gotlin v. Lederman,* 367 F.Supp.2d 349, 363–64 (E.D.N.Y.2005); *Toto v. McMahan, Brafman, Morgan & Co.,* No. 93 Civ. 5894, 1995 WL 46691, at \*16 (S.D.N.Y.

Feb.7, 1995) ("Frequently courts will strike references that have criminal overtones.").

The Court will grant the defendants' motion to strike in full. First, particularly given Ahold's dismissal for lack of personal jurisdiction, the Court will strike the allegation in ¶ 17 concerning Ahold's agreement to indemnify USF. Second, the Court will grant the motion to strike as to the allegation in ¶ 164, as it relates only to a charge against Ahold. Third, the Court will grant the motion to strike concerning all allegations related to USF's overstatement of promotional allowances, as such accounting irregularities, as well as the resultant investigations, convictions, or other resolutions, are unrelated to plaintiffs' allegations of USF's fraudulent activities involving the VASP System. Plaintiffs' argument that many of the same people were allegedly involved in both the promotional allowance accounting irregularities and the VASP System is insufficient to make those irregularities and investigations relevant. Specifically, the Court strikes the following: the second, third, and fourth sentences of ¶ 61; the first sentence of ¶ 62; "after discovering accounting fraud at USF" in the first sentence of ¶ 68; the second sentence of ¶ 68; all of ¶ 69; reference to the criminal trial of Mark Kaiser in the first sentence of ¶ 71; and "USF's scheme to inflate its reported earning by recording completely fictitious promotional allowances" in ¶ 85. Finally, the Court will also strike ¶ 70 of the Complaint regarding information the DOJ has requested from Ahold in relation to its civil investigation of USF's billing practices, including the use of the VASPs, with regard to contracts with federal agency customers. Although the plaintiffs allege that the civil investigation is likely related to the "same type of fraudulent contracting and billing practices at issue in this case," the fact of the DOJ's investigation or the information the DOJ has requested is irrelevant to this case.

## VI. *Conclusion*

**\*28** Ahold's motion to dismiss [Dkt. # 50] is GRANTED. USF's motion to dismiss [Dkt. # 53] is GRANTED IN PART and DENIED IN PART; remaining against USF are Counts One, Two, and Three. USF's motion to strike [Dkt. # 58] is GRANTED.

## SO ORDERED.

## Parallel Citations

75 Fed.R.Serv.3d 721

---

**End of Document**                                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# E

2005 WL 1353609
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

NORTHWESTERN HUMAN
SERVICES, INC. et al., Plaintiffs
v.
Robert C. PANACCIO et al., Defendants

No. Civ.A. 03-157.    |    June 6, 2005.

**Attorneys and Law Firms**

George Bochetto, David J. Perlman, Bochetto & Lentz PC,
Joseph T. Kelley, Jr., Kelley & Murphy, Philadelphia, PA, for
Plaintiffs.

Thomas E. Groshens, Sprague & Sprague, David B. Smith,
Timothy J. Holman, Smith, Giacometti & Chikowski, LLC,
Philadelphia, PA, John A. Gallagher, High, Swartz, Roberts
& Seidel, Norristown, PA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

RUFE, J.

**\*1** Plaintiffs Northwestern Human Services, Inc.
("Northwestern") and its subsidiaries Northwestern
Intrasystems, Inc., and Northwestern Intrasystems, Inc.
Trust Dated April 1, 1994 (collectively, "NHS"), are non-
profit entities providing mental health services to indigent
individuals. NHS filed their original Complaint on January
13, 2003. This Complaint did not name Barry N. Bowers
as a defendant. On October 27, 2003, Plaintiffs filed their
First Amended Complaint, asserting three claims of the
Racketeer Influenced and Corrupt Organizations Act (RICO)
violations and eight state law claims, including fraud and
negligence, against Bowers. On September 24, 2004, this
Court granted several motions to dismiss, dismissing with
prejudice Plaintiffs' claims against several Defendants and
giving Plaintiffs leave to re-plead certain other claims,
including their claims against Bowers.

Plaintiffs filed their Second Amended Complaint on October
12, 2004. Presently pending before the Court is Bowers'
Motion to Dismiss.

**I. BACKGROUND**

Defendant Bowers was a personal accountant to Defendant
Robert C. Panaccio, NHS's former President and Chief
Executive Officer. The First Amended Complaint's claims
against Bowers were based on allegations that Panaccio
hired Bowers as an "outside accountant" to create secret
bank accounts. Panaccio then used the secret accounts to
siphon money from Northwestern's for-profit automobile
leasing company, Amica Leasing, and pay his personal,
non-reimbursable expenses (the "Amica fraud"). Although
Bowers did not file a motion to dismiss, the Court
dismissed all claims against him as part of its dismissal
of Plaintiffs' Amica fraud claims, finding that Plaintiffs
failed to allege fraud with particularity, as required by Rule
9(b). Deficiencies pointed out by the Court included the
First Amended Complaint's failure "to go beyond ambitious
allegations of a connection between the Amica fraud and
the secret accounts." Although Plaintiffs attached as exhibits
numerous checks, allegedly mailed in furtherance of the
fraud, the Court found that Plaintiffs failed to explain
how the checks, innocent on their face, were part of
the fraudulent scheme, and failed to identify any non-
reimbursable expenses.

The Second Amended Complaint's allegations concerning
the Bowers fraud are nearly identical to those of the
First Amended Complaint. Nevertheless, for clarity's sake
the Court sets forth Plaintiffs' allegations below, pointing
out any additions to the First Amended Complaint.
Plaintiffs allege that Panaccio hired Bowers as an outside
accountant to create and control secret bank accounts from
which Bowers knowingly paid Panaccio's personal, non-
reimbursable expenses. [1] Panaccio funded these accounts by
causing NHS' Chief Financial Officers "CFO") to forward
moneys to Bowers, who deposited the funds, reviewed the
invoices, and personally signed all of the illegal checks. [2]

[1]    2nd Am. Compl. ¶¶ 97-99.

[2]    2nd Am. Compl. ¶¶ 100-103.

The Second Amended Complaint adds a paragraph describing
some of the checks issued by Bowers on the secret
accounts. These checks, which Plaintiffs attach as exhibits,
include payments to American Express, personal payments
to Panaccio, Panaccio's personal dentist, florists and caterers,
payments for Panaccio's memberships at golf and other
clubs, and season tickets to numerous professional sporting
events. [3]

3       2nd Am. Compl. ¶ 98.

**\*2** Plaintiffs allege that Bowers knew that the accounts in question were secret and that he was participating in a fraudulent scheme by unlawfully siphoning funds from NHS. He allegedly also paid his fees with NHS' funds from the secret accounts. [4] The looting was accomplished by using the United States mail to forward the unlawful checks in question.

4       2nd Am. Compl. ¶¶ 104-106.

## II. THE RICO CLAIMS

Bowers contends that the Second Amended Complaint fails to cure to defects identified by the Order because it lacks the specificity required by Federal Rule of Civil Procedure 9(b). He argues that Plaintiffs fail to identify any misrepresentations allegedly made by Bowers, and that the checks attached to the Second Amended Complaint are in many respects duplicative of the exhibits to the First Amended Complaint, which the Court previously characterized as "innocent on their face." [5] The familiar standard of review governs Bowers' Motion to Dismiss. [6]

5       Bowers also argues that Plaintiffs purposefully omitted several exculpatory exhibits previously attached to the First Amended Complaint in an attempt to avoid a dismissal of their claims. Bowers urges the Court to nonetheless consider these documents, since they are already part of the record. These documents allegedly show that officers of NHS, such as its CFO, assistants to the President and assistant secretaries to the Board of Trustees, were aware of Bowers' services and the allegedly secret bank accounts. While it is not necessary to address this argument, Plaintiffs' response that "corrective measures" of omitting documents previously attached to Plaintiffs' submissions are permitted by Federal Rule of Civil Procedure 15(a), seems misplaced. It ignores Rule 12(b)(6), which allows the Court to consider documents that form the basis of the plaintiff's claim. "The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." *Lum v. Bank of America,* 361 F.3d 217, 222 n. 3 (3d Cir.2004).

6       In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.

A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. The Court primarily considers the allegations of the complaint, but it may also consider a document integral to, attached to, or explicitly relied upon in the complaint. Dismissal is warranted if it is certain that no relief can be granted under any set of facts which could be proved. *See Brody v. Hankin,* 299 F.Supp.2d 454, 457-58 (E.D.Pa.2004) (outlining standard of review for motion to dismiss pursuant to Rule 12(b)(6)).

### A. Section 1962(c) of RICO

NHS brings one substantive RICO count and one RICO conspiracy count against Bowers. According to the RICO statute, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." [7] To plead a violation of RICO, Plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. [8] The exhaustive list of "racketeering activities" found at 18 U.S.C. § 1961(1) includes any mail fraud indictable under 18 U.S.C. § 1341.

7       18 U.S.C. § 1962(c).

8       *Lum,* 361 F.3d at 223.

Where Plaintiffs rely on "mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity." [9] They "may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.' " [10]

9       *Id.*

10      *Id.* at 224 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984)).

Plaintiffs fail to identify any alleged misrepresentations made by Bowers, much less the dates, time, or place of any such misrepresentation. Plaintiffs argue that they injected precision into their allegations by identifying four specific types of payments from the allegedly secret account and attaching checks with Bowers' signature that were used to

pay Panaccio's personal expenses. They rely on *Seville*, which held that the plaintiff satisfied Rule 9(b) by pleading which machines were the subject of the alleged fraud involving the sale of industrial equipment.[11] In *Seville*, the complaint adequately set forth the nature and the subject of the alleged misrepresentations made by the defendants to the plaintiff.[12]

[11]    *See Seville,* 742 F.2d at 791.

[12]    *Id.*

The Second Amended Complaint lacks the specificity of the complaint in *Seville*. Plaintiffs broadly allege that Bowers failed to give any information regarding the secret accounts to NHS' CFOs, and that he was aware that by making the alleged payments, he was "circumventing the proper lines of authority and review."[13] However, mere non-disclosure, without more, is not actionable under the mail fraud statute.[14] Although a scheme to defraud "need not be fraudulent on its face," it "must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."[15] Nevertheless, the Second Amended Complaint cannot be construed to satisfy this requirement.

[13]    2nd Am. Compl. ¶¶ 100, 104.

[14]    *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1416 (3d Cir.1991) (quoting cases).

[15]    *Id.* at 1415.

**\*3**  "[P]remature application of Rule 9(b) can permit sophisticated defrauders to conceal fraud ... Nevertheless, 'even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within the defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based."[16] The Second Amended Complaint does not provide a statement of such facts with respect to its claims against Bowers.[17]

[16]    *Shapiro v. UJB Fin'l Corp.,* 964 F.2d 272, 289 (3d Cir.1992).

[17]    Bowers also argues that the allegations still contain only oblique references to Amica. Plaintiffs respond that they now present the Bowers' looting scheme as "an independent facet of the overall looting scheme," separate from the Amica fraud, making it unnecessary

for them to explain how the use or administration of the secret accounts connected with the alleged Amica fraud. However, a close look at Plaintiffs' allegations suggests that they simply deleted most of the references to Amica from their description of the alleged Bowers' scheme, and overlooked those references in paragraphs 98 and 104 of the Second Amended Complaint. As discussed above, there are several other bases for a dismissal of Plaintiffs' section 1962(c) claim against Bowers, making it unnecessary to reach the issue of Plaintiffs' sloppy editing of the Second Amended Complaint.

Finally, as Bowers points out, a party is not liable under section 1962(c) unless it played "some part in directing" the affairs of the alleged enterprise.[18] In *Reves,* the Supreme Court endorsed the "operation or management" test of participation in the alleged RICO enterprise.[19] "Under this test, not even action involving some degree of decisionmaking constitutes participation in the affairs of an enterprise."[20] The Third Circuit emphasized that the accounting firm in *Reves* "made a critical, erroneous decision that affected on the solvency of the co-op and did not tell the board of directors about it," and yet "even this decisionmaking did not rise to the level of directing an enterprise."[21]

[18]    *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

[19]    *Id.*

[20]    *Univ. of Maryland v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993). Contrary to Plaintiffs' unsubstantiated argument, *Reves* applies in the motion to dismiss as well as in the summary judgment context. *Id.*

[21]    *Id.* ("[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result").

Plaintiffs have not alleged that Bowers knowingly engaged in *directing* the affairs of the RICO enterprise, or had any part in operating or managing its affairs. While Plaintiffs broadly state in their opposition to Bowers' Motion that Bowers was an "insider," this claim does not appear anywhere in the Second Amended Complaint. Nor do the allegations of the Second Amended Complaint give rise to an inference that Bowers had a part in directing or managing the affairs of the alleged enterprise. Accordingly, Plaintiffs' allegations that Bowers knowingly paid Panaccio's personal expenses with corporate funds do not satisfy the operation and management test for liability under section 1962(c).[22]

22    As Bowers points out, some of Plaintiffs' exhibits contradict their allegation that Bowers personally signed all of the checks to Panaccio from the alleged secret accounts. *See* 2nd Am. Compl. at ¶ 98(b); Ex. AA. Specifically, Plaintiffs refer to bi-weekly personal payments to Panaccio "in excess of $2,500 each," but review of the checks shows that these $2,500 checks were signed not by Bowers but by NHS' CFO, Thomas Donoghue. Even though Plaintiffs' opposition to Bowers' Motion completely fails to address this issue, Plaintiffs incomprehensibly argue that they have not abandoned their claim against Bowers based on the $2,500 payments to Panaccio, boldly stating that they "have conceded nothing." The Court agrees with Bowers that Plaintiffs' own evidence would support dismissal with prejudice of count 98(b) of the Second Amended Complaint, and expects more candor (as well as adherence to the standard of conduct required by Federal Rule of Civil Procedure 11(b)) from Plaintiffs and their counsel in the future.

**B. Section 1962(d) of RICO**

Section 1962(d) makes it unlawful to conspire to violate sections 1962(a)-(c) of RICO. [23] Bowers argues, without citation to any legal authority, that Plaintiffs' claim under section 1962(d) fails because Bowers is not liable under the "substantive" section 1962(c). Plaintiffs do not address this argument. Bowers' argument is incorrect. The Third Circuit specifically held that liability under section 1962(c) is not a prerequisite to section 1962(d) liability, in either the civil or the criminal contexts. [24]

23    18 U.S.C. § 1962(d).

24    *Smith v. Berg,* 247 F.3d 532, 537 (3d Cir.2001) (adopting in civil context the Supreme Court's analysis in *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), that for purposes of RICO conspiracy it "suffices that defendant adopt the goal of furthering or facilitating the criminal endeavor."). While in both *Berg* and *Salinas* there was a substantive RICO violation by at least one other defendant, in *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), the Supreme Court held that a plaintiff may pursue a RICO conspiracy claim even after dismissal of all substantive RICO claims if he can show harm caused by an act of racketeering under section 1961(1). Accordingly, an agreement to conspire to violate RICO in and of itself is not enough for liability, and the RICO conspiracy plaintiff must allege injury from an act "that is independently wrongful under

RICO." *Beck,* 529 U.S. at 501. Bowers, however, does not challenge the sufficiency of Plaintiffs' allegations of allegedly wrongful acts committed by other defendants or Plaintiffs' injury therefrom.

Nevertheless, even under the common law of criminal conspiracy, which presently governs liability under section 1962(d), the plaintiff must allege that the defendant "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." [25] A "mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under section 1962(d)." [26] Where service providers (such as accountants) are concerned, "liability arises only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." [27]

25    *Berg,* 247 F.3d at 538.

26    *Seville,* 742 F.2d at 792 n. 8.

27    *Id.* at 538 n. 11.

**\*4** Plaintiffs' section 1962(d) claim alleges that Defendants' purpose of participation in the RICO enterprise was to enrich themselves by looting NHS by inflating its revenues via a series of fraudulent acts, and that Defendants conspired to participate in this fraudulent scheme to violate section 1962(c), thereby causing Plaintiffs harm. [28] However, Plaintiffs do not allege that services provided by Bowers were knowingly directed at furthering the alleged overarching RICO scheme. Accordingly, the Court will dismiss this RICO claim with prejudice also.

28    *Cf.* 2nd Am. Compl. ¶ 167 (alleging that Defendants "Panaccio and Flaherty knowingly and willingly conducted or participated directly or indirectly in the conduct of the enterprise's affairs.").

**III. CONCLUSION**

Having dismissed the federal RICO claims against Bowers, retaining jurisdiction over the state law claims against him is within the Court's discretion. The Third Circuit has instructed, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." [29]

29    *Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995).

The Court believes there is no affirmative justification for retaining the state law claims. Further, Plaintiffs have offered no persuasive justification for retaining jurisdiction. Accordingly, the Court declines to exercise jurisdiction over the state law claims against Bowers and dismisses him from this action.

An appropriate Order follows.

## ORDER

AND NOW, this 6th day of June, 2005, upon consideration of Defendant Bowers' Motion to Dismiss [Doc.76-70], Plaintiffs' Opposition thereto [Doc. # 72], Bowers' Reply [Doc. # 74], Plaintiffs' Sur-Reply [Doc. # 77], and for the reasons set forth in the attached Memorandum Opinion, it is

hereby ORDERED that Bowers' Motion is GRANTED. It is specifically ORDERED that:

1. Plaintiffs' RICO claims against Bowers, asserted in Counts 1 and 2 of the Second Amended Complaint, are hereby DISMISSED WITH PREJUDICE;

2. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims against Bowers (Counts 3-4, 6-9, 13-15). Accordingly, those claims are hereby DISMISSED WITHOUT PREJUDICE;

3. The remaining parties are directed to confer and submit to the Court a joint report stating their remaining discovery needs and proposing a mutually agreeable case management schedule, within fourteen (14) days of the date of this Order.

It is so ORDERED.

---

**End of Document**                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**F**

2014 WL 896632
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

The YORK GROUP, INC., Milso
Industries Corporation, and Matthews
International Corporation, Plaintiffs,
v.
Scott PONTONE, Harry Pontone, Batesville
Casket Company, Inc., and Pontone
Casket Company, LLC, Defendants.

Civil Action No. 10–1078.
|
Signed March 6, 2014.

**Attorneys and Law Firms**

Brian T. Himmel, David B. Fawcett, III, Reed Smith LLP,
Pittsburgh, PA, Danielle J. Marlow, Steven I. Cooper, Reed
Smith LLP, New York, NY, for Plaintiffs.

Mindy J. Shreve, Deforest, Koscelnik, Yokitis, Skinner &
Berardinelli, Richard N. Lettieri, Lettieri Law Firm, LLC, A.
Patricia Diulus-Myers, Jackson Lewis P.C., Pittsburgh, PA,
Valeria Calafiore Healy, Healy LLC, New York, NY, John
R. Maley, Barnes & Thornburg, Indianapolis, IN, Kathleen
M. Anderson, Barnes & Thornburg LLP, Fort Wayne, IN, for
Defendants.

**MEMORANDUM OPINION**

CONTI, Chief Judge.

### I. *Introduction*

 **\*1** The instant action involves alleged breaches of restrictive
covenants executed in connection with the sale of a family
business consisting of the manufacturing and distribution
of caskets. Pending before the court are five motions for
summary judgment including thirty-one claims, including
counterclaims, filed by the parties pursuant to Federal Rule of
Civil Procedure 56. ECF Nos. 462, 463, 467, 472 & 473. All
five motions will be addressed in this memorandum opinion.
For the reasons that follow, two of the motions will be denied
in their entirety (*ECF Nos. 462 & 473* ), and the remaining
three motions (*ECF Nos. 463, 467 & 472* ) will be granted in
part and denied in part.

### II. *Background* [1]

[1] Facts relevant to specific issues will be addressed in the
discussion about those issues.

Matthews International Corporation ("Matthews") is a
Pennsylvania corporation maintaining its principal place of
business in Pittsburgh, Pennsylvania. ECF No. 70 ¶ 8. The
York Group, Inc. ("York Group"), a subsidiary of Matthews,
is incorporated under the laws of Delaware. *Id.* ¶ 6. Like
Matthews, York Group operates out of Pittsburgh. Matthews
is the second largest casket company in the United States.
ECF No. 587 ¶ 1.

Harry Pontone ("Harry") and his son, Scott Pontone ("Scott"),
operated Old Milso and its predecessor, the South Brooklyn
Casket Company, for several years. ECF No. 587 ¶ 5. Several
members of the Pontone family were involved in the business.
*Id.* Old Milso was engaged in the business of manufacturing
and distributing caskets. Non-family individuals also worked
in the business, including Josephine Pesce ("Pesce"), who
worked as Harry's administrative assistant, *id.* ¶ 4, and
Joseph Redmond ("Redmond"), who served as Old Milso's
warehouse manager, ECF No. 70 ¶ 70.

Midnight Acquisition Corporation ("Midnight"), a wholly-
owned subsidiary of York Group, acquired Old Milso's assets
on May 28, 2005. The acquisition was effectuated by an
asset purchase agreement executed by the parties. ECF No.
4–1. The sale closed on July 11, 2005, and Midnight's
name was changed to Milso Industries Corporation ("Milso").
Members of the Pontone family were paid a lump sum
of $95,000,000.00 pursuant to the terms of the agreement.
ECF No. 480–1 at 21. The agreement also provided for
the payment of contingent consideration under specified
circumstances. *Id.*

In the aftermath of the acquisition, Harry and Scott served
respectively as York Group's president and vice president.
They both served as members of York Group's board of
directors. To effectuate the arrangement, Harry and Scott
executed "key employee" employment agreements with York
Group. ECF Nos. 470–1 & 480–2. Section 1.01 of those
agreements provided that Harry and Scott would perform
"duties substantially similar to those performed for the
[b]usiness" prior to the acquisition. ECF No. 470–1 at 2; ECF
No. 480–2 at 1. As the president, Harry was given "exclusive
control" over York Group's operations, including the hiring
and firing of employees, employee compensation, product
pricing, and the implementation of its business strategy. ECF

No. 480–2 at 2. The agreement governing the terms of Harry's employment provided that his service as the president would "continue until the close of business on September 30, 2010." *Id.* Subject to certain conditions, the agreement governing the terms of Scott's employment provided that he would become York Group's president for the balance of Harry's term in the event that Harry ceased to serve in that capacity "for any reason." ECF No. 470–1 at 3.

 **\*2** Section 4.06 of the employment agreements prohibited Harry and Scott from engaging in a "Competing Business" during their terms of employment and for an additional three years.

ECF No. 470–1 at 14; ECF No. 480–2 at 13. The term "Competing Business" was defined broadly enough to include "any person, corporation or other entity" involved in the manufacture, marketing or selling of "caskets, urns, memorials or cremation equipment." *Id.* Each of the employment agreements also contained the following language:

> 4.07. *Non–Solicitation of Customers and Suppliers.* Employee agrees that while employed hereunder he shall not, directly or indirectly, solicit the trade of, or trade with, any customer, prospective customer or supplier of [York Group] with respect to the manufacture or sale of caskets, urns, memorials or cremation products for any business purpose other than for the benefit of the Company. Employee further agrees that following the termination of Employee's employment with [York Group], to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers or prospective customers or suppliers of [York Group] with respect to the manufacture or sale by [York Group] of caskets, urns, memorials or cremation products, or the supplies necessary to manufacture the same.

> 4.08. *Non–Solicitation of Employees.* Employee agrees that following termination of Employee's employment with [York Group], and to the same extent and for the same period (if any) that the Employee continues to be subject to the restrictions of Section 4.06, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any employee of the Company to leave [York Group] for any reason whatsoever, or hire any such employee. This Section 4.08 will not prohibit Employee from engaging in general advertising or solicitation not

specifically targeted at any one or more employees of [York Group] and shall not prohibit Employee from hiring any employee of [York Group] that contacts Employee as a result of such general advertising or solicitation.

ECF No. 470–1 at 14–15; ECF No. 480–2 at 13–14. Section 4.01 of the employment agreements prohibited Harry and Scott from misappropriating or disclosing confidential information without York Group's written consent. ECF No. 470–1 at 12–13; ECF No. 480–2 at 11–12. Under Section 1.07 of the agreements, Harry and Scott were not permitted to "appropriate" York Group's "business opportunities" for their "own benefit." ECF No. 470–1 at 9; ECF No. 480–2 at 8. Choice-of-law clauses provided that the agreements were to "be governed by and construed in accordance with the laws of the State of New York." ECF No. 470–1 at 16; ECF No. 480–2 at 15.

At some point, York Group apparently started to exercise some control over Milso's operations. On March 30, 2007, Harry and Scott sued York Group in the Supreme Court of the State of New York, County of New York, contending that York Group personnel had breached Section 1.01 of the employment agreement with Harry by undermining his authority and encroaching on his responsibilities as the president. ECF No. 191–2. The case was settled in May 2007. ECF No. 587 ¶ 27. Harry resigned from his position as York Group's president and became the chairman of its board of directors, a member of Milso's board of directors, and a member of the executive committees of both York Group and Milso. ECF No. 70 ¶ 51. Scott voluntarily resigned from his positions with York Group. ECF No. 28–3 at 2. York Group, Matthews and Milso agreed to pay him "severance compensation" in the amount of $300,000.00 per year for a period of three years. *Id.* The contractual provisions prohibiting Scott from soliciting customers and suppliers were to remain effective through May 30, 2010. ECF No. 587 ¶ 30. The provision prohibiting him from soliciting employees of York Group or Milso was to remain in effect through May 30, 2011. *Id.* ¶ 31. These terms were expressed in an amendment to Scott's employment contract executed in connection with the settlement agreement. ECF No. 28–3 at 2–5.

 **\*3** In January 2008, Scott became engaged in the business of selling insurance to operators of funeral homes. Civil Action No. 08–6314 (S.D.N.Y.), ECF No. 1 ¶ 39. He employed eight individuals to market his insurance products. *Id.* Seven of Scott's eight employees had never been employed by York Group. *Id.* The other employee had apparently left York

Group to work for a different employer before joining Scott's sales force. *Id.*

Several manufacturers and distributors of caskets spoke to Scott about utilizing his sales force to market and sell caskets. Civil Action No. 08–6314 (S.D.N.Y.), ECF No. 1 ¶ 40. Scott responded to those communications by informing his prospective business partners about the non-competition and non-solicitation provisions of his amended contract with York Group. *Id.* ¶ 41. The prospective business partners expressed a willingness to proceed with their proposed ventures only if they could be assured that such conduct would not contravene the restrictive covenants. *Id.*

On July 14, 2008, Scott commenced an action against Matthews, York Group and Milso in the United States District Court for the Southern District of New York, seeking a declaration that the non-competition and non-solicitation provisions of his amended employment contract were invalid under New York law. Civil Action No. 08–6314 (S.D.N.Y.), ECF No. 1 ¶¶ 47–53. Four days later, he moved for the entry of a preliminary injunction prohibiting the enforcement of the restrictive covenants or the termination of his severance payments in retaliation for his proposed business activities. Civil Action No. 08–6314 (S.D.N.Y.), ECF No. 9. The district court denied Scott's motion in a memorandum opinion and order dated October 10, 2008. *Pontone v. York Group, Inc.,* Civil Action No. 08–6314, 2008 U.S. Dist. LEXIS 80372, 2008 WL 4539488 (S.D.N.Y. Oct. 10, 2008). Two days after the rendering of the district court's decision, Scott voluntarily dismissed the action pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). Civil Action No. 08–6314 (SDNY), ECF No. 34.

In January 2010, Scott incorporated the Pontone Casket Company, LLC ("PCC"), under the laws of New York. ECF No. 587 at 79, ¶ xxvii. On June 22, 2010, Pesce and Redmond left their positions with Matthews and started to work for Batesville Casket Company, Inc. ("Batesville"). *Id.* at 82, ¶ xxxvii. Batesville is the plaintiffs' main competitor. *Id.* at 38, ¶ 70. Two days later, Scott became a consultant for Batesville. *Id.* at 34, ¶¶ 65, 82, ¶ xxxvii. The sales consulting agreement was executed through PCC. *Id.* at 35, ¶ 66. Pesce and Redmond were provided with American Express credit cards issued in PCC's name. *Id.* at 91, ¶ li.

Matthews, York Group and Milso commenced this action against Scott and Batesville on August 16, 2010, asserting claims grounded in alleged breaches of the amended

employment contract. ECF No. 1. Harry retired from his positions with York Group and Milso in September 2010. ECF No. 587 at 39–41, ¶¶ 72, 90–91, ¶ 1. In an amended complaint filed on February 28, 2011, Matthews, York Group and Milso added Harry and PCC as defendants. ECF No. 70. Batesville, Scott, Harry and PCC subsequently filed a series of counterclaims against Matthews, York Group and Milso. [2] ECF Nos. 236, 308 & 333.

[2]    Batesville originally asserted counterclaims for abuse of process and malicious prosecution. ECF No. 236 ¶¶ 82–91. Those claims were dismissed without prejudice on August 14, 2012.

**\*4**  On December 15, 2011, Scott, Harry and PCC moved for the dismissal of this action pursuant to Federal Rule of Civil Procedure 12(b)(1). ECF No. 182. The motion to dismiss was denied in a memorandum opinion and order dated July 31, 2012. *York Group, Inc. v. Pontone,* Civil Action No. 10–1078, 2012 U.S. Dist. LEXIS 106695, 2012 WL 3127141 (W.D.Pa. July 31, 2012). The parties collectively filed five motions for summary judgment on March 8, 2013. ECF Nos. 462, 463, 467, 472 & 473. All five motions will be addressed in this memorandum opinion. [3]

[3]    The parties filed various motions to strike certain portions of the record due to alleged instances of noncompliance with case management orders. ECF Nos. 582, 588 & 599. The court perceives no prejudice to any party from the alleged noncompliance as the record is fully before court and all parties had more than adequate opportunity to brief the numerous dispositive motions. Those motions will be denied. Batesville's motions for oral argument will also be denied. The briefing on the dispositive motions is robust and the court reviewed sufficient written argument, which negates the need for oral argument. ECF Nos. 568 & 632.

### III. *Standard of Review*

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that a judgment as a matter of law is warranted. Fed.R.Civ.P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party,

drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.,* 478 F.3d 144, 147 (3d Cir.2007).

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conos hen ti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 140 (3d Cir.2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir.2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.,* 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989).

**IV.** *Jurisdiction and Venue*
The court has jurisdiction in this case pursuant to 28 U.S.C. § 1332(a)(1). Venue is proper under 28 U.S.C. § 1391(b).

**V.** *Discussion*
In the amended complaint, Matthews, York Group and Milso purported to assert claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against Scott and PCC. ECF No. 70 ¶¶ 174–184. Those claims were dismissed on August 24, 2011. ECF No. 141 at 21. The pending motions for summary judgment implicate the claims remaining in the amended complaint. Those claims include breach-of-contract claims against Scott and Harry, a breach-of-fiduciary-duty claim against Harry, tortious interference with contractual relations claims against Scott, Harry and Batesville, and unfair competition and unjust enrichment claims against Scott, Harry, PCC and Batesville. ECF No. 70 ¶¶ 123–73, 185–96. Batesville and the remaining defendants separately move for summary judgment with respect to all claims asserted against them in the amended complaint. ECF Nos. 462 & 472.

\*5 On April 25, 2012, Batesville filed counterclaims against Matthews, York Group and Milso for tortious interference with prospective economic advantage, abuse of process, malicious prosecution, unjust enrichment, and breach of a restrictive covenant involving former Batesville sales representative Kathy Brooks ("Brooks"). ECF No. 236 ¶¶ 68–113. The court dismissed without prejudice the abuse of process and malicious prosecution claims on August 14, 2012. Matthews, York Group and Milso move for summary judgment with respect to Batesville's remaining counterclaims. ECF No. 463.

On August 17, 2012, Scott, Harry and PCC filed eighteen separate counterclaims against Matthews, York Group and Milso. ECF No. 308. Amended counterclaims, including a new claim for defamation and previously-asserted claims for abuse of process, were filed on October 2, 2012. ECF No. 333. On May 22, 2013, the court filed a memorandum opinion and order dismissing without prejudice the abuse of process claims. ECF No. 579. Scott, Harry and PCC continue to assert counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with prospective business advantage, unjust enrichment, unfair competition, misappropriation of Harry's name, image and likeness, defamation, intrusion on seclusion, and false and misleading advertising. ECF No. 333 ¶¶ 165–266, 279–99. Scott and Harry also seek declaratory and injunctive relief in relation to their contractual obligations under their respective employment agreements with York Group. *Id.* ¶¶ 300–20. Matthews, York Group and Milso seek summary judgment with respect to the remaining seventeen counterclaims asserted by Scott, Harry and PCC. ECF No. 467. Scott and Harry move for partial summary judgment with respect to their counterclaims seeking declaratory and injunctive relief. ECF No. 473.

**A. The Validity of the Restrictive Covenants**
Among the thirty-one claims currently pending in this case, only two are subject to cross-motions for summary judgment. Those claims are the counterclaims seeking declarations that certain restrictive covenants found in the employment agreements are invalid. ECF No. 333 ¶¶ 300–20; ECF Nos. 467 & 473. Since many of the other claims asserted in this action center on the disputed contractual provisions, the court will consider the validity of the restrictive covenants before addressing the remaining issues.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**1. Collateral Estoppel Asserted by Matthews, York Group and Milso**

Matthews, York Group and Milso raise the affirmative defense of collateral estoppel in defense of the challenges brought to the restrictive covenants. ECF No. 468 at 35–38. This defense is based on the October 10, 2008, decision denying Scott's motion for a preliminary injunction. *Pontone,* 2008 U.S. Dist. LEXIS 80372, 2008 WL 4539488. The preclusive effect of a decision rendered by a federal court is governed by federal common law. *Smith v. Bayer Corp.,* ––– U.S. ––––, ––– n. 6, 131 S.Ct. 2368, 2376 n. 6, 180 L.Ed.2d 341 (2011). Uniform federal rules of preclusion apply to judgments entered in federal-question cases. *Taylor v. Sturgell,* 553 U.S. 880, 891, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). When a federal-court judgment in a diversity case is at issue, federal common law incorporates the applicable state rules of preclusion to the extent that those rules are not "incompatible with federal interests." *Semtek International, Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 508–09, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). Like most jurisdictions, New York applies the doctrine of collateral estoppel only where "the identical issue was necessarily decided in the prior action or proceeding and is decisive of the present action." *Howard v. Stature Electric, Inc.,* 20 N.Y.3d 522, 964 N.Y.S.2d 77, 986 N.E.2d 911, 913–14 (N.Y.2013). The prior action concerned only the validity of the provisions in Scott's amended employment agreement prohibiting him from engaging in competitive conduct and soliciting former customers and suppliers for a period of three years. *Pontone,* 2008 U.S. Dist. LEXIS 80372, at *4–5, 2008 WL 4539488. Those provisions are not being challenged in this action. ECF No. 333 ¶ 300–20. Under these circumstances, the counterclaims asserted in this action are not precluded by the decision rendered in the earlier action. *Hawksbill Sea Turtle v. Federal Emergency Management Agency,* 126 F.3d 461, 474–77 (3d Cir.1997); *PG Publishing Co. v. Aichele,* 902 F.Supp.2d 724, 742–44 (W.D.Pa.2012).

**2. Choice–of–Law Rules**

 **\*6** A federal court sitting in diversity normally applies the choice-of-law rules applicable in the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Choice-of-law clauses contained in the relevant employment agreements provided that they were to "be governed by and construed in accordance with the laws of the State of New York." ECF No. 470–1 at 16; ECF No. 480–2 at 15. Contractual provisions of this kind are generally enforceable

under Pennsylvania law. *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55–56 (3d Cir.1994). In light of the choice-of-law clauses, the parties have stipulated that New York law governs the terms of the employment agreements. ECF No. 159 at 2. Consequently, the court will consider the validity of the challenged contractual provisions in accordance with the law of New York.

**3. Non-disclosure/Confidentiality Provisions**

When Scott and Harry executed their respective employment agreements with York Group, they agreed to the following terms:

> 4.01. *Non–Disclosure of Confidential Information.* Employee agrees to hold and safeguard the Confidential Information in trust for the Company, its successors and assigns and agrees that he or she shall not, without the prior written consent of the Company, misappropriate or disclose or make available to anyone for use outside the Company's organization at any time, either during his employment with the Company or subsequent to the termination of his employment with the Company for any reason, including without limitation termination by the Company for Cause or without Cause, any of the Confidential Information, whether or not developed by Employee, except as required in the performance of Employee's duties to the Company. Without limitation, Employee shall not be permitted to remove Confidential Information from Company computer servers to use for any personal purpose.

ECF No. 470–1 at 12–13; ECF No. 480–2 at 11–12. The agreements define the term "Confidential Information" to mean

> information concerning the Company's sales, sales volume, sales methods, sales proposals, customers and prospective customers, identity of customers and prospective customers, identity of key purchasing personnel

in the employ of customers and prospective customers, amount or kind of customers' purchases from the Company, the Company's sources of supply, the Company's computer programs, system documentation, special hardware, product hardware, related software, the Company's manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to the Company or relating to the Company's affairs.

ECF No. 470–1 at 12; ECF No. 480–2 at 11.

Scott and Harry maintain that these terms are "unreasonable and unnecessary to protect [the] legitimate business interests" of Matthews, York Group and Milso. ECF No. 333 ¶ 304, 312. According to Scott and Harry, they would effectively "be barred for life from competing in the casket industry" if the terms of their employment agreements were to be given full effect. *Id.* ¶¶ 306, 313. This assertion is based on the idea that the non-disclosure provisions were crafted "to achieve the same effect" as "express non-compete provision[s]." ECF No. 479 at 2. Matthews, York Group and Milso deny that the non-disclosure provisions should be construed broadly enough to constitute *de facto* non-compete provisions. ECF No. 507 at 16. They contend that the non-disclosure provisions, which remain effective for the duration of the lives of Scott and Harry, can be enforced without depriving those individuals of opportunities to work in the casket industry. *Id.* at 16–17.

**\*7** Joseph C. Bartolacci ("Bartolacci"), the president and chief executive officer ("CEO") of Matthews, testified that, in his view, Scott and Harry could not effectively compete with Matthews in the New York market without breaching the non-disclosure provisions. ECF No. 348–1 at 94–102. Scott and Harry rely on Bartolacci's testimony for the proposition that Matthews, York Group and Milso are attempting to use the non-disclosure provisions as a pretext to force them out of the casket business. ECF No. 578 at 2–8. In the present context, however, the court must consider the provisions as drafted without conflating them with "the theory of inevitable disclosure." *Earthweb, Inc. v. Schlack,* 71 F.Supp.2d 299, 311–12 (S.D.N.Y.1999).

Under New York law, a restrictive covenant is ordinarily "subject to specific enforcement [only] to the extent that it is *reasonable in time* and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Reed, Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590, 593 (N.Y.1976) (emphasis added). The requirement of durational reasonableness, however, does not apply in cases involving "only the so-called 'implied covenant' to refrain from soliciting former customers following the sale of the 'good will' of a business." *Mohawk Maintenance Co., Inc. v. Kessler,* 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324, 328 (N.Y.1981). This principle derives from *Von Bremen v. MacMonnies,* 200 N.Y. 41, 93 N.E. 186 (N.Y.1910), in which the New York Court of Appeals explained:

> The good will, which the former owner thereof parts with *in invitum,* as in bankruptcy proceedings or by operation of law, as in the liquidation of a partnership by the lapse of time or its termination pursuant to the articles of copartnership, is a lesser property than the good will which is the subject of a voluntary sale and transfer by the owner for a valuable consideration. In the first class of cases the former owner remains under no legal obligation restricting competition on his part in the slightest degree; in the second class of cases the former owner, by his voluntary act of sale, has excluded himself from competing with the purchaser of the good will to the extent of having impliedly agreed that he will not solicit trade from customers of the old business. To this extent this good will is a more valuable property than the good will of a business which goes to a trustee in bankruptcy or a receiver or survivor of a partnership in liquidation. The good will which is the subject of a voluntary sale is, therefore, a different thing from the good will which the owner parts with perforce or under compulsion.

*Von Bremen,* 93 N.E. at 189. In this vein, "[a] seller's 'implied covenant' not to solicit his [or her] former customers is 'a permanent one that is not subject to divestiture upon the passage of a reasonable period of time.' " *Bessemer Trust Co., N.A. v. Branin,* 16 N.Y.3d 549, 925 N.Y.S.2d 371, 949 N.E.2d 462, 468 (N.Y.2011) (quoting *Mohawk,* 437 N.Y.S.2d 646, 419 N.E.2d at 329). This implied covenant is based on the idea that a transaction facilitating the sale of a business essentially constitutes "an attempt to transfer the loyalties of the business' customers from the seller, who cultivated and created them, to the new proprietor." *Bessemer,* 437 N.Y.S.2d 646, 419 N.E.2d at 329. When the seller of a business actively solicits his or her former customers in connection with a competing business, he or she violates the law of New York even in the absence of a contractual covenant restricting his or her ability to engage in competitive conduct. *Mohawk,* 437 N.Y.S.2d 646, 419 N.E.2d at 329, n. 6.

**\*8** Matthews, York Group and Milso argue that the confidentiality provisions contained in the employment agreements merely codify an employee's common-law duty to refrain from disclosing proprietary information maintained by his or her employer. ECF No. 468 at 39–40. To the extent that those provisions prohibit the disclosure of "customers," it can certainly be said that they prophylactically safeguard certain interests independently protected under the "implied covenant" recognized in New York. *Bessemer,* 925 N.Y.S.2d 371, 949 N.E.2d at 469 (explaining that "[t]he 'implied covenant' not to solicit former customers bars a seller from taking affirmative steps to directly communicate with them"). Scott and Harry attempt to distinguish this case from the cases involving the "implied covenant" by pointing out that their respective employment agreements were separate and distinct from the asset purchase agreement. ECF No. 578 at 9. That attempted distinction is unavailing. The employment agreements were executed on the same date as the asset purchase agreement. ECF No. 470–1 at 2; ECF No. 480–2 at 1. They became effective on the closing date specified therein.[4] *Id.* Like other members of the Pontone family, Scott and Harry received significant sums of money in connection with the sale. ECF No. 4 ¶ 10. The mere fact that separate agreements were executed does not mean that the overall context of the transaction can be ignored. Since New York law independently precluded Scott and Harry from competitively soliciting Milso's former customers for the duration of their lives, the confidentiality provisions appear to be enforceable to the extent that they prohibit the disclosure of those customers. *Reed, Roberts Associates,* 386 N.Y.S.2d

677, 353 N.E.2d at 593 (declaring that "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information").

4       The employment agreements would not have become effective if the asset purchase agreement had been terminated prior to the closing, or if some other event had prevented the closing's occurrence. ECF No. 470–1 at 2; ECF No. 480–2 at 1. Furthermore, the employment agreements incorporated certain definitions contained within the asset purchase agreement. *Id.*

The purchasing habits of particular customers are not inevitably "confidential." *Earthweb,* 71 F.Supp.2d at 315. In this case, however, Scott and Harry are more limited in their dealings with former customers because they *sold* their family business. *Bessemer,* 925 N.Y.S.2d 371, 949 N.E.2d at 468–470. Matthews, York Group and Milso were permitted to negotiate employment contracts providing more protection than that independently provided under New York's common law. *Mohawk,* 437 N.Y.S.2d 646, 419 N.E.2d at 329 n. 6. The court acknowledges that the employment agreements expressly permitted Scott and Harry to solicit former customers of York Group and Milso after the passage of three years. ECF No. 28–3 at 4; ECF No. 470–1 at 14–15; ECF No. 480–2 at 13–14. For this reason, Scott and Harry are not amenable to suit on the theory that they breached the implied covenant not to solicit former customers. *MGM Court Reporting Service, Inc. v. Greenberg,* 74 N.Y.2d 691, 543 N.Y.S.2d 376, 541 N.E.2d 405, 406 (N.Y.1989). This court previously recognized that New York law permits parties to waive the implied covenant by agreement. ECF No. 72 at 9–10. It does not follow, however, that the existence of the implied covenant under New York law has no bearing whatsoever on the reasonableness of the employment contracts. Since New York law (in the absence of the agreements) would prohibit Scott and Harry from soliciting their former customers for the duration of their lives, it follows *a fortiori* that the parties were free to prohibit *contractually* the *disclosure* of those customers for an indefinite period of time. *Mohawk,* 437 N.Y.S.2d 646, 419 N.E.2d at 329, n. 6.

**\*9** On the other hand, a confidentiality agreement utilized as a *de facto* restrictive covenant "can be a powerful weapon in the hands of an employer," especially since "the risk of litigation alone may have a chilling effect on the employee." *Earthweb,* 71 F.Supp.2d at 310. Bartolacci's testimony suggests that Matthews, York Group and Milso

view any attempts by Scott and Harry to compete with them in the New York market as necessarily encompassing violations of the non-disclosure provisions. ECF No. 348–1 at 94–102. Some applications of the those provisions could restrain the activities of Scott and Harry in a manner that is inconsistent with the law of New York. Neither confidentiality clause has to be enforced or invalidated as an undifferentiated whole, since the New York Court of Appeals has found restrictive covenants to be severable. *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1226–1227 (N.Y.1999). Given that the public policy implications of the non-disclosure provisions are not apparent from the record, the invalidity of those provisions in some contexts will be determined after the remaining factual issues in this case are tried. *Barbagallo v. Marcum LLP,* 820 F.Supp.2d 429, 449–50 (E.D.N.Y.2011). In the meantime, the motion for partial summary judgment filed by Scott and Harry will be denied.[5] ECF No. 473. The motion for summary judgment filed by Matthews, York Group and Milso will be denied with respect to the counterclaims seeking declaratory and injunctive relief from the application of the non-disclosure provisions. ECF No. 463.

[5]    Although Harry sought injunctive relief from other restrictive covenants contained in his employment agreement, those covenants have already expired. ECF No. 333 ¶¶ 300–10. In any event, the reasons given by the United States District Court for the Southern District of New York for upholding the challenged provisions in Scott's amended employment agreement would appear to counsel in favor of a similar resolution in relation to Harry's employment agreement. *Pontone v. YorkGroup, Inc.,* Civil Action No. 08–6314, 2008 U.S. Dist. LEXIS 80372, at *11–14, 2008 WL 4539488 (S.D.N.Y. Oct. 10, 2008).

## B. The Breach–of–Contract Claims
The asset purchase agreement provides:

> 12.1 *Confidentiality.* Sellers and Shareholders hereby covenant and agree that, except as may be required by law, rule or regulation or court order, or as permitted by this Agreement, unless this Agreement is terminated, they will not at any time reveal, divulge or make known to any Person (other than Buyer or its agents and Affiliates) any information that relates to this Agreement, the

> transactions contemplated hereby or the Business (whether now possessed by Sellers or furnished by Buyer after the Closing Date), including, but not limited to, customer lists or other customer information, trade secrets or formulae, marketing plans or proposals, financial information or any data, written material, records or documents used by or relating to the Business that are of a confidential nature (collectively, the *"Confidential Information"* ).

ECF No. 4–1 at 47. Matthews, York Group and Milso allege that Scott and Harry breached Section 12.1 of the asset purchase agreement by disclosing their "customer lists and customer information, trade secrets and other proprietary information" to Batesville. ECF No. 70 ¶¶ 128, 146. The breach-of-contract claims asserted against Scott and Harry are also based on allegations that they violated their respective employment agreements by inducing Pesce and Redmond to leave their prior positions and start working for Batesville. *Id.* ¶¶ 129, 147. Scott and Harry move for summary judgment with respect to those claims. ECF No. 472.

### 1. Choice–of–Law
**\*10** The asset purchase agreement contains a choice-of-law clause declaring that it "shall be governed by and construed in accordance with the laws of the State of Delaware." ECF No. 4–1 at 56. In accordance with that clause, the parties have stipulated that Delaware law governs the breach-of-contract claims stemming from the asset purchase agreement. ECF No. 159 at 2. The asset purchase agreement also has a forum-selection provision stating that "any suit, action or proceeding arising [thereunder] shall be brought solely in the state or federal courts of Delaware." ECF No. 4–1 at 56. Scott and Harry maintain that Matthews, York Group and Milso breached the asset purchase agreement by bringing their claims in this court, thereby rendering those claims infirm. ECF No. 477 at 31–32. Matthews, York Group and Milso offer no coherent argument relating to the forum-selection clause. ECF No. 510 at 27, n. 14.

In *Atlantic Marine Construction Co., Inc. v. U.S. District Court for the Western District of Texas,* ––– U.S. ––––, –––– – ––––, 134 S.Ct. 568, 577–78, 187 L.Ed.2d 487 (2013), the United States Supreme Court held that a contractual forum-selection clause agreed to by the parties had no impact on

the propriety of venue under 28 U.S.C. § 1391. The Supreme Court explained that the proper method for enforcing the forum-selection clause was either a transfer pursuant to 28 U.S.C. § 1404(a) or the application of the doctrine of *forum non conveniens. Atlantic Marine,* 134 S.Ct. at 579–80. No opinion was expressed about whether the defendant in a breach-of-contract action could obtain a merits-based dismissal on the ground that the suit was commenced in violation of a forum-selection clause, since that issue had not been briefed by the parties. *Id.* at 580.

Scott and Harry do not move for a transfer. Instead, they merely contend that the apparent violation of the forum-selection clause justifies the dismissal of the breach-of-contract claims for merits-based reasons. ECF No. 477 at 31–32. The propriety of such a dismissal can only be considered in relation to Delaware law. The Delaware Supreme Court has held that the doctrine of "unclean hands" should be applied to prelude a breach-of-contract claim only where the plaintiff's independent breach is "repugnant." *Smithkline Beecham Pharmaceuticals Co. v. Merck & Co., Inc.,* 766 A.2d 442, 449–50 (Del.2000). Although the claims based on the asset purchase agreement were filed in violation of the forum-selection clause, they are accompanied by virtually identical claims arising under the employment agreements. ECF No. 70 ¶¶ 128, 147. Unlike the asset purchase agreement, the employment agreements are governed by New York law. ECF No. 159. They contain forum-selection clauses requiring "any suit, action or proceeding arising [thereunder to] be brought solely in the state or federal courts of Pittsburgh, Pennsylvania or New York, New York." ECF No. 470–1 at 16; ECF No. 480–2 at 15. Matthews, York Group and Milso could have strictly complied with all applicable forum-selection clauses only by commencing two separate actions. They adhered to the forum-selection clauses contained in the employment agreements by filing suit in this court. Given that only a small subset of the claims asserted in this action are subject to the forum-selection clause in the asset purchase agreement, the court cannot conclude that the "breach" attributable to the choice of this forum was sufficiently "repugnant" to justify the dismissal of those claims under the law of Delaware. [6] *Smithkline Beecham,* 766 A.2d at 449–50.

[6]   The court expresses no opinion about whether Scott and Harry would have been entitled to have this case transferred to Delaware if they had moved for such a transfer pursuant to 28 U.S.C. § 1404(a). *Atlantic Marine Construction Co., Inc. v. U.S. District Court for the*

*Western District of Texas,* ––– U.S. ––––, ––––  – ––––, 134 S.Ct. 568, 579–82, 187 L.Ed.2d 487 (2013).

**\*11**  Under New York law, a plaintiff proceeding with a breach-of-contract claim must demonstrate the existence of an agreement, adequate performance on his or her part, a breach by the defendant, and resulting damages. *Fischer & Mandell LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir.2011). The elements of a breach-of-contract claim under Delaware law are not materially different. *VLIW Technology, LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del.2003). Scott and Harry contend that the record fails to establish that they breached their respective contractual obligations, or that any damages resulted from the alleged breaches. ECF No. 477 at 14.

Under the amended employment agreement, Scott was not permitted to "directly or indirectly solicit or induce any employee of York Group, Inc. or Milso to leave either company or hire any such employee." ECF No. 28–5 at 4. It is undisputed that this prohibition, which remained effective for four years following Scott's departure, was in effect when Pesce and Redmond left their positions and started to work for Batesville. *Id.* Attempting to refute any assertion that he violated his contractual obligations, Scott asserts that Pesce and Redmond were employed only by Matthews and, therefore, not within the categories of York Group and Milso employees falling within the scope of the non-solicitation provision. ECF No. 477 at 40. Scott also argues that he did not "solicit or induce" Pesce or Redmond to leave Matthews in any event. *Id.* at 41–44.

The record contains conflicting evidence concerning the employment status of Pesce and Redmond. Pesce and Redmond submitted statements declaring that they had been employed by Matthews. ECF No. 484–25 at 1–2, ¶¶ 3–8; ECF No. 485–8 at 1–2, ¶¶ 3–10. Both individuals received their paychecks from Matthews. ECF No. 511 at 27, ¶ 12, 31, ¶ 24. Jennifer Ciccone ("Ciccone"), Matthews' vice president of Human Resources, responded in the affirmative when asked whether Pesce and Redmond were subject to a handbook describing certain policies pertaining to Matthews' employees. ECF No. 485–6 at 26. Nonetheless, the documentary record contains evidence suggesting that those individuals were employed by York Group and Milso. On September 21, 2006, Redmond received a memorandum stating that Matthews "w[ould] be handling the payroll for Milso effective 10/01/2006." ECF No. 518–107 at 2. The memorandum instructed Redmond to complete a "special payroll check request form" in order to "expedite payroll

changes." *Id.* An "employee status change notice" form contained in the record indicates that Pesce "transfer[ed] from Milso to York" on December 29, 2007. ECF No. 518–97 at 2. In a declaration dated April 1, 2013, Ciccone stated that Pesce and Redmond had both become employees of Milso after the 2005 acquisition. ECF No. 518–94 at 3, ¶ 3. She confirmed that Pesce had later become a York Group employee in December 2007. *Id.* Ciccone declared that Redmond had remained a Milso employee until his resignation on June 22, 2010. *Id.* According to Ciccone, the fact that Pesce and Redmond had been paid by Matthews was attributable to the centralization of human resources and payroll records among employees of Matthews, York Group and Milso. *Id.* at 3, ¶ 5. Pesce and Redmond were listed on the payroll registers respectively for York Group and Milso. *Id.* at 3, ¶ 4. On the basis of the existing record, a reasonable trier of fact could conclude that Pesce and Redmond were within the categories of York Group and Milso employees falling within the non-solicitation provision found in Scott's amended employment agreement. ECF No. 28–3 at 4.

**\*12** Pesce and Redmond started to work for Batesville on June 22, 2010. ECF No. 587 at 82–83, ¶ xxxvii. Scott became a Batesville consultant two days later. *Id.* Matthews, York Group and Milso allege that Scott breached the non-solicitation provision of his amended contract by inducing Pesce and Redmond to leave their positions with York Group and Milso in order to work for Batesville. ECF No. 70 ¶ 129. Scott denies that allegation. ECF No. 477 at 41–44.

In declarations signed in March 2013, Pesce and Redmond both denied that Scott or Harry had influenced their decisions to accept positions at Batesville. ECF No. 484–25 at 6, ¶ 30; ECF No. 485–8 at 4, ¶ 16. Pesce stated that she had approached Dave Bowers ("Bowers"), Batesville's director of sales for the Metropolitan Region, about a position at Batesville during the Metropolitan Funeral Directors Golf Outing conducted in May 2010. [7] ECF No. 484–25 at 6, ¶ 28. This conversation evidently led to Pesce's hiring a few weeks later. Redmond asserted that he had gone to Batesville in search of better work hours, a greater potential for advancement, and more job security. ECF No. 485–8 at 2–3, ¶¶ 11–15. He stated that his employment with Batesville had resulted from an inquiry initiated by him in May 2010. [8] *Id.* at 3, ¶ 15.

[7]   Bowers testified that the golf outing was held on May 27, 2010. Bowers Dep. 99:1–4.

[8]   Batesville's vice president of sales, Doug Kunkel ("Kunkel"), testified that the potential hiring of Pesce and Redmond was discussed at some point in April or May 2010. ECF No. 518–21 at 4. It is not clear whether those discussions occurred before or after the golf outing.

Pesce declared that she had feared losing her job at Matthews because her mother, a seamstress, had been terminated by Matthews roughly four months after the settlement that had resolved the 2007 lawsuit brought by Scott and Harry against York Group. ECF No. 484–25 at 2–3, ¶¶ 9–14. She explained that a letter to Harry from James P. Doyle ("Doyle"), a Matthews official, had caused her to question her job security. *Id.* at 4–5, ¶¶ 19–25. The letter, which was dated March 22, 2010, contained the following language:

> As you might expect, I was very disappointed with both the tone and content of your recent correspondence addressing the various proposals Matthews has communicated over the past year to extend your employment with the Casket Division. Simply stated, I do not understand your alleged outrage or the manner in which you are now mischaracterizing Matthews' repeated good faith attempts to retain your services beyond the expiration of your existing employment agreement.

> Obviously, no one affiliated with Matthews ever attempted to "bribe" Josephine. To the contrary, we openly discussed with you in person our interest in expanding Josephine's sales role and, prior to formally doing so, specifically sought your approval. When this idea was presented to you, you expressed both satisfaction and unequivocal support for increasing Josephine's responsibilities. However, given your recent admonishment of our efforts to formally secure Josephine's continued position with Matthews, we will now reconsider Josephine's long-term role with the Casket Division. ECF No. 484–25 at 7. The attempted "bribe" referenced in Doyle's letter appears to be an alleged offer from Steven Pontone ("Steven"), Harry's nephew, to pay Pesce $10,000.00 to service Harry's funeral home customers for Matthews. [9] *Id.* at 3, ¶ 16. Pesce described this alleged offer, which she later disclosed to Harry, as an attempt to secure the loyalties of Harry's customers even if Matthews ultimately decided to get "rid of him." *Id.* at 3–4, ¶ 17.

[9]   Doyle's letter was apparently prepared in response to a letter authored by Harry in March 2010. ECF No. 518–6 at 5.

**\*13** Scott vehemently denies that he played a role in steering Pesce or Redmond to Batesville. ECF No. 570 at 39–42. Under the present circumstances, however, a reasonable jury could infer that Scott was involved in the decisions of those two individuals to leave Matthews, York Group or Milso for Batesville. On June 18, 2010, Bowers forwarded a "Tactical Marketing Plan" to John Schutte ("Schutte") via email. BCC1—0050394–402. The document stated that the "plan overview" was to "[l]everage the relationships of Scott Pontone, Josephine Pesce, and Joseph Redmond in the Metropolitan Region to increase [Batesville's] customer awareness and market share." BCC10050396. Under the "message summary" heading, the document stated as follows:

> We're pleased to announce that Batesville has entered into a consultative relationship with Scott Pontone. As the former Vice President of Milso Industries and President of the Matthews Casket Division, Scott is widely known and respected in the funeral industry. He has spent his entire career in the funeral industry and has a true passion for his work. Scott will be working as a marketing consultant to Batesville in the Metropolitan area, leveraging his current and past relationships to open doors that will allow us to present Batesville's valuable proposition to funeral directors. Relationships are critical in funeral service and we believe Scott will effectively compliment [sic] our resources in helping grow our business in New York and the surrounding area. In addition we're also pleased to announce that Josephine Pesce and Joey Redmond have also joined our Team. Josephine has spent over 35 years with South Brooklyn and Milso Casket Company is [sic] various roles. Josephine will be an account specialist for Batesville Casket Company, we will use her knowledge and customer expertise to help us transition business quickly and efficiently. In this new role Josephine will report directly to the Regional Director. Joey has spent over 25 years with his former

employer where he managed the South Brooklyn service center. Prior to the sale to Matthews this was the largest service center that Milso operated. His knowledge of the customers and their buying habits will be critical to our success transitioning products.

BCC1—0050399.

Shortly after receiving the marketing plan, Schutte forwarded it to Doug Kunkel ("Kunkel"), who served as Batesville's Vice President of Sales. BCC1—0050394. In an email message to Kunkel, Schutte made the following observations:

> Please review the Capri tactical plan. Please keep in mind the plan is based off of direction from Dibease and the requirements/expectations of Scott. You and I should probably discuss after you review due to a few structural changes that need your blessing.

BCC1_0050394. The language referring to the "requirements" and "expectations of Scott" suggests that he was involved in Batesville's marketing strategy *before* Pesce and Redmond started to work there. An internal message sent to Bowers referred to Batesville's acquisition of the "Pontone trio" as its "most important action step taken in decades." BCC10022975. It is worth noting that Michael DiBease ("DiBease"), Batesville's vice president of marketing, testified that Batesville had not even completed reference checks before hiring Pesce and Redmond. DiBease Dep. 151: 9–23. Although the contents of the "Capri [10] tactical plan" do not conclusively establish that Scott solicited the services of Pesce and Redmond on behalf of Batesville, they provide enough circumstantial evidence of inducement to permit a reasonable trier of fact to draw such an inference. [11] *InterVest, Inc. v. Bloomberg, L.P.,* 340 F.3d 144, 159 (3d Cir.2003).

[10]    Mike DiBease ("DiBease"), Batesville's vice president of marketing, testified that the term "Capri" had been taken from the name of a vacation site frequented by Scott and his wife. DiBease Dep. 47: 5–15.

[11]    Brian Walters ("Walters"), Matthews' general counsel, testified that Harry had verbally acknowledged Scott's coordination of the departures of Pesce and Redmond.

ECF No. 518—7 at 5. Batesville maintains that Walters' testimony constitutes inadmissible hearsay that cannot be considered in connection with the pending motions for summary judgment. ECF No. 561 at 9. The court need not consider the admissibility of Walters' testimony at this time, since the record independently contains sufficient circumstantial evidence to give rise to an inference that Scott played a role in recruiting Pesce and Redmond to Batesville.

**\*14** Matthews, York Group and Milso allege that Scott and Harry breached their contractual obligations by providing Batesville with "customer lists and customer information, trade secrets and other proprietary information." ECF No. 70 ¶¶ 128, 146. Peter Hounsell ("Hounsell") testified that, during "the few months leading up to" the departures of Pesce and Redmond, Pesce had been "extensively" shredding papers. ECF No. 518—27 at 3. Hounsell stated that, on April 19, 2010, Pesce asked him to "run reports on Harry's entire account base." [12] *Id.* at 10. Bartolacci testified that Harry had originally recommended Pesce for a promotion, but that he had suddenly changed his mind after learning that she would need to sign a non-competition agreement. ECF No. 518—20 at 19. In addition, Bartolacci stated that Harry had "changed significant contractual relationships with certain customers from a rebate program to an upfront discount program" and "prevented [him] from meeting with the most significant customer of that group." *Id.* at 9–10. Batesville's "Capri tactical plan" was apparently crafted to capitalize on "knowledge of the customers and their buying habits" provided by Scott, Pesce and Redmond. BCC10050399. Under the present circumstances, this "delicate construct of circumstantial evidence" could enable a reasonable jury to conclude that Scott and Harry misappropriated confidential information in violation of their respective employment agreements. *Greenberg v. Croydon Plastics Co., Inc.,* 378 F.Supp. 806, 814 (E.D.Pa.1974).

[12]     Pesce refused to participate in an exit interview after providing notice of her departure. YORK—0081817.

In order to recover on their breach-of-contract claims, Matthews, York Group and Milso must establish that they suffered damages as a result of the breaches allegedly committed by Scott and Harry. *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). The existing record provides sufficient evidence of damages to create a triable issue. The documentary evidence indicates that Batesville's sales to several regular Matthews customers dramatically increased between July 1, 2010, and June 30, 2011. BCC1—0059068. Andrew Pontone ("Andrew")

declared that several former customers had removed Matthews' products from their showrooms, and replaced them with products offered by Batesville, shortly after the departures of Pesce and Redmond. ECF No. 518—12 at 7, ¶ 18. Redmond testified that Scott, Pesce and he had been "instrumental" in getting some customers to purchase products from Batesville rather than from Matthews. ECF No. 518—26 at 18. Thomas Pontone ("Thomas") testified that Matthews had been forced to offer other customers higher discounts and better rebates in order to retain their business. ECF No. 518—28 at 15. He stated that Batesville had been offering funeral homes slightly higher discounts than those previously offered by Matthews, leading him to believe that Batesville's sales representatives had been provided with confidential information about the terms of Matthews' deals with those customers. *Id.* at 11–12. In his declaration, Andrew stated that Matthews had been forced to offer increased discounts to four of Harry's former customers in order to retain their business. ECF No. 518—12 at 8–9, ¶ 22.

**\*15** The court acknowledges that several funeral home operators have submitted declarations stating that their decisions to purchase products from Batesville rather than from Matthews were entirely attributable to factors other than the actions of Scott, Harry, Pesce or Redmond. ECF No. 484—7 at 7, ¶ 39; ECF No. 484—8 at 6, ¶ 28; ECF No. 484—9 at 5–6, ¶ 27; ECF No. 484—10 at 8, ¶ 31; ECF No. 484—11 at 4, ¶ 21; ECF No. 484—12 at 5–6, ¶ 30. In the present context, however, those declarations do not preclude a finding that strategic information improperly provided to Batesville personnel played a determinative role in causing the customers to deal with Batesville rather than with Matthews. The causal relationship between a contractual breach and the damages suffered by the non-breaching party presents a question of fact for the jury. *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.,* 429 F.Supp.2d 582, 610–611 (S.D.N.Y.2006). The motion for summary judgment filed by Scott, Harry and PCC will be denied with respect to the breach-of-contract claims asserted against Scott and Harry. ECF No. 70 ¶¶ 123–32, 141–50.

## C. The Breach–of–Fiduciary Duty Claim

Matthews, York Group and Milso allege that Harry breached certain fiduciary duties in connection with the departures of Pesce and Redmond and the alleged misappropriation of confidential information. ECF No. 70 ¶ 151–57. Harry argues that this claim should be dismissed under the "gist of the action doctrine." ECF No. 477 at 16. That doctrine, which is grounded in Pennsylvania law, generally precludes

plaintiffs from characterizing ordinary breach-of-contract claims as tort claims. *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 14 (Pa.Super.Ct.2002). "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth. of Cambria Cnty. v. Int'l Ins. Co. .,* 454 Pa.Super. 374, 685 A.2d 581, 590 (Pa.Super.Ct.1996) (*en banc* ). The "gist of the action principle" can be applied even where the misconduct alleged is fraudulent in nature. *Pediatrix Screening, Inc. v. Telechem Int'l, Inc.,* 602 F.3d 541, 548 (3d Cir.2010).

The parties stipulated that the breach-of-fiduciary duty claim asserted against Harry is governed by Delaware law. ECF No. 159 at 2. Consequently, the "gist of the action doctrine" recognized in Pennsylvania cannot be applied as such. Nevertheless, Delaware recognizes "the primacy of contract law over fiduciary law." *Wood v. Baum,* 953 A.2d 136, 143, n. 23 (Del.2008). In disputes arising from obligations addressed in contractual provisions, "any fiduciary claims arising out of the same facts that underlie [those] obligations [are] foreclosed as superfluous." *Nemec v. Shrader,* 991 A.2d 1120, 1129 (Del.2010). Section 1.07 of Harry's employment agreement specifically provided that he "owe[d] a fiduciary duty of loyalty to act at all times in the best interests of the Company." ECF No. 480–2 at 8. That provision prohibited Harry from appropriating York Group's "business opportunities" for his "own benefit." *Id.* For this reason, any alleged breaches of Harry's fiduciary duties are subsumed by the contract, which is governed by New York law. *Id.* at 15. The breach-of-contract claims asserted against Harry are based, at least in part, on Section 1.07 of the agreement. ECF No. 70 ¶ 147. Since genuine issues of material fact exist about whether Harry breached his contractual obligations, those claims remain viable. Under Delaware law, however, the common-law breach-of-fiduciary-duty claim must be dismissed as superfluous in light of the contractual claims. *Nemec,* 991 A.2d at 1129. With respect to the breach-of-fiduciary duty claim, summary judgment will be entered in favor of Harry. ECF No. 70 ¶¶ 151–57.

**D. The Tortious Interference with Contractual Relations Claims**

 **\*16** Matthews, York Group and Milso assert tortious interference with contractual relations claims against Scott, Harry and Batesville. ECF No. 70 ¶¶ 133–40, 158–73. A party cannot be injured by the application of a particular jurisdiction's law if that law "is not in conflict with that of

any other [interested] jurisdiction." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 816, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Consequently, an extensive choice-of-law analysis is unnecessary when no difference exists between the laws of the competing jurisdictions. *Pacific Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.,* 693 F.3d 417, 432 (3d Cir.2012). The parties agree that no difference exists between the laws of Pennsylvania and New York with respect to the tort of interfering with existing contractual relations. ECF No. 159 at 2–3. Therefore, the court may interchangeably refer to the laws of those jurisdictions. *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 229 (3d Cir.2007).

Pennsylvania recognizes "an action in tort for an intentional, unprivileged interference with contractual relations." *Birl v. Phila. Elec. Co.,* 402 Pa. 297, 167 A.2d 472, 474 (Pa.1960). To sustain a cause of action for "intentional interference with business relations" under Pennsylvania law, a plaintiff must demonstrate that: (1) there was an existing contractual relationship between the plaintiff and a third party; (2) the defendant induced the third party to breach his or her contractual obligations; (3) the defendant's conduct was not privileged; and (4) the breach caused the plaintiff to suffer pecuniary loss. *Al Hamilton Contracting Co. v. Cowder,* 434 Pa.Super. 491, 644 A.2d 188, 191 (Pa.Super.Ct.1994). "The third element requires proof that the defendant's actions were *improper* under the circumstances presented." *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 98 (Pa.Super.Ct.2009) (emphasis in original). Pennsylvania law essentially requires a plaintiff to establish, as a part of his or her *prima facie* case, that "the defendant's conduct was not justified." *Triffin v. Janssen,* 426 Pa.Super. 57, 626 A.2d 571, 574 n. 3 (Pa.Super.Ct.1993). In determining whether an actor's conduct is "improper," a court must consider: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." *Id* . (quoting the Restatement (Second) of Torts § 767). A plaintiff who maintains a successful claim under this theory may be entitled to an award of punitive damages. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.,* 500 F.Supp. 1312, 1322 (W.D.Pa.1980).

The New York Court of Appeals has declared that a defendant must have knowledge of a plaintiff's contract with a third

party in order tortiously to procure a breach thereof. *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (N.Y.1996). "[W]here there is an existing, enforceable contract and a defendant's deliberate indifference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." [13] *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 496 (N.Y.1996). A claim for tortious interference with a contractual relationship cannot normally be asserted against a party to that relationship. *Albert v. Loksen,* 239 F.3d 256, 274–275 (2d Cir.2001).

[13]    Where a claim is "based on interference with a nonbinding relationship," the plaintiff must ordinarily show that the defendant's conduct "amount[ed] to a crime or an independent tort." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100, 1103 (N.Y.2004). This heightened showing of impropriety is needed to assert a claim for tortious interference with *prospective* contractual relations, where "the balance of interests is different ." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422, 835 N.Y.S.2d 530, 867 N.E.2d 381, 384 (N.Y.2007).

**\*17** Scott and Harry were obviously parties to their respective employment agreements. The interference claims asserted against them are grounded in an allegation that they each interfered with the contractual obligations owed by the other. ECF No. 70 ¶¶ 133–40, 158–65. The record clearly establishes that Scott and Harry were each aware of the other's contractual obligations. Indeed, the agreement governing the terms of Scott's employment specifically referred to Harry's status as the president. [14] ECF No. 470–1 at 2–3. Scott joined Harry's 2007 lawsuit challenging York Group's alleged violations of the asset purchase agreement. ECF No. 191–2. Neither individual could be credibly described as a stranger to the other's employment agreement.

[14]    Scott was designated as Harry's successor in the event that Harry did not complete his term. ECF No. 470–1 at 3.

As discussed earlier, genuine issues of material fact exist about whether Scott and Harry breached their respective employment agreements, and whether pecuniary losses resulted from the alleged breaches. The remaining questions center on the issues of inducement and impropriety. *Al Hamilton,* 644 A.2d at 191; *Walnut Street,* 982 A.2d at 98.

Contrary to the assertions of Scott and Harry, the existing record contains sufficient evidence from which a reasonable trier of fact could infer that each of them facilitated breaches of the other's contractual obligations.

The document discussing Batesville's "Capri tactical plan" could give rise to an inference that Scott was involved in the procurement and disclosure of confidential information available to Pesce and Redmond. BCC1—0050394–402. According to Hounsell, Pesce was "run[ning] reports on Harry's entire account base" just two months prior to her defection to Batesville. ECF No. 518–27 at 10. Bartolacci testified that Harry had resisted Pesce's receipt of a promotion after learning that Pesce would be asked to sign a non-competition agreement. ECF No. 518–20 at 19. Andrew declared that, during the months immediately preceding June 2010, Harry had actively prevented other Matthews salespersons from communicating with "his" customers. ECF No. 518–12 at 4, ¶ 7. Although Scott was the member of the Pontone family specifically affiliated with Batesville, Andrew stated that Harry had been the one with "close relationships" with the customers who were switching their business from Matthews to Batesville. *Id.* at 5, ¶ 9. Scott, Pesce and Redmond all started to work for Batesville in June 2010. ECF No. 587 at 34, ¶ 65, 82, ¶ xxxvii. Batesville's internal documents suggest that, shortly thereafter, Harry may have been involved in Scott's efforts to steer business from Matthews to Batesville. Frank Connelly ("Connelly"), a strategic account specialist for Batesville, forwarded the following comments to Bowers on July 19, 2010:

> Comments: Vicki Thompson–Simmions [sic] asked about the hiring of Scott Pontone. I advised Vicki that Scott Pontone wanted to get back into the casket business. Scott stated after careful review of all the casket companies Batesville was in the best position to provide the funeral service industry with the right products and services. Scott states Batesville offers the best products, technology and is forward thinking to take on the challenges and demands in todays [sic] funeral service industry. Vicki was very happy to see Scott Pontone join us. Vicki and her farther [sic] will be meeting with Harry Pontone to discuss the Scott move. Vicki thinks that this will be an opportunity to move

all of their business to Batesville. Will follow up and advised.

**\*18** BCC10022994–95. Andrew asserted that he had personally seen Harry solicit customers for Batesville on September 23, 2010. ECF No. 518–12 at 10, ¶ 27. Given the "unduly suggestive" timing of these events, a reasonable jury could infer that Scott and Harry were mutually involved in concerted actions constituting corresponding violations of their respective employment agreements. [15] *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358, 369 (3d Cir.2008) (discussing the importance of "temporal proximity," and the inferences arising therefrom, in the "procedural posture" of summary judgment).

[15]    The court acknowledges that some of this evidence is contradicted. Vicki Thompson–Simmons, the assistant manager of the Lawrence H. Woodward Funeral Home, Inc., submitted a declaration denying that her decision to purchase products from Batesville had been influenced by the actions of Scott, Harry, Pesce or Redmond. ECF No. 484–12 at 5–6, ¶ 30. Scott, Harry and Batesville remain free to rely on such countervailing evidence at trial. At this stage, however, the evidence must be viewed in the light most favorable to Matthews, York Group and Milso. *Thompson v. Wagner,* 631 F.Supp.2d 664, 681– 682 (W.D.Pa.2008).

The remaining question is whether the activities allegedly engaged in by Scott and Harry could be reasonably deemed to be improper under the circumstances presented. *Walnut St.,* 982 A.2d at 98. Scott and Harry vaguely contend that they did not engage in "improper" conduct. ECF No. 477 at 38–39. The existing record, however, contains evidence suggesting that they were mutually engaging in conduct violative of their contractual obligations for the purpose of steering customers from Matthews to Batesville. BCC1—0022994–95. When the Pontones sold their family business to Matthews, they gave up the right to solicit the business of their former customers to Matthews' detriment. *Bessemer,* 925 N.Y.S.2d 371, 949 N.E.2d at 468–70. Although Scott and Harry were released from New York's "implied covenant" against solicitation by the operation of their respective employment agreements, they remained subject to additional restrictions designed to safeguard Matthews' business interests. ECF No. 28–3 at 4; ECF No. 470–1 at 14–15; ECF No. 480–2 at 13–14. To the extent that Scott and Harry induced or facilitated mutual breaches of their corresponding employment agreements, their actions could be reasonably characterized as "improper" under the present circumstances. *White Plains Coat & Apron*

*Co., Inc. v. Cintas Corp.,* 8 N.Y.3d 422, 835 N.Y.S.2d 530, 867 N.E.2d 381, 384 (N.Y.2007) (remarking that a defendant's "mere status" as the "plaintiff's competitor" does not provide "a legal or financial stake in the breaching party's business" sufficient to excuse the "inducement of a breach of contract"). Their motion for summary judgment will be denied with respect to the tortious interference with contractual relations claims. ECF No. 70 ¶¶ 133–40, 158–65.

Matthews, York Group and Milso also assert tortious interference with contractual relations claims against Batesville. ECF No. 70 ¶¶ 166–73. Batesville moves for summary judgment with respect to those claims. ECF No. 462. The crux of Batesville's argument is that Matthews did not lose any business as a result of the tortious conduct alleged in the amended complaint. ECF No. 475 at 13–21. For the reasons discussed earlier, that argument cannot carry the day at this juncture. The record indicates that Batesville's sales to Harry's former customers significantly increased during the year following its hiring of Scott, Pesce and Redmond. BCC10059068. Redmond testified that Scott, Pesce and he had been "instrumental" in securing that business for Batesville. ECF No. 518–26 at 18. Furthermore, Batesville's suggestion that Pesce was employed by Matthews (rather than by York Group or Milso) provides no basis for the entry of summary judgment. ECF No. 475 at 10–11. The record contains evidence supporting a finding that Pesce was initially employed by Milso, and later by York Group, during the period of time postdating the acquisition. ECF No. 518–94 at 3, ¶ 3; ECF No. 518–97 at 2. The documentary record indicates that Batesville may have played a direct role in procuring the services of Scott and Pesce for the specific purpose of utilizing information obtained by them in connection with their prior duties with Matthews . [16] BCC1—0050394–402. Telephone records confirm that Scott was frequently communicating with Pesce and Batesville officials on the date of Pesce's departure. SP00669–71. Given the suggestive timing of the events in question, a reasonable jury could conclude that Batesville induced Scott's alleged breach of the non-solicitation provision.

[16]    The court previously dismissed the tortious interference with contractual relations claim against Batesville pertaining to Scott's alleged recruitment of Redmond. ECF No. 177 at 33–34. Consequently, the claims against Batesville relate only to induced disclosures of contractually-protected information and Scott's alleged recruitment of Pesce. ECF No. 475 at 9–12.

*19 Unlike Scott, Harry was still subject to a non-competition provision during the summer of 2010. ECF No. 480–2 at 13. The message forwarded by Connelly to Bowers on July 19, 2010, suggests that Batesville may have knowingly utilized Harry's relationships with Matthews' customers in order to procure their business. BCC1—0022994–95. Andrew declared that he had "witnessed Harry solicit customers on behalf of Batesville" on September 23, 2010. ECF No. 518–12 at 10, ¶ 27. The employment agreements define the term "Confidential Information" broadly enough to include "sales methods, sales proposals, customers and prospective customers, [the] identit[ies] of customers and prospective customers, [the] identit[ies] of key purchasing personnel in the employ of customers and prospective customers, [and] the amount or kind of purchases from the Company." ECF No. 470–1 at 12; ECF No. 480–2 at 11. The document discussing the "Capri tactical plan" indicates that Batesville was trying to capitalize on the "knowledge and customer expertise" of Scott, Pesce and Redmond in order to take business from Matthews. BCC1—0050394, 99.

The record contains sufficient circumstantial evidence to create an inference that Batesville induced Scott and Harry to breach their respective employment contracts. Batesville's attempt to secure summary judgment on the ground that no direct evidence of inducement has been presented is unavailing. ECF No. 475 at 24. The United States Supreme Court "ha[s] never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In the present civil context, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pacific R.R. Co.,* 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

The only remaining question is whether Batesville had knowledge of the employment agreements at the time of its alleged interference. *Lama,* 646 N.Y.S.2d 76, 668 N.E.2d at 1375. It is undisputed that Batesville had access to Scott's amended agreement. Batesville maintains that it was never "aware of the particular terms of Harry's agreement." ECF No. 587 at 45–46, ¶ 82. Nevertheless, the New York Court of Appeals has specifically held that a defendant can tortiously interfere with the performance or execution of a contract even if he or she is "totally unaware of and "indifferent to" the "legal particulars of that contract." *Guard–Life Corp.*

*v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445, 450 (N.Y.1980). Matthews, York Group and Milso are not required to demonstrate that Batesville "had perfect or precise knowledge of the terms and conditions of the contracts [at] issue." *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 775 (S.D.N.Y.1990). It suffices for them to show that Batesville personnel knew that the conduct allegedly induced was contrary to the contractual obligations of Scott and Harry. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l, Inc.,* 241 F.Supp.2d 246, 279 (S.D.N.Y.2002). Internal business documents indicate that Batesville officials were aware of both employment agreements as early as August 2009. ECF No. 518–38 at 4. For these reasons, Batesville's motion for summary judgment will be denied with respect to the tortious interference with contractual relations claims. ECF No. 70 ¶¶ 166–73.

**E. The Unjust Enrichment Claims**

*20 Matthews, York Group and Milso assert unjust enrichment claims against Scott and Batesville. [17] ECF No. 70 ¶¶ 191–96. The parties agree that no differences relating to these claims exist between the laws of Pennsylvania and New York. ECF No. 159 at 3. Scott and Batesville move for summary judgment with respect to the unjust enrichment claims. ECF Nos. 462 & 472.

17    The claims purport to be brought against all four defendants. Nonetheless, the amended complaint does not allege that PCC received a benefit at the expense of Matthews, York Group or Milso. ECF No. 70 ¶ 193. Based on representations made by the plaintiffs' counsel during a hearing conducted on October 27, 2011, the court does not understand the plaintiffs to argue that PCC is itself liable under a theory of unjust enrichment. ECF No. 177 at 80–81. Their brief in opposition to the defendants' motion for summary judgment addresses the issue of unjust enrichment only in relation to Scott. ECF No. 510 at 31–33. To the extent that the plaintiffs intended to assert unjust enrichment claims against PCC, those claims are deemed to have been abandoned. *Glenn v. Raymour & Flanigan,* 832 F.Supp.2d 539, 547 (E.D.Pa.2011). The unjust enrichment claims against Harry were already dismissed. ECF No. 177 at 73–74.

An unjust enrichment claim requires a showing that 1) the plaintiff conferred a benefit upon the defendant, 2) the defendant was aware of the benefit, and 3) the defendant's acceptance of the benefit occurred under circumstances in which "it would be inequitable for him [or her] to retain the benefit without payment of the value thereof." *Fabral,*

*Inc. v. B & B Roofing Co., Inc.,* 773 F.Supp.2d 539, 549 n. 10 (E.D.Pa.2011). "Where unjust enrichment is found, the law implies a contract between the parties pursuant to which the plaintiff must be compensated for the benefits unjustly received by the defendant." *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347, 350 (Pa.Super.Ct.1993). "[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist. v. Skepton,* 586 Pa. 513, 895 A.2d 1250, 1254 (Pa.2006). Although a plaintiff need not be in privity with a defendant in order to recover under a theory of unjust enrichment, "a claim will not be supported if the connection between the parties is too attenuated." *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 919 N.Y.S.2d 465, 944 N.E.2d 1104, 1111 (N.Y.2011).

Since the breach-of-contract claims against Scott are based on alleged violations of express contractual provisions, the terms of those provisions define the "rights, duties, and expectations" of all relevant parties. *Curley v. Allstate Ins. Co.,* 289 F.Supp.2d 614, 619–21 (E.D.Pa.2003). Because there is a contract, Matthews, York Group and Milso cannot proceed against Scott under the guise of enforcing a "fictional contract" existing merely as "a form of the remedy of restitution." *Crawford's Auto Center, Inc. v. Pennsylvania State Police,* 655 A.2d 1064, 1070 (Pa.Commw.Ct.1995). Scott is entitled to summary judgment with respect to the unjust enrichment claims asserted against him because those are superfluous . [18] ECF No. 70 ¶¶ 191–96.

[18]   With respect to Scott and Harry, the unjust enrichment claims were included in the amended complaint solely as alternatives to the breach-of-contract claims. ECF No. 70 ¶ 196. The court already explained that the plaintiffs cannot proceed against Scott with concurrent breach-of-contract and unjust enrichment claims. ECF No. 177 at 80–82.

Given that Batesville had no contractual relationship with Matthews, York Group or Milso, the unjust enrichment claims asserted against it are "not categorically barred." *Barbagallo,* 820 F.Supp.2d at 447. Section 43 of the Restatement (Third) of Restitution and Unjust Enrichment renders "[a] person who obtains a benefit ... in breach of a fiduciary duty ... or ... in consequence of another's breach of such a duty ... liable in restitution to the person to whom the duty is owed." Restatement (Third) of Restitution and Unjust Enrichment § 43(a), (c) (2011). This court has already

predicted that § 43 would be adopted and applied by the Pennsylvania Supreme Court. ECF No. 73–77.

**\*21**   Delaware recognizes "the primacy of contract law over fiduciary law." *Wood,* 953 A.2d at 143 n. 23. Since Harry's fiduciary obligations to Matthews, York Group and Milso were subsumed by his employment contract through the operation of Section 1.07, the common-law breach-of-fiduciary-duty claim must be dismissed. *Nemec,* 991 A.2d at 1129. The contractual claims arising from Harry's alleged fiduciary breaches, however, remain viable. As explained earlier, genuine issues of material fact exist about whether Batesville profited from alleged breaches of Harry's fiduciary obligations. [19] Therefore, the unjust enrichment claims asserted against Batesville can proceed to trial. ECF No. 177 at 77. Batesville's motion for summary judgment will be denied with respect to those claims. [20] ECF No. 70 ¶¶ 191–96.

[19]   Since § 43 classifies the remedy as a form of restitution, an unjust enrichment claim thereunder can be asserted only by a plaintiff who has sustained a "financial loss." *Edmonson v. Lincoln Nat'l Life Ins. Co.,* 725 F.3d 406, 415 n. 3 (3d Cir.2013). For the reasons discussed earlier, a reasonable jury could conclude that the contractual breaches alleged in this case caused Matthews, York Group and Milso to lose business.

[20]   In order to prevail at trial on a theory of unjust enrichment, Matthews, York Group and Milso cannot simply demonstrate that information wrongfully provided by Pesce and Redmond enabled Batesville to obtain unjust profits. Since Pesce and Redmond were merely at-will employees with no employment contracts, information misappropriated solely by them cannot render Batesville liable for equitable restitution. *Barbagallo v. Marcum LLP,* 820 F.Supp.2d 429, 448 (E.D.N.Y.2011). Matthews, York Group and Milso must directly link their losses (and the corresponding benefits conferred upon Batesville) to breaches of Harry's fiduciary duties. Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011).

## F. The Unfair Competition Claims

Matthews, York Group and Milso assert common-law unfair competition claims against Scott, Harry, PCC and Batesville. ECF No. 70 ¶¶ 185–90. Each defendant moves for summary judgment with respect to the unfair competition claims. ECF Nos. 462 & 472. The parties stipulated that those claims are governed by New York law. ECF No. 159 at 3. Therefore,

the court will examine the unfair competition claims in accordance with the principles applicable under the common law of New York.

The common-law tort of "unfair competition" has been described as an "adaptable and capacious" tort encompassing a wide variety of "illegal practices." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir.1982). "New York courts have recognized that unfair competition is broadly construed to include misappropriation of a competitor's property, even if such property does not qualify as a trade secret." *Linko, Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 503 (S.D.N.Y.2002). "Although claims of unfair competition often allege misappropriation of trade secrets or ideas, a claim may be based on misappropriation of information not rising to that level, such as client lists, internal company documents, and business strategies." *Berman v. Sugo LLC,* 580 F.Supp.2d 191, 209 (S.D.N.Y.2008). "The law of unfair competition" is something that "must be applied flexibly," and the availability of relief in a given dispute "must be determined by an appraisal of the particular circumstances of the case." *Flexitized, Inc. v. Nat'l Flexitized Corp.,* 214 F.Supp. 664, 675 (S.D.N.Y.1963). The common law of New York provides remedies in tort for a broad range of "commercial immorality." *Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 197 (2d Cir.2001).

The New York Court of Appeals has declared that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (N.Y.1987). Although this legal duty may be "dependent upon the contract" in some way, it must not constitute an element thereof. *Id.* at 194. The unfair competition claims asserted against Scott and Harry appear to be based primarily on the alleged "misappropriation of ... customer lists, requirements, and other confidential information." ECF No. 70 ¶ 186. The wrongful disclosure of such information, however, was independently prohibited under the applicable employment contracts. ECF No. 470–1 at 12–13; ECF No. 480–2 at 11–12. Matthews, York Group and Milso argue that their unfair competition claims are broadly based on conduct extending beyond the misappropriation of confidential information. ECF No. 510 at 28–29. Nevertheless, they point to no wrongful conduct engaged in by Scott and Harry that would not have constituted violations of their respective employment agreements. *Id.* Since the unfair competition claims are not based on alleged violations of legal duties existing independently of the contracts, Scott and Harry are entitled to summary judgment with respect to those claims because those claims are superfluous. [21] *Clark–Fitzpatrick,* 521 N.Y.S.2d 653, 516 N.E.2d at 194 (remarking that "[m]erely charging a breach of a 'duty of due care,' employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim").

[21]   The tortious interference with contractual relations claims are based on allegations that Scott and Harry tortiously induced one another to violate the contracts, which distinguishes those claims from the unfair competition claims. ECF No. 70 ¶¶ 136, 161. The obligation to refrain from inducing another person to violate his or her contract is a legal duty existing independent of the contract itself. *Barbagallo v. Marcum LLP,* 820 F.Supp.2d 429, 444 (E.D.N.Y.2011).

**\*22** The unfair competition claims asserted against Batesville rest on a different premise. Unlike Scott and Harry, Batesville has no contract with Matthews, York Group or Milso. Hounsell testified that Pesce had requested information about "Harry's entire account base" just two months before her defection to Batesville. ECF No. 518–27 at 10. The "Capri tactical plan" was designed to utilize Pesce's "knowledge and customer expertise to help [Batesville] transition business quickly and efficiently." BCC10050399. In his declaration, Andrew characterized "customer preferences, customer tastes, customer likes and dislikes, requisite inventory levels for customers, customer discount arrangements, customer rebate arrangements, consignment agreements, showroom preferences and arrangements, personal and company financial information, and intimate personal information" as "confidential information." ECF No. 518–12 ¶ 30. An unfair competition claim can arise from the "misappropriation of client lists, internal company documents, and business strategies." *Barbagallo,* 820 F.Supp.2d at 447. The misappropriation of a business' "distribution list of customers and subdistributors" can give rise to an unfair competition claim even if the information contained therein does not include trade secrets. *Milton Abeles, Inc. v. Farmers Pride, Inc.,* 603 F.Supp.2d 500, 503 (E.D.Pa.2009). Because the record contains evidence giving rise to an inference that Pesce "wrongfully" appropriated confidential business information for Batesville's benefit, a reasonable trier of fact could conclude that Batesville engaged in unfair competition. *Paz Systems, Inc. v. Dakota Group Corp.,* 514 F.Supp.2d 402, 409 (E.D.N.Y.2007).

The evidence suggesting that customers were transitioned to Batesville could support a finding that Matthews, York Group and Milso suffered "special damages." *Barbagallo,* 820 F.Supp.2d at 447.

An unfair competition claim can also arise where the misappropriation of another's "labors and expenditures" is likely to confuse or deceive purchasers about the origin of certain products. *Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.,* 58 F.3d 27, 34–35 (2d Cir.1995). "A likelihood of confusion exists when consumers are likely to assume that a product is associated with a manufacturer other than its actual source because of similarities between the related goods." *Forschner Group, Inc. v. Arrow Trading Co., Inc.,* 124 F.3d 402, 408 (2d Cir.1997). The unfair competition claim asserted against PCC appears to be grounded in an allegation that its use of the "Pontone" name is likely to mislead potential customers into believing that it is affiliated with Matthews, which continues to employ several members of the Pontone family. ECF No. 70 ¶ 186. The court previously dismissed the Lanham Act claims against PCC on the ground that its use of the "Pontone" name was not likely to cause confusion under the circumstances at issue. ECF No. 141 at 17–21. That line of reasoning applies with equal force to the common-law unfair competition claims based on PCC's name. *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1048 (2d Cir.1992). With respect to the unfair competition claims contained in the amended complaint, the court will grant the motion for summary judgment filed by Scott and Harry because those claims are superfluous. The court will grant the motion for summary judgment filed by PCC and deny the motion for summary judgment filed by Batesville. ECF No. 70 ¶¶ 185–90.

## G. The Tortious Interference with Prospective Economic Advantage Counterclaims

**\*23** Batesville, Scott and PCC assert counterclaims against Matthews, York Group and Milso for tortious interference with prospective economic advantage. ECF No. 236 ¶¶ 68–81; ECF No. 333 ¶¶ 203–10. These claims are based on allegations that Matthews, York Group and Milso acted to interfere with the business of Batesville and PCC by initiating this action and badmouthing Scott to potential customers. *Id.* In order to establish actionable counterclaims, Batesville, Scott and PCC must demonstrate that: (1) they were engaged in business relations with other parties; (2) Matthews, York Group and Milso interfered with those business relations; (3) Matthews, York Group and Milso either "acted for the sole purpose of harming" Batesville, Scott and PCC

or "used dishonest, unfair, or improper" tactics; and (4) Batesville, Scott and PCC suffered injuries to their business relationships. *Nadel v. Play–By–Play Toys & Novelties, Inc.,* 208 F.3d 368, 382 (2d Cir.2000). Improper tactics, or "wrongful means," include the use of "physical violence, fraud or misrepresentation," the initiation of "civil suits and criminal prosecutions," and the intentional deployment of "economic pressure." *Guard–Life,* 428 N.Y.S.2d 628, 406 N.E.2d at 449.

Batesville and PCC entered into a consulting agreement on June 24, 2010. SP00362–SP00404. The agreement classified PCC as an "independent contractor" of Batesville and specifically provided that the parties were not establishing an employment or agency relationship. SP00364. Pursuant to the terms of the agreement, Batesville was to utilize PCC to market its burial products to funeral homes that were not existing Batesville customers. SP00362. The agreement provided that PCC was to be compensated by the payment of a monthly finder's fee for each "qualified sale." SP00364. PCC agreed to assign Scott, and no other employee, to provide services for Batesville. SP00364. The contract contained an exception permitting PCC to utilize Bobby Wynn ("Wynn") to market Batesville's products in Texas. SP00364. The agreement was executed just two days after Pesce and Redmond started to work for Batesville. ECF No. 587 at 82, ¶ xxxvii.

Michael Baklarz ("Baklarz"), the vice president and general manager of sales and distribution for Matthews' Casket Division, learned about the consulting agreement on June 28, 2010. ECF No. 548–17 at 3. The information was apparently relayed to Baklarz by Glenn Dunn ("Dunn"), who had spoken with Wynn by telephone. *Id.* Baklarz sent an email to Thomas, Andrew, Doyle and Stephen Duffy ("Duffy") about the situation. *Id.* After receiving a reply from Thomas, Baklarz sent the four recipients a message reading as follows:

> From what Bobby has shared with Glenn, anyone not buying from Batesville is open to Bobby and Scott. We are having a call in the morning with the sales force to make sure all are aware. Also I really believe Scott has set up a separate company and yes, it is strange, that this is the arrangement Batesville has established. Could they have contracted with Scott as an Independent Contractor? We will hear more shortly

**\*24** Also Bobby told Glenn he would no longer be selling Chinese caskets. I will keep you posted. We have calls to

make with the Funeral Homes of Texas–Dr. Mo and a few others.

*Id.* at 2, 428 N.Y.S.2d 628, 406 N.E.2d 445. In a response sent to Baklarz, Andrew, Doyle and Duffy at 5:06 p.m. on June 28, 2010, Thomas made the following comments:

> Let's see if we can see what the name of his company is, very interesting Batesville wanted nothing to do with Bobby so Scott had to open a company to keep him employed. Should be easy to put out of business ... Mike, let's put them out of bizz.

*Id.* Batesville, Scott and PCC rely on this exchange as a basis for asserting that Matthews, York Group and Milso were disparaging them while communicating with prospective customers. ECF No. 512 at 14.

Peter M. Ferris ("Ferris"), director of market development for Matthews' International Casket Division, sent an email to several Matthews officials on July 15, 2010. ECF No. 466–5 at 2. A phrase reading "Brooklyn Issues Confidential" appeared in the subject line of the message. *Id.* The contents of the message included telephone numbers for four funeral homes. *Id.* Those numbers were followed by the following statements:

Key Lines to Use

Don't bash Harry

Scott has torn his family apart

"We could have sold our company to Batesville for more money, but we couldn't have done that to our customers and employees" words from Scott Pontone.

*Id.* This information was prefaced by a statement suggesting that the referenced "items" had been discussed one day earlier. *Id.*

On the evening of August 8, 2010, Steven emailed Thomas a message reading as follows:

> Tom I have a good idea we should sue scott the day harry leaves for italy so it ruins his whole fukin trip for italy he ruined our whole summer that scum bag, plus he won't call any customers from italy he will be all fuked up.

ECF No. 548–16 at 2. This action was commenced against Scott and Batesville on August 16, 2010. ECF No. 1. On February 28, 2011, Matthews, York Group and Milso amended their complaint and added Harry and PCC as defendants. ECF No. 70. In a memorandum to Matthews' board of directors dated April 13, 2011, Bartolacci made the following remarks:

> Our litigation against Batesville and Scott/Harry Pontone has effectively stymied Batesville's effort to utilize the Pontones to convert business and poach our employees. Although this will be a protracted legal matter which has and will continue to cost us significant legal fees, we continue to believe that this lawsuit is in the long-term best interest of the Company.

ECF No. 548–18 at 3. Batesville, Scott and PCC maintain that these messages suggest that

Matthews, York Group and Milso improperly took actions to interfere with their business opportunities. ECF No. 512 at 9–13; ECF No. 522 at 35–36. Matthews, York Group and Milso argue that they are not amenable to suit for tortious interference with prospective business relations because they had an economic interest in securing or maintaining the business of the relevant funeral homes. ECF No. 464 at 8–9. Batesville refutes that argument by relying on the following passage in *NBT Bancorp, Inc. v. Fleet–Norstar Financial Group, Inc.,* 215 A.D.2d 990, 628 N.Y.S.2d 408, 410 (N.Y.App.Div.1995):

> **\*25** To successfully oppose a motion for summary judgment on a cause of action for tortious interference with prospective business relations, plaintiffs must establish that defendants engaged in the use of wrongful or unlawful means to secure a competitive advantage over plaintiffs, or that defendants acted for the sole purpose of inflicting intentional harm on plaintiffs.

*NBT Bancorp,* 628 N.Y.S.2d at 410. According to Batesville, "the use of wrongful or unlawful means to secure a competitive advantage" is actionable even if a defendant does not act for the "sole purpose of inflicting intentional harm"

on a competitor. ECF No. 512 at 16. Phrases "connected by a disjunctive" are ordinarily "given separate meanings." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The court agrees with Batesville's position that the counterclaims are not infirm simply because Matthews, York Group and Milso may have acted to further their own economic interests. Conduct that is "wrongful" remains "independently actionable" and "is not protected by the competitor's privilege." *Smithkline Beecham Corp. v. Apotex Corp. .,* 383 F.Supp.2d 686, 704 (E.D.Pa.2004).

Matthews, York Group and Milso contend that the statements contained in Ferris' email were never conveyed to prospective customers of Batesville, Scott and PCC. ECF No. 464 at 7–8. Nonetheless, the record contains evidence suggesting that statements akin to those referenced in the email were repeated to customers. Andrew Lanza ("Lanza") is the owner and director of the Colonial Funeral Home in Staten Island, New York. ECF No. 484–17 ¶ 1. Andrew testified that he had "laid out the whole scenario" during a conversation with Lanza. ECF No. 548–21 at 9–10. That statement from Andrew came in response to an inquiry about whether he had accused Scott of "breaking apart" the Pontone family. *Id.* Steven Kanowitz ("Kanowitz"), a Matthews' customer, testified that Michael Pontone ("Michael") had stated that the members of the Pontone family working for Matthews were no longer talking to Scott. ECF No. 517–17 at 9–10. Baklarz's email of June 28, 2010, indicates that Matthews' officials were planning to make the "sales force" aware of Scott's activities. ECF No. 548–17 at 2. Ferris' comment about Scott's "ha[ving] torn his family apart" appeared under the phrase "Key Lines to Use." ECF No. 466–5 at 2. A reasonable trier of fact may infer from this evidence that members of Matthews' sales force followed their instructions and proceeded to disparage Scott in the presence of customers. *Boston Excelsior Co. v. Sweatt,* 229 F. 321, 324 (1 st Cir.1916).

In order to proceed with their tortious interference with prospective economic advantage counterclaims, Batesville, Scott and PCC must demonstrate that they suffered damages because of the alleged interference. *Nadel,* 208 F.3d at 382. On the basis of the existing record, a reasonable jury could conclude that the "wrongful" interference relied upon by Batesville, Scott and PCC caused them to incur losses. Richard Adlman ("Adlman") testified that at least one funeral home was refusing to do business with Scott due to a belief that he had "torn [his] family apart." ECF No. 517–16 at 7. Bartolacci's memorandum of April 13, 2011, suggested that the commencement of this action had

"effectively stymied Batesville's effort to utilize the Pontones to convert business" in the New York market. ECF No. 548–18 at 3. The court cannot conclude as a matter of law that the interference allegedly perpetrated by Matthews, York Group and Milso had no adverse impact on the prospective business opportunities available to Batesville, Scott and PCC. The motions for summary judgment filed by Matthews, York Group and Milso will be denied with respect to the tortious interference with prospective economic advantage counterclaims filed by those parties. ECF No. 236 ¶¶ 68–81; ECF No. 333 ¶¶ 203–10.

**\*26** Harry also asserts counterclaims against Matthews, York Group and Milso for tortious interference with prospective business advantage. ECF No. 333 ¶¶ 211–18. Matthews, York Group and Milso move for summary judgment with respect to those claims. ECF No. 467. Harry's interference claims are grounded in a lost employment opportunity in the aftermath of his retirement.

Mel Payne ("Payne"), the CEO of Carriage Services, Inc. ("Carriage Services"), approached Harry shortly after his retirement and asked him to purchase funeral homes for Carriage Services. ECF No. 535–11 at 52–53. Scott testified that Payne had already decided on a compensation package for Harry, but that Bartolacci was to be contacted in order to ensure that the arrangement would not contravene the non-competition provision in Harry's employment agreement. *Id.* at 56, 64–65. During his deposition, Bartolacci confirmed that he had spoken with Payne about the prospect of Harry working for Carriage Services. ECF No. 535–12 at 6. Bartolacci testified that he had expressed uncertainty about whether the proposed arrangement would constitute a violation of the non-competition provision contained in Harry's employment contract. *Id.* David Adams ("Adams"), the strategic director for Carriage Services, subsequently telephoned Scott and informed him that Harry would not be offered a position with Carriage Services. ECF No. 535–11 at 62. Scott apparently relayed the message to his father. *Id.* Based on the testimonial record, a reasonable jury could infer that Carriage Services' decision not to retain Harry's services was attributable to Bartolacci's statements to Payne.

The terms of Harry's employment contract prohibited him from engaging in a "Competing Business" during the three-year period immediately following the termination of his employment. ECF No. 480–2 at 13. The term "Competing Business" was defined broadly enough to include "any person, corporation or other entity [engaged

in the] manufacture[ ], market[ing] or sell[ing of] caskets, urns, memorials or cremation equipment." *Id.* Scott testified that Carriage Services owned funeral homes and cemeteries throughout the United States. ECF No. 535–11 at 49–50. He explained that Harry's role with the business was to consist of the acquisition of funeral homes. *Id.* at 50. At this stage, the court does not understand Matthews, York Group and Milso to argue that Carriage Services qualified as a "Competing Business" within the meaning of Harry's employment agreement. ECF No. 468 at 11–15. Indeed, Barlolacci described Carriage Services as a Matthews' "customer."[22] ECF No. 535–12 at 7. Since the record contains evidence creating an inference that Matthews, York Group and Milso prevented Harry from securing a permissible employment relationship with Carriage Services, their motion for summary judgment will be denied with respect to Harry's tortious interference with prospective business advantage counterclaims. ECF No. 333 ¶¶ 211–18.

[22]    Carriage Services evidently sold caskets supplied by both Matthews and Batesville. ECF No. 535–12 at 6–7.

### H. Batesville's Counterclaims Relating to Kathy Brooks

**\*27** Brooks started to work as a sales representative for Batesville in January 2004. ECF No. 465 ¶ 15; ECF No. 513 at 21, ¶ 33. The terms of her employment were spelled out in a written employment agreement.[23] ECF No. 548–22 at 2–16. The document stated that Brooks had accepted employment on an "at-will" basis, and that both Batesville and Brooks had "retain[ed] the right to terminate th[e] relationship at any time, with or without cause, for any reason not prohibited by applicable law upon proper notice." *Id.* at 3. The terms of the agreement provided that, in the event of separation, Brooks was prohibited from marketing competitive products in the same geographic area that she had covered during her final two years as a Batesville employee. *Id.* at 8–10. The prohibition was to remain in effect for two years. *Id.* at 10. Pursuant to the contract, Brooks was forbidden to "make use of [Batesville's] Confidential Information for [her] own purposes or for the benefit of any other entity or person." *Id.* at 7–8. The term "Confidential Information" was broadly defined as

[23]    The agreement contained in the record was evidently executed on October 31, 2006. ECF No. 548–22 at 14. It is not clear whether an earlier version of the contract governed the terms of Brooks' employment before that date.

products and services, marketing strategies, business plans, operations, costs, current or prospective customer information (including customer identities, contacts, requirements, creditworthiness, preferences, and like matters), product concepts, designs, prototypes or specifications, research and development efforts, technical data and know-how, sales information, including pricing and other terms and conditions of sale, financial information, internal procedures, techniques, forecasts, methods, trade information, trade secrets, software programs, project requirements, inventions, trademarks, trade names, and similar information regarding [Batesville's] business(es).

*Id.* at 7.

During the course of her employment with Batesville, Brooks sold caskets and urns to funeral homes in the New York metropolitan area. ECF No. 513 at 22, ¶ 34. Batesville terminated Brooks' employment on January 6, 2010. ECF No. 465 ¶ 16; ECF No. 513 at 22, ¶ 38. After learning about her discharge, Brooks telephoned Andrew and inquired about employment opportunities with Matthews. ECF No. 517–7 at 6–7. On June 7, 2010, Matthews hired Brooks to work as a regional sales manager in its "Bronze" Division. ECF No. 465 ¶ 17. Matthews terminated Brooks' employment in July 2011. *Id.* ¶ 18.

Batesville alleges that Brooks improperly disclosed confidential information and solicited her former Batesville customers during her period of employment with Matthews. ECF No. 236 ¶¶ 97–113. These allegations appear in counterclaims asserted against Matthews, York Group and Milso. *Id.* Those counterclaims appear to rest on a theory of "unfair competition." *Id.* ¶ 113. Matthews, York Group and Milso move for summary judgment with respect to the counterclaims. ECF No. 463.

The unfair competition counterclaims asserted by Batesville rest on evidence suggesting that Brooks improperly solicited business from the Massapequa Funeral Home ("Massapequa") shortly after the commencement of her duties with Matthews. Anthony L. Preziosi ("Preziosi"), Massapequa's funeral director, testified that Brooks had successfully convinced Massapequa to regularly purchase products from Batesville during her tenure as a Batesville sales representative. ECF No. 517–6 at 6. At some point in 2008, Massapequa agreed to purchase its products exclusively from Batesville for a period of twenty-four months. ECF No. 466–8 at 4. In December 2010, after the expiration of the contract, Massapequa started to

purchase its products from Matthews. *Id.* at 7, 14. Batesville maintains that it lost Massapequa's business because of improper solicitations made by Brooks. ECF No. 512 at 17–19. Matthews, York Group and Milso contend that the change in business was solely attributable to Massapequa's dissatisfaction with Batesville's products and the expiration of the two-year exclusive purchasing agreement. ECF No. 558 at 18–24.

**\*28** The documentary record confirms that Brooks telephoned Travis Nicholson ("Nicholson"), the owner of Massapequa, on December 1, 2010. ECF No. 548–24 at 3. Preziosi identified the cellular telephone number appearing on Brooks' Verizon Wireless telephone record as that of Nicholson. ECF No. 517–6 at 13. When questioned about Massapequa's decision to start purchasing products from Matthews rather than from Batesville, Preziosi stated that Nicholson and he had jointly made the decision in December 2010. *Id.* at 12–13. During his deposition, Andrew testified that Massapequa personnel had become dissatisfied with Batesville's "level of service" in the aftermath of Brooks' departure. ECF No. 548–21 at 15. He stated that since Massapequa's "relationship with Batesville" had essentially existed "through Kathy," the individuals responsible for purchasing products on behalf of Massapequa had become alienated with Batesville because of Brooks' discharge. *Id.* Based on the evidence relied upon by Batesville, a reasonable trier of fact could conclude that Massapequa's decision to switch its dealings from Batesville to Matthews was triggered by contractually-prohibited solicitations made by Brooks.

As of December 2010, Brooks was contractually prohibited from soliciting Massapequa's business on Matthews' behalf and disclosing Batesville's "Confidential Information." ECF No. 548–22 at 7–10. Under the terms of her employment agreement with Batesville, Brooks was forbidden to disclose "customer identities, contacts, requirements, creditworthiness, preferences, and like matters." *Id.* at 7. The tort of unfair competition encompasses a wide range of "commercial immorality." *Telecom*, 280 F.3d at 197. Even the misappropriation of a business strategy can support an unfair competition claim. *Berman*, 580 F.Supp.2d at 209. Because a reasonable jury could conclude that Matthews improperly utilized Brooks' "relationship" with Massapequa to take its business from Batesville, the motion for summary judgment pertaining to Batesville's "unfair completion" counterclaims will be denied. ECF No. 236 ¶¶ 97–113.

## I. The Breach–of–Contract Counterclaims

The employment agreements applicable to Scott and Harry required York Group "to cause its directors, officers, agents, representatives, stockholders, employees and affiliates not to[ ] disparage [Scott or Harry], either orally or in writing." ECF No. 470–1 at 15; ECF No. 480–2 at 14. Scott and Harry assert counterclaims against Matthews, York Group and Milso for alleged breaches of this contractual obligation. ECF No. 333 ¶¶ 165–85. Matthews, York Group and Milso move for summary judgment with respect to those counterclaims. ECF No. 467. The court has already concluded that, based on the evidence contained in the record, a reasonable jury could infer that Matthews employees disparaged Scott in the presence of prospective customers, and that Scott suffered pecuniary losses as a result of such disparagement. ECF No. 466–5 at 2; ECF No. 548–17 at 2–3. Therefore, the motion for summary judgment will be denied with respect to Scott's breach-of-contract counterclaims. ECF No. 333 ¶¶ 165–74.

**\*29** On May 30, 2007, Harry's employment agreement with York Group was amended. ECF No. 527–5. The amendments changed the terms of Harry's compensation. *Id.* at 2. Section 1.03(c) of the amended agreement provided as follows:

> Notwithstanding that Employee is not entitled to any future bonus, the Company's board of directors may, in the future, in its sole discretion and only after a majority vote decide to award a bonus to Employee based upon merit and the future performance of the Company.

*Id.* at 2–3. It is undisputed that Harry was not awarded the bonus referenced in Section 1.03(c). Harry alleges that Matthews, York Group and Milso breached the amended agreement by declining to award him a "merit bonus" despite the fact that he had been one of their "top producers." ECF No. 333 ¶ 181.

In an attempt to establish that the denial of his bonus constituted a breach of the employment agreement, Harry relies on language in *Dalton v. Educational Testing Service,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (N.Y.1995), declaring that a contract which "contemplates the exercise of discretion" incorporates an implicit "promise not to act arbitrarily or irrationally in exercising that discretion." ECF No. 522 at 13–14. That language in *Dalton,* however, was used with reference to New York's implied "covenant of good faith and fair dealing in the course of contract performance." *Dalton,* 639 N.Y.S.2d 977, 663 N.E.2d at

291. The New York Court of Appeals went on to state that "[t]he duty of good faith and fair dealing" was "not without limits," and that "no obligation c[ould] be implied that 'would be inconsistent with other terms of the contractual relationship.' " *Id.* at 291–92 (quoting *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 91 (N.Y.1983)). The amended contract plainly provided that Harry was "*not* entitled to any future bonus," and that the provision of such a bonus rested within the "*s ole* discretion" of York Group's board of directors. ECF No. 527–5 at 2 (emphasis added). The contract's use of the word "sole" indicates that certain prerogatives were "reposed in the [board of directors] and nowhere else." *Nixon v. United States,* 506 U.S. 224, 229, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (interpreting the provision in Article I, § 3, of the United States Constitution affording the United States Senate "the sole Power to try all Impeachments"). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (N.Y.1990). Since the contractual language in question unambiguously stated that Harry was "*not* entitled to any future bonus," his breach-of-contract counterclaim relating to the desired bonus must be dismissed. *Namad v. Salomon, Inc.,* 74 N.Y.2d 751, 545 N.Y.S.2d 79, 543 N.E.2d 722, 723 (N.Y.1989) ( "To read the second sentence of the bonus clause as binding defendants to pay plaintiff a fixed amount approximating his annual salary-as he alleges was the 'customary policy'- would render the previous sentence vesting defendants with complete discretion a nullity.").

**\*30** Harry alleges that Matthews, York Group and Milso breached the amended agreement by excluding him from meetings of the board of directors. ECF No. 333 ¶ 182. Testimony provided by Bartolacci suggests that Harry *may* not have been present for some meetings conducted in Pittsburgh. [24] ECF No. 527–2 at 98–100. Even if that is the case, it does not follow that the agreement was breached. Section 1.01 of the agreement stated that Harry was expected to "perform such duties for the Company as may reasonably be assigned to him from time to time by the Company's board of directors." ECF No. 527–5 at 2. The relevant portion of the agreement went on to provide as follows:

[24]    The responsive brief filed by Scott, Harry and PCC mischaracterizes Bartolacci's testimony by stating that "Bartolacci testified under oath that Milso's Board regularly met informally in Pittsburgh without sending

any notice to Harry, and without keeping any minutes to be distributed to Harry." ECF No. 522 at 14. Bartolacci actually testified that, to the best of his recollection, Harry had been present for several of the meetings. ECF No. 527–2 at 98–100.

Employee acknowledges that a reasonable assignment of duties includes expecting his regular attendance at meetings of the Board of Directors of the Company and of Milso, and expecting his regular attendance at meetings of the Executive Committee of either entity should he choose to remain a member of such committees, *provided,* however, that Employee shall be permitted to resign his membership on either Committee or decline to accept any future assignment of duties by the Company's or Milso's board of directors should he wish to do so in his sole discretion.

*Id.* Although this language suggests that Harry was contractually *expected* (or *obligated* ) to attend certain meetings in connection with a "reasonable assignment of duties," it does not support his assertion that he had a contractually-enforceable *right* to prevent meetings from being conducted outside of his presence. "Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations." *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231, 232 (N.Y.1986). Matthews, York Group and Milso are entitled to summary judgment with respect to Harry's breach-of-contract counterclaims based on his alleged exclusion from board meetings. ECF No. 333 ¶ 182.

To some extent, Harry appears to base his breach-of-contract counterclaims on alleged violations of the non-disparagement provision of the employment contract. ECF No. 333 ¶ 180. There are, however, several problems with Harry's attempt to rely on such a theory. Ferris' email of July 15, 2010, which underpins Scott's breach-of-contract counterclaims, suggests that Matthews sales representatives were specifically instructed *not* to "bash Harry ." [25] ECF No. 466–5 at 2. Furthermore, a plaintiff asserting a breach-of-contract claim must demonstrate that he or she has actually been damaged by the alleged breach. *Action Nissan, Inc. v. Nissan North America,* 454 F.Supp.2d 108, 133 (S.D.N.Y.2006). The testimonial record suggests that some customers were unwilling to deal with Scott and PCC because of disparaging comments uttered by Matthews

personnel. ECF No. 517–16 at 7. Harry does not point to evidence indicating that he was damaged by any statements alleged to have constituted "disparagement." ECF No. 522 at 13. Although Bartolacci's conversation with Payne creates an inference that Matthews, York Group and Milso tortiously interfered with Harry's prospective employment with Carriage Services by falsely suggesting that the proposed arrangement would violate a contractual provision, the record does not support a finding that Harry was "disparaged" while the terms of his contract were being discussed. ECF No. 535–12 at 6–7. For these reasons, the motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to Harry's breach-of-contract counterclaims. ECF No. 333 ¶¶ 175–85.

25    The text of this email is specifically contained in Scott's pleadings. ECF No. 333 at 36–37, ¶ 171.

### J. The Counterclaims Based on the Implied Covenant of Good Faith and Fair Dealing

**\*31** The law of New York implies a covenant of good faith and fair dealing "pursuant to which neither party to a contract [may] do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (*per curiam* ). Scott and Harry allege that Matthews, York Group and Milso breached this implied covenant by bringing "baseless claims" grounded in the employment agreements. ECF No. 333 ¶¶ 191, 199. Matthews, York Group and Milso move for summary judgment with respect to the counterclaims premised on alleged violations of the implied covenant. ECF No. 467.

As an initial matter, New York does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing when the factual allegations underpinning the claim mirror those constituting breaches of contractual obligations. *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.,* 887 F.Supp.2d 459, 482 (E.D.N.Y.2012). To the extent that the counterclaims premised on the implied covenant are based upon conduct alleged to be in violation of contractual provisions, they must be dismissed. *Fellows v. CitiMortgage, Inc.,* 710 F.Supp.2d 385, 407 (S.D.N.Y.2010). "[A] covenant of good faith can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 922 (N.Y.1987). Section 5.03 of the employment agreements provided as follows:

5.03. *Remedies.* In the event of a breach by Employee of the terms of this Agreement, the Company shall be entitled, if it shall so elect, to institute legal proceedings to obtain damages for any such breach, or to enforce the specific performance of this Agreement by Employee and to enjoin Employee from any further violation of this Agreement and to exercise such remedies cumulatively or in conjunction with all other rights and remedies provided by law. Employee acknowledges, however, that the remedies at law for any breach by him of the provisions of this Agreement may be inadequate and that the Company shall be entitled to injunctive relief against him in the event of any breach.

ECF No. 470–1 at 15; ECF No. 480–2 at 14. This language specifically *preserves* York Group's right to commence the instant action. "[C]ourts have declined to find that the implied covenant of good faith and fair dealing adds to the contract a substantive provision not intended by the parties." *Geren v. Quantum Chemical Corp.,* 832 F.Supp. 728, 732 (S.D.N.Y.1993). It is worth noting that Scott and Harry have themselves commenced civil actions in order to enforce their rights under the relevant contracts. ECF No. 191–2 at 2–9. They cannot credibly assert that Matthews, York Group and Milso acted in violation of covenants implicit in those contracts merely by commencing the instant action to enforce the terms thereof. Therefore, the court will dismiss the counterclaims grounded on alleged breaches of the implied covenant of good faith and fair dealing. ECF No. 333 ¶¶ 186–202.

### K. The Intrusion on Seclusion Counterclaims

**\*32** Scott and Harry assert counterclaims against Matthews, York Group and Milso for intruding on their seclusion. ECF No. 333 ¶¶ 279–92. These claims are based on allegations that Scott and Harry were subjected to the "unauthorized surveillance and investigation of [their] whereabouts, travels, personal associates, family members, daily activities, and other private personal and financial affairs." *Id.* ¶¶ 280, 287. Matthews, York Group and Milso move for summary judgment on two separate grounds. First, they contend that the

counterclaims should be dismissed because New York does not recognize a cause of action for "intrusion on seclusion." ECF No. 468 at 28; ECF No. 562 at 22. Second, they maintain that Scott and Harry cannot establish actionable violations of Pennsylvania's tort law in any event. ECF No. 468 at 28–29; ECF No. 562 at 22–23. Since Pennsylvania's choice-of-law rules compel the application of New York law to the counterclaims, the court has no occasion to consider whether the alleged actions of Matthews, York Group and Milso were otherwise violative of Pennsylvania law.

Pennsylvania law imposes liability on "[o]ne who intentionally intrudes, physically or otherwise, upon the solicitude or seclusion of another or his private affairs or concerns ... if the intrusion would be highly offensive to a reasonable person." *Harris v. Easton Publishing Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984) (quoting the Restatement (Second) of Torts § 652B). Unlike Pennsylvania, New York has "no common law of privacy." *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 703 (N.Y.1993). In New York, "the right to privacy is governed exclusively" by statutory provisions "prohibit[ing] the use of a living person's name, portrait or picture for 'advertising' or 'trade' purposes without [his or her] prior written consent." *Id.* The counterclaims for intrusion on seclusion are not based on conduct proscribed by those statutes. ECF No. 333 ¶¶ 279–92. Hence, Scott and Harry are attempting to proceed with claims that are cognizable in Pennsylvania but not in New York.

In order "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that [the] choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (plurality opinion). Scott and Harry argue that Matthews, York Group and Milso are "subject to Pennsylvania law" because "their business is directed and controlled from Pittsburgh." ECF No. 522 at 19. Because the Full Faith and Credit Clause and the Due Process Clause place only "modest restrictions" on a state's ability to apply its own law to a particular dispute, Pennsylvania's contacts with the parties and events at issue in this case would render the application of its substantive law constitutionally *permissible. Phillips Petroleum Co.,* 472 U.S. at 818. The mere fact that Pennsylvania *could* apply its own law in this case, however, does not mean that it *would* do so. *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 856–57 (Pa.1970)

(applying the law of Delaware over that of Pennsylvania even though each jurisdiction had an interest in having its own law govern the case). Since this case falls within the overlapping legislative jurisdiction of Pennsylvania and New York, the law of either state could be constitutionally applied. *Sun Oil Co. v. Wortman,* 486 U.S. 717, 727, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (explaining that "it is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the contrary law of another").

**\*33** In any case involving a choice-of-law question, Pennsylvania applies a "flexible rule" permitting a specific "analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796, 805 (Pa.1964). The first step in the analysis is to ascertain whether the conflict between the competing laws constitutes a "true" conflict, a "false" conflict, or an "unprovided-for" case. *Howden North America, Inc. v. ACE Property & Cas. Ins. Co.,* 875 F.Supp.2d 478, 495 (W.D.Pa.2012). A "true" conflict exists when each jurisdiction has an interest in applying its substantive law. *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 n. 15 (3d Cir.1991). In that situation, the court must "determin[e] which state has the greater interest in the application of its law." *Cipolla,* 267 A.2d at 566. "A false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law." *Lacey,* 932 F.2d at 187. In the event of a false conflict, the court must apply the law of the interested jurisdiction. *Kuchinic v. McCrory,* 422 Pa. 620, 222 A.2d 897, 899–900 (Pa.1966). An "unprovided-for" case exists when neither jurisdiction's interests would be impaired by the application of the other jurisdiction's law. *Budget Rent–A–Car System, Inc. v. Chappell,* 407 F.3d 166, 170 (3d Cir.2005). The traditional *lex loci delicti* rule, which applies "the law of the place of the wrong," "continues to govern unprovided-for cases ." *Id.*

Scott and Harry are domiciled in New York. ECF No. 70 ¶¶ 9–10. The surveillance alleged to have been tortious occurred primarily in New York. ECF No. 333 ¶¶ 279–92. Matthews, York Group and Milso operate out of Pennsylvania. ECF No. ¶¶ 6–8. Since the parties are essentially advancing countervailing arguments disfavoring the application of the laws of their respective domiciles, neither jurisdiction has a particularly strong interest in applying its law to the counterclaims. *Miller v. Gay,* 323 Pa.Super. 466, 470 A.2d 1353, 1355 (Pa.Super.Ct.1983). Pennsylvania has no interest

in imposing liability on its own businesses for engaging in extraterritorial conduct that was not tortious where performed. New York has no interest in providing Scott and Harry with remedies for conduct that it does not regard as tortious. This is arguably an "unprovided-for" case in which the *lex loci delicti* rule should govern, thereby defaulting to New York law. *Garcia v. Plaza Oldsmobile Ltd.,* 421 F.3d 216, 220 (3d Cir.2005). Even if it is assumed that a deeper choice-of-law analysis is needed, the law of New York would govern the counterclaims based on alleged violations of privacy rights. Pennsylvania's choice-of-law rules are grounded in the Restatement (Second) of Conflict of Laws. *Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co.,* 609 F.3d 223, 233 (3d Cir.2010). Section 152 of the Restatement provides that "[i]n an action for an invasion of a right of privacy, the local law of the state where the invasion occurred determines the rights and liabilities of the parties Restatement (Second) of Conflict of Laws § 152. Scott and Harry, who reside in New York, have the right to sue for intrusion on seclusion under the law of the state where the invasion occurred, which also happens to be their state of domicile. *Howell,* 596 N.Y.S.2d 350, 612 N.E.2d at 703. Under these circumstances, Pennsylvania's choice-of-law rules would not permit Scott and Harry to invoke Pennsylvania's substantive law to redress conduct occurring in New York. *Shuder v. McDonald's Corp.,* 859 F.2d 266, 270 (3d Cir.1988) (observing that, under Pennsylvania law, residents of another state "should not be accorded rights not given them by their home state" to redress conduct occurring therein); *Miller,* 470 A.2d at 1356 (remarking that inhabitants of another state "should not be accorded rights not given them" by that state merely "because a visitor from a state offering higher protection decides to visit there"). The motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to the "intrusion on seclusion" counterclaims. ECF No. 333 ¶¶ 279–92.

## L. The False and Misleading Advertising Counterclaims

**\*34** Scott and PCC assert counterclaims against Matthews, York Group and Milso for "false, deceptive, and misleading advertising." ECF No. 333 ¶¶ 294–95. The counterclaims themselves do not make reference to specific statutory provisions. *Id.* When Matthews, York Group and Milso moved for summary judgment, they pointed out that the legal basis for the counterclaims was unclear. ECF No. 468 at 30 n. 18. In a responsive brief, Scott and PCC contend that they can establish actionable violations of both the Lanham Act and New York General Business Law §§ 349(h) and 350.

Federal Rule of Civil Procedure 8(a)(2) requires a complaint asserting a claim to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The factual allegations contained in the complaint must be sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although "legal conclusions" are not entitled to a "presumption of truth," they are often necessary to "provide the framework of a complaint." *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The averments pertaining to the false advertising claims are so imprecise that they have left Matthews, York Group and Milso unsure about whether the claims are grounded in federal or state law. ECF No. 333 ¶¶ 293–99; ECF No. 468 at 30 n. 18. "A plaintiff may not amend [his or] her complaint through argument in a brief opposing summary judgment." *Nykiel v. Borough of Sharpsburg,* 778 F.Supp.2d 573, 587 (W.D.Pa.2011). For this reason, the false advertising counterclaims should arguably be dismissed on the ground that they were never properly pled in the first place. *Id.* In any event, however, Scott and PCC cannot establish violations of the Lanham Act and New York General Business Law §§ 349(h) and 350 even if it is assumed that they properly stated claims under those statutory provisions.

A federal court operating under the strictures of Article III "generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit." *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 430–31, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). Like all other Article III tribunals established by Congress, this court exercises "[t]he judicial Power of the United States." U.S. Const., Art. III, § 1. This "judicial Power" is validly exercised only where a true "Case" or "Controversy" exists between the parties. *Id.* An action does not constitute a justiciable "Case" or "Controversy" unless the person bringing the action has the proper legal "standing" to do so. *Flast v. Co hen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In order for a plaintiff to have Article III standing, he or she must establish that: (1) he or she has suffered an "injury in fact" (*i.e.,* an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, and not merely conjectural or hypothetical); (2) there is a causal relationship between his or her injury and the alleged conduct of the defendant; and (3) it is likely that the injury will be redressed by a decision rendered in his or her favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119

L.Ed.2d 351 (1992). "This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Article III's injury-in-fact requirement can be satisfied by "an identifiable trifle of injury." *NCAA v. Governor of N.J.,* 730 F.3d 208, 219 (3d Cir.2013). "Apart from this minimal constitutional mandate," the Supreme Court "has recognized other limits on the class of persons who may invoke [a federal court's] decisional and remedial powers." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The "judicially-imposed limits on the exercise of federal jurisdiction" include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**\*35** Unlike the jurisdictional limitations inherent in Article III, which exist as a matter of constitutional mandate, the prudential limitations on the exercise of federal adjudicatory jurisdiction "can be modified or abrogated by Congress." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Section 43(a)(1) of the Lanham Act provides:

### § 1125. False designations of origin, false descriptions, and dilution forbidden

**(a) Civil Action.**

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or

commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). In enacting the Lanham Act, Congress aimed "to protect persons engaged in [interstate] commerce against unfair competition." 15 U.S.C. § 1127. "The congressionally-stated purpose of the Lanham Act, far from indicating an express intent to abrogate prudential standing doctrine, evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act." *Conte Bros. Auto., Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 229 (3d Cir.1998).

The Lanham Act does not give standing to parties "having no competitive or commercial interests affected by the conduct at issue ." *Id.* The issue of standing, however, must still be considered in relation to the statutory provision giving rise to the claim. *Worth,* 422 U.S. at 500 (explaining that a plaintiff's standing to bring a particular claim "often turns on the nature and source of the claim asserted"). Given that the plain language of the statute provides a remedy to "any person who believes that he or she is likely to be damaged," prudential standing under the Lanham Act "demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980). This standard screens out frivolous claims and prevents the federal courts from being flooded with "Lanham Act claims contrary to the type envisioned by Congress." *Thorn v. Reliance Van Co., Inc.,* 736 F.2d 929, 933 (3d Cir.1984). Since Scott and PCC market products on behalf of Matthews' main competitor in the New York market, their alleged "injuries" are sufficiently connected to Matthews' "false advertising" to establish their standing to seek relief under the Lanham Act. *Joint Stock Society v. UDV N. Am., Inc.,* 266 F.3d 164, 179–85 (3d Cir.2001).

**\*36** In order to proceed with their claims under the Lanham Act, Scott and PCC must demonstrate that Matthews, York Group or Milso made false statements "in connection with any goods or services," or that they conveyed misrepresentations "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1). This inquiry centers on whether "the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 57 (2d Cir.2002). The claims asserted by

Scott and PCC are premised, to a large extent, on language appearing in a press release announcing Harry's retirement and discussing the Pontone family's contributions to the funeral service industry. ECF No. 523 ¶¶ 184–85; ECF No. 533–17 at 1. Scott and PCC accuse Matthews of falsely claiming that customers continued to be serviced at the same location at which Harry had started the business eighty years earlier, even though that facility was no longer being utilized. ECF No. 522 at 33. Given the context and purpose of the press release, however, no reasonable jury could conclude that the statements contained therein were made "in commercial competition with" other businesses or "with the intention of influencing customers" to purchase "goods or services." *Nevyas v. Morgan,* 309 F.Supp.2d 673, 680–81 (E.D.Pa.2004).

The remaining Lanham Act counterclaims are based on allegations that Matthews, York Group and Milso failed to disclose that certain products had been manufactured by Batesville and gave pretextual reasons for certain price increases. ECF No. 523 ¶¶ 186–88. Where a plaintiff proves the literal falsity of advertisements or promotions, "a court may grant relief without considering whether the buying public was actually misled." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co.,* 290 F.3d 578, 586 (3d Cir.2002). Absent a showing of literal falsity, "the success of the claim usually turns on the persuasiveness of a consumer survey" offered to *prove* that the challenged communication is "deceptive or misleading." *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Rhone–Poulenc Rorer Pharmaceuticals, Inc.,* 19 F.3d 125, 129–30 (3d Cir.1994). The evidence provided by Scott and PCC consists primarily of internal emails suggesting that prices may have been adjusted in response to information found on Batesville's pricelist. ECF No. 523 ¶ 188; ECF Nos. 549–59 & 549–60. While those emails are offered for the purpose of establishing the falsity of certain communications, the contents of the communications are not *themselves* offered as evidence. [26] In the absence of specific advertisements or promotions, Scott and PCC cannot show that any particular statement was literally false. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922 (3d Cir.1990) (explaining that whether a communication is "false or misleading" must be ascertained by reference to "the message conveyed"). Since they cannot show the literal falsity of a specific communication, Scott and PCC are not "excused from the burden of demonstrating actual deception through the use of a consumer survey." *Novartis Consumer Health,* 290 F.3d at 587. No such evidence was offered. Accordingly,

Matthews, York Group and Milso are entitled to summary judgment with respect to any counterclaims brought under the Lanham Act. ECF No. 333 ¶¶ 293–99.

26      Given the voluminous nature of the record and the excessive number of counterclaims asserted in this case, the court will not scour the documentary evidence in search of information that is not cited by the parties. Fed.R.Civ.P. 56(c)(3).

**\*37** "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]" is statutorily prohibited. N.Y. CLS Gen. Bus. § 350. An individual aggrieved by a violation of this statute "may bring an action in his [or her] own name to enjoin [the] unlawful act or practice, an action to recover his [or her] actual damages or fifty dollars, whichever is greater, or both actions." N.Y. CLS Gen. Bus. § 349(h). Upon a finding that a defendant has "willfully or knowingly" violated the statute, a court may "increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars." *Id.* Scott and PCC seek both injunctive relief and money damages in this case. ECF No. 333 ¶¶ 298–99.

A plaintiff asserting a "false advertising" claim under New York law must demonstrate that the defendant "is engaging in an act or practice that is deceptive or misleading in a material way." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N .A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 744 (N.Y.1995). A plaintiff must show "consumer-oriented conduct that would mislead a reasonable consumer ." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.,* 348 F.Supp.2d 217, 251 (S.D.N.Y.2004). Since Scott and PCC do not provide evidence of specific communications directed at consumers, they cannot establish that any particular communication would deceive or mislead an objectively reasonable person. The motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to all counterclaims premised on a theory of "false advertising." ECF No. 333 ¶¶ 293–99.

**M. Harry's Misappropriation Counterclaims**

Section 50 of New York's Civil Rights Law provides that "[a] person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor." N.Y. CLS CIV. R. § 50. "Any person whose name, portrait, picture or voice

is used" in violation of that prohibition "may maintain an equitable action ... against the person, firm or corporation so using his [or her] name, portrait, picture or voice, to prevent and restrain the use thereof," and "may also sue and recover damages for any injuries sustained by reason of such use...." N.Y. CLS CIV. R. § 51. New Jersey recognizes a common-law tort for the misappropriation of an individual's "name and image" in connection with "a commercial purpose directly benefiting" the defendant. *G.D. v. Kenny,* 205 N.J. 275, 15 A.3d 300, 321 (N.J.2011). Harry alleges that Matthews, York Group and Milso wrongfully used his name, portrait and image to promote their products to potential customers without seeking his permission to do so. ECF No. 333 ¶¶ 244–57.

In a letter dated May 18, 2009, Bartolacci offered to extend Harry's employment through September 2014. ECF No. 532–6. In connection with the offer, Matthews sought permission to utilize Harry's name in certain "trade publications" and "customer letters" for the purpose of supporting its Casket Division. *Id.* at 2. Harry ultimately rejected the offer and decided to retire. ECF No. 587 at 39–41, ¶ 72, 90–91, ¶ 1.

**\*38** The record indicates that photographs of Harry and his brothers were displayed at customer appreciation events held in New York and New Jersey. ECF No. 530–5 at 11–15. Harry asserts counterclaims against Matthews, York Group and Milso for misappropriating his name, image and likeness to further their commercial interests. ECF No. 333 ¶¶ 244–57. Matthews, York Group and Milso argue that Harry's counterclaims are barred by the applicable statutes of limitations. ECF No. 562 at 19. The problem with that argument is that the statutes of limitations, which operate as affirmative defenses, were never raised in the answer to the counterclaims. ECF No. 388 at 35–37. Because the misappropriation claims appear to be based, at least in part, on communications with customers after the relevant customer appreciation events, it is not clear whether the application of the statutes of limitations would be prejudicial to Harry. *Kleinknecht v. Gettysburg Coll.,* 989 F.2d 1360, 1373–74 (3d Cir.1993). It is certainly conceivable that he may have engaged in further discovery of this issue had he known that statute-of-limitations defenses would be forthcoming. ECF No. 522 at 31.

The statutory provision applicable in New York does not "prevent any person, firm or corporation from using the name, portrait, picture or voice of any manufacturer or dealer in connection with the goods, wares and merchandise

manufactured, produced or dealt in by him which he has sold or disposed of with such name, portrait, picture or voice used in connection therewith." N.Y. CLS CIV. R. § 51. Matthews, York Group and Milso assert that Harry's misappropriation claims are barred by this statutory language. ECF No. 468 at 23–24. Their argument is based on language in the asset purchase agreement stating that Harry (along with the other sellers) was transferring "[a]ll right, title and interest ... in and to the goodwill incident to the Business." ECF No. 4–1 at 19. The language of the asset purchase agreement, however, does not speak with clarity in relation to the use of Harry's name and image for advertising purposes. Under New York law, a person's "written consent" is required to render the use of his or her name or image "for advertising purposes" lawful. N.Y. CLS CIV. R. § 51. The statutory prerequisite clearly contemplates something more definitive than the vague phraseology found in the asset purchase agreement.

New York's statutory prohibition is violated only where the unauthorized use of a person's name is used for the purpose of "advertising" or "trade." *Herink v. Harper & Row Publishers, Inc.,* 607 F.Supp. 657, 659 (S.D.N.Y.1985). A plaintiff asserting a misappropriation claim under New York law must show that his or her name or image was wrongfully utilized "for a commercial purpose ." *G.D.,* 205 N.J. 275, 15 A.3d at 321. Matthews, York Group and Milso contend that Harry's name and likeness were used only "to celebrate the Pontone family's 80th anniversary of service in the casket industry." ECF No. 468 at 24. Nevertheless, New York law does not permit a "commercial advertiser" to "unilaterally neutralize or override the longstanding and significant statutory privacy protection by wrapping its advertising message in the cloak of public interest, however commendable the educational and informational value." *Beverly v. Choices Women's Med. Ctr., Inc.,* 78 N.Y.2d 745, 579 N.Y.S.2d 637, 587 N.E.2d 275, 279 (N.Y.1991). The images of Harry were evidently displayed at events to which several Matthews customers were invited. ECF No. 530–5 at 14. Under these circumstances, the question whether Harry's name and image were used for "advertising" or "trade" purposes presents a question of fact for the jury. *Freihofer v. Hearst Corp.,* 102 A.D.2d 974, 477 N.Y.S.2d 847, 850 (N.Y.App.Div.1984).

**\*39** Matthews, York Group and Milso argue that "Harry has demonstrated no damage as a result of the alleged misappropriation of his likeness." ECF No. 468 at 25. The plain language of the statute, however, contains no requirement of injury for the maintenance of an "equitable action" to "prevent and restrain" the unauthorized use of one's

"name, portrait, picture or voice ... for advertising purposes or for the purposes of trade...." N.Y. CLS CIV. R. § 51. Harry seeks both injunctive and monetary relief. ECF No. 333 ¶¶ 254–55, 257. He may be entitled to equitable relief even if no damages resulted from the alleged misappropriation of his name, image and likeness. *Schwartz v. Hebrew Nat'l, Inc.,* 130 Misc.2d 942, 497 N.Y.S.2d 1000, 1002–03 (N.Y. Spec. Term 1986). The motion for summary judgment filed by Matthews, York Group and Milso will be denied with respect to Harry's misappropriation counterclaims. ECF No. 333 ¶¶ 244–57.

### N. Scott's Defamation Counterclaims

Scott asserts counterclaims against Matthews, York Group and Milso for defamation. [27] ECF No. 333 ¶¶ 258–66. Under New York law, a writing constitutes defamation "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him." *Mencher v. Chesley,* 297 N.Y. 94, 75 N.E.2d 257, 259 (N.Y.1947). A writing's susceptibility to defamatory meaning presents a question of law for the court to decide. *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 182 N.Y.S.2d 1, 155 N.E.2d 853, 854–55 (N.Y.1959). "[I]f the words taken in their natural and ordinary meaning are susceptible to a defamatory connotation, then it is for the jury to decide how [they] would be understood by the average reader." *Carney v. Mem'l Hosp. & Nursing Home of Green Cnty.,* 64 N.Y.2d 770, 485 N.Y.S.2d 984, 475 N.E.2d 451, 453 (N.Y.1985). In order to establish an actionable defamation claim, Scott must demonstrate that: (1) Matthews' officials made a defamatory statement of fact; (2) the statement was false; (3) the statement was published to a third party; (4) the statement was "of and concerning" Scott; (5) the officials spoke with the applicable level of fault; (6) the speech either constituted defamation *per se* or caused special harm; and (7) the speech was not privileged. *Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir.2001).

[27]    Matthews, York Group and Milso argue that these claims are barred by New York's one-year statute of limitations. ECF No. 468 at 26; N.Y. CLS C iv. Prac. § 215(3). Since the defamation claims lack viability for other reasons, the court does not need to consider whether Matthews, York Group and Milso have waived the statute-of-limitations defense by failing to include it in their answer. *Lassiter v. City of Phila.,* 716 F.3d 53, 56 n. 2 (3d Cir.2013).

Scott's defamation claims are partially based on an email sent by the Casket & Funeral Supply Association of America ("CFSA") on September 21, 2010. ECF No. 333 ¶ 262. The relevant portion of the CFSA's message stated as follows:

**Matthews Sues Scott Pontone & Batesville**

The York Group, Milso Industries and Matthews International Corporation have filed a complaint against Scott Pontone and Batesville Casket co. [sic], Inc., for "wrongful solicitation of Plaintiff's employees and customers." Matthews alleges that Batesville hired Mr. Pontone to facilitate the hiring of two key Matthews employees and solicit customer accounts with the knowledge that Mr. Pontone had a non-compete clause in his employment agreement until May 30, 2011. Matthews has requested a jury trial in the Western District of Pennsylvania District Court.

 **\*40**  ECF No. 470–29 at 2 (boldface type in original). The statement referring to a "non-compete clause" was obviously alluding to the provision of Scott's amended employment agreement prohibiting him from soliciting *employees* of York Group and Milso for a period of four years. ECF No. 28–3 at 4. The non-competition provision of his contract had already expired when the instant action was commenced. *Id.* Scott alleges that this misstatement caused him to suffer "harm and loss" in his "trade, business, or profession." ECF No. 333 ¶ 263.

The statement relied upon by Scott in support of his defamation claims is incapable of defamatory meaning as a matter of law. *Tracy,* 182 N.Y.S.2d 1, 155 N.E.2d at 854. Words that are "not reasonably susceptible of a defamatory meaning ... are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (N.Y.1985). "The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader." *Id.* Even if it is assumed that the message sent by the CFSA can be credibly attributed to information provided by Matthews, York Group or Milso, the statement contained therein constituted nothing more than an inartful (or legally incorrect) characterization of the contractual provision prohibiting Scott from soliciting Pesce and Redmond. No reasonable reader would view the CFSA's use of the term "noncompete clause" (rather than the phrase "non-solicitation clause") as a defamatory misstatement.

Scott also bases his defamation claims on the contents of the email sent by Ferris on July 15, 2010. ECF No.

333 ¶¶ 260–61. That email contained a statement asserting that Scott had "torn his family apart." ECF No. 466–5 at 2. In the portion of his brief opposing the motion for summary judgment in relation to his breach-of-contract counterclaims, Scott correctly points out that Matthews, York Group and Milso were contractually prohibited from uttering disparaging statements about him regardless of the truth or falsity of such statements. ECF No. 522 at 12. The inquiry differs when defamation is at issue, since a plaintiff attempting to establish liability under such a theory must demonstrate that the defendant made a *false* statement of *fact. Albert,* 239 F.3d at 265–66. The New York Court of Appeals recently declared that "only statements of fact can be defamatory because statements of pure opinion cannot be proven untrue." *Thomas H. v. Paul B.,* 18 N.Y.3d 580, 942 N.Y.S.2d 437, 965 N.E.2d 939, 942 (N.Y.2012). Ferris' statement (which was allegedly reiterated by others in the presence of customers) cannot be reasonably characterized as a false factual assertion. *Albert,* 239 F.3d at 265–66. Since the statement is not "capable of being proven true or false," it cannot constitute actionable defamation under the law of New York. *Brian v. Richardson,* 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (N.Y.1995). The motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to Scott's defamation counterclaims. ECF No. 333 ¶¶ 258–66.

### O. The Unjust Enrichment Counterclaims

**\*41** Batesville, Scott, Harry and PCC all assert counterclaims against Matthews, York Group and Milso for unjust enrichment. ECF No. 236 ¶¶ 92–96; ECF No. 333 ¶¶ 219–32. As explained earlier, "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area Sch. Dist.,* 895 A.2d at 1254. The unjust enrichment counterclaims asserted by Scott and Harry are pled as alternatives to their respective breach-of-contract counterclaims. ECF No. 333 ¶¶ 225, 232. Because their business relationships with Matthews, York Group and Milso were governed by the terms of express contracts, they cannot proceed on a theory of unjust enrichment. *Third Nat'l Bank & Trust Co. of Scranton v. Lehigh Valley Coal Co.,* 353 Pa. 185, 44 A.2d 571, 574 (Pa.1945) (explaining that the "principle of quasi-contract is not applicable to agreements deliberately entered into by the parties however harsh the provisions of such contracts may seem in the light of subsequent happenings"). Since PCC's unjust enrichment counterclaims

are not distinguished from those asserted by Scott, they will be dismissed for the same reason. [28] ECF No. 333 ¶¶ 219–25.

[28]
    PCC's unjust enrichment claims are somewhat convoluted because they are pled as alternatives to breach-of-contract claims that do not exist. ECF No. 333 ¶ 225. PCC has no breach-of-contract claims stemming from Scott's employment agreement. *Id.* ¶¶ 165–74. In their brief in opposition to the pending motion for summary judgment, Scott, Harry and PCC raise a litany of arguments about how Matthews, York Group and Milso were "unjustly enriched" by actions taken in connection with this litigation. ECF No. 522 at 39–44. As noted earlier, however, a party cannot amend his or her complaint "through argument in a brief opposing summary judgment." *Nykiel v. Borough of Sharpsburg,* 778 F.Supp.2d 573, 587 (W.D.Pa.2011). Since the unjust enrichment counterclaims are clearly pled as alternatives to the breach-of-contract counterclaims, Scott, Harry and PCC cannot articulate new theories in an attempt to forestall summary judgment.

Batesville's unjust enrichment counterclaims rest on a different premise. ECF No. 236 ¶¶ 92–96. No contractual relationship existed between Matthews, York Group, Milso and Batesville. The precise basis for Batesville's unjust enrichment claims, however, cannot be readily ascertained. In its responsive brief, Batesville argues that its unjust enrichment claims are based on the alleged misappropriation of "confidential information and customer relationships" procured by Brooks. ECF No. 512 at 23. Matthews, York Group and Milso correctly point out that Batesville's unjust enrichment counterclaims are clearly *not* grounded in Brooks' conduct. ECF No. 558 at 17 n. 12. The averments supporting those counterclaims do not incorporate the factual allegations pertaining to Brooks, which appear in a subsequent count premised on a theory of "unfair competition." ECF No. 236 ¶¶ 92, 97–113. Batesville cannot effectuate an amendment to its complaint through argument. *Nykiel,* 778 F.Supp.2d at 587. The motions for summary judgment filed by Matthews, York Group and Milso will be granted with respect to all counterclaims based on a theory of unjust enrichment. ECF No. 236 ¶¶ 92–96; ECF No. 333 ¶¶ 219–32. For the reasons discussed earlier, Batesville can proceed with its "unfair competition" claims based on the improper actions allegedly taken by Brooks. ECF No. 236 ¶¶ 97–113.

### P. The Remaining Unfair Competition Counterclaims

Scott, Harry and PCC assert various counterclaims grounded in theories of unfair competition. ECF No. 333 ¶¶ 233–

43. Based on their briefing, they appear to premise these counterclaims on Pennsylvania law. ECF No. 522 at 36. Matthews, York Group and Milso move for summary judgment with respect to the unfair competition counterclaims. ECF No. 467.

**\*42** The common law of Pennsylvania incorporates torts relating to unfair competition. *Pennsylvania State Univ. v. Univ. Orthopedics,* 706 A.2d 863, 870–71 (Pa.Super.Ct.1998). Pennsylvania courts generally follow the Restatement (Third) of Unfair Competition in determining the applicable rules. *Giordano v. Claudio,* 714 F.Supp.2d 508, 521 (E.D.Pa.2010). The viability of the unfair competition counterclaims will be considered in relation to the principles found in the Restatement.

Scott, Harry and PCC purport to base some of their unfair competition claims on the alleged "copying" of Batesville's products, prices, and marketing strategy. ECF No. 522 at 37. Under the present circumstances, however, they lack prudential standing to assert the rights of Batesville. *Twp. of Lyndhurst v. Priceline.com, Inc.,* 657 F.3d 148, 154 (3d Cir.2011). A party ordinarily cannot rest his or her claim to relief on the legal rights or interests of others. *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). There is nothing which hinders Batesville's ability to assert its own interests in this litigation. *Kowalski v. Tesmer,* 543 U.S. 125, 130, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004). To the extent that the unfair competition counterclaims brought by Scott, Harry and PCC are premised on the alleged misappropriation of Batesville's confidential information, they will be dismissed.

Section 46 of the Restatement imposes liability on "[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade...." Restatement (Third) of Unfair Competition § 46. Harry's unfair competition claims are partially based on the alleged misappropriation of his name, image and likeness. ECF No. 333 ¶ 241. For the reasons discussed earlier, Harry can proceed with his misappropriation claims based on conduct occurring in New York and New Jersey. ECF No. 333 ¶¶ 244–57. It does not follow that he can assert parallel claims under Pennsylvania law based on the *same* conduct. Pennsylvania treats the "appropriation of [an]other's name or likeness" as a tort grounded in a theory of "invasion of privacy." *Burger v. Blair Med. Assocs., Inc.,* 600 Pa. 194, 964 A.2d 374, 376 (Pa.2009). The court already concluded that Pennsylvania

would not apply its substantive law of privacy to claims based on torts occurring in other jurisdictions. Restatement (Second) of Conflict of Laws § 152. To the extent that Harry bases his claims on the alleged distribution of his image to customers in various jurisdictions, the relevant choice-of-law rules would apply the law applicable in his state of domicile. Restatement (Second) of Conflict of Laws § 153. He already has viable statutory claims arising under the law of New York. ECF No. 333 ¶¶ 244–57. Consequently, the unfair competition counterclaims will be dismissed insofar as they are premised on a theory of misappropriation.[29] *Id.* ¶ 241, 964 A.2d 374.

29    Scott and Harry assail Matthews, York Group and Milso for "misusing" their family name. ECF No. 522 at 37. This contention makes no sense. It is undisputed that several members of the Pontone family remain employed by Matthews. Furthermore, the court already concluded that the "Pontone" name has not acquired the status of a trade name. ECF No. 141 at 8.

**\*43** Harry contends that Matthews, York Group and Milso engaged in a form of "unfair competition" by interfering with his employment prospects with Carriage Services. ECF No. 522 at 39. Nevertheless, his tortious interference claim stemming from that prospective engagement is specifically premised on the idea that Carriage Services was Matthews' *customer* rather than its *competitor.* ECF No. 522 at 34. After his 2010 retirement, Harry was subject to a three-year non-competition provision. ECF No. 4802 at 13. Given that Harry was not seeking to *compete* with Matthews, York Group or Milso, he cannot reasonably characterize Bartolacci's statements to Payne as an actionable form of "unfair competition."

Matthews, York Group and Milso filed their amended complaint on February 28, 2011. ECF No. 70. Scott, Harry and PCC argue that the amended complaint improperly details "confidential" information procured during the course of prior discovery. ECF No. 522 at 38. A comment to § 1 of the Restatement advises that "[a] competitor who diverts business from another ... through the wrongful use of confidential information ... may in some circumstances be subject to liability for unfair competition even if the conduct is not specifically actionable under the rules relating to deceptive marketing or the appropriation of trade secrets." Restatement (Third) of Unfair Competition § 1, comment g. Relying on this language, Scott, Harry and PCC seek to hold Matthews, York Group and Milso liable for the contents of the amended complaint. ECF No. 522 at 38.

No authority is cited for the proposition that this nebulous, flexible theory of "unfair competition" can be stretched far enough to hold a party liable for information contained in a pleading. The common law of Pennsylvania "accords an absolute privilege of immunity to statements, whether defamatory or not, [contained in] pleadings and other papers filed in regular judicial proceedings." *Preiser v. Rosenzweig,* 538 Pa. 139, 646 A.2d 1166, 1167 (Pa.1994). It is doubtful that the Pennsylvania Supreme Court would recognize an exception to this specific, well-established privilege based on generalized theories of fair play. Assuming *arguendo* that such a cause of action would be recognized, Scott, Harry and PCC do not explain how they have lost business *because* "confidential information" was disclosed in the amended complaint. ECF 522 at 38. Hence, their unfair competition counterclaims cannot proceed on such a theory.

Scott and PCC allege that Matthews, York Group and Milso have engaged in unfair competition "by entering into contracts in restraint of trade with customers." ECF No. 333 ¶¶ 235. The documentary record confirms that Matthews executed contracts with several funeral homes requiring that certain products be purchased exclusively from Matthews for specified periods of time. ECF Nos. 549–63 & 549–65. Internal emails suggest that Matthews' purpose for entering into exclusive sales agreements was to "lock in" its customers and prevent their business from being pursued by Batesville and other competitors.[30] ECF No. 549–49 at 1. Scott and PCC maintain that the execution of these contracts constituted unfair competition "in restraint of trade." ECF No. 333 ¶ 235.

---

[30]    It is worth noting that Batesville appears to utilize exclusive sales agreements as well. ECF No. 466–8 at 4.

**\*44** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, in restraint of trade or commerce among the several States, or with foreign nations...." 51 U.S.C. § 1. Judicial decisions interpreting this statutory provision can be used to inform the inquiry about whether an alleged "restraint of trade" constitutes a form of "unfair competition" under the common law. *State Oil Co. v. Khan,* 522 U.S. 3, 20–21, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (explaining that the Sherman Act's use of the phrase "restraint of trade" was designed to incorporate principles applicable under the common law). Under the "rule of reason" applicable to claims arising under the Sherman Act, an "exclusive dealing arrangement" is deemed to be unlawful only if its "probable effect" is to "substantially lessen competition in the relevant market,"

rather than merely to "disadvantage rivals." *ZF Merit or, LLC v. Eaton Corp.,* 696 F.3d 254, 281 (3d Cir.2012). An illegal "restraint of trade" exists only if "the competition foreclosed by the contract ... constitute[s] a substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 328, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (applying the Clayton Act). "Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Merit or,* 696 F.3d at 284. In this vein, an unfair competition claim cannot be grounded solely on the fact that a competitor enters into exclusive purchasing arrangements with certain customers. Since Scott and PCC do not point to evidence which suggests that the competition foreclosed by Matthews' exclusive sales contracts constituted a "substantial share of the relevant market," their counterclaims based on Matthews' alleged anticompetitive conduct must be dismissed. *Tampa Elec. Co.,* 365 U.S. at 328. Accordingly, the motion for summary judgment filed by Matthews, York Group and Milso will be granted with respect to all counterclaims asserted by Scott, Harry and PCC under common-law theories of "unfair competition." ECF No. 333 ¶¶ 233–43.

## Q. The Motion for Leave to File Amended Counterclaims

Scott, Harry and PCC originally asserted counterclaims for abuse of process. ECF No. 333 ¶¶ 267–78. On November 30, 2012, Matthews, York Group and Milso moved for a judgment on the pleadings in relation to the abuse of process counterclaims. ECF No. 390. That motion was granted in a memorandum opinion and order dated May 22, 2013. ECF No. 579. The counterclaims were dismissed without prejudice. *Id.* at 26. Scott, Harry and PCC now seek leave to file amended counterclaims for abuse of process. ECF No. 589. The motion for leave to amend is opposed by Matthews, York Group and Milso. ECF No. 591.

Scott, Harry and PCC do not provide a verbatim copy of their proposed amended counterclaims. ECF No. 589. Nonetheless, they supplemented their motion with a document detailing in a lengthy and rambling fashion the "substance" of the supplemental allegations that would be contained within their abuse of process averments. ECF No. 600–1 at 1. A court does not abuse its discretion in denying a motion for leave to amend that is unaccompanied by the pleading that the complaining party wishes to file. *Ranke v. Sanofi–Synthelabo, Inc.,* 436 F.3d 197, 205–206 (3d Cir.2006). The court, however, is not absolutely forbidden to

grant leave to amend in the absence of a proposed pleading. *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252–53 (3d Cir.2007) (contrasting situations in which leave to amend may be denied with situations in which leave to amend must be granted *sua sponte* ).

 **\*45** Scott, Harry and PCC contend that Matthews, the York Group and Milso were not required to seek leave to amend in order to file their amended complaint. ECF No. 600 at 1–2. Alluding to this alleged history of the case, Scott, Harry and PCC maintain that the "burden of persuasion" that they should be required to carry to obtain leave to amend "should be minimal." *Id.* at 2. A careful review of the documentary record reveals that Matthews, the York Group and Milso were only given twenty days to file their amended complaint without seeking leave to amend. ECF No. 59 at 45. Leave was orally granted because the substance of the forthcoming allegations had already been discussed at a hearing concerning a pending motion to dismiss.[31] *Id.* at 42–43. Each party seeking leave to amend has been required to provide some explanation about what its amended pleading would allege. Therefore, the court has not "imposed a burden" on Scott, Harry and PCC that it "elected not to impose" on Matthews, the York Group and Milso at an earlier stage in this case. ECF No. 600 at 1–2.

[31]    The deadline was extended at a subsequent hearing. ECF No. 72 at 27.

The court has already declared that any abuse of process counterclaims based on the "initiation and continuation" of this case are unripe. ECF No. 579 at 19. Scott, Harry and PCC will not be granted leave at this time to replead claims of that nature because the litigation is ongoing. The overall gist of the extensive and numerous supplemental allegations implicates that what Scott, Harry and PCC are complaining about is the entirety of the litigation. The prior abuse of process claims were dismissed as premature because they raised issues with respect to the initiation and continuation of the litigation. Nonetheless, Pennsylvania recognizes a cause of action for abuse of process in circumstances "where a legal process is pursued in a perverted manner in order to directly harm an adversary." *General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 306 (3d Cir.2003). Scott, Harry and PCC will be granted leave to file new amended counterclaims for abuse of process but only to the extent that such claims are based on specific factual allegations linked to an identified kind of process asserted to have been abused. The amended counterclaims cannot be based on broad

allegations and conclusions implicating the "initiation and continuation" of the instant case.

The amended counterclaims for abuse of process should be set forth in a supplemental pleading. ECF No. 600 at 10; ECF No. 600–3. Scott, Harry and PCC will not be permitted to replead counterclaims already considered for purposes of summary judgment. In accordance with the court's prior admonition, the forthcoming abuse of process counterclaims will be severed from the other claims in this case pursuant to Federal Rule of Civil Procedure 42(b). ECF No. 579 at 26–27 n. 7. At the present time, the court expresses no opinions concerning the viability of the proposed counterclaims for abuse of process.

## VI. *Conclusion*

 **\*46** The motion for partial summary judgment filed by Scott and Harry (*ECF No. 473* ) and the motion for summary judgment filed by Batesville (*ECF No. 462* ) will be denied. The remaining three motions for summary judgment (*ECF Nos. 463, 467 & 472* ) will be granted in part and denied in part. Among the claims asserted in the amended complaint (*ECF No. 70* ), the court will dismiss the breach of fiduciary duty claim against Harry (¶¶ *151–57* ), the unfair competition claims against Scott, Harry and PCC (¶¶ *185–90* ), and the unjust enrichment claims against Scott and PCC (¶¶ *191–96* ).[32] Batesville's counterclaims for unjust enrichment (*ECF No. 236* ¶¶ *92–96* ) will likewise be dismissed. Among the amended counterclaims asserted by Scott, Harry and PCC (*ECF No. 333* ), the court will dismiss Harry's breach-of-contract claim (¶¶ *175–85* ), the claims premised on alleged breaches of the implied covenant of good faith and fair dealing (¶¶ *186–202* ), the unjust enrichment claims (¶¶ *219–32* ), the unfair competition claims (¶¶ *233–43* ), the defamation claims (¶¶ *258–66* ), the claims based on a theory of "intrusion on seclusion" (¶¶ *279–92* ), and the false advertising claims (¶¶ *293–99* ). The pending motions for summary judgment will be denied with respect to all other claims remaining in the case. Subject to limitations noted above with respect to premature claims, Scott, Harry and PCC will be granted leave to file new counterclaims for abuse of process. Any such abuse of process counterclaims must be filed "as a separate and supplemental pleading." ECF No. 600–3. An appropriate order will be entered.

[32]    The unfair competition and unjust enrichment claims remain viable with respect to Batesville.

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.