**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES L. BROWN,** *on behalf of himself and all others similarly situated,* | : | |
| | : | |
| **Plaintiffs** | : | **CIVIL ACTION NO. 3:14-0591** |
| | : | |
| **v.** | : | |
| | | **(JUDGE MANNION)** |
| **ACCESS MIDSTREAM PARTNERS, L.P., CHESAPEAKE ENERGY CORP., and DOMENIC J. DELL'OSSO, JR.,** | : | |
| | : | |
| | : | |
| **Defendants** | : | |
| | : | |

## MEMORANDUM

Pending before the court are: (1) a motion to dismiss the plaintiffs' amended complaint filed on behalf of defendant Access Midstream Partners, L.P., ("Access Midstream"), (Doc. 68); (2) a motion to dismiss the plaintiffs' amended complaint filed on behalf of defendant Chesapeake Energy Corporation, ("Chesapeake Energy"), (Doc. 70); and (3) a motion to dismiss the plaintiffs' amended complaint filed on behalf of defendant Domenic J. Dell'Osso, Jr., ("Mr. Dell'Osso"), (Doc. 72).

## I.  PROCEDURAL HISTORY

On March 28, 2014, the plaintiff James L. Brown filed the instant action on behalf of himself and all others similarly situated. (Doc. 1). An amended

complaint was filed on August 22, 2014, which was brought by James L. Brown and Alice R. Brown on behalf of themselves and on behalf of all others similarly situated. (Doc. 57).

On September 19, 2014, defendant Access Midstream, defendant Chesapeake Energy and defendant Dell'Osso filed motions to dismiss the plaintiffs' amended complaint, (Doc. 68, Doc. 70, Doc. 72, respectively). Accompanying the motions to dismiss were supporting briefs, (Doc. 69, Doc. 71, Doc. 73). The plaintiffs filed briefs opposing each of the defendants' motions to dismiss on October 17, 2014. (Doc. 75, Doc. 76, Doc. 77). On November 14, 2014, the defendants each filed their reply briefs. (Doc. 82, Doc. 83, Doc. 84).

## II.    STANDARD OF REVIEW

The defendants' motions to dismiss are brought pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly,

550 U.S. 544 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. at 544. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. See Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the

court may not rely on other parts of the record in determining a motion to dismiss. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. See, e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

### III. DISCUSSION

#### A.    Plaintiffs' Allegations[1]

The following allegations are taken directly from the plaintiffs' amended complaint. As set forth above, the court accepts any factual allegations as true for purposes of the instant motions to dismiss. The plaintiffs are

---

[1]The allegations set forth in the instant action are factually and legally similar to allegations raised in a related action pending before this court. Suessenbach Family Limited Partnership v. Access Midstream Partners, L.P., et al., Civil Action No. 3:14-1197. Although these actions are currently consolidated for purposes of discovery, the court has recently declined to consolidate the matters for all purposes. That ruling however is subject to reconsideration upon completion of discovery.

Pennsylvania residents who own land in Pennsylvania's Marcellus basin. On or about June 20, 2007, plaintiff James Brown entered into a "Paid-Up Oil & Gas Lease" with Chesapeake Appalachia, LLC, ("Chesapeake Appalachia").[2] On that same day, plaintiff Alice Brown also entered into a "Paid-Up Oil & Gas Lease" with Chesapeake Appalachia.

According to the amended complaint, Chesapeake Energy is a NYSE-traded company and is one of the largest natural gas producers in the United States. Natural gas is generally located in sub-surface deposits and is extracted either through drilling or hydraulic fracturing, ("fracking"). Once a natural gas deposit is reached through these processes, a wellhead is placed on the deposit. After a wellhead is in place, natural gas can be moved from the well through gathering pipes and ultimately transported through an intrastate transmission pipeline. Intrastate transmission pipelines connect to major interstate transmission pipelines which transport natural gas throughout the United States. The transport and processing steps which follow removal of natural gas from the wellhead but precede entry of the gas into an interstate transmission pipeline are sometimes referred to by industry

---

[2]The plaintiffs have not named Chesapeake Appalachia as a defendant in this action, as it is a signatory to oil and gas leases with plaintiffs which contain arbitration clauses. Therefore, plaintiff James Brown, on behalf of himself and others, has brought claims in arbitration against Chesapeake Appalachia before the American Arbitration Association.

participants in a collective fashion as "gathering."

The Marcellus basin in Pennsylvania contains large natural gas deposits. Chesapeake Energy, among other companies, has conducted extensive natural gas drilling and fracking operations in the basin over the past decade. In order to facilitate Chesapeake Energy's drilling and fracking operations in the Marcellus basin, its subsidiary, Chesapeake Appalachia, entered into agreements to lease land from Pennsylvania residents. These lease agreements, such as the ones entered into by the plaintiffs, give Chesapeake Appalachia the right to extract oil and natural gas from lessors' lands and to transport and sell the oil and gas.

Due to major capital expenditures and lower natural gas prices, the plaintiffs allege that Chesapeake Energy found itself in severe financial difficulty at the beginning of 2012. In February 2012, Chesapeake Energy announced its intent to sell certain "midstream assets," which included its natural gas gathering and intrastate pipeline operations in the Marcellus basin. These midstream assets were held by its subsidiary, Chesapeake Midstream Operating, LLC, ("CMO"). On December 20, 2012, Chesapeake Energy completed the sale of CMO to Access Midstream, which is a publicly traded Master Limited Partnership and was originally formed by Chesapeake Energy. Access Midstream paid Chesapeake Energy $2.16 billion to acquire CMO and its midstream assets. In return for this payment, Access Midstream

6

got not only Chesapeake Energy's midstream assets, it also got gas gathering agreements with certain Chesapeake Energy subsidiaries, including Chesapeake Appalachia. Chesapeake Energy and Access Midstream sought confidential treatment of the gas gathering agreements from the SEC and have not otherwise made the agreements public. Certain terms of the agreements have, however, been described in public disclosures by Chesapeake Energy and Access Midstream, as well as in a report issued by *ProPublica*.[3]

Pursuant to the agreements, Chesapeake Energy's subsidiaries agreed to pay Access Midstream for natural gas gathering and transportation services, including intrastate transport. The agreement between Access Midstream and Chesapeake Appalachia covered Chesapeake Energy's operations in the Marcellus basin, ("Marcellus Agreement"). Under the Marcellus Agreement, Chesapeake Appalachia's payments to Access Midstream for gas gathering and transportation services were referred to as the "Marcellus fee." Access Midstream characterizes the Marcellus fee as a "cost-of-service based fee." However, the plaintiffs contend that the Marcellus fee is not based on Access Midstream's costs of service but is, instead, an inflated fee meant to provide Access Midstream with a guaranteed, above-

---

[3]Lustgarten, Abrahm, "Chesapeake Energy's $5 Billion Shuffle", *ProPublica*, March 13, 2014. (Doc. 57, Ex. C).

market return as an incentive and consideration for the $2.16 billion payment made to Chesapeake Energy. The Marcellus Agreement has a 15-year term and provides that, "[e]ffective on January 1, 2014 and January 1st of each year thereafter for a period of 15 years from July 1, 2012," the Marcellus fee will be recalculated to provide "a specified pre-income tax rate of return on invested capital." Thus, the plaintiffs allege that the Marcellus Agreement was structured to insure a guaranteed rate of return to Access Midstream for a 15-year period backdated to July of 2012. Neither Chesapeake Energy nor Access Midstream has filed the Marcellus Agreement with the SEC; however, *ProPublica* has reported that the rate of return is 15% per year. *ProPublica* further reports that the Marcellus fee is not a cost-of-service based fee, but was instead intended to provide Access Midstream with a guaranteed rate on its investment, much like a loan. Chesapeake Energy agreed to the above-market rate of return, as well as to pay Access Midstream supra-competitive prices for natural gas gathering and transportation services, as part of the Marcellus fee. The plaintiffs allege that Chesapeake Appalachia has, in some cases, paid fees for gas pipeline transport to Access Midstream that are many multiples of Access Midstream's actual costs and far more than the costs previously incurred by Chesapeake Appalachia when it owned the pipelines themselves.

The plaintiffs allege that Chesapeake Appalachia has passed the cost

of the Marcellus fee along to Pennsylvania oil and gas lessors, by deducting the inflated expenses built into the Marcellus fee from the lessors' royalty payments. Further, the plaintiffs allege that Chesapeake Energy's subsidiaries have deducted amounts far in excess of their payments to Access Midstream for gas gathering and transportation services. As a result of the Marcellus Agreement going into effect, the amounts of Chesapeake Appalachia's royalty payments to Pennsylvania oil and gas lessors began to drop significantly with each increasing cost deduction for charges such as "gathering," "transport," and payments to a "third party." The plaintiffs have cited to numerous of their royalty statements which they allege reflect the wrongful deductions dating from December 21, 2012, through July 31, 2014.

Consistent with the Marcellus Agreement, which provides that the first recalculation of the Marcellus fee would occur in January 2014, the plaintiffs allege that the royalty deductions began to increase dramatically in January 2014. According to the plaintiffs, this recalculation was a material component of Access Midstream's acquisition of Chesapeake CMO and was specifically designed to bump up Access Midstream's Marcellus fee to reach the 15% pre-tax rate of return it was guaranteed by Chesapeake Energy. Accordingly, the charges passed along to the plaintiffs began to escalate in January 2014 with the first Marcellus fee recalculation, which activated increased payments from Chesapeake Energy to Access Midstream.

As to the relationship between Chesapeake Energy and Access Midstream, the plaintiffs allege that Access Midstream came into existence on or about July 24, 2012, when it changed its name from "Chesapeake Midstream Partners, L.P." to "Access Midstream Partners, L.P." Chesapeake Midstream Partners, L.P., had originally been formed by defendant Chesapeake Energy.

According to the plaintiff's amended complaint, Access Midstream is managed and directed by several current and former Chesapeake Energy officers. Specifically, Access Midstream CEO J. Mike Stice was formerly President and Chief Operating Officer of Chesapeake Midstream Development, L.P., a wholly-owned subsidiary of Chesapeake Energy, and Senior Vice President - Natural Gas Projects for Chesapeake Energy. As late as December 20, 2012, defendant Dell'Osso had been the Executive Vice President and Chief Financial Officer of Chesapeake Appalachia. At the same time, Mr. Dell'Osso was a member of the board of directors of Access Midstream and the Executive Vice President and Chief Financial Officer of the following Chesapeake Energy affiliates: Chesapeake Midstream Development, LLC; Chesapeake Energy Marketing, Inc.; Chesapeake Exploration LLC and Chesapeake Operating, Inc. Most importantly, the plaintiffs allege that defendant Dell'Osso is and has been, at all relevant times, the Executive Vice President and Chief Financial Officer of

Chesapeake Energy. Thus, the plaintiffs allege that both Mr. Stice and Mr. Dell'Osso were formerly officers of a wholly-owned subsidiary of Chesapeake Energy, responsible for its midstream assets, which are now owned by Access Midstream. Currently, Mr. Dell'Osso is both a director of Access Midstream and an officer of Chesapeake Energy, while Mr. Stice is the Chief Executive Officer of Access Midstream.

The plaintiffs allege that the collusive non-arm's length relationship between Chesapeake Energy, Chesapeake Appalachia and Access Midstream is not only demonstrated by the above officers' relationships with the companies, but is further evidenced by the provisions of a Transition Services Agreement entered into by Chesapeake Energy, certain of its subsidiaries, and Access Midstream, on June 15, 2012, and later amended. The plaintiffs allege that the Transition Agreement provides that Access Midstream will pay Chesapeake Energy for certain services on a going-forward basis, as well as guarantee the "secondment [sic] (assignment) of Chesapeake employees to Access Midstream to assist in its operations." This Agreement, according to the plaintiffs, insures that Chesapeake Energy and certain of its subsidiaries and affiliates get a rebate of some of the monies they will pay out to Access Midstream under the Gas Gathering Agreements, in the form of payments for services and additional assets. Thus, the plaintiffs allege that Chesapeake Energy created an entity, Access Midstream, which

allowed it to raise more than $2 billion of needed capital, in return for which it agreed to pay Access Midstream supra-competitive fees for gas gathering and transportation services and guarantee an above-market rate of return on Access Midstream's purchase price of Chesapeake Energy's assets over a 15-year term. Offsetting the costs to Chesapeake Energy is Access Midstream's agreement to purchase certain services and assets from Chesapeake over time. Facilitating this agreement is the fact that Access Midstream is managed and directed by former and current Chesapeake Energy officers, and makes use of other Chesapeake Energy employees in conducting its operations.

Finally, in aid of Chesapeake Energy's ability to make good on its promise to lock in Access Midstream's rate of return, the plaintiffs allege that Chesapeake Appalachia has deducted the inflated costs for gas gathering and transportation services paid by Chesapeake Energy to Access Midstream from oil and gas lessors' royalty payments. The plaintiffs allege that Chesapeake Energy has not disclosed the real reason behind the surge in the costs assessed against royalty payments, nor has Chesapeake Energy fully shared the reasons for its increasing gas gathering and transportation costs with its shareholders. According to the plaintiffs, Chesapeake Energy treats its obligations under the Gas Gathering Agreements as off-balance sheet arrangements and only recently disclosed in a footnote in its 2013 SEC Form

10-K the significant liabilities it has incurred under the Gas Gathering Agreements.

Based upon the above allegations, the plaintiffs set forth two causes of action in their amended complaint. The first cause of action is a claim of a violation of the Racketeering Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. §§1962(c) and (d). Here, the plaintiffs allege that Access Midstream and the association-in-fact enterprise of Access Midstream, Dell'Osso, Chesapeake Appalachia, and Chesapeake Energy, are each an "enterprise" as that term is used in 18 U.S.C. §1961(4). Since 2012, the association-in-fact enterprise of Access Midstream, Dell'Osso, Chesapeake Appalachia, and Chesapeake Energy had the purposes of entering into non-arm's length agreements to: (1) aid Chesapeake Energy with its liquidity problems by transferring to it a payment of more than $2 billion; (2) guaranteeing Access Midstream supra-competitive fees and a high rate of return on its multi-billion dollar payment to Chesapeake Energy; (3) rebating to Chesapeake Energy and its subsidiaries and affiliates some of the inflated fees paid to Access Midstream; and (4) passing on the inflated fees charged by Access Midstream and paid by Chesapeake Energy and/or its subsidiaries through reduced royalty payments to oil and gas lessors, including lessors in Pennsylvania.

The plaintiffs claim that the association-in-fact enterprise was related by

13

the non-arm's length agreements entered into between Access Midstream and Chesapeake Appalachia, including the Marcellus Gas Gathering Agreement, as well as other agreements between Access Midstream and Chesapeake Appalachia's parent, Chesapeake Energy, and Chesapeake Energy's other subsidiaries and affiliates. According to the plaintiffs, defendant Dell'Osso was related to Access Midstream as a member of its board of directors and to Chesapeake Appalachia as its former CFO and as the current CFO of its parent, Chesapeake Energy.

The plaintiffs allege that the foregoing enterprises have been engaged in activities which affect interstate commerce in that their gas gathering and transportation charges and deductions have reduced oil and gas royalty payments to lessors throughout the United States and have been directed against lessors throughout the Commonwealth of Pennsylvania and other states. Further, the Gas Gathering Agreements and other non-arm's length agreements entered into by defendants and their co-conspirator, Chesapeake Appalachia, govern assets and employees located throughout the United States, and prescribe payments to be sent throughout the United States.

According to the plaintiff's amended complaint, Chesapeake Appalachia, Access Midstream, Chesapeake Energy and defendant Dell'Osso, ("RICO conspirators"), are each "persons" as that term is used in 18 U.S.C. §1961(3). Starting in 2012, with the creation, financing and

14

acquisition of the gas gathering operations of Chesapeake Midstream Operating, L.L.C., and continuing to the present time, the plaintiffs allege that the RICO conspirators have participated in the conduct of the affairs of each of the enterprises identified above through a "pattern of racketeering activity" as that phrase is defined in 18 U.S.C. §§1961(1) and (5). To this extent, the RICO conspirators have shared common management and direction, including defendant Dell'Osso and Chesapeake Energy, and have entered into non-arm's length agreements for the purpose of passing on inflated oil and gas gathering and transportation costs, through fraudulent royalty statements and payments to lessors, delivered by the mails and wires.

The plaintiffs allege that the conduct of the RICO conspirators, as described, constituted the execution of a scheme and artifice to deprive oil and gas lessors of royalties properly due them by means of fraudulent pretenses and representations through the use of the United States mail in violation of 18 U.S.C. §1341. Their use of the mails formed a central feature of the scheme and included, by way of example and as described in the plaintiffs' complaint, sending oil and gas lessors royalty statements and royalty payments which reflected deductions for vastly inflated gas gathering and transportation fees incurred by Chesapeake Appalachia and Chesapeake Energy pursuant to the Gas Gathering Agreements. According to the plaintiffs, hundreds and likely thousands of such royalty statements and

15

payments have been sent by Chesapeake Appalachia through the mails and wires across state lines. Each of these statements and payments fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases. The plaintiffs allege that this conduct constituted multiple violations of 18 U.S.C. §1341, which is a predicate offense for purposes of 18 U.S.C. §1962(c).

In addition, on a monthly basis since 2012, the plaintiffs allege that the RICO conspirators have sent by wire thousands of royalty statements and payments to oil and gas lessors which have fraudulently pretended and represented that deductions for gas gathering and transportation costs were legitimately incurred and constituted permissible deductions from royalties under the oil and gas leases. Further, it is alleged that the RICO conspirators have, on a monthly basis, transferred payments between themselves by wire, which payments were made pursuant to the non-arm's length and monopolistic agreements described in the complaint. According to the amended complaint, this conduct constituted multiple violations of 18 U.S.C. §1343, which is a predicate offense for purposes of 18 U.S.C. §1962(c).

With full knowledge of the deceptive, fraudulent and unlawful conduct described in the amended complaint, the plaintiffs allege that the RICO conspirators conspired to violate 18 U.S.C. §1962(c), in violation of §1962(d).

This conspiracy was consummated by 2012, by the non-arm's length Gas Gathering Agreements entered into by Access Midstream with certain Chesapeake Energy subsidiaries, including Chesapeake Appalachia. The Gas Gathering Agreements, including the Marcellus Agreement, were the *quid pro quo* afforded Access Midstream whereby Chesapeake Energy would guarantee Access Midstream a high rate of return on its purchase price of Chesapeake's midstream assets and supra-competitive fees. The RICO conspirators knew that the Gas Gathering Agreements, including the Marcellus Agreement, were not reached at arm's-length and further, that they were not cost-of-service based agreements, as evidenced by their guaranteed 15% "pre-income tax rate of return on invested capital" to Access Midstream. The RICO conspirators, the plaintiffs allege, also knew that the fees charged by Access Midstream under the Gas Gathering Agreements, including the Marcellus Agreement, were far in excess of the market rates of such fees. In addition, the RICO conspirators knew and agreed that Access Midstream would rebate a portion of these inflated fees to Chesapeake Energy and its subsidiaries and affiliates, ostensibly for the use of other equipment and services to be utilized by Access Midstream. The plaintiffs further allege that the RICO conspirators knew and agreed that the inflated gas gathering and transportation fees would be passed along to Pennsylvania oil and gas lessors by Chesapeake Energy and/or its subsidiaries in the form of cost

17

deductions from the lessors's royalty payments.

The plaintiffs allege that the conduct by the RICO conspirators, as alleged above, through Access Midstream and the association-in-fact enterprise injured tens of thousands of victims by depriving them of their rightful royalty payments, was continuous and open-ended and was intended to continue and, indeed, it continues today. The plaintiffs allege that they were the intended targets of the scheme that was facilitated by the knowing and purposeful involvement of the RICO conspirators. Further, they allege that the financial harms suffered by them were the direct result of the defendants' conduct and were the intended and reasonably foreseeable consequence of such conduct.

In their second cause of action, the plaintiffs allege a Pennsylvania state law claim for unjust enrichment. Here, the plaintiffs allege that the defendants, by the policies and actions benefitted from and increased their profits by effecting a scheme which deprived the plaintiffs of the full royalties due to them. Specifically, the plaintiffs allege that Chesapeake Energy benefitted from the royalty amounts wrongfully withheld by its subsidiary, Chesapeake Appalachia, whose financial results are included in Chesapeake Energy's and whose costs were substantially reduced by not paying the proper royalty amounts. Access Midstream benefitted from the royalty amounts wrongfully withheld by Chesapeake Appalachia because some of the monies which

should have been paid to oil and gas lessors were, instead, paid to Access Midstream. According to the plaintiffs, defendant Dell'Osso, as a board member of Access Midstream and the CFO of Chesapeake Energy, also benefitted from the wrongfully withheld royalty amounts. The plaintiffs allege that the defendants accepted and received the benefits of royalty monies properly due the plaintiffs and that it is inequitable and unjust for defendants to retain these monies which were procured by fraudulent pretenses and representations.

## II.    Defendants' Motions to Dismiss[4]/[5]

The defendants argue that the plaintiffs' complaint does not state a RICO claim. The federal RICO statute creates a civil remedy, including an award of treble damages, costs, and attorneys fees, for "any person injured in his business or property" by reason of a violation of one of RICO's substantive provisions. 18 U.S.C. §1964(c). Pursuant to 18 U.S.C. §1962(c), it is unlawful for "'any person' who is employed by or associated with 'any

---

[4]Many of the arguments for dismissal raised by the defendants in this action were also raised by the defendants in the related Suessenbach action. The court relies upon the reasoning of the Suessenbach decision in further support of its decision not to dismiss the plaintiffs' RICO claims.

[5]In large part, the arguments raised in each of the motions to dismiss filed in the instant action are duplicative. Therefore, the motions are given consolidated consideration.

enterprise' affecting interstate commerce to 'participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" Genty v. Resolution Trust Corp., 937 F.2d 899, 906 (3d Cir. 1991) (quoting 18 U.S.C. §1962(c)). The RICO statute defines racketeering activity by a list of crimes, or "predicate offenses," including federal crimes such as bribery, mail fraud and wire fraud. 18 U.S.C. §1961(1).

In this case, the plaintiffs allege that the predicate offenses consisted of mail and wire fraud. The elements of mail and wire fraud are: (1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme. United States v. Riley, 621 F.3d 312, 329 (3d Cir. 2010); United States v. Yusuf, 536 F.3d 178, 187-88 & n.14 (3d Cir. 2008).

The defendants argue that the instant case does not fall under RICO, but is essentially a breach of contract action. The court addressed this same argument in the Suessenbach action. As discussed in Suessenbach, the plaintiffs here are alleging something more than a simple breach of contract claim. The plaintiffs are alleging that the defendants entered into an unlawful agreement to purposefully charge inflated gathering and transportation costs for the specific purpose of disguising the true nature of the deductions from lessors' royalty payments. Thus, beyond the terms of their contracts, of which

none of the named defendants are parties, the plaintiffs allege that the defendants engaged in fraudulent transactions specifically to disguise the fact that the defendants were deducting monies that they were not legally entitled to and were unlawfully profiting at the plaintiffs' expense. These allegations, even if connected to the plaintiffs' leases, concern a specific intent to defraud and deceive the lessors. These actions, whether or not they also constitute a breach of contract, appear to go beyond a simple breach of contract claim and bring them into the realm of RICO. As such, the defendants' motions to dismiss will be denied on this basis.

The defendants also argue that the plaintiffs' RICO claim fails because they have not adequately alleged that they suffered an injury directly caused "by reason of" defendants' alleged RICO violation.[6]

---

[6]As in the Suessenbach action, Chesapeake Energy states that an effective relevant gathering rate can be calculated from the face of the plaintiffs' royalty statements attached to the complaint which evidences that the plaintiffs' gathering rate did not increase after December 2012. As the court previously stated, whether the royalty statements appended to the plaintiffs' complaint can, in fact, be demonstrated to support the plaintiffs' claim of decreased royalty payments after the defendants entered into the gathering agreements, or whether Chesapeake Energy's calculation is the accepted method by which to calculate such gathering rate, are questions of fact which the court is not to resolve on a motion to dismiss. The plaintiffs have alleged that deductions from their royalties increased after the defendants entered into certain gathering agreements. This is sufficient to allege injury at this stage of the proceedings, and it will be for the plaintiff to establish those injuries further on in the litigation.

The plaintiffs in this case have alleged in their amended complaint that they were improperly charged inflated rates and that their royalty payments were reduced by virtue of the improper charges deducted by Chesapeake Energy and its subsidiaries. The plaintiffs have alleged that Chesapeake Energy passed the inflated charges it paid to Access Midstream along to its lessors through increased rates for gathering, transportation and third party costs. The plaintiffs argue that whether charges to lessors for transportation and third party costs included amounts it paid to Access Midstream is an issue of fact. The plaintiffs further allege that gathering, transportation, and third party costs produced from plaintiffs' properties increased dramatically beginning in January 2014 and that this is consistent with their allegations that, under the Marcellus Gathering Agreement, the first fee recalculation which would activate increased payments from Chesapeake Energy to Access Midstream would be on January 1, 2014. At this stage of the proceedings, the court finds the plaintiffs have sufficiently pleaded an injury. Thus, the defendants' motions to dismiss will be denied on this basis.

Even if the plaintiffs have alleged an injury, the defendants argue that the plaintiffs have not properly alleged causation. Here, the defendants argue that the amended complaint does not plausibly allege that the alleged predicate acts of mail and wire fraud caused plaintiffs' injuries.

RICO plaintiffs must demonstrate that their injuries were the direct result

of the defendants' predicate acts. See Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 457 (2006) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985)) ("The compensable injury flowing from a violation of [§1962(c)] 'necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.'"). The plaintiffs cannot establish liability merely by showing that they suffered harm from an otherwise legal action of the enterprise unconnected to the predicate acts. See V-Tech Svcs., Inc. v. Street, 215 Fed.App'x. 93, 96 (3d Cir. 2007). Instead, the plaintiffs must demonstrate that the predicate acts directly and proximately caused the injury of which the plaintiffs complain. See id. ("[P]roximate cause requires a direct relation between the injury claimed and the injurious conduct alleged."); see also Smith v. Berg, 247 F.3d 532, 539 (3d Cir. 2001). Three factors govern whether the plaintiffs have established the requisite proximate cause for a RICO claim: (1) whether the plaintiffs were directly harmed by the defendants' predicate acts, (2) whether damages are speculative or concrete, and (3) whether alternative potential plaintiffs exist who could better redress the harm alleged. See Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 443 (3d Cir. 2000).

Here, the plaintiffs have alleged that the predicate mailings and wires transmitted the fraudulent royalty statements, as well as the royalty

underpayments which were based on the statements. The plaintiffs allege therefore that the predicate mailings and wires were the direct source of their harm and that the harm is concrete and measurable by the difference between the charges for gas gathering and transportation that Chesapeake Energy would have paid in a competitive market and the inflated charges it paid to Access Midstream and then passed along to lessors. The plaintiffs allege that there are no others better situated to address the harm to lessors than the plaintiffs who have been directly harmed. For present purposes, the plaintiffs' allegations are sufficient to survive the defendants' motions to dismiss.

Next, the defendants argue that the amended complaint does not adequately allege a scheme to defraud. A scheme to defraud has been defined as "any deliberate plan of action or course of conduct by which someone intends to deceive or cheat another or by which someone intends to deprive another of something of value." Coleman v. Commonwealth Land Title Ins. Co., 684 F.Supp.2d 595, 614-15 (E.D. Pa. 2010). The plaintiffs may satisfy their burden by showing a scheme to defraud involving "some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Id. (quoting Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991)). Deceitful statements, half truths, or the knowing concealment of material facts

are all actionable under the mail and wire fraud statutes. Id. (citing United States v. Townley, 665 F.2d 579, 585 (5th Cir. 1982)).

> The statements need not be false or fraudulent on their face, and the accused need not misrepresent any fact, since all that is necessary is that the scheme be reasonably calculated to deceive a person of ordinary prudence and comprehension, and that the mail service of the United States be used in the execution of the scheme.

Id. Moreover, the plaintiffs must allege that the defendants acted with an intent to defraud, which is to act knowingly and with the intention to deceive or to cheat. Id. (citing United States v. Hoffecker, 530 F.3d 137, 181 (3d Cir. 2008)). "An intent to defraud is ordinarily accompanied by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." Id. (citing United States v. Leahy, 445 F.3d 634, 644 (3d Cir. 2006)).

In this case, as was the case in Suessenbach, the plaintiffs are alleging that the defendants entered into an unlawful agreement to purposefully charge inflated gathering and transportation costs for the specific purpose of disguising the true nature of the deductions from lessors' royalty payments. Thus, beyond the terms of their leases, the plaintiffs allege that the defendants engaged in fraudulent transactions specifically to disguise the fact that the defendants were deducting monies that they were not legally entitled to and were unlawfully profiting at the plaintiffs' expense. These allegations concern

a specific intent to defraud and deceive the lessors and, whether or not they also constitute a breach of contract, appear to go beyond a simple breach of contract claim and bring them into the realm of RICO. The court finds that, at this stage of the proceedings, these allegations are sufficient to allege a scheme to defraud and the defendants' motions to dismiss will be denied on this basis.

The defendants also argue that the amended complaint does not allege a "pattern of racketeering activity" or a "threat of continued criminal activity." A pattern of racketeering activity requires proof of two predicate acts, committed within a ten year period, that are "related, and . . . amount to or pose a threat of continued criminal activity." Kehr Packages, Inc. v. Fideicor, Inc., 926 F.2d 1406, 1411-12 (3d Cir.) ((quoting H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989)), *cert. denied*, 501 U.S. 1222 (1991); Bardsley v. Powell, Trachtman, Logan, Carrie & Bowman, P.C., 916 F.Supp. 458, 463 (E.D.Pa. 1996), *aff'd*, 106 F.3d 384 (3d Cir. 1996).

Predicate acts are "related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir. 1995) (quoting H .J., Inc., 492 U.S. at 240). Continuity can be either an "open ended" or a "closed ended" pattern. Here, the plaintiffs allege a "closed ended" pattern. The "closed

ended" pattern simply refers to a "closed period of repeated conduct" and requires a showing of events occurring over a "substantial" period of time. H.J., Inc., 492 U.S. at 241; Tabas, 47 F.3d at 1292. In the Third Circuit, a period of time less than twelve months will not satisfy the close ended requirement. See Tabas, 47 F.3d at 1293.

The plaintiffs here have alleged that the defendants engaged in numerous acts of mail fraud under 18 U.S.C. §1341 and wire fraud under 18 U.S.C. §1343. The plaintiffs allege that the defendants mailed hundreds or thousands of royalty statements and payments to lessors, which reflected improper deductions for inflated rates and that they engaged in numerous acts of wire fraud by wiring royalty statements and payments on a monthly basis which fraudulently pretended and represented that deductions for gas gathering and transportation were legitimately incurred and were permissible deductions from royalties under the plaintiffs' leases. The plaintiffs further allege that the RICO conspirators wired improper payments among themselves on a monthly basis pursuant to the Marcellus Gas Gathering Agreement, the Transition Agreement and other collusive agreements. The plaintiffs have alleged that the 15-year term of the Marcellus Gas Gathering Agreement ensures that the predicate acts of mail and wire fraud will pose a continued threat of criminal activity into the future.

As required, the plaintiffs have alleged more than two predicate acts

within the required ten-year period, with sufficient allegations of relatedness and continuity. Whether the plaintiffs can establish their claims is yet to be seen. However, for purposes of the instant motions to dismiss, the plaintiffs have alleged enough to go forward. Therefore, the defendants' motions to dismiss will be denied on this basis.

The defendants further argue that the amended complaint does not adequately allege that they "conducted or participated" in the affairs of a RICO enterprise through a pattern of racketeering activity.

A plaintiff must establish that the defendants were associated with and participated in the "operation or management" of the enterprise to bring a cause of action pursuant to civil RICO. Reves v. Ernst & Young, 507 U.S. 170, 184 (1993). In order for a defendant "to conduct or participate" in the affairs of a RICO enterprise, a defendant must, in some capacity, direct the affairs of the enterprise. Id. at 178-79. A defendant will not be liable simply because he provides services that benefit the enterprise; instead, there "must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. To say it another way, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." University of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir. 1993). That does not always mean that a defendant must have a managerial position in the

enterprise, but only that he or she "knowingly further[s] the illegal aims of the enterprise by carrying out the directives of those in control." United States v. Parise, 159 F.3d 790, 796 (3d Cir. 1998).

Here, the plaintiffs have sufficiently alleged that the defendants participated in the conduct of the Enterprise. To this extent, they allege that Chesapeake Energy sought an off-balance sheet loan from Access Midstream, its former subsidiary, disguised as asset sales with repayment to be unlawfully funded by inflated charges to the plaintiffs. The purpose of the off-balance sheet loan was to hide Chesapeake Energy's need for cash without alerting the market to its financial troubles. Instead of repaying the loan with legitimate funds, the plaintiffs allege that Chesapeake Energy, through its wholly owned subsidiary, Chesapeake Appalachia, and Access Midstream entered into gathering agreements knowing that the fees to be charged by Access Midstream were far in excess of the market rates of the fees; knowing that Access Midstream would rebate a portion of the inflated fees to Chesapeake Energy and its subsidiaries and affiliates; knowing that the inflated gas gathering and transportation fees would be passed along to lessors in the form of cost deductions from the lessors' royalty payments; and knowing that the plaintiffs were the intended targets of the scheme. The plaintiffs allege that Chesapeake Energy and Access Midstream were aware that Chesapeake Energy's affiliates had the authority to deduct certain

expenses from the lessors' royalty payments and they conspired to abuse that authority to deduct unlawful amounts from lessors' royalty payments in order to enrich themselves.

With respect to defendant Dell'Osso, the plaintiffs allege that there is a nexus between defendant Dell'Osso and the racketeering activity of the enterprises, in that he participated in the operation or management of the enterprises' affairs. As the CFO of Chesapeake, the CFO of Chesapeake Appalachia, and a director of Access Midstream, the plaintiffs allege that defendant Dell'Osso may be deemed to have participated in the operation and management of both the Access enterprise, as well as the association-in-fact enterprise which includes Chesapeake, Access Midstream, Chesapeake Appalachia and defendant Dell'Osso himself. The plaintiff alleges that defendant Dell'Osso's signature appears on various agreements related to the claims in the instant action and that the underlying scheme could not have been implemented without the knowledge of officers and directors of the various entities, of which defendant Dell'Osso is the common link.

At this early stage of the proceedings, the court finds that the plaintiffs' allegations are sufficient to survive the defendants' motions to dismiss on this basis and the defendants' motions to dismiss will therefore be denied.

As a final argument on the RICO cause of action, the defendants argue that the amended complaint does not state a RICO conspiracy claim. A RICO

conspiracy is not a mere conspiracy to commit the underlying predicate acts. It is a conspiracy to violate RICO - that is, to conduct or participate in the activities of a corrupt enterprise. See Salinas v. United States, 522 U.S. 52, 62 (1997) ("Before turning to RICO's conspiracy provision, we note the substantive RICO offense, which was the goal of the conspiracy[.]" (emphasis added)); Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990) ("[A] defendant can be liable under RICO's conspiracy provision for agreeing to the commission of a pattern of racketeering activity." (emphasis added)); United States v. Elliott, 571 F.2d 880, 902 (5th Cir. 1978) ("[T]he object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity."). Thus, if the plaintiff's claim under §1962(c) does not state a cognizable claim, their §1962(d) conspiracy claim must necessarily fail. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993). Here, the court has found that, at this stage of the proceedings, the plaintiffs are entitled to go forward with their substantive RICO claim and further finds the plaintiffs' claim of a RICO conspiracy to be adequately alleged.

Outside of the RICO claim, the defendants also argue that the amended complaint does not state an unjust enrichment claim. "[T]o establish a claim

for unjust enrichment under Pennsylvania law, a party must show 'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" Stoeckinger v. Presidential Financial Corp. of Delaware Valley, 948 A.2d 828, 833 (Pa.Super.Ct. 2008)); see also Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 447 (3d Cir. 2000). "To prevail, 'a claimant must show that the party against whom recovery is sought has received a benefit that would be unconscionable for [it] to retain.'" Mass. Mut. Life Ins. Co. v. Curley, 459 Fed.Appx. 101, 108 (3d Cir. 2012) (citations omitted)).

In this case, the plaintiffs have alleged that a substantial monetary benefit was conferred upon the defendants derived from the inflated gathering costs paid by the plaintiffs which were used by Chesapeake Energy to repay the loan to Access Midstream along with a guaranteed rate of return. In addition, they have alleged that the defendants appreciated the benefit from the inflated gathering expenses deducted from the plaintiffs' royalty payments and that it is inequitable for the defendants to retain the benefits because it is they who have wrongfully paid the price for the defendants' benefit. As to defendant Dell'Osso, the plaintiffs have alleged that, as an officer of Chesapeake and a board member of Access Midstream, he stood to benefit

from the scheme which helped assure Chesapeake's survival and provided Access Midstream with a guaranteed rate of return on its $2.16 billion payment. The plaintiffs allege that defendant Dell'Osso has been able to appreciate and retain benefits flowing from the inflated rates deducted from the plaintiffs' royalty payments and the retention of these benefits would be inequitable.

While the plaintiffs did enter into leases with Chesapeake Appalachia, the allegations of the complaint are that none of the named defendants in this case are parties to a contract and cannot be liable for a breach of any such contract. See Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 420 (E.D.Pa. 2006) (allowing claims for unjust enrichment to proceed against defendants who were not parties to the original contract) (citing Com. ex rel. Pappert v. Tap Pharm. Products, Inc., 885 A.2d 1127, 1137-38 (Pa. Cmwlth. Ct. 2005)).

At this stage of the proceedings, the court will deny the defendants' motion to dismiss the plaintiffs' unjust enrichment claim.

Finally, separate and apart from the other defendants, defendant Dell'Osso argues that venue in the Middle District of Pennsylvania is improper as to him under the RICO venue provision, 18 U.S.C. §1965.

In considering defendant Dell'Osso's argument, the RICO venue provision is not exclusive, but rather supplements the general venue provision

in 28 U.S.C. §1391(b), which provides, in relevant part, that venue is proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." In this case, all of the lessor class members are located in Pennsylvania, the properties at issue and from which the claims arise are located here, and the relevant gas gathering and transportation services are provided in Pennsylvania. As such, the court finds that venue is properly situated in Pennsylvania under the general venue statute.

Further, the plaintiffs have alleged a RICO conspiracy pursuant to which the forum contacts of a defendant's co-conspirators may be attributed to the defendant for purposes of RICO venue under §1965(a). See American Trade Partners v. A-1 Int'l Importing Enter., Ltd., 755 F.Supp. 1292, 1303 (E.D.Pa. 1990). There is no claim that defendants Access Midstream, Chesapeake and Chesapeake Appalachia do no have sufficient contacts in the Middle District of Pennsylvania to subject them to venue here.

In light of the foregoing, defendant Dell'Osso's motion to dismiss will also be denied on this basis.

### III.    CONCLUSION

Whether or not the plaintiffs can ultimately be successful on the substance of their claims is yet to be seen. However, considering the above

34

arguments, accepting all of the allegations set forth in the plaintiffs' amended complaint as true, and drawing all reasonable inferences in favor of the plaintiffs, the court finds dismissal of the instant action inappropriate at this time.

An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  September 30, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-0591-02.wpd