# EXHIBIT A

2015IR0069-0015  2/8/2016 9:22 AM # 1291656
AMENDED COMPLAINT FILED

Bradford County Prothonotary

# IN THE COURT OF COMMON PLEAS
## OF BRADFORD COUNTY, PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **CIVIL COMPLAINT** |
| : | |
| **CHESAPEAKE ENERGY CORP.;** : | **Case No: 2015IR0069** |
| **CHESAPEAKE APPALACHIA, LLC;** : | |
| **CHESAPEAKE OPERATING, LLC;** : | |
| **CHESAPEAKE ENERGY MARKETING,** : | |
| **LLC; ANADARKO PETROLEUM** : | |
| **CORPORATION and ANADARKO E&P** : | |
| **ONSHORE, LLC,** : | |
| : | |
| **Defendants.** : | |

## AMENDED COMPLAINT

**AND NOW**, comes the Commonwealth of Pennsylvania,[1] by the Office of

Attorney General (hereinafter "Commonwealth" or "Plaintiff"), and brings this

action pursuant to the <u>Unfair Trade Practices and Consumer Protection Law</u>, 73

---

[1] 71 P.S. § 732-103.

P.S. § 201-1, *et seq.* ("UTPCPL"), to restrain unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the UTPCPL.

The UTPCPL authorizes the Office of Attorney General to bring an action in the name of the Commonwealth of Pennsylvania to restrain by temporary or permanent injunction unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the UTPCPL.

The Commonwealth has reason to believe that Defendants used methods, acts or practices declared unlawful by Section 201-3 of the UTPCPL; and that citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of are enjoined. The Commonwealth believes that the public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts and practices of the Defendants as hereinafter set forth. Further, the Commonwealth requests statutory restoration, civil penalties, costs and other appropriate equitable relief as redress for violations of the UTPCPL.

The Commonwealth also brings this action pursuant to Pennsylvania antitrust common law proceeding under the Commonwealth Attorneys Act, 71 P.S. § 732-204 (c) to restrain anticompetitive conduct proscribed by the common law

2

doctrine against restraints of trade. The Commonwealth also requests a permanent injunction to restrain such anticompetitive conduct of the Defendants as hereinafter set forth. The Commonwealth further requests damages, monetary and non-monetary equitable relief as appropriate as redress for violations of Pennsylvania antitrust common law.

In support of this action, the Commonwealth respectfully represents the following:

## INTRODUCTION

1.     This action seeks to recover for Pennsylvania Landowners money wrongfully deducted from royalty checks as a result of the wrongful conduct of Defendants detailed herein.

2.     Pennsylvania Landowners entered into lease agreements[2] with the Chesapeake Defendants and the Anadarko Defendants seeking to commercially exploit Marcellus Shale under the leased surfaces for royalty payments in reliance on representations that their royalty payments would not be reduced by deductions for post-production costs.

---

[2] The Commonwealth will obtain these agreements through discovery and present same at trial. Chesapeake Defendants and Anadarko Defendants possess these agreements.

3.    Chesapeake Defendants induced Pennsylvania Landowners to enter into lease agreements through a bait and switch scheme involving the Market Enhancement Clause and similar type royalty provisions as detailed herein.

4.    Defendant Chesapeake Energy also engaged in a self-dealing scheme which resulted in increased deductions being passed on to Pennsylvania Landowners detailed herein.

5.    Chesapeake Defendants engaged in a scheme in which it failed to disclose it was reducing certain landowner royalty payments for deductions paid to affiliated entities, when the landowners' leases provided deductions could only be made for costs paid to non-affiliated third parties.

6.    Defendant Chesapeake Energy engaged in a scheme in which it failed to disclose revenues received from its former midstream unit to Pennsylvania Landowners who are to receive royalties based on all revenue realized as detailed herein.

7.    Anadarko Defendants and Chesapeake Defendants agreed to allocate certain territories in certain counties for the acquisition of leases resulting in lower bonus payments and lower royalty rates as detailed herein.

8.    The impact of unfair and deceptive conduct alleged herein is not limited to Marcellus Shale but also Utica Shale and any other Natural Gas Play

because the oil and gas leases remain effective while production continues

regardless of the geologic horizon being extracted.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 42 Pa.

C.S. § 931(a).

10.     Venue is proper pursuant to Pa. R.C.P. No. 1006 (a) (1), because each

Defendant transacts business within Bradford County, Pennsylvania and/or some

of the transactions out of which this action arose occurred in Bradford County,

Pennsylvania.

11.     This Court has personal jurisdiction over each Defendant either

because the Defendant resides in Pennsylvania, does business in Pennsylvania

and/or has the requisite minimum contacts with Pennsylvania necessary to

constitutionally permit the Court to exercise jurisdiction, pursuant to 42 Pa. C.S. §

5322.

12.     This Court has personal jurisdiction over each of the Chesapeake

Defendants because each Chesapeake Defendant has registered as a foreign entity

to conduct business in the Commonwealth and because each Chesapeake

Defendant has designated an in-state registered agent, pursuant to pursuant to 42

Pa. C.S. § 5301 (a)(2)(i) and (ii).

13.    This Court has personal jurisdiction over each of the Anadarko Defendants because each Anadarko Defendant has registered as a foreign entity to conduct business in the Commonwealth and because each Anadarko Defendant has designated an in-state registered agent, pursuant to pursuant to 42 Pa. C.S. § 5301 (a)(2)(i) and (ii).

14.    The Commonwealth brings this action exclusively under the common law and statutes of the Commonwealth of Pennsylvania.  No federal claims are being asserted.  No aspect of the claims asserted herein is brought pursuant to the Guaranteed Minimum Royalty Act ("GMRA").  To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal law or the GMRA, such claim is expressly and undeniably disavowed and disclaimed by the Commonwealth.

## PLAINTIFF

15.    Plaintiff is the Commonwealth of Pennsylvania, by the Office of Attorney General, 14th Floor, Strawberry Square, Harrisburg, Dauphin County, Pennsylvania 17120.

16.    The Office of Attorney General is statutorily authorized to bring this action pursuant to the Commonwealth Attorneys Act, 71 P.S. § 732-204 and the UTPCPL, 73 P.S. § 201-4.

17.     The Office of Attorney General has determined that bringing this action is in the public interest pursuant to 73 P.S. § 201-4.

## DEFENDANTS

18.     The Defendants named in this Complaint include all of their predecessor entities and all their past and present component, subsidiary and affiliate entities.

19.     Defendant Chesapeake Energy Corporation ("Chesapeake Energy") is an Oklahoma for-profit corporation, registered as a foreign entity and designated CT Corporation as its in-state registered service agent with the Pennsylvania Department of State, Bureau of Corporations and Charitable Organizations: Corporations Section (herein referred to as "Corporations Bureau"), with a business office address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.  Chesapeake Energy, itself and through and with its subsidiaries, engages in trade or commerce in the Commonwealth of Pennsylvania through the exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and through the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play.

20.     Defendant Chesapeake Appalachia, LLC ("Chesapeake Appalachia"), is an Oklahoma limited liability company, registered as a foreign entity and

designated CT Corporation as its in-state registered service agent with the

Corporations Bureau, with a business office address of 6100 North Western

Avenue, Oklahoma City, Oklahoma 73118. Chesapeake Appalachia is the

nominal lessee of oil and gas leases secured within any Natural Gas Play on behalf

of Chesapeake Energy. Chesapeake Appalachia is a wholly-owned subsidiary of

Chesapeake Energy.

  21. Defendant Chesapeake Operating, LLC. ("COLLC"), successor by

conversion to Chesapeake Operating, Inc. is an Oklahoma limited liability

company, registered as a foreign entity and designated CT Corporation as its in-

state registered service agent with the Corporations Bureau, with a business office

address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

COLLC is the arm of Chesapeake Energy for the drilling and operation of

producing wells in any Natural Gas Play. COLLC is a wholly-owned subsidiary of

Chesapeake Energy.

  22. Defendant Chesapeake Energy Marketing, LLC. ("CEMI"), successor

by conversion to Chesapeake Energy Marketing, Inc. is an Oklahoma limited

liability company, registered as a foreign entity and designated CT Corporation as

its in-state registered service agent with the Corporations Bureau, with a business

office address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

CEMI is the arm of Chesapeake Energy for the marketing of oil and gas extracted

from oil and gas leaseholds ultimately owned by Chesapeake Energy in any Natural Gas Play. CEMI is a wholly-owned subsidiary of Chesapeake Energy.

23. At all times relevant and material hereto, Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Operating, LLC. and Chesapeake Energy Marketing, LLC (collectively, the "Chesapeake Defendants") engaged, and continues to engage, in trade or commerce in the Commonwealth of Pennsylvania through the exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and through the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play.

24. At all times relevant and material hereto, Chesapeake Energy exercised ultimate control over Chesapeake Appalachia, COLLC, and CEMI.

25. Defendant Anadarko Petroleum Corporation ("Anadarko Petroleum") is a Delaware for-profit corporation, registered as a foreign entity and designated CT Corporation as its in-state registered service agent with the Corporations Bureau, with a business office address of 1201 Lake Robbins Drive, The Woodlands, Texas 77380. Anadarko Petroleum, itself and through and with its subsidiaries, engages in trade or commerce in the Commonwealth of Pennsylvania through the exploration, drilling, extraction, gathering, compression, transportation

and sale of natural gas from any Natural Gas Play and through the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play.

26.     Defendant Anadarko E&P Onshore LLC, successor by conversion to Anadarko E&P Company, L.P. ("Anadarko E&P"), is a Delaware limited liability company, registered as a foreign entity and designated CT Corporation as its in-state registered service agent with the Corporations Bureau, with a business office address of 1201 Lake Robbins Drive, The Woodlands, Texas 77380. Anadarko E&P is the nominal lessee of oil and gas leases secured within any Natural Gas Play on behalf of Anadarko Petroleum. Anadarko E&P is the arm of Anadarko Petroleum for the drilling and operation of producing wells in any Natural Gas Play. Anadarko E&P is a wholly-owned subsidiary of Anadarko Petroleum.

27.     At all times relevant and material hereto, Anadarko Petroleum and Anadarko E&P (collectively, the "Anadarko Defendants") engaged, and continues to engage, in trade or commerce in the Commonwealth of Pennsylvania through the exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and through the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play.

28.    At all times relevant and material hereto, Anadarko Petroleum exercised ultimate control over Anadarko E&P.

## DEFINITIONS

29.    Unless otherwise specified, whenever reference is made in this complaint to "Landman" or "Landmen," such term shall mean an agent who works for an exploration and production company or who is contracted by an exploration and production company or broker to negotiate with landowners to enter into a lease for the exploration and production of natural gas.

30.    Unless otherwise specified, whenever reference is made in this complaint to "Dry Gas," such term shall mean natural gas from the well free of liquid hydrocarbons, such as ethane, propane, butanes and pentanes, composed mainly of methane.

31.    Unless otherwise specified, whenever reference is made in this complaint to "Natural Gas Liquids" or "NGL," such term shall mean components of natural gas that are separated from the gas state in the form of liquid hydrocarbons, such as ethane, propane, butanes and pentanes.

32.    Unless otherwise specified, whenever reference is made in this complaint to "Drilling Unit," such term shall mean the area from which a well drains natural gas as designated by the exploration and production company.

33.     Unless otherwise specified, whenever reference is made in this complaint to "Midstream Services," such term shall mean the gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing of oil, natural gas and natural gas liquids.

34.     Unless otherwise specified, whenever reference is made in this complaint to "Natural Gas Play," such term shall mean any geologic horizon including, but not limited to, Marcellus Shale and Utica Shale containing reserves, proven or otherwise, of oil, Dry Gas and Natural Gas Liquids in Pennsylvania.

35.     Unless otherwise specified, whenever reference is made in this complaint to "Pennsylvania Landowner,"[3] such term shall mean any Pennsylvania landowner leasing oil and gas rights to an exploration and production company for the extraction of oil, Dry Gas and Natural Gas Liquids from any Natural Gas Play.

## BACKGROUND

36.     The Office of Attorney General has received landowner complaints against the Defendants indicating they engaged in unfair and deceptive acts and practices in violation of the UTPCPL, as described more fully herein.

37.     Among the Pennsylvania Landowners who have filed complaints against the Defendants are persons who are sixty (60) years of age or older.

---

[3] The identities of each such Pennsylvania Landowner are better known to the Chesapeake Defendants and the Anadarko Defendants than to the Commonwealth. Such detail will be obtained through discovery and presented at trial.

38.     The Commonwealth believes and therefore avers that there may be additional Pennsylvania Landowners who have not filed complaints with the Section and who have been harmed due to the methods, acts and practices of the Defendants, which include, but are not limited to, the practices alleged herein.

39.     At all times relevant and material hereto, each of the Defendants authored, approved, endorsed, formulated, directed, controlled, ratified, benefitted from and/or participated in their respective conduct alleged herein.

40.     At all times relevant and material hereto, the unfair or deceptive methods, acts, and practices complained of herein have been willfully used by Defendants.

41.     Unless otherwise specified, whenever reference is made in this complaint to any act of any of the Defendants or any employee and/or agent of the Defendants, such allegations shall be deemed to mean the act of Defendants, acting individually, collectively or in any combination.

42.     The Commonwealth seeks legal redress for any claim based on a violation of the UTPCPL and Pennsylvania's antitrust common law.

## **MARCELLUS SHALE**

43.     Marcellus Shale is a strata of rock found in Pennsylvania ranging in depth from an outcropping to 9,000 feet below the surface.

44.    The thickness of Marcellus Shale in Pennsylvania ranges from 49 feet at the western border to 790 feet to the northeast.

45.    Marcellus Shale is found throughout the Allegheny Plateau of the northern Appalachian Basin beginning in southern New York and extending through northern and western Pennsylvania, eastern Ohio, western Maryland, most of West Virginia and ending in western Virginia.

46.    Marcellus Shale encompasses an area of approximately 95,000 square miles or 60.8 million acres.

47.    Marcellus Shale is but one of many geologic horizons found under the surface of Pennsylvania.

48.    There are other geologic horizons including, but not limited to, Utica Shale offering the potential of commercially viable extraction of oil, Dry Gas and Natural Gas Liquids within Pennsylvania.

49.    Marcellus Shale is the largest gas play in the United States with proven reserves of 42.8 trillion cubic feet of which approximately 32.7 trillion cubic feet is in Pennsylvania.

50.    The Marcellus Shale gas play began in 2004 in Washington County, Pennsylvania.

51.    Early drillers applied lessons learned in the Barnett Shale gas play in Texas and applied them to the Marcellus Shale gas play in Pennsylvania.

52.     Early drillers used hydraulic fracturing technology to crack the rock with a mixture of water, sand and chemicals at high pressure down a vertical shaft.

53.     To improve results, these early drillers switched to a horizontal drilling process, which begins with drilling a typical vertical well and then turning the drill 90° to bore through the desired gas bearing strata, allowing the well run along the length of the geologic seam as opposed to bisecting it.

54.     Unlike vertical drilling, horizontal drilling allows for several wells to be drilled from the same well pad in a radial pattern.

55.     Individual horizontal wells may extend over one mile in length.

56.     Horizontal drilling enables gas companies to drain gas from one square mile or 640 acres from a single well pad, corresponding to the industry convention for size of a Drilling Unit.

57.     Commercialization of the Marcellus Shale gas play began ramping up following the issuance of a press release[4] by Penn State on January 17, 2008, claiming Marcellus Shale contains 50 trillion cubic feet of gas.

58.     Future commercialization of other geologic horizons including, but not limited to, Utica Shale can leverage the existing infrastructure in place for past, current and future Marcellus Shale production in Pennsylvania.

---

[4] The Penn State press release is attached as Exhibit A.

59.     The future as to the commercialization of Utica Shale is approaching as one test tract in Tioga County is estimated to contain one trillion cubic feet of gas.

## PAST LEASING PRACTICES

60.     Prior to the Penn State press release, gas companies with information about the potential of the Marcellus Shale gas play quietly entered into leases with Pennsylvania Landowners for what had been the standard $25 per acre signing bonus and 12.5% royalty.

61.     On information and belief, large Pennsylvania Landowners such as farmers and ranchers, leased oil and gas rights for decades, if not generations, to exploration and production companies.

62.     Prior to the advent of the economic feasibility of fracking to extract natural gas, such large landowners had no expectation that exploration and production companies would attempt gas production under such oil and gas leases.

63.     Most Pennsylvania Landowners relied on payments made by the exploration and production companies such as the bonus for signing such leases as a means of paying property taxes during the term of their respective leases.

64.     On information and belief, many landowners and landowners from preceding generations repeated the practice of using such signing bonus from the

exploration and production companies to pay property taxes for decades, if not generations, leading up to the advent of fracking.

65.    Most, if not all, Pennsylvania Landowners lack access to proprietary information concerning the commercial viability of drilling for oil and gas.

66.    Conversely, the exploration and production companies are in the business of acquiring, developing and maintaining proprietary information concerning the commercial viability of drilling for oil and gas.

## LEASE ACQUISITION DURING THE MARCELLUS SHALE BOOM

67.    Exploration and production companies leveraged their access to proprietary geologic information to identify the commercially viable core of Marcellus Shale in northeast Pennsylvania for exploration and production of natural gas.

68.    To fully exploit the commercial opportunity of Marcellus Shale in northeast Pennsylvania, exploration and production companies had to acquire as much oil and gas rights acreage as possible.

69.    Exploration and production companies employed Landmen or contracted with independent land services companies to deploy teams of Landmen to identify parcels within the commercially viable core of Marcellus Shale in northeast Pennsylvania, to conduct title searches related to those parcels to identify

owners of the respective mineral estates and ultimately to contact those identified owners to secure leases of the mineral estate.

70.    At the beginning of the Marcellus Shale boom, exploration and production companies competed vigorously against each other to acquire leases for oil and gas rights in northeast Pennsylvania.

71.    Such competition benefited Pennsylvania Landowners in obtaining higher bonus payments, higher royalty and enhanced protections in addenda such as surface rights.

72.    Exploration and production companies incentivized Landmen to secure as many leases as they could on a daily and weekly basis on behalf of the exploration and production company.

73.    The exploration and production companies' urgency to secure leases to establish market position in the vacuum of a finite number of mineral estates within the commercially viable core of Marcellus Shale in northeast Pennsylvania provided the conditions necessary for the unscrupulous procurement of oil and gas leases from Pennsylvania Landowners.

74.    An oil and gas lease is a misnomer as it operates as a fee simple determinable for the mineral estate.

75.    A fee simple determinable for the mineral estate operates to sever the ownership of certain minerals from the ownership of the surface of the land.

76.   The mineral estate conveyed by Pennsylvania Landowners typically includes all geologic horizons including, but not limited to, Marcellus Shale and Utica Shale.

77.   The exploration and production companies authorized Landmen to use oil and gas lease forms, containing language drafted and approved by the exploration and production companies, to acquire oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale under the land of each such Pennsylvania Landowner.

78.   The oil and gas lease forms varied, immaterially, with respect to general formatting and the ordering of the usual boilerplate.

79.   However, the oil and gas lease forms also varied, materially, with respect to the royalty clause.

80.   Upon information and belief, there is a subset of oil and gas leases with royalty clauses that are ostensibly silent to the unsophisticated landowner on the subject of costs, if any, being charged as deductions against royalties accruing to the landowner.

81.   Upon information and belief, there is a subset of oil and gas leases which only permit deductions for costs paid to non-affiliated third parties.

82.   Upon information and belief, there is a subset of oil and gas leases with royalty clauses which purport to be "free of cost."[5]

83.   Upon information and belief, there is a subset of oil and gas leases with royalty clauses which expressly provide for the deduction of costs against royalties accruing to the landowner.

84.   Landmen presented the oil and gas lease forms as part of a pitch to a Pennsylvania Landowner either at a landowner group meeting, a landowner residence or a Landman office to secure leases.

85.   Landmen generally pitched the positive monetary aspect to a Pennsylvania Landowner as an inducement to secure a lease.

86.   Landmen responded to questions regarding surface rights concerns of landowners to secure a lease.

87.   Landmen fielded demands from landowners on the amount of the bonus based on acreage to secure a lease.

88.   Landmen fielded demands from landowners on the royalty percentage to secure a lease.

89.   Landmen also fielded demands from landowners to receive royalties free of cost or to otherwise avoid deductions.

---

[5] One such lease is attached as Exhibit B.  Chesapeake Defendants and Anadarko Defendants possess other leases with Pennsylvania Landowners and the Commonwealth will obtain these leases through discovery and present same at trial.

90.    In each such case, Landmen exercised the flexibility of adapting the standard pre-printed lease form through various addenda to address a given concern or demand of a landowner to secure a lease.

91.    Upon information and belief, Landmen retrieved a lease addendum most closely adapted to address a given concern or demand, for example, from a set of folders in the trunk of a Landman's car to secure a lease.

92.    Upon information and belief, Landmen alternatively made edits to a lease form using a word processor program on a laptop and then printed a revised lease form from a printer connected to the laptop based, for example, in the Landman's car to secure a lease.

93.    Included among the changes Landmen could and did make with blanket permission from the exploration and production companies was the incorporation of a certain set of addenda which was given as a matter of course to landowners who requested them as these were considered throwaways by the exploration and production companies.

94.    One example of a term given as a matter of course to Pennsylvania Landowners who requested them is an increase in the royalty from 12.5% to as much as 20%.

95.    Landmen negotiated with certain Pennsylvania Landowners who made demands regarding financial terms and surface rights concerns which exceeded their blanket authority to make certain changes to secure leases.

96.    In such cases, Landmen had to obtain the express authority from the exploration and production companies to modify certain financial and surface rights terms to secure leases.

97.    The exploration and production companies gave such permission depending on the value of the land owned by the hard-bargaining landowner to the exploration and production companies.

98.    Included among the changes Landmen could and did make with express permission from the exploration and production companies was the incorporation of a certain set of addenda which was only conceded to landowners who strenuously insisted on such terms.

99.    One example of a term conceded by an exploration and production company in an addendum to a lease to satisfy a Pennsylvania Landowner who strenuously objected to receiving royalty payments reduced by deductions for post-production costs is the Market Enhancement Clause.

100.    The Market Enhancement Clause typically contains the following language:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all

22

oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements.   However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

101.   Such terms were offered as an inducement to Pennsylvania Landowners to secure leases of highly valued mineral estates within the commercially viable core of Marcellus Shale in northeast Pennsylvania.

## SPECIFIC CONDUCT OF CHESAPEAKE DEFENDANTS CONCERNING INFLATED MIDSTREAM SERVICES PRICES IN VIOLATION OF UTPCPL

102.   Chesapeake Defendants engaged in the assessment of inflated prices for Midstream Services and the concealment of such inflation.

103.   Upon information and belief, Chesapeake Energy, through its effort to expand its activities in the exploration and drilling for natural gas in the United States, overleveraged its balance sheet with excessive debt by the end of 2011.

104.   Upon information and belief, Chesapeake Energy faced a projected cash-flow shortage of approximately $10 billion in 2012.

105.   Upon information and belief, Chesapeake Energy planned to divest approximately $11.5 billion to cover its operations in 2012.

106.   Upon information and belief, Chesapeake Energy expected to raise $4.9 billion from the sale of its entire oil and gas gathering and processing business.

107.   Chesapeake Energy divested its midstream assets in a series of transactions.

108.   On June 8, 2012, Global Infrastructure Partners, a private equity firm, acquired all of Chesapeake Energy's interest in Chesapeake Midstream Partners, LP for $2.2 billion.

109.   On July 24, 2012, Chesapeake Midstream Partners, LP changed its name to Access Midstream Partners, LP ("Access Midstream").

110.   On December 11, 2012, Williams agreed to acquire a 50% stake in Access Midstream GP, LLC ("Access GP"), the general partner of Access Midstream, and approximately 25% of the limited partner units of Access Midstream for $2.4 billion.

111.   On December 11, 2012, Access Midstream announced an agreement to acquire Chesapeake Midstream Operating, LLC from Chesapeake Energy for $2.16 billion.

112.   Chesapeake Midstream Operating, LLC owned Chesapeake Energy's natural gas gathering and processing assets in various gas plays, including Marcellus in Pennsylvania.

113.   Upon information and belief, the book value for the aforementioned divested assets was approximately $2.4 billion, thus resulting in a premium of approximately $1.76 billion to Chesapeake Energy.

114.   Prior to the dropdown, Chesapeake Energy and its midstream unit executed a series of gas gathering agreements[6] which provided for a guaranteed minimum rate of return with low risk to interest potential purchasers of the midstream assets.

115.   Upon information and belief, the gas gathering agreements between Chesapeake Energy and its midstream unit were not negotiated at arm's length; thus, resulting in a scheme of artificially inflated and/or unreasonably excessive post-production costs to be passed on to Pennsylvania Landowners.

116.   The series of transactions constituting the dropdown of the midstream assets from Chesapeake Energy to Access Midstream have the effect of a financial loan.

---

[6] The Commonwealth will obtain these agreements through discovery and present same at trial.  Chesapeake Defendants possess these agreements.

117.   Upon information and belief, the costs for Midstream Services increased significantly and materially following the dropdown of the midstream assets.

118.   Upon information and belief, the artificially inflated post-production costs were passed on to and continue to be passed on to Pennsylvania Landowners.

119.   Chesapeake Defendants funded the debt service on what is effectively a loan using royalty funds payable to Pennsylvania Landowners.

120.   Upon information and belief, contemporaneously with the dropdown, Chesapeake Energy and Access Midstream executed transition service agreements[7] in which Access Midstream paid Chesapeake Defendants to provide management, labor and other related services on behalf of Access Midstream to facilitate continued operations of Midstream Services.

121.   Upon information and belief, Chesapeake Defendants did not disclose to Pennsylvania Landowners the transition services agreements in which Chesapeake Defendants received a premium in excess of the actual cost of Midstream Services purportedly borne by both the Chesapeake Defendants and Pennsylvania Landowner as allocated by royalty interest; thus, resulting in a scheme of artificially-deflated royalty payments to Pennsylvania Landowners, who are to share in revenue realized related to the sale of gas.

---

[7] The Commonwealth will obtain these agreements through discovery and present same at trial.  Chesapeake Defendants possess these agreements.

## COUNT I

## COMMONWEALTH V. CHESAPEAKE DEFENDANTS VIOLATION OF UTPCPL 73 P.S. § 201-2(4)(v),(vii) and (xxi)

122.   The preceding paragraphs are incorporated herein as though fully set forth below.

123.   In exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under land leased from Pennsylvania Landowners, and in otherwise engaging in the conduct more fully described herein with respect to any Natural Gas Play, Chesapeake Defendants are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth, including, but not limited to, Bradford County, within the meaning of 73 P. S. § 201-2(3).

124.   By reason of the foregoing, Chesapeake Defendants assessed inflated deductions for Midstream Services against royalty checks payable to Pennsylvania Landowners.

125.   By misrepresenting and/or omitting material facts concerning the inflated deductions for Midstream Services, Chesapeake Defendants misled Pennsylvania Landowners into believing they were being charged deductions for Midstream Services borne of a free and fair market.

126.   Specifically, Chesapeake Defendants, by engaging in the practices set forth above, have:

    a.   Deceptively entered into oil and gas leases, extracted, marketed and sold Marcellus Shale natural gas by misleading Pennsylvania Landowners that royalties paid to each such landowner were reduced by deductions for Midstream Services borne of a free and fair market;

    b.   Deceptively concealed from Pennsylvania Landowners the significant and material amount by which deductions from royalties to be paid to each such landowner to satisfy a guaranteed rate of return to Williams Partners or to otherwise cover inflated inter-affiliate transactions, while indicating that the deductions for Midstream Services result from arm's length negotiations, thereby causing a likelihood of confusion or misunderstanding for such landowners who are led to believe that deductions for Midstream Services result from arm's length negotiations;

    c.   Deceptively concealed from Pennsylvania Landowners the significant and material amount by which payments from Williams Partners to Chesapeake Defendants in excess of the

actual cost for Midstream Services constitute revenues realized, while indicating gross sales reported to each such landowner reflect all revenue realized in connection with the sale of gas, thereby causing a likelihood of confusion or misunderstanding for such landowners who are led to believe that gross sales reflect all revenues realized.

d.   As a result of Chesapeake Defendants' acts in deceiving Pennsylvania Landowners that royalties paid to each such landowner were reduced by deductions for Midstream Services borne of a free and fair market, landowners who believed they were being paid their bargained for royalties reduced by deductions for Midstream Services resulting from arm's length negotiations, in fact, were charged with knowingly duplicitous deductions resulting from inflated charges for certain Midstream Services to satisfy a guaranteed rate of return to Williams Partners or to otherwise cover inflated inter-affiliate transactions.

127.   Chesapeake Defendants violated the UTPCPL:

a.   Each time a Pennsylvania Landowner was assessed an inflated deduction for midstream services;

b.   Each time a Pennsylvania Landowner was assessed a
     retroactive deduction for midstream services to satisfy a
     guaranteed rate of return to Williams Partners and based on the
     *Kilmer* decision which did not have any collateral estoppel
     effect on each such landowner;

c.   Each time a Pennsylvania Landowner failed to receive a royalty
     payment as retaliation for complaining against assessment of
     inflated deductions;

d.   Each time a Pennsylvania Landowner received a royalty
     statement wherein gross sales did not include the premium
     Chesapeake Defendants received in excess of the actual cost of
     Midstream Services;

e.   Each time an artificially high drilling, extraction, processing,
     compression or transportation payment was made to an affiliate
     causing inflated deductions against royalty payments to
     Pennsylvania Landowners;

f.   Each time an artificially high drilling, extraction, processing,
     compression or transportation payment was made to a
     purported third-party in a supposedly arm's length transaction

causing inflated deductions against royalty payments to

Pennsylvania Landowners; and

g.   Each time Chesapeake Defendants sent a letter[8] to a

Pennsylvania Landowner stating a purported reason for

wrongfully taking deductions.

128.   Chesapeake Defendants' conduct more fully described herein is,

accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

129.   The aforesaid methods, acts or practices constitute unfair or deceptive

acts or practices within the meaning of Section 201-2(4) of the UTPCPL,

including, but not limited to:

a.   "Causing likelihood of confusion or of misunderstanding as to

the source, sponsorship, approval or certification of goods or

services" in violation of 73 P.S. § 201-2(4)(ii);

b.   "Representing that goods or services have sponsorship,

approval, characteristics, ingredients, uses, benefits or

quantities that they do not have or that a person has a

sponsorship, approval, status affiliation or connection that he

does not have" in violation of 73 P.S. § 201-2(4)(v);

---

[8] One such letter is attached as Exhibit C.  Chesapeake Defendants possess other letters sent to Pennsylvania Landowners and the Commonwealth will obtain these letters through discovery and present same at trial.

c.     "Representing that goods or services are of a particular

standard, quality or grade, or that goods are of a particular style

or model, if they are of another" in violation of 73 P.S. § 201-

2(4)(vii);  and

d.     "Engaging in any other fraudulent or deceptive conduct which

creates a likelihood of confusion or of misunderstanding" in

violation of 73 P.S. § 201-2(4)(xxi).

130.   The above described conduct has been willful within the meaning of

73 P.S. § 201-8 and is unlawful under the UTPCPL.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commonwealth respectfully requests this Honorable

Court to enter an Order:

A.     Declaring the Chesapeake Defendants' conduct to be in violation of

the UTPCPL;

B.     Permanently enjoining the Chesapeake Defendants and any agents,

successors, assigns, and employees acting directly or through any corporate or

business device from engaging in the acts and practices alleged in this complaint

and any other acts and practices which violate the UTPCPL;

C.      Directing the Chesapeake Defendants to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.      Directing the Chesapeake Defendants pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

E.      Directing the Chesapeake Defendants to disgorge and forfeit all profits they have derived as a result of their unfair and deceptive acts and practices as set forth in this complaint pursuant to Section 201-4.1 of the UTPCPL;

F.      Directing the Chesapeake Defendants to pay the Commonwealth all costs for the investigation and prosecution of this action pursuant to Section 201-4.1 of the UTPCPL;

G.      Directing the Chesapeake Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and involving the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted

from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.   Providing any other such relief as the Court may deem necessary and appropriate.

## SPECIFIC CONDUCT OF CHESAPEAKE DEFENDANTS CONCERNING LEASING PRACTICES IN VIOLATION OF UTPCPL

131.   Chesapeake Defendants engaged in the following conduct.

132.   Upon information and belief, Chesapeake Defendants entered into oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under the land of each such Pennsylvania Landowner.

133.   Upon information and belief, Chesapeake Defendants deployed Landmen to obtain oil and gas leases from Pennsylvania Landowners owning land over commercially viable Marcellus Shale gas play.

134.   The Chesapeake Defendants empowered the Landmen to use unfair and deceptive negotiation tactics with Pennsylvania Landowners such as:

     a.   Failure to disclose facts material to making a decision as to signing an oil and gas lease; and

    b.    Making affirmative statements containing a falsity or prevarication.

135.  The sales pitches by Landmen to Pennsylvania Landowners included:

    a.    High pressure;

    b.    Leveraging information advantage:

    c.    Dissuading contact with other landowners to compare terms;

    d.    Dissuading contact with anyone else to discuss terms;

    e.    Presenting 'take it or leave it' contracts; and

    f.    Limiting time for consideration of contract.

136.  Chesapeake Defendants, directly or indirectly through Landmen, made the following misrepresentations to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

    a.    Stating that if anyone in the drilling unit were to sign the lease now, the money would be placed in escrow for future payment; otherwise, if anyone signed later, such person would lose out on the money or otherwise receive much less;

    b.    Representing that all the neighboring properties were leased and the gas company would drill to capture the gas whether the landowner signed or not;

c. Stating that if the landowner did not sign the lease that day, it would be the landowner's last chance to sign and the gas company would extract the gas one way or another;

d. Telling a landowner an attorney was not necessary when signing a lease because the landowner would get a 12.5% royalty because that was the law in Pennsylvania;

e. Representing to a landowner that all of the neighboring properties were leased and that royalties totaling $500,000 at 20% could be expected without disclosing any impact from deductions;

f. Agreeing in negotiations to a 20% royalty and a no deduction clause; instead, presenting a lease for signing that provided for only a 12.5% royalty and permitted deductions;

g. Telling a landowner, in response to a question about the possibility of the price per acre increasing, that the price per acre for the signing bonus does not increase despite knowing that it may;

h. Showing landowners copies of spreadsheets called "royalty calculators," which reflect how much money a landowner can expect to make in royalty payments each year over a twenty

year period based on the number of acres in production and the

price of gas, with no references to deductions;

i.    Coercing a landowner to agree in writing to permit a pipeline

running diagonally across a landowner's field;

j.    Taking $3,000 in deductions from a Pennsylvania Landowner

who was not previously informed that it might purportedly cost

the landowner money in deductions if the gas had to be shipped

farther away;

k.    Charging a Pennsylvania Landowner deductions for

compression when such service was not being done; and

l.    To avoid complying with a recently-enacted setback

requirement, seeking a waiver from an 89-year old

Pennsylvania Landowner as purportedly being necessary to

proceed on the existing lease.

### Chesapeake Defendants Use of Advertisements as an Unfair and Deceptive Inducement to Secure Leases

137.   Chesapeake Defendants advertised through brochures[9] to solicit oil

and gas leaseholds.

138.   The advertisements targeted Pennsylvania Landowners.

---

[9] The brochure is attached as Exhibit D.

139. The brochure identifies Defendant Chesapeake Energy as making the solicitation.

140. The brochure is titled as "Partners for the Future, Chesapeake's Commitment to Mineral Owners, Pennsylvania."

141. The brochure claims that Defendant Chesapeake Energy is "The Nation's Most Active Driller" and "A Champion of the Environment," while stating "Five Reasons to Lease with Chesapeake."

142. On the page titled, "The Drilling & Production Process" and under the subheading, "2. Signing the leasing agreement, Chesapeake Defendants "incurs all risks and costs associated with drilling and producing the well."

143. The brochure makes no reference to post-production costs or deductions.

144. Chesapeake Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the applicability of deductions against prospective royalty payments.

145. Pennsylvania Landowners relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease in connection with the brochure.

### Chesapeake Defendants Use of Royalty Calculator as an Unfair and Deceptive Inducement to Secure Leases

146. Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the economic effect of deductions in royalty spreadsheet calculators[10] when pitching the potential ranges of royalty payments based on a certain percentage and anticipated production levels as consideration for signing the oil and gas lease.

147. The royalty spreadsheet calculators, as used by Landmen, lacked any field for any type of deduction against any hypothetical royalty for review by a Pennsylvania Landowner prior to entering into an oil and gas lease.

148. Upon information and belief, Chesapeake Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the applicability of deductions against prospective royalty payments.

### Chesapeake Defendants Created a Likelihood of Confusion or of Misunderstanding as to Which Party Is the Offeror and the Offeree as an Unfair and Deceptive Inducement to Forbear from Considering Competing Offers

149. Most, if not all, landowners lack sophistication in understanding that the oil and gas leases presented by the Landmen at the direction of Chesapeake Defendants to the landowners for execution was construed by Chesapeake

---

[10] One such printing of a royalty calculator is attached as Exhibit E.

Defendants as an offer by the landowners to be accepted by the Chesapeake Defendants and not the converse.

150.   The dynamic of the Landman knocking, often unannounced and unscheduled, on the door of a landowner's house to pitch an oil and gas lease with the Chesapeake Defendants with lease forms authorized by Chesapeake Defendants in the hands of the Landman would reasonably confuse most, if not all, landowners, that the Chesapeake Defendants were making the offer and that upon execution by the landowner, the deal was struck as the grant of a fee simple determinable was conveyed.

151.   Instead, Chesapeake Defendants maintained that they could and, in fact, did reject oil and gas leases with Pennsylvania Landowners who believed that they had a deal which foreclosed each such landowner from considering or accepting offers from any other gas exploration and production company.

## Chesapeake Defendants Used Affiliate Transactions as an Artifice to Inflate Costs and Reduce Royalty Payments

152.   Most, if not all, landowners lack sophistication in understanding that the oil and gas leases presented by the Landmen at the direction of Chesapeake Defendants provided Chesapeake Defendants with free rein to structure the sale of natural gas from the wellhead through a series of affiliate transactions before being sold to an unrelated third party.

153.   Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the degree of self-dealing by Chesapeake Defendants in selling natural gas to an unrelated third party.

154.   Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the opportunity by Chesapeake Defendants to inflate the reporting of post-production costs at each step of a series of affiliate transactions which had the effect of reducing royalty payments to Pennsylvania Landowners.

155.   Upon information and belief, Chesapeake Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the structure of the sale of natural gas from the wellhead through a series of affiliate transactions before being sold to an unrelated third party to inflate costs; thus, reducing royalty payments to Pennsylvania Landowners.

156.   Chesapeake Defendants assessed the inflated costs as deductions against the royalty checks payable to Pennsylvania Landowners.

157.   Upon information and belief, Chesapeake Defendants issued division orders which underreported the decimal interest of Pennsylvania Landowners in a drilling unit resulting in a smaller royalty payment.

### Chesapeake Defendants Use of Market Enhancement Clause as an Unfair and Deceptive Inducement to Secure Leases

158.   Most, if not all, Pennsylvania Landowners lack sophistication related to the applicability of deductions against prospective royalty payments.

159.   Most, if not all, landowners lack sophistication related to the drafting of industry-specific oil and gas lease terms.

160.   Conversely, the exploration and production companies have the sophistication relative to the drafting of industry-specific oil and gas lease terms due to years of experience in executing oil and gas leases.

161.   Some landowners wanted further assurance in the contract that deductions would not be assessed against royalty payments resulting from the usual and customary sale of natural gas.

162.   Upon information and belief, Chesapeake Defendants, directly or indirectly through Landmen, offered the Market Enhancement Clause to certain Pennsylvania Landowners to overcome their objections to being assessed deductions against royalties resulting from the usual and customary sale of natural gas.

163.   The Market Enhancement Clause is typically found in the addendum to a lease with standard language otherwise providing for deductions against royalties resulting from the usual and customary sale of natural gas.

164.    Chesapeake Defendants used language in the Market Enhancement Clause which, in its plain language meaning to a layman, ostensibly conveyed the requested assurance against the assessment of deductions, and which, as an industry term of art to a sophisticated person, operated to permit the taking of deductions to perfect the prevarication.

165.    The language in the Market Enhancement Clause which was the proverbial bait to induce certain Pennsylvania Landowners to sign oil and gas leases was:

> ...all oil, gas or other proceeds accruing to the Lessor under this lease or by state law ***shall be without deduction***, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing the oil, gas and other products produced hereunder to transform the product into marketable form...

(emphasis added)

166.    On information and belief, Chesapeake Defendants knew that the Market Enhancement Clause would not negate the permissive deduction language in the standard lease form in giving the Pennsylvania Landowner, who bargained hard for it, a hollow victory.

167.    Chesapeake Defendants made the following misrepresentations relating to the Market Enhancement Clause to Pennsylvania Landowners who

relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

    a.    Representing that the Market Enhancement Clause benefitted the landowner;

    b.    Representing that the Market Enhancement Clause protected the landowner from deductions;

    c.    Stating that it was beneficial for the landowner to have the Market Enhancement Clause because enhancement meant making the gas better and more valuable;

    d.    Claiming that the Market Enhancement Clause meant that landowners would not be charged deductions to make the gas marketable because the gas was already marketable from the wellhead;

    e.    Assuring that the landowner would receive at least 12.5% in royalties because that is "state law;"

    f.    Telling a landowner that because natural gas is dry in northeast Pennsylvania, it would be unlikely and remote to incur expenses for enhancement to process wet gas to market NGLs ("Remote Situations");

g.  Stating that the Market Enhancement Clause meant that the landowner could possibly receive more money for the gas if Chesapeake Defendants were able to get a higher price through enhancement; and

h.  Leading a landowner to believe that there would be no post-production costs deductions due to Chesapeake Defendants' silence on the subject during negotiations.

168.  In practice, regardless of the representations made by Chesapeake Defendants, directly or indirectly through Landmen, to such landowners, Chesapeake Defendants charged deductions against royalties to be paid to those very landowners who sought assurances that they would be insulated from deductions on the premise that the Market Enhancement Clause permitted all the deductions the Pennsylvania Landowners were led to believe were excluded by the terms of the oil and gas lease.

169.  Chesapeake Defendants have willfully resorted to taking such deductions despite representing otherwise to generate cash needed to cover losses, debt service or negative cash flows due to Chesapeake Defendants' past spending practices.

**Chesapeake Defendants Unfair and Deceptive Reinterpretation of Leases**

170.   Due to noticing unexpected deductions on royalty check statements resulting from production on an oil and gas lease believed by Pennsylvania Landowners to be protected from deductions by the Market Enhancement Clause or to be otherwise free of cost, Pennsylvania Landowners contacted the Chesapeake Defendants to dispute the deductions.

171.   The Chesapeake Defendants replied, by letter,[11] to those Pennsylvania Landowners with the explanation that the gas was marketable at the wellhead and the post-production services enhanced the value of the gas.

172.   Pennsylvania Landowners were the unwitting victims of a bait and switch as the Chesapeake Defendants misled such landowners into believing that such post-processing services done to transform the gas into a marketable form would not be deducted between the wellhead and the market.

173.   Pennsylvania Landowners also contacted the Chesapeake Defendants to dispute increased deductions.

174.   The Chesapeake Defendants replied, by letter,[12] to those Pennsylvania Landowners with the explanation that such landowners would receive no more than or no less than the price received by Chesapeake Defendants for the gas.

---

[11] One such letter is attached as Exhibit F.
[12] See Exhibit C.

175.   The Chesapeake Defendants further explained, by letter[13], to those Pennsylvania Landowners that the gas is sold at the wellhead to its affiliate CEMI which takes title and possession and sells it downstream at the connection point of the interstate pipeline.

176.   Upon information and belief, this explanation is belied by the contract between Chesapeake and CEMI that provides that CEMI does not take title and possession of the gas at the wellhead, but rather at the connection point of the interstate pipeline, the market, when CEMI sells the gas to a third party.

177.   The explanation given by the Chesapeake Defendants to such landowners misrepresents the operation of the Market Enhancement Clause or free of cost leases to mollify those into accepting the deductions as appropriate.

178.   Pennsylvania Landowners also contacted the Chesapeake Defendants to dispute royalty statements which reflected a zero or negative balance payable to such landowners.

179.   The Chesapeake Defendants replied, by letter,[14] to those Pennsylvania Landowners with the explanation that the holding in *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413 (March 24, 2010) permitted the taking of deductions in January 2012.

---

[13] See Exhibit F.
[14] One such letter is attached as Exhibit G.

180. The Chesapeake Defendants sent such letters[15] to Pennsylvania Landowners who had previously relied on the representations of the Chesapeake Defendants to be protected from such deductions by the Market Enhancement Clause or to be otherwise free of cost.

181. The Chesapeake Defendants informed Pennsylvania Landowners that it would, and did, take deductions for post-productions services retroactively to March 24, 2010.

182. Upon information and belief, this explanation is belied by the conduct of the Chesapeake Defendants which had paid royalties without taking deductions for years including the almost two years between issuance of the *Kilmer* decision and the notice of taking.

183. The Chesapeake Defendants knew that the Kilmer lease expressly provided for the deduction of post-production costs unlike many of the leases from which Chesapeake Defendants unilaterally decided to take retroactive deductions and deductions on a going forward basis.

184. Chesapeake Defendants made the following misrepresentations to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to accepting the truth or accuracy of the deductions:

---

[15] See Exhibit G.

a.  Representing that the gas was marketable at the wellhead in order to take deductions for purported value enhancements between wellhead and the point of sale to a third party;

b.  Representing that CEMI is a Chesapeake affiliate that acquires title and possession of the gas at the wellhead without disclosing that CEMI actually acquires title and possession at the interconnection point where the gas is sold;

c.  Representing that a sale to an affiliate to effect an end-run around the Market Enhancement Clause and a subsequent sale to a third party resulted in the Pennsylvania Landowner receiving no more than or no less than the price received by Chesapeake Defendants; and

d.  Representing that the *Kilmer* decision permitted the taking of deductions from Pennsylvania Landowners who believed, in reliance of representations made by Chesapeake Defendants to sign a lease, to be protected from deductions by the Market Enhancement Clause or to be otherwise free of cost.

185.   Chesapeake Defendants have willfully made such representations to justify continuing to take such deductions

## COUNT II

### COMMONWEALTH V. CHESAPEAKE DEFENDANTS
### VIOLATION OF UTPCPL
### 73 P.S. § 201-2(4)(v),(vii) and (xxi)

186. The preceding paragraphs are incorporated herein as though fully set forth below.

187. In exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under land leased from Pennsylvania Landowners, and in advertising and soliciting of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from Marcellus Shale or any other Natural Gas Play, and in otherwise engaging in the conduct more fully described herein with respect to any Natural Gas Play, Chesapeake Defendants are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth, including, but not limited to, Bradford County, within the meaning of 73 P. S. § 201-2(3).

188. By reason of the foregoing, Chesapeake Defendants misrepresented the applicability of deductions, the degree of self-dealing and the meaning of the Market Enhancement Clause to Pennsylvania Landowners.

189. By misrepresenting and/or omitting material facts concerning the applicability of deductions, the degree of self-dealing and the meaning of the

Market Enhancement Clause, Chesapeake Defendants misled Pennsylvania Landowners into believing they were signing leases free of deductions, were reaping the full benefit of a sale to an unrelated third party and were otherwise insulated from deductions through the Market Enhancement Clause.

190.    Specifically, Chesapeake Defendants, by engaging in the practices set forth above, have:

a.    Deceptively entered into oil and gas leases, extracted, marketed and sold Marcellus Shale natural gas by promising to Pennsylvania Landowners that royalties paid to each such landowner was transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations;

b.    Deceptively concealed from Pennsylvania Landowners that deductions would be taken from royalties to be paid to each such landowner based on the need to generate cash to cover losses, debt service or negative cash flows due to Chesapeake Defendants' past spending practices, while indicating that royalties are transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations, thereby causing a likelihood of

confusion or misunderstanding for landowners who are led to

believe that the royalties paid to them are transparently based

on a certain, agreed upon percentage either free of deductions

or otherwise prohibited except for Remote Situations;

c.   Deceptively concealed from Pennsylvania Landowners that

deductions would be taken from royalties to be paid to each

such landowner based on a latent meaning of industry terms not

at the time fully developed under Pennsylvania jurisprudence,

while indicating that royalties are transparently based on a

certain, agreed upon percentage either free of deductions or

otherwise prohibited except for Remote Situations, thereby

causing a likelihood of confusion or misunderstanding for

landowners who are led to believe that the royalties paid to

them are transparently based on a certain, agreed upon

percentage either free of deductions or otherwise prohibited

except for Remote Situations; and

d.   As a result of Chesapeake Defendants' acts in deceiving

Pennsylvania Landowners that royalties are transparently based

on a certain, agreed upon percentage either free of deductions

or otherwise prohibited except for Remote Situations,

landowners who believed they were being paid their bargained

for royalties, in fact, received less royalties and continue to

receive less royalties than promised resulting from the taking of

deductions.

191.   Chesapeake Defendants violated the UTPCPL:

   a.   Each time a Pennsylvania Landowner was assessed a deduction

        based on a Market Enhancement Clause expense;

   b.   Each time a Pennsylvania Landowner was assessed an inflated

        deduction;

   c.   Each time a Pennsylvania Landowner was assessed a

        retroactive deduction based on the *Kilmer* decision which did

        not have any collateral estoppel effect on each such landowner;

   d.   Each time a Pennsylvania Landowner failed to receive a royalty

        payment as retaliation for complaining against assessment of

        Market Enhancement Clause deductions;

   e.   Each time a Pennsylvania Landowner failed to receive a royalty

        payment as retaliation for complaining against assessment of

        inflated deductions;

   f.   Each time an artificially high drilling, extraction, processing,

        compression or transportation payment was made to an affiliate

causing inflated deductions against royalty payments to Pennsylvania Landowners;

g.   Each time an artificially high drilling, extraction, processing, compression or transportation payment was made to a purported third-party in a supposedly arm's length transaction causing inflated deductions against royalty payments to Pennsylvania Landowners;

h.   Each time a Pennsylvania Landowner received a smaller royalty payment because Chesapeake Defendants underreported the decimal interest the landowner holds in a drilling unit;

i.   Each time Chesapeake Defendants distributed a brochure which failed to disclose that any deductions might be taken;

j.   Each time Chesapeake Defendants sent a letter[16] to a Pennsylvania Landowner stating a purported reason for wrongfully taking deductions;

k.   Each time a representation was made to a Pennsylvania Landowner to use a certain amount of acreage for a well pad but more land was used instead;

---

[16] See Exhibit C.

l.  Each time a representation was made to a Pennsylvania Landowner to use a certain area of land for a well pad but another area was used instead;

m.  Each time a representation was made to a Pennsylvania Landowner that land would not be destroyed for a well pad but land was destroyed regardless;

n.  Each time a royalty was paid to a Pennsylvania Landowner without deducting Market Enhancement Clause expenses and without disclosing that deductions may be taken retroactively and with interest; and

o.  Each time unfair and high pressure sales tactics were employed to coerce a Pennsylvania Landowner to sign an oil and gas lease or a modification to an existing oil and gas lease.

192.  Chesapeake Defendants' conduct more fully described herein is, accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

193.  The aforesaid methods, acts or practices constitute unfair or deceptive acts or practices within the meaning of Section 201-2(4) of the UTPCPL, including, but not limited to:

a.   "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

b.   "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

c.   "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);  and

d.   "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

194.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the UTPCPL.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to enter an Order:

A.    Declaring the Chesapeake Defendants' conduct to be in violation of the UTPCPL;

B.    Permanently enjoining the Chesapeake Defendants and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in the acts and practices alleged in this complaint and any other acts and practices which violate the UTPCPL;

C.    Directing the Chesapeake Defendants to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.    Directing the Chesapeake Defendants pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

E.    Directing the Chesapeake Defendants to disgorge and forfeit all profits they have derived as a result of their unfair and deceptive acts and practices as set forth in this complaint pursuant to Section 201-4.1 of the UTPCPL;

F.      Directing the Chesapeake Defendants to pay the Commonwealth all costs for the investigation and prosecution of this action pursuant to Section 201-4.1 of the UTPCPL;

G.      Directing the Chesapeake Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and involving the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.      Providing any other such relief as the Court may deem necessary and appropriate.

## SPECIFIC CONDUCT OF CHESAPEAKE DEFENDANTS AND ANADARKO DEFENDANTS IN VIOLATION OF UTPCPL AND PENNSYLVANIA ANTITRUST COMMON LAW

195.    Chesapeake Defendants and Anadarko Defendants (collectively, the "Joint Venture Defendants") engaged in the following conduct.

196.    Upon information and belief, the Joint Venture Defendants entered into a joint venture concerning an area of mutual interest in 2006.

197.   The area subject to the joint venture constituted certain counties in northeast Pennsylvania within the Marcellus Shale gas play, including Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga and Wyoming.

198.   The joint venture included collaboration concerning lease acquisition, among other things.

199.   Prior to the joint venture, both the Chesapeake Defendants and Anadarko Defendants independently secured leases for the exploration of natural gas within the Marcellus Shale gas play for their respective portfolios.

200.   Prior to the joint venture, Pennsylvania Landowners enjoyed competition between the Chesapeake Defendants and Anadarko Defendants for the leasing of the mineral estate.

201.   Following the consummation of the joint venture, the Chesapeake Defendants and Anadarko Defendants assigned territories to each other for the acquisition of oil and gas leases.

202.   Anadarko Defendants agreed to allocate the Counties of Bradford, Sullivan, Tioga and Wyoming to Chesapeake Defendants as exclusive territories for the acquisition of oil and gas leases.

203.   In turn, Chesapeake Defendants agreed to allocate the Counties of Clinton, Lycoming and Potter to Anadarko Defendants as exclusive territories for the acquisition of oil and gas leases.

204.   Each Joint Venture Defendant had the option of partnering on the leases secured by the other.

205.   Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the existence of the joint venture agreement and the option of Anadarko Defendants to acquire an interest in the lease.

206.   Upon information and belief, Landmen, at the direction of Anadarko Defendants, failed to disclose the existence of the joint venture agreement[17] and the option of Chesapeake Defendants to acquire an interest in the lease.

207.   Upon information and belief, Landmen, at the direction of the Joint Venture Defendants, failed to disclose the economic effect of the joint venture on the acreage signing bonus and the royalty terms when pitching an oil and gas lease to Pennsylvania Landowners.

208.   Upon information and belief, the Joint Venture Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the absence of competition or other interested persons in the securing of an oil and gas lease.

---

[17] The Commonwealth will obtain this agreement through discovery and present same at trial.  Chesapeake Defendants and Anadarko Defendants possess this agreement.

209.   The Joint Venture Defendants have willfully deceived Pennsylvania Landowners to drive down lease acquisition costs to deprive each such landowner the benefits of a fair and open market.

## COUNT III

### COMMONWEALTH V. JOINT VENTURE DEFENDANTS
### VIOLATION OF UTPCPL
### 73 P.S. § 201-2(4)(v),(vii) and (xxi)

210.   The preceding paragraphs are incorporated herein as though fully set forth below.

211.   In exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under land leased from Pennsylvania Landowners, and in advertising and soliciting of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from Marcellus Shale or any other Natural Gas Play, and in otherwise engaging in the conduct more fully described herein with respect to any Natural Gas Play, the Joint Venture Defendants are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth, including, but not limited to, Bradford County, within the meaning of 73 P. S. § 201-2(3).

212.   By reason of the foregoing, the Joint Venture Defendants misrepresented the absence of competition for the acquisition of oil and gas leases

and the related allocation of territories within the area of mutual interest to
Pennsylvania Landowners.

213.   By misrepresenting and/or omitting material facts concerning the
absence of competition for the acquisition of oil and gas leases and the related
allocation of territories within the area of mutual interest to Pennsylvania
Landowners, the Joint Venture Defendants misled Pennsylvania Landowners into
believing there were no other persons interested in competing for the oil and gas
leases.

214.   The Joint Venture Defendants agreed to and did, in fact, act in
restraint of trade or commerce in a market that includes Pennsylvania, by affecting,
fixing, controlling and/or maintaining at artificial and non-competitive levels, the
acreage signing bonus and the royalty for oil and gas leases within the area of
mutual interest covering the Marcellus Shale gas play in Pennsylvania.

215.   The Joint Venture Defendants misrepresented to Pennsylvania
Landowners that Joint Venture Defendants' acreage signing bonus and royalty for
oil and gas leases within the area of mutual interest covering the Marcellus Shale
gas play in Pennsylvania were competitive and fair.

216.   The Joint Venture Defendants' misrepresentation and failure to
disclose material facts had the following effects:  (1) acreage signing bonus and
royalty competition was restrained, suppressed and eliminated throughout

Pennsylvania; (2) acreage signing bonus and royalty were raised, fixed, maintained and stabilized at artificially-low levels throughout Pennsylvania; (3) Pennsylvania Landowners were deprived of free and open markets; and (4) Pennsylvania Landowners received infracompetitive, artificially deflated prices for acreage signing bonus and royalty for oil and gas leases within the area of mutual interest covering the Marcellus Shale gas play in Pennsylvania.

217.   The Joint Venture Defendants' misrepresentation and failure to disclose material facts have caused Pennsylvania Landowners to suffer and to continue to suffer an ascertainable loss of money or property as a result of Joint Venture Defendants' use or employment of unfair or deceptive commercial practices as set forth above.

218.   Joint Venture Defendants violated the UTPCPL:

a.     Each time a Joint Venture Defendant failed to disclose the existence of the joint venture agreement in the course of negotiating an oil and gas lease with a Pennsylvania Landowner within the area of mutual interest covering the Marcellus Shale gas play;

b.     Each time a Pennsylvania Landowner received an artificially deflated acreage signing bonus from a Joint Venture Defendant; and

     c.     Each time a Pennsylvania Landowner received an artificially deflated royalty from a Joint Venture Defendant.

219.    The Joint Venture Defendants' conduct more fully described herein is, accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

220.    The aforesaid methods, acts or practices constitute unfair or deceptive acts or practices within the meaning of Section 201-2(4) of the UTPCPL, including, but not limited to:

     a.     "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

     b.     "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

     c.     "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii); and

d.   "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

221.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the UTPCPL.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to enter an Order:

A.   Declaring the Joint Venture Defendants' conduct to be in violation of the UTPCPL;

B.   Permanently enjoining the Joint Venture Defendants and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in the acts and practices alleged in this complaint and any other acts and practices which violate the UTPCPL;

C.   Directing the Joint Venture Defendants to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.   Directing the Joint Venture Defendants pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three

Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

E.     Directing the Joint Venture Defendants to disgorge and forfeit all profits they have derived as a result of their unfair and deceptive acts and practices as set forth in this complaint pursuant to Section 201-4.1 of the UTPCPL;

F.     Directing the Joint Venture Defendants to pay the Commonwealth all costs for the investigation and prosecution of this action pursuant to Section 201-4.1 of the UTPCPL;

G.     Directing the Joint Venture Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and involving the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.     Providing any other such relief as the Court may deem necessary and appropriate.

## COUNT IV

## COMMONWEALTH V. JOINT VENTURE DEFENDANTS VIOLATION OF PENNSYLVANIA ANTITRUST COMMON LAW DOCTRINE AGAINST UNREASONABLE RESTRAINT OF TRADE

222.   The preceding paragraphs are incorporated herein as though fully set forth below.

223.   The relevant market is the acquisition of oil and gas leases in the Counties of Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga and Wyoming comprising an area of mutual interest within the Marcellus Shale gas play in Pennsylvania.

224.   The agreement to allocate territories is memorialized in the joint venture agreement between the Chesapeake Defendants and Anadarko Defendants whereby each has an option to acquire an interest in oil and gas leases secured by the other in its allocated territory within the area of mutual interest.

225.   Such an agreement constitutes *per se* unreasonable restraint of trade in violation of Pennsylvania antitrust common law.

226.   Unless its overall anticompetitive scheme is enjoined, the Joint Venture Defendants will continue to illegally restrain trade in the relevant market in concert with another in violation of the Pennsylvania common law doctrine against unreasonable restraint of trade.

227.   Joint Venture Defendants' conduct in engaging in a contract to unreasonably restrain trade for the acquisition of oil and gas leases in the Counties of Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga and Wyoming comprising an area of mutual interest within the Marcellus Shale gas play in Pennsylvania threatens injury to the Plaintiff and Pennsylvania Landowners.

228.   Joint Venture Defendants' anticompetitive and unlawful conduct alleged herein has injured, is injuring and will injure competition in the relevant market by denying landowner choice and otherwise thwarting competition in the relevant market.

229.   The Joint Venture Defendants' contract in restraint of trade had the following effects:  (1) acreage signing bonus and royalty competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) acreage signing bonus and royalty were raised, fixed, maintained and stabilized at artificially-low levels throughout Pennsylvania; (3) Pennsylvania Landowners were deprived of free and open markets; and (4) Pennsylvania Landowners received infracompetitive, artificially deflated prices for acreage signing bonus and royalty for oil and gas leases within the area of mutual interest covering the Marcellus Shale gas play in Pennsylvania.

230.   The Joint Venture Defendants' illegal conduct has had a substantial effect on Pennsylvania Landowners.

231.   As a direct and proximate result of the Joint Venture Defendants' unlawful conduct, the Plaintiff and Pennsylvania Landowners have been injured in their business and property.

232.   By reason of the foregoing, the Joint Venture Defendants have entered into an agreement in restraint of trade in violation of Pennsylvania common law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to enter an Order:

A.   Declaring the Joint Venture Defendants' conduct to be in violation of Pennsylvania common law doctrine against unreasonable restraint of trade;

B.   Permanently enjoining the Joint Venture Defendants and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in the acts and practices alleged in this complaint and any other acts and practices which violate the Pennsylvania common law doctrine against unreasonable restraint of trade;

C.   Directing the Joint Venture Defendants, jointly and severally, to pay damages to Pennsylvania Landowners for any violation of the Pennsylvania common law doctrine against unreasonable restraint of trade;

D.   Directing the Joint Venture Defendants, jointly and severally, to restore to Pennsylvania Landowners any moneys which may have been acquired

by means of any violation of the Pennsylvania common law doctrine against unreasonable restraint of trade;

E.     Directing the Joint Venture Defendants, jointly and severally, to disgorge and forfeit all profits they have derived as a result of their anticompetitive acts and practices as set forth in this complaint;

F.     Directing the Joint Venture Defendants, jointly and severally, to pay landowners all damages suffered by landowners as a result of their anticompetitive acts and practices as set forth in this complaint;

G.     Directing the Joint Venture Defendants, jointly and severally, to pay the Commonwealth all costs of for the investigation and prosecution of this action pursuant to 42 Pa. C.S. § 1726 (a);

H.     Directing the Joint Venture Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and involving the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for damages, restitution and costs; and

I.     Providing any other such relief as the Court may deem necessary and appropriate.

## SPECIFIC CONDUCT OF ANADARKO DEFENDANTS CONCERNING LEASING PRACTICES IN VIOLATION OF UTPCPL

233.   Anadarko Defendants engaged in the following conduct.

234.   Upon information and belief, Anadarko Defendants entered into a joint venture with the Chesapeake Defendants in 2006.

235.   Upon information and belief, the joint venture between Anadarko Defendants and the Chesapeake Defendants concerned the exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale under land leased from Pennsylvania Landowners in eight counties in northeast Pennsylvania comprising an area of mutual interest.

236.   The area subject to the joint venture constituted certain counties in northeast Pennsylvania within the Marcellus Shale gas play, including Bradford, Centre, Clinton, Lycoming, Potter, Sullivan, Tioga and Wyoming.

237.   Upon information and belief, both the Anadarko Defendants and the Chesapeake Defendants contributed capital in the form of services, skill, material and money to the joint venture.

238.   Upon information and belief, the Anadarko Defendants and the Chesapeake Defendants shared profits from the joint venture from the sale of natural gas.

71

239.   Upon information and belief, both the Anadarko Defendants and the Chesapeake Defendants exercised control over the joint venture.

240.   Under Pennsylvania law, parties to a joint venture are vicariously liable for the harms caused by the joint venture.

### Anadarko Defendants Direct and Joint Venture Vicarious Liability

241.   Upon information and belief, Anadarko Defendants entered into oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under the land of each such Pennsylvania Landowner.

242.   Upon information and belief, Anadarko Defendants acquired interest, in whole or in part, from Chesapeake Defendants through assignment as provided in their joint venture in oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale under the land of each such Pennsylvania Landowner within the delineated area of mutual interest.

243.   Upon information and belief, Anadarko Defendants deployed Landmen to obtain oil and gas leases from Pennsylvania Landowners owning land over commercially viable Marcellus Shale gas play.

244.   Upon information and belief, Anadarko Defendants authorized, through the joint venture, Chesapeake Defendants' deployment of Landmen to obtain oil and gas leases from Pennsylvania Landowners owning land over commercially viable Marcellus Shale gas play.

245.   The Anadarko Defendants empowered the Landmen to use unfair and deceptive negotiation tactics with Pennsylvania Landowners such as:

    a.   Failure to disclose facts material to making a decision as to signing an oil and gas lease; and

    b.   Making affirmative statements containing a falsity or prevarication.

246.   The sales pitches by Landmen to Pennsylvania Landowners included:

    a.   High pressure;

    b.   Leveraging information advantage:

    c.   Dissuading contact with other landowners to compare terms;

    d.   Dissuading contact with anyone else to discuss terms;

    e.   Presenting 'take it or leave it' contracts; and

    f.   Limiting time for consideration of contract.

247.   Anadarko Defendants, directly or indirectly through Landmen, made the following misrepresentations to Pennsylvania Landowners who relied on the

affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

a.  Stating that if anyone in the drilling unit were to sign the lease now, the money would be placed in escrow for future payment; otherwise, if anyone signed later, such person would lose out on the money or otherwise receive much less;

b.  Representing that all the neighboring properties were leased and the gas company would drill to capture the gas whether the landowner signed or not;

c.  Stating that if the landowner did not sign the lease that day, it would be the landowner's last chance to sign and the gas company would extract the gas one way or another;

d.  Telling a landowner an attorney was not necessary when signing a lease because the landowner would get a 12.5% royalty because that was the law in Pennsylvania;

e.  Telling a landowner, in response to a question about the possibility of the price per acre increasing, that the price per acre for the signing bonus does not increase despite knowing that it may;

     f.     Showing landowners copies of spreadsheets called "royalty calculators," which reflect how much money a landowner can expect to make in royalty payments each year over a twenty year period based on the number of acres in production and the price of gas, with no references to deductions; and

     g.     Charging a landowner deductions for compression when such service was not being done.

248.   Anadarko Defendants authorized, through the joint venture, Chesapeake Defendants to make the following misrepresentations, directly or indirectly through Landmen, to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

     a.     Stating that if anyone in the drilling unit were to sign the lease now, the money would be placed in escrow for future payment; otherwise, if anyone signed later, such person would lose out on the money or otherwise receive much less;

     b.     Representing that all the neighboring properties were leased and the gas company would drill to capture the gas whether the landowner signed or not;

c.    Stating that if the landowner did not sign the lease that day, it would be the landowner's last chance to sign and the gas company would extract the gas one way or another;

d.    Telling a landowner an attorney was not necessary when signing a lease because the landowner would get a 12.5% royalty because that was the law in Pennsylvania;

e.    Representing to a landowner that all of the neighboring properties were leased and that royalties totaling $500,000 at 20% could be expected without disclosing any impact from deductions;

f.    Agreeing in negotiations to a 20% royalty and a no deduction clause; instead, presenting a lease for signing that provided for only a 12.5% royalty and permitted deductions;

g.    Telling a landowner, in response to a question about the possibility of the price per acre increasing, that the price per acre for the signing bonus does not increase despite knowing that it may;

h.    Showing landowners copies of spreadsheets called "royalty calculators," which reflect how much money a landowner can expect to make in royalty payments each year over a twenty

year period based on the number of acres in production and the price of gas, with no references to deductions;

i.    Coercing a landowner to agree in writing to permit a pipeline running diagonally across a landowner's field;

j.    Taking $3,000 in deductions from a landowner who was not previously informed that it might purportedly cost the landowner money in deductions if the gas had to be shipped farther away;

k.    Charging a landowner deductions for compression when such service was not being done; and

l.    To avoid complying with a recently-enacted setback requirement, seeking a waiver from an 89-year old Pennsylvania Landowner as purportedly being necessary to proceed on the existing lease.

### Anadarko Defendants Use of Royalty Calculator as an Unfair and Deceptive Inducement to Secure Leases

249.   Upon information and belief, Landmen, at the direction of Anadarko Defendants, failed to disclose the economic effect of deductions in royalty spreadsheet calculators when pitching the potential ranges of royalty payments

based on a certain percentage and anticipated production levels as consideration for signing the oil and gas lease.

250. The royalty spreadsheet calculators, as used by Landmen, lacked any field for any type of deduction against any hypothetical royalty for review by a Pennsylvania Landowner prior to entering into an oil and gas lease.

251. Upon information and belief, Anadarko Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the applicability of deductions against prospective royalty payments.

### Anadarko Defendants Created the Likelihood of Confusion or of Misunderstanding as to Which Party Is the Offeror and the Offeree as an Unfair and Deceptive Inducement to Forbear from Considering Competing Offers

252. Most, if not all, landowners lack sophistication in understanding that the oil and gas leases presented by the Landmen at the direction of Anadarko Defendants to the landowners for execution was construed by Anadarko Defendants as an offer by the landowners to be accepted by Anadarko Defendants and not the converse.

253. The dynamic of the Landman knocking, often unannounced and unscheduled, on the door of a Landowner's house to pitch an oil and gas lease with Anadarko Defendants with lease forms authorized by Anadarko Defendants in the hands of the Landman would reasonably confuse most, if not all, landowners, that

Anadarko Defendants were making the offer and that upon execution by the landowner, the deal was struck as the grant of a fee simple determinable was conveyed.

254.   Instead, Anadarko Defendants maintained that they could and, in fact, did reject oil and gas leases with Pennsylvania Landowners who believed that they had a deal which foreclosed each such landowner from considering or accepting offers from any other gas exploration and production company.

### Anadarko Defendants Vicarious Use of Market Enhancement Clause as an Unfair and Deceptive Inducement to Secure Leases

255.   Most, if not all, Pennsylvania Landowners lack sophistication related to the applicability of deductions against prospective royalty payments.

256.   Most, if not all, landowners lack sophistication related to the drafting of industry-specific oil and gas lease terms.

257.   Conversely, the exploration and production companies have the sophistication relative to the drafting of industry-specific oil and gas lease terms due to years of experience in executing oil and gas leases.

258.   Some landowners wanted further assurance in the contract that deductions would not be assessed against royalty payments resulting from the usual and customary sale of natural gas.

259.   Upon information and belief, Anadarko Defendants authorized, through the joint venture, Chesapeake Defendants to offer the Market

Enhancement Clause, directly or indirectly through Landmen, to certain Pennsylvania Landowners to overcome their objections to being assessed deductions against royalties resulting from the usual and customary sale of natural gas.

260.   The Market Enhancement Clause is typically found in the addendum to a lease with standard language otherwise providing for deductions against royalties resulting from the usual and customary sale of natural gas.

261.   Anadarko Defendants authorized, through the joint venture, Chesapeake Defendants to use language in the Market Enhancement Clause which, in its plain language meaning to a layman, ostensibly conveyed the requested assurance against the assessment of deductions, and which, as an industry term of art to a sophisticated person, operated to permit the taking of deductions to perfect the prevarication.

262.   The language in the Market Enhancement Clause which was the proverbial bait to induce certain Pennsylvania Landowners to sign oil and gas leases was:

> ...all oil, gas or other proceeds accruing to the Lessor under this lease or by state law *shall be without deduction*, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing the oil, gas and other products produced hereunder to transform the product into marketable form...

(emphasis added)

263.   On information and belief, Anadarko Defendants knew that the Market Enhancement Clause would not negate the permissive deduction language in the standard lease form in giving the Pennsylvania Landowner, who bargained hard for it, a hollow victory.

264.   Anadarko Defendants authorized, through the joint venture, Chesapeake Defendants to make the following misrepresentations relating to the Market Enhancement Clause to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

    a.    Representing that the Market Enhancement Clause benefitted the landowner;

    b.    Representing that the Market Enhancement Clause protected the landowner from deductions;

    c.    Stating that it was beneficial for the landowner to have the Market Enhancement Clause because enhancement meant making the gas better and more valuable;

    d.    Claiming that the Market Enhancement Clause meant that landowners would not be charged deductions to make the gas

marketable because the gas was already marketable from the

wellhead;

e.    Assuring that the landowner would receive at least 12.5% in

royalties because that is "state law;"

f.    Stating that the Market Enhancement Clause meant that the

landowner could possibly receive more money for the gas if

Anadarko Defendants were able to get a higher price through

enhancement;

g.    Telling a landowner that because natural gas is dry in northeast

Pennsylvania, it would be unlikely and remote to incur

expenses for enhancement to process wet gas to market NGLs;

and

h.    Leading a landowner to believe that there would be no post-

production costs deduction due to Anadarko Defendants'

silence on the subject during negotiations.

265.   In practice, regardless of the representations made by Anadarko

Defendants, directly or indirectly through Landmen as authorized through the joint

venture with Chesapeake Defendants, to such landowners, Anadarko Defendants

charged deductions against royalties to be paid to those very landowners who

sought assurances that they would be insulated from deductions on the premise that

the Market Enhancement Clause permitted all the deductions the landowners were led to believe were excluded by the terms of the oil and gas lease.

266.   Anadarko Defendants have willfully resorted to taking such deductions despite representing otherwise.

## Anadarko Defendants Unfair and Deceptive Reinterpretation of Leases

267.   Due to noticing unexpected deductions on royalty check statements resulting from production on an oil and gas lease believed by Pennsylvania Landowners to be protected from deductions by the Market Enhancement Clause or to be otherwise free of cost, Pennsylvania Landowners contacted Anadarko Defendants to dispute the deductions.

268.   Anadarko Defendants replied to those Pennsylvania Landowners with the explanation in a letter[18] that it could sell the gas at the wellhead and receive a lower price or, in the alternative, move the gas downstream to receive a better price.

269.   The explanation given by Anadarko Defendants to such landowners misrepresents the operation of the Market Enhancement Clause to mollify those into accepting the deductions as appropriate.

---

[18] One such letter is attached as Exhibit H.  Anadarko Defendants possess other letters sent to Pennsylvania Landowners and the Commonwealth will obtain these letters through discovery and present same at trial.

270.    Anadarko Defendants made the following misrepresentations to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to accepting the truth or accuracy of the deductions:

    a.    Disregarding the fact that the market is downstream at the interconnection point with the interstate pipelines where gas is sold to third parties; and

    b.    Representing that transporting gas to market is an enhancement.

271.    Anadarko Defendants have willfully made such representations to justify continuing to take such deductions.

## COUNT V

**COMMONWEALTH V. ANADARKO DEFENDANTS**
**VIOLATION OF UTPCPL**
**73 P.S. § 201-2(4)(v),(vii) and (xxi)**

272.    The preceding paragraphs are incorporated herein as though fully set forth below.

273.    In exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under land leased from Pennsylvania Landowners, and in advertising and soliciting of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted from Marcellus Shale or any other Natural Gas Play, and in otherwise engaging in the conduct more fully described herein with respect

to any Natural Gas Play, Anadarko Defendants are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth, including, but not limited to, Bradford County, within the meaning of 73 P. S. § 201-2(3).

274.   By reason of the foregoing, Anadarko Defendants misrepresented the applicability of deductions and the meaning of the Market Enhancement Clause to Pennsylvania Landowners.

275.   By misrepresenting and/or omitting material facts concerning the applicability of deductions and the meaning of the Market Enhancement Clause, Anadarko Defendants misled Pennsylvania Landowners into believing they were signing leases free of deductions and were otherwise insulated from deductions through the Market Enhancement Clause.

276.   Specifically, Anadarko Defendants, by engaging in the practices set forth above, have:

     a.     Deceptively entered into oil and gas leases, extracted, marketed and sold Marcellus Shale natural gas by promising to Pennsylvania  Landowners that royalties paid to each such landowner was transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations;

b.      Deceptively concealed from Pennsylvania Landowners that deductions would be taken from royalties to be paid to each such landowner based on a latent meaning of industry terms not at the time fully developed under Pennsylvania jurisprudence, while indicating that royalties are transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations, thereby causing a likelihood of confusion or misunderstanding for landowners who are led to believe that the royalties paid to them are transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations; and

c.      As a result of Anadarko Defendants' acts in deceiving Pennsylvania Landowners that royalties are transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations, landowners who believed they were being paid their bargained for royalties, in fact, received less royalties and continue to receive less royalties than promised resulting from the taking of deductions.

277.   Anadarko Defendants violated the UTPCPL:

    a.    Each time a Pennsylvania Landowner was assessed a deduction based on a Market Enhancement Clause expense;

    b.    Each time a Pennsylvania Landowner was assessed an inflated deduction;

    c.    Each time a Pennsylvania Landowner was assessed a retroactive deduction based on the *Kilmer* decision which did not have any collateral estoppel effect on each such landowner;

    d.    Each time a Pennsylvania Landowner failed to receive a royalty payment as retaliation for complaining against assessment of Market Enhancement Clause deductions;

    e.    Each time a Pennsylvania Landowner failed to receive a royalty payment as retaliation for complaining against assessment of inflated deductions;

    f.    Each time an artificially high drilling, extraction, processing, compression or transportation payment was made to an affiliate or  Joint Venture Defendant affiliate causing inflated deductions against royalty payments to landowners;

    g.    Each time an artificially high drilling, extraction, processing, compression or transportation payment was made to a

purported third-party in a supposedly arm's length transaction causing inflated deductions against royalty payments to landowners;

h.    Each time a Pennsylvania Landowner received a smaller royalty payment because Anadarko Defendants underreported the decimal interest the landowner holds in a drilling unit;

i.    Each time Anadarko Defendants sent a letter[19] to a Pennsylvania Landowner stating a purported reason for wrongfully taking deductions;

j.    Each time a representation was made to a Pennsylvania Landowner to use a certain amount of acreage for a well pad but more land was used instead;

k.    Each time a representation was made to a Pennsylvania Landowner to use a certain area of land for a well pad but another area was used instead;

l.    Each time a representation was made to a Pennsylvania Landowner that land would not be destroyed for a well pad but land was destroyed regardless;

---

[19] See Exhibit H.

m.    Each time a royalty was paid to a Pennsylvania Landowner without deducting Market Enhancement Clause expenses and without disclosing that deductions may be taken retroactively and with interest; and

n.    Each time unfair and high pressure sales tactics were employed to coerce a Pennsylvania Landowner to sign an oil and gas lease or a modification to an existing oil and gas lease.

278.   Anadarko Defendants' conduct more fully described herein is, accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

279.   The aforesaid methods, acts or practices constitute unfair or deceptive acts or practices within the meaning of Section 201-2(4) of the UTPCPL, including, but not limited to:

a.    "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

b.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

c.   "Representing that goods or services are of a particular standard,

quality or grade, or that goods are of a particular style or model,

if they are of another" in violation of 73 P.S. § 201-2(4)(vii);

and

d.   "Engaging in any other fraudulent or deceptive conduct which

creates a likelihood of confusion or of misunderstanding" in

violation of 73 P.S.

§ 201-2(4)(xxi).

280.   The above described conduct has been willful within the meaning of

73 P.S. § 201-8 and is unlawful under the UTPCPL.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth respectfully requests this Honorable

Court to enter an Order:

A.   Declaring Anadarko Defendants' conduct to be in violation of the

UTPCPL;

B.   Permanently enjoining Anadarko Defendants and any agents,

successors, assigns, and employees acting directly or through any corporate or

business device from engaging in the acts and practices alleged in this complaint

and any other acts and practices which violate the UTPCPL;

C.     Directing Anadarko Defendants to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.     Directing Anadarko Defendants pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

E.     Directing Anadarko Defendants to disgorge and forfeit all profits they have derived as a result of their unfair and deceptive acts and practices as set forth in this complaint pursuant to Section 201-4.1 of the UTPCPL;

F.     Directing Anadarko Defendants to pay the Commonwealth all costs for the investigation and prosecution of this action pursuant to Section 201-4.1 of the UTPCPL;

G.     Directing Anadarko Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play and involving the advertisement and solicitation of oil and gas leases for value in the form of royalties from the sale of oil, Dry Gas and Natural Gas Liquids extracted

91

from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.     Providing any other such relief as the Court may deem necessary and appropriate.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

Bruce R. Beemer
First Deputy Attorney General

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

By:     _____

Joseph S. Betsko
Senior Deputy Attorney General
PA Bar #82620

Norman W. Marden
Deputy Attorney General
PA Bar #203423

Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 705-7110 (fax)

*Attorneys for the Commonwealth of Pennsylvania*

**COMMONWEALTH OF PENNSYLVANIA**       )
                                       )       **SS**
**COUNTY OF DAUPHIN**                  )


## AFFIDAVIT OF VERIFICATION

I, Maryann E. Walsh, depose and state that I am a Senior Civil Investigator

for the Office of Attorney General, Antitrust Section, and that I am authorized to

make this affidavit and that the factual allegations contained within the Complaint

are true and correct to the best of my knowledge, information and belief.


Maryann E. Walsh
Senior Civil Investigator


Sworn to and subscribed before

me this 5ᵗʰ day

of February, 2016.


NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA

NOTARIAL SEAL
MELISSA M RITZMAN, Notary Public
Dauphin County, City of Harrisburg
My Commission Expires April 29, 2016

IN THE COURT OF COMMON PLEAS
OF BRADFORD COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL COMPLAINT |
| | : | |
| CHESAPEAKE ENERGY CORP.; | : | Case No: 2015IR0069 |
| CHESAPEAKE APPALACHIA, LLC; | : | |
| CHESAPEAKE OPERATING, LLC; | : | |
| CHESAPEAKE ENERGY MARKETING, | : | |
| LLC; ANADARKO PETROLEUM | : | |
| CORPORATION and ANADARKO E&P | : | |
| ONSHORE, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on this date, February 8, 2016, a true and correct copy of the Commonwealth's Amended Complaint was served on the parties listed below by electronic mail and United States mail, first class certified mail with return receipt, postage pre-paid, satisfying the requirements of Pa. R.C.P. 403, 404, 424 and 440.

Ronald A. Sarachan (PA Bar # 59448)
Drinker Biddle & Reath, LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103
Tel: (215) 988-3342
ronald.sarachan@dbr.com

*Counsel for Defendants Chesapeake
Appalachia, LLC and Chesapeake
Operating, LLC*

Daniel T. Donovan (*Pro Hac Vice*)
Kirkland & Ellis, LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: (202) 879-5174
ddonovan@kirkland.com

*Counsel for Defendant Chesapeake
Energy Corporation*

Daniel T. Brier (PA Bar # No. 53248)
Myers Brier & Kelly, LLP
425 Spruce Street, Suite 200
Scranton, PA 18503
Tel: (570) 342-6100
dbrier@mbklaw.com

*Counsel for Defendant Chesapeake
Energy Marketing, LLC*

Anadarko Petroleum Corporation
1201 Lake Robbins Drive
The Woodlands, Texas 77380

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380

Respectfully Submitted,

Joseph S. Betsko
Senior Deputy Attorney General

# Exhibit A



# Unconventional natural gas reservoir could boost U.S. supply

**January 17, 2008**

University Park, Pa. – Natural gas distributed throughout the Marcellus black shale in northern Appalachia could conservatively boost proven U.S. reserves by trillions of cubic feet if gas production companies employ horizontal drilling techniques, according to a Penn State and State University of New York, Fredonia, team.

"The value of this science could increment the net worth of U.S. energy resources by a trillion dollars, plus or minus billions," said Terry Engelder, professor of geosciences, at Penn State.

The Marcellus shale runs from the southern tier of New York, through the western portion of Pennsylvania into the eastern half of Ohio and through West Virginia. In Pennsylvania, the formation extends from the Appalachian plateau into the western valley and ridge. This area has produced natural gas for years, but the Marcellus shale, a deep layer of rock, is officially identified as holding a relatively small amount of proven or potential reserves. However, many gas production companies are now interested in the Marcellus.

Engelder, working with Gary Lash, professor of geoscience, SUNY Fredonia, has conservatively estimated that the Marcellus shale contains 168 trillion cubic feet of natural gas in place and optimistically suggests that the amounts could be as high as 516 trillion cubic feet.

"Conservatively, we generally only consider 10 percent of gas in place as a potential resource," said Engelder. "The key, of course, is that the Marcellus is more easily produced by horizontal drilling across fractures, and until recently, gas production companies seemed unaware of the presence of the natural fractures necessary for magnifying the success of horizontal drilling in the Marcellus."

The U.S. currently produces roughly 30 trillion cubic feet of gas a year, and these numbers are dropping. According to Engelder, the technology exists to recover 50 trillion cubic feet of gas from the Marcellus, thus keeping the U.S. production up. If this recovery is realized, the Marcellus reservoir would be considered a Super Giant gas field.

Engelder, who has studied this area of the U.S. for most of his career and began looking into fractures under a National Science Foundation grant 25 years ago, has identified and mapped natural fractures in the Marcellus shale. He and Lash will present some of their recent work at the 2008 American Association of Petroleum Geologists Annual Convention and Exhibition this spring.

The researchers look at the patterns of fractures in the shale and determine which are important for gas production. Fractures that correlate with the folding of the ridge and valley system are less common in black shale. However, because of their orientation, the fractures that formed prior to the folding will release gas if the wells cross the fracture zones.

These fractures, referred to as J1 fractures by Engelder and Lash, run as slices from the northeast to the southwest in the Marcellus shale and are fairly close together. While a vertical well may cross one of these fractures and other less productive fractures, a horizontally drilled well aimed to the north northwest will cross a series of very productive J1 fractures.

"It takes $800,000 to drill a vertical well in the Marcellus, but it takes $3 million to drill a horizontal well," said Engelder.

Companies that drill gas wells need to be certain that horizontal drilling will produce the gas they expect, and the work by Engelder and Lash suggests that it will.

"We know that the Marcellus shale appears as an outcrop near Batavia, N.Y., east of Buffalo," said Engelder. "And we can see the fractures in the Marcellus in the exposed sections of the ridge and valley areas to the southeast. Because we see them going through the folded areas, we know they were there before the folding. If it happened earlier, then we know they have to be in the intervening basin as well."

The natural fractures in the Marcellus shale are the key to recovering large amounts of gas. As heavily organic sediments were laid down 365 million years ago, the black shale of the Marcellus formed. As the organic material decayed and degraded, methane and other components of natural gas formed and dispersed through the pores in the rock. About 300 million years ago, the pressure of the gas caused fractures to form in the shale. It was not until 280 million years ago that the eastern portion of Pennsylvania was pushed into the folding of the ridge and valley province that makes up that area. Gas that occurs in pockets underground is considered a conventional reservoir; gas that is distributed throughout the rock, like the Marcellus, is called an unconventional reservoir.

The Penn State-Fredonia approach is not restricted to production of the Marcellus shale, but can be applied to any gas-bearing shale with this type of fracture. Because the approach begins with a vertical well and then drills horizontally in the direction that will crosscut the productive fractures, old vertical wells can be reused.

Case 8:14-cv-00591-MEM   Document 143-1   Filed 03/23/16   Page 100 of 137

"We can go back to wells that are already drilled and played out, and then drill horizontal from there," said Engelder. "Reusing old wells has both economic and environmental value."

Engelder and Lash are principals in Appalachian Fracture Systems Inc., a consulting firm.

**CONTACTS:**

**Andrea Messer, aem1@psu.edu">aem1@psu.edu**
**Work Phone:** 814-865-9481
http://live.psu.edu

*Last Updated November 18, 2010*

# Exhibit B

PA Paid Up 11/05

## OIL AND GAS LEASE
### PAID-UP



AGREEMENT, Made and entered into this __28th__ day of __February__ A.D. 20 06__ by and

between _

_____

hereinafter called LESSOR, and T.S. Calkins & Associates, Inc., P.O. Box 198, Bradford, PA  16701 hereinafter called LESSEE.

WITNESSETH, that for and in consideration of one dollar and other good and valuable consideration in hand paid by the said LESSEE, the receipt whereof is hereby acknowledged, and the further consideration of the agreement hereinafter contained, LESSOR and LESSEE agree to the following. LESSOR hereby grants, demises, leases and lets exclusively to LESSEE the oil and gas, including coalbed methane gas, underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for LESSEE, at its election, to explore for, develop, produce, measure and market production from the premises, using methods and techniques which are not restricted to current technology, including the exclusive right to conduct geophysical and other exploratory tests; to conduct dewatering operations upon formations in which LESSEE plans to produce coalbed methane gas; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, pipelines with appurtenant facilities, necessary or convenient for use in the production and transportation of products from the premises and from neighboring lands, and such rights shall survive the term of this agreement for so long thereafter as operations are continued on this Lease or adjacent lands; to use oil, gas, and non-domestic water sources, free of cost, to store gas of any kind underground regardless of the source thereof, including the injecting of gas therein and removing the same therefrom; to protect stored gas: to operate, maintain, repair, and remove material and equipment.

This Lease covers the premises, all or in part, in the Township(s) of __Asylum__, County of __Bradford__

and State of __Pennsylvania__, bounded substantially by lands now or formerly owned as follows;

On the North by:   _____

On the East by:   _____

On the South by:   _____

On the West by:   _____

Deed Book & Page (for ref. only)   Tax Map No.(for ref. only)

containing for the purpose of calculating rentals and royalties, __61.37__ acres whether actually containing more or less.   In addition to the above described land, any and all strings or parcels of land adjoining or contiguous to the above described land and owned or claimed by LESSOR are hereby leased to LESSEE.  All tracts or parcels of land leased to LESSEE herein, including strata and horizons underneath the surface thereof, are herein referred to as "the premises."

For purposes of this Lease, oil and gas includes all hydrocarbons and other substances produced or associated therewith, including coalbed methane gas.

It is agreed that this Lease shall remain in full force and effect until midnight on the 5th anniversary of the date hereof (the primary term) and as long thereafter as (1) drilling operations continue with due diligence, provided that LESSEE has commenced drilling operations on any portion of the premises or any lands pooled or unitized therewith, within the primary term, (2) an application for a drilling permit is pending with the appropriate authorities, and LESSEE, after grant of such permit, commences drilling operations within a reasonable time thereafter and continues same with due diligence, provided said permit application was filed prior to the expiration of the primary term, (3) oil and gas or either of them is produced or withdrawn from any portion of the premises or any lands pooled or unitized therewith, (4) gas storage operations are conducted in or on any portion of the premises, or (5) a completed oil or gas well would be capable of producing oil or gas from any portion of the premises or any lands pooled or unitized therewith, but for acts of God, unavailability or interruption of markets or pipelines, delays due to pending governmental or regulatory authorization, or any other causes, which have caused LESSEE not to commence production from such well or to suspend production from such well.

### IN CONSIDERATION OF THE PREMISES:

A.   The LESSEE covenants and agrees as follows:

I<sup>st</sup> -- LESSEE shall pay the LESSOR on oil and liquid hydrocarbons produced and saved from the premises and used off the premises or lands pooled therewith or sold (whether to an affiliated or non-affiliated purchaser), the market value at the well of one-eighth (1/8) of the oil and liquid hydrocarbons so used or sold, or deliver to the credit of LESSOR, free of cost, into tank reservoirs or into the pipeline to which LESSEE may connect his wells the equal one-eighth (1/8th) part of all oil or liquid hydrocarbons produced and saved from the premises, and shall pay the LESSOR on gas, including casinghead gas, coalbed methane gas and other gaseous substances, produced from the premises and used off the premises or lands pooled therewith or, in the manufacture of gasoline, or other products therefrom, or sold (whether to an affiliated or non-affiliated purchaser) the market value at the well of one-eighth (1/8th) of the gas so used or sold. In no event shall the gas royalty payable hereunder be computed on the basis of a price the collection of which by LESSEE is unlawful or prohibited by order or regulation of any governmental authority having jurisdiction, and market value at the well shall not exceed the amount realized by LESSEE for such production computed at the well. Payment for royalties in accordance herewith shall constitute full compensation for the gas and all of its components. Prior to payment of royalty, LESSOR shall execute a Division Order setting forth LESSOR's interest in production. LESSEE may pay all taxes and fees levied upon LESSOR's royalty share of production of oil and gas, and deduct the amount so paid from any monies payable to LESSOR hereunder.  No royalty shall be due on stored gas produced from the premises or on gas produced form a storage formation or formations thereunder.

1

EXHIBIT

PA Paid Up 11/05

2nd – If at any time after the primary term hereof there is a well capable of producing gas in paying quantities located upon the premises or on lands pooled therewith but such well is shut-in (whether before or after production) and this lease is not maintained in force by operations, including but not limited to dewatering, or production at any well, by gas storage, or by other activity or event, nevertheless it shall be considered that gas is being produced in paying quantities within the meaning of this lease. If at any time or times after the expiration of the primary term, all wells located upon the leased premises or lands pooled or unitized therewith (whether classified as oil wells or gas wells) are shut-in for a period of ninety (90) consecutive days, and during such time there are no other operations being conducted on the premises or lands pooled or unitized therewith, then on or before the expiration of said ninety day period, Lessee shall pay or tender to Lessor hereunder, or to those entitled to the royalties provided in this lease (as shown by Lessee's records) at the addresses shown by Lessee's records, a shut-in royalty equal to $2.00 per acre for the acreage held under this lease (as shown by Lessee's records) at the time such payment or tender is made, and it shall be considered that gas is being produced from the premises. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this shut-in provision. Lessee's failure to timely or correctly pay or tender the shut-in royalty for any year shall not operate to terminate this lease or serve as a basis for its cancellation, but Lessee shall correct any erroneous payment or tender, when notified thereof, and if late then Lessee shall make the correcting payment or tender with interest at the rate of seven (7%) percent per annum to those to whom such shut-in royalty was not timely or correctly paid or tendered. As long as any well is shut-in, it shall be considered for the purposes of maintaining this lease in force that gas is being produced in paying quantities and this lease shall continue in effect both before and after the primary term.

3rd – To pay to LESSOR an annual storage rental of $2.00 per acre for the utilization of one or more strata in the premises for storage operations, for so long as any stratum is so utilized, and to give to LESSOR written notice of the use of the premises for storage operations; and it is agreed that said storage rental is in lieu of royalty payments, except that storage rental and royalty payments shall be paid simultaneously by LESSEE if LESSEE simultaneously conducts storage operations in one or more strata in the premises and produces oil or gas from one or more other strata; and it is further agreed that the termination of gas storage operations shall be a full liquidation of all storage rental during the remainder of the term of this Lease.

4th – To correct any damages LESSEE may cause to crops, fences or structures as a result of its operations, and to restore, as nearly as reasonably practicable, all surface used by LESSEE to its condition existing as of the date of this lease.

5th – To drill no well within two hundred (200) feet of any dwelling or barn now on the premises without the written consent of the LESSOR.

B.   The LESSOR covenants and agrees as follows:

1st – To erect no dwelling or barn within two hundred (200) feet of any producing well drilled on the premises, or within fifty (50) feet of any pipeline, without the written consent of the LESSEE.

2nd – That LESSOR has full title to the premises and to all the oil and gas therein at the time of granting this Lease, and forever warrants title to the leasehold estate hereby conveyed to LESSEE, that LESSEE shall have exclusive, full and quiet possession of the premises for the purposes set forth herein, and that LESSOR shall not interfere in the operations of LESSEE hereunder.

C.   It is mutually agreed by and between LESSOR and LESSEE as follows:

1st – LESSEE shall have the right at any time to redeem for LESSOR, or otherwise acquire for payment, any mortgage or any other liens or encumbrances upon the premises that may in any manner affect the LESSEE's interest therein, and LESSEE shall be subrogated in full to all the rights of the holder thereof the same as if LESSEE were the original owner of said mortgage, lien or encumbrance, and LESSEE may reimburse itself by applying to the discharge of any such mortgage, lien or other encumbrance any royalty or rental owed or accruing hereunder.

2nd – LESSEE shall have the exclusive right to employ all or any of the oil or gas strata in the premises for the storage of gas, and may reopen and reclaim any and all abandoned wells on the premises that may have penetrated said strata, or drill new wells on the premises, for the purpose of freely introducing and storing gas in such strata and recovering gas therefrom. A well need not be drilled, reopened or reclaimed on the premises in order for gas to be stored in the premises. LESSEE shall be the sole judge as to whether gas is being stored in the premises, and its determination shall be final and conclusive. Storage of gas hereunder shall not diminish any of LESSEE's other rights under this Lease.

3rd – If LESSOR owns less than all of the oil and gas rights in the premises, LESSOR shall be entitled to only a share of the rentals and royalties equivalent to the proportion of such oil and gas rights owned by LESSOR. If LESSOR owns less than all of the storage rights in the premises, LESSOR shall be entitled to a proportionate share of storage rentals equivalent to the proportion of such storage rights owned by LESSOR. Unless deeds of conveyance or other instruments of record otherwise provide, storage rentals shall be apportioned equally between ownership of the surface of the premises and ownership of the gas rights therein. If LESSEE makes rental or royalty payments to LESSOR in excess of LESSOR's entitlement thereto, LESSOR shall refund to LESSEE such part of all such payments made by LESSEE under this Lease as shall be proportionate to the title not held by LESSOR, and LESSEE may reduce subsequent payments in the same proportion. If LESSOR does not timely provide such refund, LESSEE may also reduce payments to LESSOR by the amount that should have been refunded.

4th – In case of a conveyance or reservation of all or a part of or an undivided interest in the premises, LESSEE shall apportion all entitlements or benefits under the Lease according to interest, acreage, or the terms of the conveyance as the case may be (except as provided in paragraph 5th hereof). Notwithstanding the above, LESSEE may continue to pay or provide all such entitlements or benefits to LESSOR until furnished with the original or a certified copy of the deed of conveyance or other documents or proof of conveyance, so that LESSEE may identify the land or interests conveyed as being all or part of the premises. In case of notice of any adverse claim to the premises or any portion thereof or interest therein, whether or not in connection with a conveyance, LESSEE may withhold any or all entitlements or benefits under this Lease until such claims, and the entitlements and benefits are, in LESSEE's sole discretion, decided by compromise, or by final decree of a court of competent jurisdiction, and to this end LESSEE may file a petition for interpleader.

5th – LESSEE shall at any time, upon payment of all monies due hereunder up to such time, have the right to surrender this Lease as to all or part of the premises, and shall thereupon be released and discharged from all payments, obligations,

2

P.4 Paid Up 11/05

terms, conditions and covenants contained herein, whereupon this Lease shall be null and void as to the entire premises or the part thereof as to which this surrender was made, and rental and royalty payments shall cease or be reduced accordingly. Notwithstanding the above, LESSEE shall still have the right to continue to use any pipeline rights of way herein granted upon a single payment to LESSOR of two dollars ($2) per rod.

6th – LESSEE is hereby granted the right to pool or unitize all or any part of the premises with any other leases, lands, oil or gas estates, or any of them whether owned by the LESSEE or others, so as to create one or more drilling or production units. Such units shall not exceed 640 acres in extent provided, however, that if any Federal or State law, Executive order, rule or regulation shall prescribe a spacing pattern for the development of the field or allocate a producing allowable on acreage per well, then any such units may embrace as much additional acreage as may be prescribed or as may be used in such allocation or allowable. LESSEE shall record a copy of the unit operation designation in the county in which the premises are located. In order to give effect to the known limits of the oil and gas pool, as such limits may be determined from available geological or scientific information or drilling operations. LESSEE may at any time increase or decrease that portion of the premises that is included in any drilling or production unit, or exclude it altogether, provided that written notice thereof shall be given to LESSOR. As to each such unit, LESSOR agrees to accept, in lieu of the royalty herein described, such proportion of such royalty as the acreage in the premises in such unit bears to the total acreage included in such unit. The commencement, drilling, completion of or production from a well on any portion of a unit including all or some of the premises shall have the same effect upon the terms and conditions of this Lease as if a well were commenced, drilled, completed or producing on the premises.

7th – All expressed or implied covenants of this Lease shall be subject to all federal, state and local laws, orders, rules and regulations. If LESSEE is unable to fulfill any covenant hereunder because of such laws, orders, rules or regulations, acts of God (such as natural disasters), wars, civil disturbances, insurrections, riots, epidemics, equipment or pipeline breakdown or freeze-up, or similar causes not reasonably within the control of LESSEE, for such time as such situation exists, the term of this Lease shall be extended for an equal period of time, and LESSEE's obligation to fulfill its covenants under this Lease shall be suspended for such period of time. This Lease shall not be terminated, in whole or in part, nor Lessee held liable for any failure to perform unless such obligation, covenant or condition remains unsatisfied and unperformed for a period of one year following the express and specific written demand upon Lessee by Lessor for such satisfaction and performance. Neither the service of said notice nor the doing of any acts by Lessee intended to satisfy any of the alleged obligations shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder. No judicial action may be commenced by Lessor for forfeiture of this lease or for damages until after said period. Lessee shall be given a reasonable opportunity after judicial ascertainment to prevent forfeiture by discharging its expressed or implied obligation as established by the court.

8th – This Lease may be executed in counterparts each having the same validity as the original. Should any one or more of the parties named as LESSOR or owning an oil or gas interest in the premises fail to execute this Lease, it nevertheless shall be binding upon all such parties who do execute it as LESSOR.

9th – LESSEE shall have the right to assign this Lease or any interest therein, and the assignee of LESSEE shall have corresponding rights, privileges and obligations with respect thereto. All terms, conditions and covenants between the parties hereto shall extend to their respective heirs, successors, personal representatives and assigns. If LESSEE assigns this Lease or any interest therein, LESSOR will look solely to assignee for fulfillment of all obligations of the Lease or of the interest assigned, as the case may be. Representations other than those contained herein shall not be binding on either party.

10th – LESSEE's exercise of any right or entitlement granted under this Lease shall continue this Lease in full force and effect as to all rights and entitlements granted herein, and each right and entitlement granted herein may be exercised by LESSEE simultaneously with its exercise of one or more other rights and entitlements, or singly, on a continuing basis.

11th – Operations. Whenever used in this lease, the word "operations" (unless specified to the contrary) shall mean operations for and any of the following: dirt work, building of roads and locations, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repairing, abandoning or dewatering (meaning pumping or flowing of water and/or associated hydrocarbons from a well) of a well in search of or in an endeavor to obtain, increase or restore and/or market or render marketable or more valuable production of oil or gas, and/or production, actual or constructive, of oil or gas.

12th – This lease may, at LESSEE's option, be extended as to all or part of the lands covered hereby for an additional primary term of five (5) years commencing on the date that this lease would have expired but for the extension. LESSEE may exercise its option by paying or tendering to LESSOR an extension payment of forty dollars ($40.00) per net acre for the land then covered by the extended lease. Said bonus is to be paid or tendered to the LESSOR by cash, check or draft, mailed or delivered on or before the expiration of the primary term hereof, and the depositing of such cash, check or draft in any post office, addressed to the LESSOR (at LESSOR's last known address as shown by LESSEE's records) on or before the expiration of the primary term hereof, shall be deemed payment or tender as herein provided. If LESSEE exercises this option, the primary term of this lease shall be considered to be continuous, commencing on the date of the lease and continuing from that date to the end of the extended primary term.

IN WITNESS WHEREOF, this Oil & Gas Lease is executed the day and year first above written.

WITNESS:

_____        _____(SEAL)


_____        _____(SEAL)


_____        _____(SEAL)

3

PA-Paid Up 11/05

## ACKNOWLEDGMENT

State of  Pennsylvania
County of  Bradford

On this the  28th  day of  FEBRUARY  2006 before me a Notary Public, the undersigned officer, personally appeared _____

_____ known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that  They  executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SEAL.
My commission expires:

_____
(Notary Public)

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
James E. Smith, Notary Public
Bradford Twp., McKean County
My Commission Expires June 26, 2008
Member, Pennsylvania Association Of Notaries

## ACKNOWLEDGMENT

State of _____
County of _____

On this the _____ day of _____ 20___, before me a Notary Public, the undersigned officer, personally appeared _____

_____ known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that ___he___ executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

SEAL.
My commission expires:

_____
(Notary Public)

## CORPORATE ACKNOWLEDGMENT

State of _____
County of _____

On this the ____ day of _____, 20___, before me a Notary Public, the undersigned officer, personally appeared ____
_____, who acknowledged h__self to be the _____ of _____
_____, a corporation, and that he as such _____
_____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by h__self as _____

SEAL.
My commission expires:

_____
(NOTARY PUBLIC)

4

# Exhibit C



Jason P. Blose
*Attorney*

December 10, 2012



Re: Chesapeake Lease No. ████████
Ulster Township, Bradford County, Pennsylvania

Dear Ms. Williams:

On behalf of Chesapeake Appalachia, L.L.C. ("Chesapeake"), I have been asked to respond to your letter dated November 1, 2012 regarding calculation of royalty payments pursuant to the above referenced oil and gas lease ("Lease"). For the following reasons, it is Chesapeake's position that your royalties have been properly calculated.

By way of background, gas produced from the Lease is in marketable form at the wellhead, and is sold by Chesapeake to Chesapeake Energy Marketing, Inc. ("CEMI") at this point. CEMI is a marketing company which takes title to and possession of gas at the wellhead, and aggregates it with gas from multiple other wells into a downstream pool, typically on an interstate pipeline. The volume of natural gas aggregated in this pool is then sold to many different buyers, at different prices. On a monthly basis, CEMI determines a weighted average sales price for the gas sold from the pool at the downstream, value-added points of sale. The weighted average sales price is calculated by averaging the price received from the individual sales from this pool across the entire volume contained in the pool. CEMI pays Chesapeake 97 percent of this weighted average sales price (CEMI retains a 3 percent marketing fee which is borne solely by Chesapeake and is not passed on to you), less the costs CEMI incurs between the wellhead point of sale and the downstream points of sale. The costs incurred by CEMI are those indicated in your royalty statement.

The Lease provides for a royalty on gas based on the revenue realized by lessee, and contains the following provision in the addendum:

It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; *however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production* so long as

Chesapeake Energy Corporation
P.O. Box 18496 • Oklahoma City, OK 73154-0496 • 6100 N. Western Avenue • Oklahoma City, OK 73118
405-935-6295 • fax 405-849-6295 • cell 405-246-5610 • jason.blose@chk.com

December 10, 2012
Page 2

they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

As noted above and as you indicate, gas is in marketable form at the wellhead, and is sold at that point.   The italicized language above expressly provides that the costs incurred by CEMI may be deducted, as they enhance the value of marketable gas. Regardless, the underlined language above clearly states that lessor is not to receive a price that is more than that received by the lessee, which is the price received by Chesapeake from the sale to CEMI. In that regard, please understand that although the costs CEMI incurs are shown on your royalty statement in an effort to be transparent, these costs are not in fact deductions taken by the lessee.  The lessor actually receives a price greater than that received by lessee, since Chesapeake bears the marketing fee retained by CEMI.

I hope this letter adequately addresses your concerns.   Should you need further information, please do not hesitate to contact me.

Very truly yours,

Jason P. Blose

# Exhibit D



# The Nation's Most Active Driller

Chesapeake has grown rapidly to become a top-tier energy producer with an enterprise value of approximately $32 billion and more than 7,600 employees. With its acquisition of Columbia Natural Resources in 2005, Chesapeake has been active in Pennsylvania through its predecessors since the mid-1900s. Chesapeake is headquartered in Oklahoma City, and focuses its operations on exploratory and developmental drilling and corporate and property acquisitions.

The company owns a substantial leasehold position in every major onshore play east of the Continental Divide, and our 14.3 million net acres make up the nation's largest natural gas resource base. We have built and maintained successful partnerships with more than 137,000 royalty owners whose mineral-bearing properties are located across the eastern two-thirds of America, from Louisiana and the Gulf Coast, through the plains of the Midwest to central New York.

With more than 20 years of industry experience, Chesapeake understands that each well is unique. We do what it takes to succeed as a driller, a producer and a partner, whether the situation calls for providing sound abatement walls around our drillsites to meet noise requirements in urban communities or building access roads across rural landscapes. At Chesapeake, we value our reputation as an excellent operator — and an excellent partner.

## We are...

- one of the largest producers of natural gas in the U.S.
- the nation's number one and most active driller
- an industry leader in 3-D seismic and onshore leasehold acreage
- one of the most active consolidators in the industry
- the largest inventories of onshore leasehold and 3-D seismic in the U.S.



"In my 32 years as a landman, I have never seen another company that has the ability to take new concepts and ideas and apply them as successfully as Chesapeake. Chesapeake strives to treat each royalty owner with respect and their property like our own."

—Jim Fansher, Senior Landman



STAGES OF DRILLING

1 Seismic
2 Leasing
3 Permitting
4 Drilling

STAGES OF DRILLING

5 Completing
6 Producing
7 Royalty
8 Exiting

# The Drilling & Production Process

**5. Completing** – As a well reaches the completion phase, the original drilling rig is removed and a smaller completion rig is moved in to perform a detailed, in-depth analysis of potentially productive zones. These high-technology fracing completion processes stimulate production by fracturing existing completion finds and materials into the rock and creating cracks for production to flow.

**6. Producing** – A wellhead (or Christmas-tree) is placed on top of the existing well site to control and regulate the flow of gas into a pipeline in order for the gas to be transported to market through a regional pipeline system.

**7. Receiving your royalty payment** – Mineral rights owners can usually expect to begin to receive monthly royalty payments approximately 90 days after mineral production begins on a well.

The period can however vary depending on title research. This is required to confirm the title history on each tract, from courthouse records and have a title attorney authenticate royalty ownership for all tracts in the unit.

**8. Exiting** – Regardless of how long a well is active, upon cessation of production, Pennsylvania law requires operators to plug wells below the surface. The operator must remove all equipment and restore the well site.

Note: The duration of drilling time and any well of production will vary from a well to well depending on drilling depth, location, formation and numerous other variables associated with the risks of exploration and production.

# A Champion of the Environment

As we explore for and produce clean-burning, environmentally friendly natural gas, we provide an important solution to our nation's energy crisis. Natural gas has lower levels of greenhouse gas emissions than oil or coal. With at least a 125-year supply, natural gas is a clean, abundant, affordable and American fuel.

At Chesapeake, we realize that the way a great product is produced can be as important as the product itself. Protecting the beauty of the areas where we operate is an important goal throughout our drilling process, and we recognize that no two areas are the same. In some locations, particularly in urban areas, multiwell padsites enable us to drill several wells from a single spot, greatly reducing the footprint of our drilling and production activities. We also use the newest horizontal and directional

drilling technology so we can place wells at a distance from homes, schools and businesses. In each location, we take every possible measure to conserve water and protect precious groundwater resources.

We begin each job, whether it is located in an urban neighborhood or on acres of rural farmland, with the utmost respect and care for the environment. That's an attitude we are proud to say continues throughout the producing life of each Chesapeake well. Our objective is simple: to leave each wellsite, environment, neighborhood and community in which we operate in as good, if not better, condition than when we began drilling.



## EPA NATURAL GAS STAR PROGRAM MEMBER

Chesapeake is a member of the Environmental Protection Agency's (EPA) Natural Gas STAR Program, a voluntary initiative encouraging oil and natural gas companies to work with the government and each other to reduce methane emissions by adopting environmentally-sound technologies and techniques. This partnership with the EPA is truly part of our company's overall effort to do everything we can to reduce emissions and operate in an environmentally responsible manner.



# Partnerships

From countryside to cities and towns, Chesapeake is deeply committed to improving the lives of all of our partners, including communities as well as individual royalty owners. That's just one reason we strive to excel as a good neighbor and responsible corporate citizen in every situation. Another reason is that our employees live in just about every county and town where we operate. We're not just your partner – we're your neighbor.

At Chesapeake, we value our relationships with each royalty owner. Whether it's a rural or city owner in the Appalachian Basin, or a large entity such as the Dallas/Fort Worth International Airport, an Oklahoma landowner, a 10-acre landowner in Pennsylvania or a neighborhood resident in Shreveport, Louisiana, we are committed to providing open and honest communication during all aspects of the drilling process.

A successful partnership between a mineral owner and a driller/producer can only be achieved by working together. Each mineral owner has the rights to the natural gas below the surface of their property, while Chesapeake has the expertise and capital necessary to bring that natural gas to the surface.

It's a working partnership. With active participation and open communication, we can both win.

# Choosing Chesapeake

As a major participant in the region's energy industry, our 7,000 Appalachian wells produced in excess of 40 billion cubic feet of natural gas equivalent in 2008. We are committed to helping Pennsylvania realize the great potential of its rich natural gas resources while maintaining the state's historic beauty.

CHESAPEAKE PAID MORE THAN $6.4 MILLION TO PENNSYLVANIA ROYALTY OWNERS IN 2008.

■ Contain Chesapeake
Operations or
Leasehold

## MOST ACTIVE
## U.S. OPERATORS
NUMBER OF RIGS*

160

120

80

40

0

| Anadarko | Encana | EOG | XTO | Chesapeake Energy |

25  29  38  48

* NUMBER OF RIGS AS OF 09.21.09



# Five Reasons to Lease with Chesapeake

① We are the nation's most active driller and as such have the knowledge, skills, and experience to find your mineral resources at the surface.

② Chesapeake is 100% long-term E&P stocks since 1993, has the financial strength to underwrite and complete the drilling process in a timely manner.

③ We own the most likely most extensive acreage database in the nation. With a world-class team of geologists and geophysical and our own core lab, we can determine the best time to drill before a drill bit ever touches the ground. That, in turn, leads to our impressive 90% drilling success rate that means fewer disappointments for mineral owners.

④ Chesapeake owns our own fleet of drilling rigs, because we don't have to wait for someone to drill, but instead begin the projects earlier than line competitors.

⑤ We live here too. Our employees don't just work in your community, they call it home, and we want to provide an environment and community where our families can thrive.

Chesapeake's
operating areas



PRINTED ON RECYCLED PAPER

# The Drilling & Production Process

**5. Completing** — As a well reaches the completion phase, the original drilling rig is removed and a smaller completion rig is moved in to perforate and treat the potentially productive zones. These high-technology "fracing" completion processes stimulate production by pressuring completion fluids and materials into the zone and creating cracks for production to flow.

**6. Producing** — A wellhead or "Christmas tree" is placed on top of the existing wellsite to control and regulate the flow of gas into a pipeline in order for the gas to be transported to market through a regional pipeline system.

**7. Receiving your royalty payment** — Mineral rights owners can usually expect to begin to receive monthly royalty payments approximately 90 days after initial production begins on a well.

The period can, however, vary depending on title research. This is required to confirm the title history on each tract (from courthouse records) and to have a title attorney authenticate royalty ownership for all tracts in the unit.

**8. Exiting** — Regardless of how long a well is active, upon cessation of production, Pennsylvania law requires operators to plug wells below the surface. The operator must remove all equipment and restore the wellsite.

Note: The duration of drilling time and amount of production will vary from well to well depending on drilling depth, location, formation and numerous other variables associated with the risks of exploration and production.

# The Drilling & Production Process

**1. Gathering seismic information** — The potential existence of oil and natural gas may be determined by the observation of sound wave recordings in a process called 3-D seismic. Vibrations are sent underground and reflected back to a listening device on the surface. Different zones and formations below the earth reflect these vibrations at different speeds, allowing operators to generate a picture or cross section of the potential zones and structures located beneath the surface.

**2. Signing the leasing agreement** — Chesapeake's talented employees spend weeks and months researching the mineral ownership records for each tract in the unit in which we plan to drill. Standard oil and natural gas lease forms establish a partnership between you, the mineral owner, and Chesapeake for the drilling and production of oil and natural gas. The mineral owner bears no risk, but in return receives regular royalty payments based on the well's production revenue. The operator incurs all risks and costs associated with drilling and producing the well.

**3. Preparing the drillsite** — After a lease agreement is signed, Chesapeake evaluates its geological information combined with its leasehold position in the area before selecting a spot to drill. Chesapeake begins construction of a drillsite (or padsite if used to drill more than one well) before commencing drilling operations. We build drillsites utilizing as small an area as possible that will safely accommodate the drilling rig and associated equipment. Once drilling is completed, the drillsite is typically downsized to a minimum area for the surface production equipment.

**4. Drilling** — Once the drilling rig and other necessary equipment are in place, the drilling process begins. Chesapeake's Appalachian wells are drilled to depths ranging from 1,500 to 22,500 feet. Chesapeake also drills horizontal wells which begin by drilling a vertical hole, then drilling horizontally (approximately 3/4 mile) into the potential productive zone to recover the maximum reserves.     *(continued)*

# Exhibit E

ROYALTY CALCULATOR - LENGTH UPGRADE

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | U | V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Total [redacted] Acreage: | 395.25 | | | | | Messersmith S | | | Reilly SE | | | Reilly North | | | ET | | | | |
| 2 | What if.....Royalty Calculator | Base | | | All Unit | | 4 Legs | | | 4 Legs | | | 6 Legs | | | 6 Legs | | | % of Total | Cumm Total |
| 3 | 11/15/12 4:53 PM | | | | | | 5,000' Legs | | | 5,000' Legs | | | 5,000' Legs | | | 5,000' Legs | | | | |
| 4 | | | | | | | | | | | | | (est 554) | | | (est 574) | | | | |
| 5 | IF Your Acres in Production Unit were | 1 | Acres | | 640 | | 1.4032 | | | 35.7110 | | | 270.1359 | | | 88.0000 | | | REMEMBER | |
| 6 | And the total Acres in Production Unit were | 640 | Acres | | 640 | | 591.2650 | | | 586.4390 | | | 575.0000 | | | 575.0000 | | | | |
| 7 | And your Royalty % from your lease was | 0.125 | percent | | 0.125 | | 12.500% | | | 12.500% | | | 12.500% | | | 12.500% | | | No well will be drilled until the rig shows up | |
| 8 | Then Your Royalry Share is | 0.0195% | | | 12.5000% | | 0.0297% | | | 0.7612% | | | 5.8725% | | | 1.9130% | | | Any well can be a dry hole | |
| 9 | | | | | | | | | | | | | | | | | | | Precise allocations determined by the UO | |
| 10 | If the price for Natural Gas is | $8.00 | Mcfe | | 8 | | 1 | 4 | | 1 | 4 | | 1 | 6 | | 1 | 6 | | UO recorded 6 months after first flow | |
| 11 | And your daily production was | 1 | MMcfe | | 1 | | Leg @ | Legs | | Leg @ | Legs | | Leg @ | Legs | | Leg @ | Legs | | | |
| 12 | Then the TOTAL value of well Production/day is | $8,000 | per day | | $8,000 | | Ken's Nos: | After Adjust: | | Ken's Nos: | After Adjust: | | Ken's Nos: | After Adjust: | | Ken's Nos: | After Adjust: | | | |
| 13 | AND..... | | | | | | | | | | | | | | | | | | | |
| 14 | Your royalty per day would be | $2 | per day | | $1,000 | | $2 | $11 | | $61 | $274 | | $470 | $3,171 | | $153 | $1,033 | | | |
| 15 | Your royalty for MONTH 1 would be | $48 | | | $30,400 | | $72 | $325 | | $1,851 | $8,330 | | $14,282 | $96,403 | | $4,653 | $31,405 | | | |
| 16 | Your royalty for YEAR 1 would be | $570 | per year | | $365,000 | | $866 | $3,898 | | $22,227 | $100,019 | | $171,478 | $1,157,474 | | $55,861 | $377,061 | | | |
| 17 | Based on experience in the Barnett Shale we might expect royalty income to look like this.* | | | | | | | | | | | | | | | | | | | |
| 18 | Your royalty for YEAR 1 would be | $570 | per year | | $365,000 | | $866 | $3,898 | | $22,227 | $100,019 | | $171,478 | $1,157,474 | | $55,861 | $377,061 | | 13.06% | 13.06% |
| 19 | Your royalty for YEAR 2 | $399 | per year | | $255,500 | | $606 | $2,729 | | $15,559 | $70,014 | | $120,034 | $810,231 | | $39,103 | $263,943 | | 9.14% | 22.20% |
| 20 | Your royalty for YEAR 3 | $279 | per year | | $178,850 | | $424 | $1,910 | | $10,891 | $49,009 | | $84,024 | $567,162 | | $27,372 | $184,760 | | 6.40% | 28.59% |
| 21 | Your royalty for YEAR 4 | $257 | per year | | $164,542 | | $390 | $1,757 | | $10,020 | $45,089 | | $77,302 | $521,789 | | $25,182 | $169,979 | | 5.89% | 34.48% |
| 22 | Your royalty for YEAR 5 | $237 | per year | | $151,379 | | $359 | $1,617 | | $9,218 | $41,482 | | $71,118 | $480,046 | | $23,168 | $156,381 | | 5.41% | 39.89% |
| 23 | Your royalty for YEAR 6 | $218 | per year | | $139,268 | | $331 | $1,487 | | $8,481 | $38,163 | | $65,428 | $441,642 | | $21,314 | $143,870 | | 4.98% | 44.88% |
| 24 | Your royalty for YEAR 7 | $200 | per year | | $128,127 | | $304 | $1,368 | | $7,802 | $35,110 | | $60,194 | $406,311 | | $19,609 | $132,361 | | 4.58% | 49.46% |
| 25 | Your royalty for YEAR 8 | $184 | per year | | $117,877 | | $280 | $1,259 | | $7,178 | $32,301 | | $55,379 | $373,806 | | $18,040 | $121,772 | | 4.22% | 53.67% |
| 26 | Your royalty for YEAR 9 | $169 | per year | | $108,447 | | $257 | $1,158 | | $6,604 | $29,717 | | $50,948 | $343,902 | | $16,597 | $112,030 | | 3.88% | 57.55% |
| 27 | Your royalty for YEAR 10 | $156 | per year | | $99,771 | | $237 | $1,065 | | $6,076 | $27,340 | | $46,873 | $316,389 | | $15,269 | $103,068 | | 3.57% | 61.12% |
| 28 | Your royalty for YEAR 11 | $143 | per year | | $91,789 | | $218 | $980 | | $5,589 | $25,153 | | $43,123 | $291,078 | | $14,048 | $94,822 | | 3.28% | 64.41% |
| 29 | Your royalty for YEAR 12 | $132 | per year | | $84,446 | | $200 | $902 | | $5,142 | $23,140 | | $39,673 | $267,792 | | $12,924 | $87,236 | | 3.02% | 67.43% |
| 30 | Your royalty for YEAR 13 Re-Fracturing | $234 | per year | | $149,656 | | $355 | $1,598 | | $9,113 | $41,010 | | $70,309 | $474,584 | | $22,904 | $154,601 | | 5.35% | 72.78% |
| 31 | Your royalty for YEAR 14 | $215 | per year | | $137,684 | | $327 | $1,470 | | $8,384 | $37,729 | | $64,684 | $436,617 | | $21,072 | $142,233 | | 4.92% | 77.70% |
| 32 | Your royalty for YEAR 15 | $198 | per year | | $126,669 | | $301 | $1,353 | | $7,713 | $34,711 | | $59,509 | $401,688 | | $19,386 | $130,855 | | 4.53% | 82.24% |
| 33 | Your royalty for YEAR 16 | $182 | per year | | $116,536 | | $277 | $1,244 | | $7,096 | $31,934 | | $54,749 | $369,553 | | $17,835 | $120,386 | | 4.17% | 86.40% |
| 34 | Your royalty for YEAR 17 | $168 | per year | | $107,213 | | $254 | $1,145 | | $6,529 | $29,379 | | $50,369 | $339,989 | | $16,408 | $110,755 | | 3.84% | 90.24% |
| 35 | Your royalty for YEAR 18 | $154 | per year | | $98,636 | | $234 | $1,053 | | $6,006 | $27,029 | | $46,339 | $312,790 | | $15,096 | $101,895 | | 3.53% | 93.77% |
| 36 | Your royalty for YEAR 19 | $142 | per year | | $90,745 | | $215 | $969 | | $5,526 | $24,866 | | $42,632 | $287,766 | | $13,888 | $93,743 | | 3.25% | 97.01% |
| 37 | Your royalty for YEAR 20 | $130 | per year | | $83,485 | | $198 | $892 | | $5,084 | $22,877 | | $39,222 | $264,745 | | $12,777 | $86,244 | | 2.99% | 100.00% |
| 38 | Total Principal Value of Royalty for a 20 Year period | $4,368 | TOTAL | | $2,795,619 | | $6,634 | | | $170,238 | | | $1,313,386 | | | $427,851 | | | 100.00% | |
| 39 | | | | | | | | | | | | | | | | | | | | |
| 40 | IF YOU OWNED ENTIRE UNIT | | | | $2,795,619 | | 0.0297% | | | 0.7612% | | | 5.8725% | | | 1.9130% | | | | |
| 41 | | | | | | | | | | | | | | | | | | | | |
| 42 | IF GAS PRICE WERE $2 | $2.00 | | | $698,905 | | | | | | | | | | | | | | | |
| 43 | | | | | | | | | | | | | | | | | | | | |
| 44 | IF EACH 5,000' WELL INITIALLY PRODUCED 4.5 Mmcfe | 4.5 | | | $3,145,071 | | $7,464 | | | $191,518 | | | $1,477,559 | | | $481,333 | | | | |
| 45 | | | | | | | | | | | | | | | | | | | | |
| 46 | IF EACH UNIT HAD 6 WELLS | 6 | | | $18,870,425 | | $29,855 | $29,855 | | $766,071 | $766,071 | | $8,865,355 | $8,865,355 | | $2,887,996 | $2,887,996 | | $12,549,276 | |
| 47 | | | | | | | | | | | | | | | | | | | | |
| 48 | [redacted] Acres Included in Units | | | | 395.2500 | | 1.4032 | | | 35.7110 | | | 270.1359 | | | 88.0000 | | | Monthly | 1st Month |
| 49 | | | | | | | | | | | | | | | | | | | | |
| 50 | TOTAL [redacted] Royalty Revenue | | | | | | | | | | | | | | | | | | $52,288.65 | $105,115.90 |
| 51 | | | | | | | | | | | | | | | | | | | | |
| 52 | Per Acre | | | | | | | | | | | | | | | | | | $132.29 | $265.95 |

# Exhibit F



Jason P. Blose
*Attorney*

December 13, 2012

Re:   Chesapeake Lease No.
      Troy Township, Bradford County, Pennsylvania

Dear

On behalf of Chesapeake Appalachia, L.L.C. ("Chesapeake"), I have been asked to respond to your letter dated November 6, 2012 in which you assert that Chesapeake is improperly paying royalty pursuant to the above referenced oil and gas lease ("Lease"). For the following reasons, it is Chesapeake's position that your royalties have been properly calculated.

As stated in your letter, the Lease states that lessee agrees "to pay Lessor, free of cost, a royalty of one-eighth (1/8th) of the revenue realized by Lessee for all gas marketed from the Leasehold." Your letter states your position that "by deducing gathering and third party costs, Chesapeake has applied their production costs to us."

By way of background, gas produced from the Lease is in marketable form at the wellhead, and is sold by Chesapeake to Chesapeake Energy Marketing, Inc. ("CEMI") at this point. CEMI is a marketing company which takes title to and possession of gas at the wellhead, and sells that gas at downstream value-added points of sale, typically on an interstate pipeline. CEMI pays Chesapeake 97 percent of the sales price CEMI receives (CEMI retains a 3 percent marketing fee which is borne solely by Chesapeake and is not passed on to you), less the costs CEMI incurs between the wellhead point of sale and the value-added downstream points of sale. The costs incurred by CEMI include a compression fee, gathering fee, and a transportation fee, as indicated in your royalty statements.

As mentioned above, the Lease requires royalties be paid based on the revenue realized by lessee. The revenue realized by Chesapeake is that received in the wellhead sale from Chesapeake to CEMI. Your claim that Chesapeake has applied the

EXHIBIT
8

December 13, 2012
Page 2

costs of production to you is simply incorrect.   Your royalty is free of the cost of production.   In <u>Kilmer v. Elexco Land Services, Inc.</u>, 990 A.2d 1147 (Pa. 2010), the Pennsylvania Supreme Court recently recognized that a lessor's royalty is generally free of the cost of production, but is subject to a proportionate share of post production costs.   <u>Id.</u>, at 1152, 1157.

I hope this letter adequately addresses your concerns.   Should you need further information, please do not hesitate to contact me.

Very truly yours,

Jason P. Blose

# Exhibit G



# Chesapeake
### ENERGY

**David T. Mobley**
*Vice President — Land Administration*

January 18, 2012

Re:   Adjustment in Royalty Payments

Dear Royalty Owner:

As a royalty owner in one or more wells operated by Chesapeake, you share in the economic benefits of natural gas production. We appreciate our relationship with you and are mindful of the trust you placed in us to explore and produce your minerals. Since we drilled our first well in Pennsylvania, our company has paid almost $2 *billion* in lease bonuses and royalties to individuals, businesses and townships across Pennsylvania.

I am sending you this letter to let you know of some adjustments you will notice in your royalty payments this year. Let me explain the reason for the adjustments: In 2008-2009, several lawsuits were filed in Pennsylvania seeking to clarify whether royalty owners should share in the expense of post-production functions necessary to get the gas to market. These are costs incurred beyond the wellhead after the gas is ready for sale or use. Opinions varied on this issue as it had never been decided in Pennsylvania. The Pennsylvania Supreme Court agreed to hear the case, and in a ruling issued March 24, 2010, the Supreme Court held in the case of *Herbert Kilmer, et al. vs. Elexco Land Services, Inc. et al.,* 605 Pa. 413, 990 A.2d 1147, (Pa. 2010), that post-production costs, such as gathering, compression and transportation, are properly shared by royalty owners through proceeds deductions unless the lease expressly provides otherwise.

Your lease is on a form that does not specifically address these types of costs. Given the uncertainty of how your lease could be interpreted, we felt it was prudent to suspend the deduction of these costs while the case was being considered. Royalties paid under other lease forms have always borne these deductions. Now that the Supreme Court has spoken on the issue in the *Kilmer* case and determined that post-production costs are properly allowable under the terms of your lease, we will now comply with that decision.

Chesapeake Energy Corporation
3817 NW Expressway • Oklahoma City, OK 73118



EXHIBIT
2

Page 2

Effective with your January 2012 check, Chesapeake will no longer absorb your share of these post-production costs and your payments will be reduced by these amounts. We will also recoup the costs that have been suspended back to the date of the *Kilmer* decision (but not before), which we believe is the fairest way to handle those deductions. Currently, these costs range between $0.55 - $0.65 per Mmbtu.

We know recouping past costs in a single month could create a hardship for some of our royalty owners. We don't want that to happen, so we will spread the recouping of costs over a minimum of six months.

As a result of these adjustments, you will see a reduction in the amount you receive for your royalty share. The reduction will be more significant until the past months' costs are recouped, but then should become less apparent in the future. The deductions will be itemized on your check stub detail.   To the extent you also receive payments under your lease from other producers, such as Anadarko and Statoil, it is our understanding they have consistently been deducting these costs already so your payments from them should not be affected.

If you have any questions about your lease, these deductions or the nature and extent of these deductions, please feel free to call our Owner Relations Department toll-free at 1-877-245-1427.

Thank you for allowing us to develop your mineral interest.   We look forward to continuing to share the rewards of this clean-burning, domestic energy with you for years to come.

Very truly yours,

David T. Mobley

# Exhibit H



December 15, 2011

██████████████████████

Re: ███████████████████████████

Dear ████████████

This letter confirms receipt of your letter dated October 5, 2011 regarding your client ████████████████████ As you may be aware, Anadarko E&P Company LP ("Anadarko") is currently paying royalties to ████████ in accordance with his proportionate royalty share in the various leases listed above within the Grippo Unit 1H & 6H and the Shirley North 2H.

The language of your client's Leases generally provide as follows:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; **however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements**. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

[Emphasis added.]

ANADARKO E&P COMPANY LP • P.O. BOX 1330 • HOUSTON, TEXAS 77251-1330

CONFIDENTIAL & PROPRIETARY

The oil and gas that Anadarko produces from your client's property is marketable at the Lease; however, if Anadarko sold it there, it would receive a lower price.  Accordingly, to enhance the value that both Anadarko and your client receive for the gas, Anadarko moves it to downstream markets where it can obtain better prices.  Your client shares in the benefit of the higher prices, therefore, as the the Leases provide, your client also will share the actual costs incurred to obtain those higher prices.  Accordingly, Anadarko believes that it has calculated your client's royalty both fairly and properly in accordance with the terms of the Lease.

Should you wish to discuss this matter further, please do not hesitate to contact me.

Yours very truly,

Lacey E. Barranco
Senior Attorney

Anadarko-000167