# EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DEMCHAK PARTNERS LIMITED
PARTNERSHIP; JAMES P. BURGER, JR.
and BARBARA H. BURGER; WILLIAM A.
BURKE, II and CLARA BURKE; WILLIAM
A. BURKE, III; EDWARD J. BURKE;
DONALD G. FULLER and KAREN M.
FULLER; RANDY K. HEMERLY; LAMAR
R.KING; LINDA J. SCHLICK; AND JANET
C. YOUNG, on Behalf of Themselves and All
Others Similarly Situated,

           Plaintiffs,

   and

RUSSELL E. BURKETT and GAYLE
BURKETT,

           Plaintiffs-Intervenors,

   v.

CHESAPEAKE APPALACHIA, L.L.C.,

           Defendant.

Case No. 3:13-cv-2289

(Hon. Malachy E. Mannion)

---

## *AMICUS CURIAE* BRIEF OF THE PENNSYLVANIA OFFICE OF ATTORNEY GENERAL IN OPPOSITION TO THE PROPOSED SETTLEMENT AGREEMENT

---

# TABLE OF CONTENTS

Table of Authorities ....................................................................... ii
I.      Introduction ...................................................................... 1
II.     Background ........................................................................ 2
III.    Pennsylvania UTPCPL ...................................................4
IV.     Terms of Release .............................................................. 6
V.      Standing To Bring UTPCPL Claims ..................................11
        A.      Standing To Bring Claims Under The UTPCPL ........ 11
        B.      Private Actions Under the UTPCPL and Class Actions ................. 13
VI.     Challenges To Class Action Settlements On This Basis Are The Reason
        CAFA Notice Is Required ........................................................ 16
VII.    Conclusion ..................................................................... 18

## TABLE OF AUTHORITIES

### Cases

*Allee v. Medrano*, 416 U.S. 802 (1974) ................................................ 15

*Commodity Futrues Trading Commission v. Commercial Hedge Services, Inc.*, 422 F. Supp. 2d 1057 (D. Neb. 2006) ........................... 10

*Commonwealth v. Budget Fuel Co.*, 122 F.R.D. 184 (E.D. Pa. 1988) ................. 11

*Commonwealth v. Flick*, 382 A.2d 762 (Pa. Cmwlth. 1978) ...............................6

*Commonwealth v. Foster*, 57 D.&C.2d 203 (Allegheny Co. 1972) .......................4

*Commonwealth v. Monumental Properties*, 459 Pa. 450, 329 A.2d 816 (1974) ......... 4

*Commonwealth v. Ted Sopko Auto Sales and Locator*, 719 A.2d 1111 (Pa. Cmwlth. 1988) ................................................................... 5

*Commonwealth Ziomeck*, 352A.2d 235 (Pa. Cmwlth. 1976) ............................. 5

*Debbs v. Chrysler Corp.*, 810 A.2d 137 (2002) ...................................... 14

*DeFazio v. Gregory*, 836 A.2d 935 (Pa. Super. 2003) ................................. 12

*Equal Employment Opportunity Commission v. Waffle House*, 534 U.S. 279 (2002) ................................................................... 9, 10

*Figueroa v. Sharper Image Corp.*, 517 F. Supp.2d 1292 (S.D. Fla. 2007) .........16, 17

*Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416 (5th Cir. 2002) .... 18

*Herman v. South Carolina National Bank*, 140 F.3d 1413 (11th Cir. 1998) ............. 10

*Hunt v. U.S. Tobacco Co.*, 538 F.3d at 217 (3d Cir. 2010) ............................. 14

*In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998) ................................................................... 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................15

*Milkman v. American Travelers Life Ins. Co.*, 61 Pa. D.&C.4th 502 (Phila. C.P. March 28, 2002) ................................................................... 17

*Roller-Edelstein v. Wyndham International, Inc.*, Case No. 02-04946-A, (Cir. Ct – Dallas 2006) ................................................................... 17

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ........................................ 15

*Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285 (W.D. Pa. 2014) ................. 14

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, No. 12-6542, 2013 WL 3380590 (E.D. Pa. July 8, 2013) ........................................... 14

*Texas v. American Tobacco Co.*, 14 F. Supp. 2d 956 (E.D. Tex. 1997) ................ 18

*Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 44, 928 A.2d 186 (2007) ...................... 13

*Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442 (2001) ........................... 15

### Statutes

28 U.S.C. § 1715 (a) (2) ................................................................... 16

28 U.S.C. § 1715 (b) (7) (B) ................................................................... 17

28 U.S.C. § 1715 (d) ...................................................................17

73 P.S. §201-1, *et seq.* ................................................................1, 3

73 P.S. § 201-4 and 201-8 (b) ............................................................. 5
73 P.S. § 201-4.1 ................................................................................ 5
73 P.S. § 201-9.2 ........................................................................ 11, 12
73 P.S. § 201-4 ................................................................................ 13
73 P.S. § 201-4.1 ............................................................................. 13

## Rules

Fed. R. Civ. P. 23(a) (2) ................................................................ 14
Fed. R. Civ. P. 23 (b) (3) ............................................................... 14
Pa. R. C. P. 1702 (2) ...................................................................... 14
Pa. R. C. P. 1708 (a) (1) ................................................................. 14

## Other Authorities

Catherine M. Sharkley, *CAFA Settlement Notice Provision:  Optimal
    Regulatory Policy?*  156 U.L. Rev. 1971, 1988, 1990 (2008) ..................... 17
Edward Brunet, *Class Action Objectors:  Extortionist Free Riders
    or Fairness Guarantors*, 2003 U. Chi. Legal F.403, 449-450 ..................... 18
Edward Brunet, *Improving Class Action Efficiency by Expanded Use of
    Parens Patriae Suits And Intervention*, 74 Tulane L. Rev. 1919,
    1932-34 (2000) ................................................................................ 18

# I. INTRODUCTION

The Pennsylvania Office of Attorney General ("Commonwealth" or "Office") in its capacity as *amicus curiae*[1] files this objection and requests that this Honorable Court reject the proposed settlement in its current form. The parties to this action have negotiated a settlement agreement in which the parties attempt to release *parens patriae* claims and other claims for relief that can only be brought by the Commonwealth and are not available in a private class action either as a claim or as an element of a negotiated release.

Further, the Commonwealth has asserted claims involving natural gas leases in state court pursuant to the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* that the named Plaintiffs and Settlement Class Members cannot individually bring due to lack of standing. As such, the Commonwealth is not precluded by the order granting class certification and preliminary approval of the proposed settlement to litigate the claims as *parens patriae*.

Accordingly, the Commonwealth requests that this Honorable Court modify, the proposed settlement, to provide for a carve-out of the Commonwealth's *parens patriae* claims from the language of the release appearing in Exhibit 1 to the Parties' Unopposed Motion for Preliminary

---

[1] The Commonwealth is not submitting to this Court's jurisdiction except as amicus and the submission of this brief is without prejudice to the Commonwealth's ability to enforce and investigate claims related to the issues under dispute.

Approval of Amended Class Action Settlement, as set forth below. The Commonwealth submits this brief to protect the public which stands to be adversely affected by the approval of the proposed settlement. Although the Commonwealth is not a party to this suit, the outcome of the proposed settlement is of great interest, especially in light of the Commonwealth's pending litigation against the very same Defendant, Chesapeake Appalachia, L.L.C. as well as others ("Defendants"), that are seeking to be released in the above-captioned class action.

## II.  BACKGROUND

The Commonwealth has a lawsuit pending against the Defendant, as well as others, regarding their involvement in acts and practices which allegedly deceived and misled Pennsylvania landowners, including senior citizens into signing oil and gas leases with Defendants. The deceptive acts and practices include, making representations to landowners about the amount of money they would receive in royalty payments when landowners signed their leases and then paying landowners something less in royalty payments when gas was later extracted and sold from their properties; that certain material lease provisions meant one thing when they signed leases, and later told they meant something different when they received royalty payments under their leases. As a result of the misrepresentations, Defendants took deductions and, in some cases,

retroactive deductions of post-production expenses from royalty checks for landowners who were told they would receive certain royalty payments, there would be no deductions and their leases contained the necessary language that prohibited deductions.

In the *parens* action brought in the Bradford County Court of Common Pleas, the Commonwealth alleged that the Defendants, in concert with others named in the state court action, conducted business in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, *et seq.* Among other things, the Commonwealth alleged that Pennsylvania landowners, including elderly Pennsylvanians, were persuaded by representatives of the Defendants, as well as others, to enter into natural gas leases with the Defendants, and were misled as to the terms of those leases. *See* Commonwealth's Complaint attached hereto as Exhibit "A".

The Commonwealth's Complaint alleges that Pennsylvania landowners relied to their detriment on the misrepresentations and omissions of the Defendants, and others, who acted individually or in concert collectively for the benefit of Defendants as their agents. The Complaint also alleges that the Defendants, as well as others, induced Pennsylvania landowners to enter into the aforementioned leases and, as a result, were able to collect deductions against royalties and profits as a result of their unfair business practices, including, but

not limited to, misrepresentations and material omissions made to Pennsylvania landowners.

Prior to filing the complaint, this Office had been conducting a non-public civil investigation since early 2014. This Office has expended considerable sweat equity in reviewing landowner complaints in determining whether there is sufficient evidence in support of finding a violation of law. Since commencing the investigation, this Office conducted field interviews in Scranton, Towanda and Williamsport with numerous landowners; reviewed reams of documents; interviewed scores of witnesses; and sought to achieve a resolution without resorting to litigation with certain defendants. However, the order granting class certification and preliminary approval has changed our approach.

### III.   PENNSYLVANIA UTPCPL

In the state court action, the Commonwealth, pursuant to the UTPCPL, seeks injunctive relief, civil penalties, as well as restoration, along with such other relief as the court deems appropriate. Pennsylvania Courts have long held that the UTPCPL is to be broadly construed to effect its objective of preventing unfair and deceptive practices and protecting the public. *Commonwealth v. Monumental Properties*, 459 Pa. 450, 460, 329 A.2d 816 (1974).

The Commonwealth brings its state court action as *parens patriae* on behalf of its citizens and its general economy. *See, Commonwealth v. Foster*, 57

4

D. & C. 2d 203, 209-210 (Allegheny Co. 1972)(The Commonwealth, acting by the Office of Attorney General as *parens patriae,* under the UTPCPL, may enjoin unfair and deceptive acts or practices). An action such as this one brought by the Commonwealth under the UTPCPL is designed to protect "the individual citizens who are the prey of unscrupulous persons." *Commonwealth v. Ziomeck,* 352 A.2d 235, 238 (Pa. Cmwlth. 1976).

The UTPCPL grants a number of remedies to the Commonwealth including injunctive relief and civil penalties. *See* 73 P.S. § 201-4 and 201-8(b). Under the later section, the court is authorized to impose a civil penalty of not exceeding $1,000.00 per violation or up to $3,000.00 in the event the victim is 60 years of age or older.

In addition to civil penalties and injunctive relief, the Attorney General is authorized to seek restoration under the UTPCPL, which provides that whenever any court issues a permanent injunction to restrain and prevent violations of the UTPCPL, the court may in its discretion direct that the Defendant restore to any person in interest any monies which may have been acquired by means of any violation of the Act, under terms and conditions to be established by the court. 73 P.S. § 201-4.1. Pennsylvania case law recognizes that restoration, as an equitable remedy, is permissible under the UTPCPL. *Commonwealth v. Ted Sopko Auto Sales and Locator,* 719 A.2d 1111, 1114 (Pa. Cmwlth. 1988). *See*

5

*also*, *Commonwealth v. Flick*, 382 A.2d 762 (Pa. Cmwlth. 1978) (in addition to assessing civil penalties, a court in an appropriate case may require defendant to pay specific sums as compensation to individuals who have been harmed by defendants ' illegal acts).

## IV.   <u>TERMS OF RELEASE</u>

The Commonwealth objects to the proposed release language, to the extent that it may be construed to strip from the Commonwealth the full panoply of equitable remedies available to it under the Commonwealth's UTPCPL.   In pertinent part, the proposed class action release reads as follows:

> As of the Effective Date, Plaintiffs and the Settlement Class Members, and each of them, for themselves and their respective heirs, agents, officers, directors, shareholders, employees, consultants, joint venturers, partners, members, legal representatives, successors and assigns, hereby expressly agree that they fully and forever release and discharge **Defendant, and its parents, present * and former affiliates, and subsidiaries**, and their respective predecessors, successors, assigns, present, former and future officers, directors, employees, **agents**, any third party payment processors, **independent contractors**, successors, assigns, attorneys and legal representatives (collectively, "Defendant Releasees") from any and all of the **Settled Claims**, except for the rights and obligations created by this Settlement Agreement, and **covenant and agree that they will not** commence, **participate in**, prosecute or cause to be commenced or prosecuted against the Defendant Releasees **any action or other proceeding based upon any of the Settled Claims** released pursuant

6

to this Settlement Agreement. Plaintiffs and the Settlement Class Members hereby further agree that they fully and forever **release and discharge all working interest owners** on whose behalf Defendant has paid or will pay Royalties pursuant to Pennsylvania Leases from any and all of the Settled Claims, but do so only to the limited extent of Defendant's payments of Gas Royalties on behalf of such working interest owners.

The proposed release must be read with the settlement agreement definition of

Settled Claims, which states that:

"Settled Claims" means **any and all claims and causes of action related to the calculation, amount, payment, and/or reporting of Royalty payments** made by **Chesapeake and/or its Affiliates** (as defined in paragraph 6.8), either on its own working interest share or on behalf of other working interests, on Gas produced pursuant to a Pennsylvania Lease, including any and all claims and causes of action that were alleged in Demchak or in the Burkett Arbitration related to the calculation, amount, payment, and/or reporting of such Gas Royalty payments. The Settled Claims **include, but are not limited to,** claims for breach of contract, fraud, conspiracy, breach of implied duties and covenants, unjust enrichment, accounting, **and injunctive relief.** The Settled Claims also include (i) challenges to the manner in which sales are made to an affiliated entity, if any, (ii) claims that formation, sale or disposition of assets or equity interests by Chesapeake and/or its Affiliates (as defined in paragraph 6.8) impacted Royalty payments, and (iii) any other challenges to the reasonableness of Post-Production Cost deductions. The Settled Claims do not include claims for royalties held in suspense, claims for the failure to pay royalties due at all, claims based on errors in determining ownership interests, or claims for mathematical or calculation errors in determining volumes, prices, values, or decimal

interests. The Settled Claims also do not include any
claims or causes of action whatsoever that Plaintiffs and
the Settlement Class Members have or may have against
persons and entities other than the Defendant-Releasees,
as defined in paragraph 12.

This definition of Settled Claims can be interpreted as releasing claims falling

under Pennsylvania's UTPCPL, which the named Plaintiffs and Settlement Class

Members neither asserted in their complaint, nor did they have standing to bring.

The Commonwealth objects to the extent that the release sweeps too

broadly by including within its scope those parties sued by the Commonwealth

and who may be considered "agents" of the named Defendant.   The

Commonwealth also objects to the highlighted language to the extent the release

would appear to attempt to impede or impair the Commonwealth's statutory right

to seek relief on behalf of affected Pennsylvanians or otherwise limit Settlement

Class Members or Plaintiffs, or any other landowner for that matter, from

"participating" in the Commonwealth's ongoing litigation including, without

limitation, by witness testimony.   The definition of Settled Claims already

contains a section indicating what is not included within the definition, and this

should be expanded to clarify the limitations of the scope of the release to be

consistent with claims that the Settlement Class had standing to bring and /or the

ability to release; the Commonwealth's *parens* claims should be specifically carved out and not included in the release.

The proposed release sweeps too broadly and includes relief well beyond what is necessary to conclude a private class action. The Commonwealth must be free to vindicate the public interest by all means necessary in the ongoing litigation and to be assured that no future arguments will be made, based on the terms of this release, which would impact its litigation in an adverse way.

The language, as currently written in the proposed settlement, is unnecessary and only remains as a source of mischief in the event the Defendants, or others, would want to attach some sort of preclusive effect to this release in the ongoing state court litigation. Admittedly, the private agreement between these parties in the class action should, in theory, in no way impact public proceedings being brought by a non-party to that release. Support for this proposition can be found in the Supreme Court's decision in *Equal Employment Opportunity Commission v. Waffle House*, 534 U.S. 279 (2002), where the Equal Employment Opportunity Commission (EEOC) filed an enforcement action against an employer on behalf of a former employee for violations of the Americans with Disabilities Act. The Supreme Court held that a mandatory arbitration clause in the former employee's employment contract did not bar the EEOC from pursuing victim-specific judicial relief on behalf of the employee.

The Court reasoned that "[t]o hold otherwise would undermine the detailed enforcement scheme created by Congress simply to give greater effect to an agreement between private parties that does not even contemplate the EEOC's statutory function." *Id.* at 296.

Similarly, in *Commodity Futures Trading Commission v. Commercial Hedge Services, Inc.*, 422 F.Supp.2d 1057 (D. Neb. 2006), a federal district court held that a federal agency was not barred from seeking restitution from a company despite the fact that some of the private victims had entered into settlement agreements with the company and received money. The court found that when private parties settle their disputes without the consent of the government agency, those settlements cannot preclude the government agency from later seeking additional or more full restitution or any other remedy. *Id.* at 1061. See also, *Herman v. South Carolina National Bank*, 140 F.3d 1413 (11th Cir. 1998) (recognizing "well-established general principle that the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests").

To be sure, neither the named Plaintiffs nor any Class Member has the authority to waive or release any right inherent and statutorily vested with the sovereign. As such, the language objected to lacks any legal authority and should be struck in order to wholly preserve the public function of the Office

which, as a law enforcement body, is guided by different considerations than private concerns in a class action settlement. See *Commonwealth v. Budget Fuel Co.*, 122 F.R.D. 184, 185-86 (E.D. Pa. 1988) (striking class allegations in private class action because overlapping *parens patriae* action, which had been simultaneously filed by Pennsylvania Attorney General, was preferable to the private action seeking the same relief).

## V.    STANDING TO BRING UTPCPL CLAIMS

Pennsylvania's UTPCPL has several sections under which a claim may be brought, all of which are available to the Commonwealth. Conversely, the named Plaintiffs and Settlement Class Members have only one path to bring claims under Pennsylvania's UTPCPL, 73 P.S. § 201-9.2, for private actions. As discussed below, the named Plaintiffs and Settlement Class Members lack standing to bring their individual claims under the UTPCPL, and even if they had the standing to bring them, they could not do so as a class action.

### A.    Standing to Bring Claims Under the UTPCPL

Pennsylvania's UTPCPL 73 P.S. § 201-9.2 entitled Private Actions provides for:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or

> employment by any person of a method, act or practice
> declared unlawful by section 3 of this act, may bring a
> private action to recover actual damages or one hundred
> dollars ($100), whichever is greater.

Standing to bring a claim under the UTPCPL private right of action is therefore

predicated on: 1) a person, 2) purchasing or leasing goods or services, 3)

primarily for personal, family or household purposes, 4) sustaining an

ascertainable loss, 5) as a result of an act or practice declared unlawful under

section 3. The named Plaintiffs and Settlement Class Members would therefore

lack standing to assert these claims as they cannot meet the second and third

standing elements listed above.

The named Plaintiffs and Settlement Class Members need to show that they

"purchase[d] or lease[d] goods or services primarily for personal, family or

household purposes" in order to have standing to bring their claims under

UTPCPL 73 P.S. § 201-9.2. This is unfortunate because the Pennsylvania

Superior Court has ruled that landowners who contract with entities to extract

natural resources from their property are generally not purchasers/consumers,

who utilize economic goods, but are instead sellers of goods, such as timber, and

therefore "cannot bring a private action under Section 201-9.2." *DeFazio v.*

*Gregory*, 836 A.2d 935, 939 (Pa. Super. 2003).

The Commonwealth, however, would have standing under Sections 201-4 and 4.1 of the UTPCPL to bring the action the named Plaintiffs and individual Settlement Class Members cannot. Sections 201-4 and 4.1 provide, that:

> Whenever the Attorney General or a District Attorney has reason to believe that any person is using or is about to use any method, act or practice declared by Section 3 of this act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice. 73 P.S. § 201-4. Whenever any court issues a permanent injunction to restrain and prevent violations of this act as authorized in section 4 above, the court may in in its discretion direct that the defendant or defendants restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any violation of this act, under terms and conditions to be established by the court. 73 P.S. § 201-4.1.

Therefore, the release in the proposed settlement should be amended to make clear that claims under the UTPCPL are expressly excluded from the release.

## B. Private Actions Under the UTPCPL and Class Actions

If the named Plaintiffs and Settlement Class Members had standing to bring claims under the UTPCPL (which they do not), they would also need to show justifiable reliance that their loss was a result of the unlawful act or practice of the defendant as well as causation. *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 44, 928 A.2d 186, 201 (2007). Furthermore, "[e]vidence of reliance must go beyond

simply a causal connection between the misrepresentation and the harm; a plaintiff must 'show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation.'" *Slapikas v. First Am. Title Ins. Co.*, 298 F.R.D. 285, 292 (W.D. Pa. 2014) (citing *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, No. 12–6542, 2013 WL 3380590, at *6 (E.D. Pa. July 8, 2013) (citing *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d Cir. 2010))).

The Pennsylvania Superior Court noted that "an action under the UTPCPL may not be amenable to class certification due to discrepancies in the respective levels of reliance displayed by individual class members." *Debbs v. Chrysler Corp.*, 810 A.2d 137, 156 (2002). Pennsylvania Rule of Civil Procedure Rule 1702 requires, for class certification, that "there are questions of law or fact common to the class." Pa.R.C.P. 1702 (2). This section is textually the same as Fed. R. Civ. P. 23(a)(2). When determining whether a class action is a fair and efficient means of litigating the dispute, "one factor to consider is whether common questions of law or fact predominate over any question affecting only individual members." Pa. R.C.P. 1708 (a) (1). A similar concern as that addressed in the federal rule. Fed. R. Civ. P. 23 (b) (3).

The Pennsylvania Supreme Court has weighed in on the issue of whether

the UTPCPL is amenable to class treatment, and has stated that:

> The statute clearly requires, in a private action, that a
> plaintiff suffer an ascertainable loss *as a result of* the
> defendant's prohibited action. That means... a plaintiff
> must allege reliance... In addition, the statute requires
> him to allege that he purchased... for personal or
> household purposes as opposed to business purposes...
> The questions of fact applicable to each individual
> private plaintiff would thus be numerous and extensive. It
> cannot be said that the trial court erred in concluding that
> individual questions of fact would predominate over
> common issues of fact and law and concluding that **the
> certification requirements of commonality and
> numerosity were not met.**

*Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001) (emphasis

added).

The named Plaintiffs must have individual standing to bring a claim on

behalf of others. *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). The named

Plaintiffs must have suffered an injury-in-fact. *Lujan v. Defenders of Wildlife*, 504

U.S. 555 (1992). Standing cannot be obtained through the back door of a class

action. *Allee v. Medrano*, 416 U.S. 802, 829 (1974). The named Plaintiffs have

not alleged an injury-in-fact cognizable under the UTPCPL or state and federal

antitrust laws. Consequently, there is no authority permitting a release of claims

by way of a settlement that the named Plaintiffs and Settlement Class Members

would have no standing to raise in any court.

15

As such, the legislative scheme in Pennsylvania renders a *parens* action as the only methodology to seek relief for numerous Pennsylvanians harmed by common acts or practices in violation of the UTPCPL. Therefore, the release in the proposed settlement should be amended to clarify that claims under the UTPCPL are expressly excluded from the release.

## VI. CHALLENGES TO CLASS ACTION SETTLEMENTS ON THIS BASIS ARE THE REASON CAFA NOTICE IS REQUIRED

The proposed release language cannot withstand the kind of judicial scrutiny contemplated by the Class Action Fairness Act ("CAFA") which has, as among its stated purposes, to assure fair and prompt recoveries for class members with legitimate claims. *Figueroa v. Sharper Image Corp.*, 517 F. Supp.2d 1292, 1320 (S.D. Fla. 2007).

Among other things, CAFA provides for notice to an appropriate state official defined to mean the person in the state who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the state, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no such primary regulator, supervisor, or licensing authority, then the appropriate state official shall be the State Attorney General. 28 U.S.C. § 1715 (a) (2). This notice must include a reasonable estimate of the number of

Settlement Class Members residing in each state and the estimated proportionate share of the claims made of such member to the entire settlement to that State's appropriate state official. 28 U.S.C. § 1715 (b) (7) (B). Under CAFA, an order giving final approval of proposed settlement may not be issued earlier than 90 days after the later of the dates in which the appropriate state official, and appropriate federal official, are served with the notice required. 28 U.S.C. § 1715 (d).

Federal district courts have recognized that the objections of the Attorneys General made in the interest of protecting their residents should weigh in favor of rejection of the settlement. See, e.g., *Figueroa*, 517 F.Supp.2d at 1328. Attorneys General are increasingly participating in class actions. *See,* Catherine M. Sharkley, *CAFA Settlement Notice Provision: Optimal Regulatory Policy?* 156 U. Pa. L. Rev. 1971, 1988-1990 (2008) (describing both formal and informal actions taken by state attorneys general). Attorneys General generally participate either by filing a *parens patriae* suit, by intervening in a class action, or, as here, by filing an *amicus curiae* brief in a pending class action.[2] *See,*

---

[2] For example, in September 2001 the Texas Attorney General objected to a proposed settlement of a Pennsylvania class action against Conseco, Inc., regarding whether nursing home policies misled elderly insureds. *See, Milkman v. American Travelers Life Ins. Co.*, 61 Pa. D. & C.4th 502 (Phila. C.P. March 28, 2002); *see also, Roller-Edelstein v. Wyndham International, Inc.*, Case No. 02-04946-A, (Cir. Ct -Dallas 2006) (Florida Attorney General objected to proposed class action settlement concerning disclosure of prices at hotel chain).

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 449-450.[3]

Here, the objections raised by the Office go to the heart of the fairness of the settlement terms. The Commonwealth has focused its objections solely on the release language in the proposed settlement. The fact that the Commonwealth has not formally objected to any other terms in the proposed settlement, including but not limited to the relief provided to Settlement Class Members, should not be viewed as an endorsement by the Commonwealth of those terms. In the case at bar, the settlement does not withstand scrutiny on the basis of the release language alone.

## VI.   CONCLUSION

The parties to this class action have negotiated a Settlement Agreement which purports to release *parens patriae* claims seeking various forms of relief in addition to claims for which the named Plaintiffs and individual Settlement Class Members lack standing to bring. *Parens patriae* claims belong uniquely and

---

[3] *See, e.g., Heaton v. Monogram Credit Card Bank of Georgia*, 297 F.3d 416, 426-27 (5th Cir. 2002) (allowing intervention by FDIC into class action alleging credit card fees to be illegal); *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283 (3d Cir. 1998) (illustrating the intervention by the Massachusetts Insurance Commissioner, the Attorney General, and the Texas Insurance Commission into a class action litigation brought by life insurance policyholders alleging fraudulent sales practices); *Texas v. American Tobacco Co.*, 14 F. Supp. 2d 956, 962 (E. D. Tex. 1997) (approving a state *parens patriae* action seeking recovery of Medicaid losses against the tobacco industry); Edward Brunet, *Improving Class Action Efficiency by Expanded Use of Parens Patriae Suits and Intervention*, 74 Tulane L. Rev. 1919, 1932-34 (2000) (concluding that the state can be an effective monitor of class action settlements).

exclusively to the Commonwealth acting through its Office of Attorney General, and cannot be brought or released through private class actions. For these reasons, the Commonwealth urges this Court to reject the Settlement Agreement unless it is revised to prevent the overbroad release of the Commonwealth's claims. The Commonwealth respectfully requests this Court modify paragraph 1.38 of the Settlement Agreement to include the following:

> The Settled Claims do not include claims the Commonwealth of Pennsylvania, through the Office of Attorney General, may bring as *parens patriae* on behalf of Pennsylvania citizens for violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1, *et seq.*, and state and federal antitrust laws to obtain the full range of remedies including, but not limited to, injunctive relief, civil penalties, damages and statutory restitution.

This modification would remove all doubt and ensure that the Commonwealth can bring its claims under the UTPCPL and state and federal antitrust laws. Moreover, when the Release is read together with the Settled Claims, as modified, the Commonwealth can freely communicate with and recover relief on behalf of the Settlement Class Members without any repercussion.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

By:   s/ *Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General
PA Bar #82620

s/ *Norman W. Marden*
Norman W. Marden
Deputy Attorney General
PA Bar #203423

Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
(717) 705-7110 (fax)

Attorneys for the Commonwealth of Pennsylvania

# CERTIFICATE OF WORD COUNT

As required by the United States District Court for the Middle District

of Pennsylvania Rules of Court Rule LR 7.8(b), I certify that this document

contains 4,904 words.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed on December 9, 2015.

s/ *Norman W. Marden*
Norman W. Marden
Deputy Attorney General
PA Bar #203423

Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 787-4530
(717) 705-7110 (fax)

# EXHIBIT "A"



2015IR0069-0000   12/9/2015 1:07 PM  # 1284391
COMPLAINT IN CIVIL ACTION FILED, W/ NOTICE
TO PLEAD

Bradford County Prothonotary

## IN THE COURT OF COMMON PLEAS
## OF BRADFORD COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL COMPLAINT** |
| **v.** | : | |
| | : | **Case No:** |
| **CHESAPEAKE ENERGY CORP.;** | : | |
| **CHESAPEAKE APPALACHIA, LLC;** | : | 2015 I R 0069 |
| **CHESAPEAKE OPERATING, INC.;** | : | |
| **CHESAPEAKE ENERGY MARKETING,** | : | |
| **INC.; and WILLIAMS PARTNERS, LP** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set

forth in the following pages, you must take action within (20) days after this

complaint and notice are served, by entering a written appearance personally or by

attorney and filing, in writing with the court, your defenses or objections to the

claims set forth against you. You are warned that if you fail to do so, the case may

proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

PROTHONOTARY
Bradford County Courthouse
301 Main Street
Towanda, Pennsylvania  18848
(570) 265-1705

# IN THE COURT OF COMMON PLEAS
## OF BRADFORD COUNTY, PENNSYLVANIA

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **CIVIL COMPLAINT** |
| : | |
| **CHESAPEAKE ENERGY CORP.;** : | **Case No:** |
| **CHESAPEAKE APPALACHIA, LLC;** : | |
| **CHESAPEAKE OPERATING, INC.;** : | |
| **CHESAPEAKE ENERGY MARKETING,** : | |
| **INC.; and WILLIAMS PARTNERS, LP,** : | |
| : | |
| **Defendants.** : | |

## <u>COMPLAINT</u>

**AND NOW**, comes the Commonwealth of Pennsylvania, by the Office of

Attorney General (hereinafter "Commonwealth" or "Plaintiff"), and brings this

action pursuant to the <u>Unfair Trade Practices and Consumer Protection Law</u>, 73

P.S. § 201-1, *et seq*. ("UTPCPL"), to restrain unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the UTPCPL.

The UTPCPL authorizes the Office of Attorney General to bring an action in the name of the Commonwealth of Pennsylvania to restrain by temporary or permanent injunction unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful by Section 201-3 of the UTPCPL.

The Commonwealth has reason to believe that Defendants used methods, acts or practices declared unlawful by Section 201-3 of the UTPCPL; and that citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of are enjoined. The Commonwealth believes that the public interest is served by seeking before this Honorable Court a permanent injunction to restrain the methods, acts and practices of the Defendants as hereinafter set forth. Further, the Commonwealth requests statutory restoration, civil penalties, costs and other appropriate equitable relief as redress for violations of the UTPCPL.

In support of this action, the Commonwealth respectfully represents the following:

# INTRODUCTION

1.     This action seeks to recover for Pennsylvania Landowners money wrongfully deducted from royalty checks as a result of the wrongful conduct of Defendants detailed herein.

2.     Pennsylvania Landowners entered into lease agreements with the Defendants seeking to commercially exploit Marcellus Shale under the leased surfaces for royalty payments in reliance on representations that their royalty payments would not be reduced by deductions for post-production costs.

3.     Defendants induced Pennsylvania Landowners to enter into lease agreements through a bait and switch scheme involving the Market Enhancement Clause and similar type royalty provisions as detailed herein.

4.     Defendant Chesapeake also engaged in a self-dealing scheme which resulted in increased deductions being passed on to Pennsylvania Landowners detailed herein.

5.     Defendant Chesapeake engaged in a scheme in which it failed to disclose it was reducing certain landowner royalty payments for deductions paid to affiliated entities, when the landowners' leases provided deductions could only be made for costs paid to non-affiliated third parties.

6.     Defendant Chesapeake engaged in a scheme in which it failed to disclose revenues received from its former midstream unit to Pennsylvania

Landowners who are to receive royalties based on all revenue realized as detailed herein.

7.      The impact of unfair and deceptive conduct alleged herein is not limited to Marcellus Shale but also Utica Shale and any other Natural Gas Play because the oil and gas leases remain effective while production continues regardless of the geologic horizon being extracted.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 42 Pa. C.S. § 931(a).

9.      Venue lies with this Court pursuant to Pa. R.C.P. No. 1006 (a) (1).

10.     This Court has personal jurisdiction over each Defendant either because the Defendant resides in Pennsylvania, does business in Pennsylvania and/or has the requisite minimum contacts with Pennsylvania necessary to constitutionally permit the Court to exercise jurisdiction.

11.     The Commonwealth brings this action exclusively under the common law and statutes of the Commonwealth of Pennsylvania.  No federal claims are being asserted.  No aspect of the claims asserted herein is brought pursuant to the Guaranteed Minimum Royalty Act ("GMRA").  To the extent any claim or factual assertion set forth herein may be construed to have stated any claim under federal

law or the GMRA, such claim is expressly and undeniably disavowed and disclaimed by the Commonwealth.

## PLAINTIFF

12.    Plaintiff is the Commonwealth of Pennsylvania, by the Office of Attorney General, 14th Floor, Strawberry Square, Harrisburg, Dauphin County, Pennsylvania 17120.

13.    The Office of Attorney General is statutorily authorized to bring this action pursuant to the Commonwealth Attorneys Act, 71 P.S. § 732-204 and the UTPCPL.

14.    The Office of Attorney General has determined that bringing this action is in the public interest pursuant to 73 P.S. § 201-4.

## DEFENDANTS

15.    The Defendants named in this Complaint include all of their predecessor entities and all their past and present component, subsidiary and affiliate entities.

16.    Defendant Chesapeake Energy Corporation is an Oklahoma for-profit corporation with a business office address of 6100 North Western Avenue, Oklahoma City, Oklahoma 73118.

17.     Defendant Chesapeake Appalachia, LLC, is an Oklahoma limited liability company with a business office address of 6100 North Western Avenue, Oklahoma City, Oklahoma  73118.

18.     Defendant Chesapeake Operating, Inc. is an Oklahoma for-profit corporation with a business office address of 6100 North Western Avenue, Oklahoma City, Oklahoma  73118.

19.     Defendant Chesapeake Energy Marketing, Inc. ("CEMI") is an Oklahoma for-profit corporation with a business office address of 6100 North Western Avenue, Oklahoma City, Oklahoma  73118

20.     At all times relevant and material hereto, Chesapeake Energy Corporation, Chesapeake Appalachia, LLC, Chesapeake Operating, Inc. and Chesapeake Energy Marketing, Inc. (collectively, the "Chesapeake Defendants") engaged in trade or commerce in the Commonwealth of Pennsylvania through the exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from Marcellus Shale.

21.     Defendant Williams Partners, LP is a Delaware limited partnership with a business address of One Williams Center, Tulsa, Oklahoma 74172. Williams Co., Inc. is the general partner and owns controlling interest in Williams Partners, LP, successor by merger to Access Midstream, LP.

22. At all times relevant and material hereto, Williams Partners, LP engaged in trade or commerce in the Commonwealth of Pennsylvania through the gathering, treating, compression, transportation and sale of natural gas from Marcellus Shale.

## DEFINITIONS

23. Unless otherwise specified, whenever reference is made in this complaint to "Landman" or "Landmen," such term shall mean an agent who works for an exploration and production company or who is contracted by an exploration and production company or broker to negotiate with landowners to enter into a lease for the exploration and production of natural gas.

24. Unless otherwise specified, whenever reference is made in this complaint to "Dry Gas," such term shall mean natural gas from the well free of liquid hydrocarbons, such as ethane, propane, butanes and pentanes, composed mainly of methane.

25. Unless otherwise specified, whenever reference is made in this complaint to "Natural Gas Liquids" or "NGL," such term shall mean components of natural gas that are separated from the gas state in the form of liquid hydrocarbons, such as ethane, propane, butanes and pentanes.

26.   Unless otherwise specified, whenever reference is made in this complaint to "Drilling Unit," such term shall mean the area from which a well drains natural gas as designated by the exploration and production company.

27.   Unless otherwise specified, whenever reference is made in this complaint to "Midstream Services," such term shall mean the gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing of oil, natural gas and natural gas liquids.

28.   Unless otherwise specified, whenever reference is made in this complaint to "Natural Gas Play," such term shall mean any geologic horizon including, but not limited to, Marcellus Shale and Utica Shale containing reserves, proven or otherwise, of oil, Dry Gas and Natural Gas Liquids in Pennsylvania.

29.   Unless otherwise specified, whenever reference is made in this complaint to "Pennsylvania Landowner," such term shall mean any Pennsylvania landowner leasing oil and gas rights to an exploration and production company for the extraction of oil, Dry Gas and Natural Gas Liquids from the Marcellus Shale gas play in Pennsylvania.

## **BACKGROUND**

30.   The Office of Attorney General has received landowner complaints against the Defendants indicating they engaged in unfair and deceptive acts and practices in violation of the UTPCPL, as described more fully herein.

8

31.     Among the Pennsylvania Landowners who have filed complaints against the Defendants are persons who are sixty (60) years of age or older.

32.     The Commonwealth believes and therefore avers that there may be additional Pennsylvania Landowners who have not filed complaints with the Section and who have been harmed due to the methods, acts and practices of the Defendants, which include, but are not limited to, the practices alleged herein.

33.     At all times relevant and material hereto, each of the Defendants authored, approved, endorsed, formulated, directed, controlled, ratified, benefitted from and/or participated in their respective conduct alleged herein.

34.     At all times relevant and material hereto, the unfair or deceptive methods, acts, and practices complained of herein have been willfully used by Defendants.

35.     Unless otherwise specified, whenever reference is made in this complaint to any act of any of the Defendants or any employee and/or agent of the Defendants, such allegations shall be deemed to mean the act of Defendants, acting individually, collectively or in any combination.

36.     The Commonwealth seeks legal redress for any claim based on a violation of the UTPCPL.

**MARCELLUS SHALE**

37.     Marcellus Shale is a strata of rock found in Pennsylvania ranging in depth from an outcropping to 9,000 feet below the surface.

38.     The thickness of Marcellus Shale in Pennsylvania ranges from 49 feet at the western border to 790 feet to the northeast.

39.     Marcellus Shale is found throughout the Allegheny Plateau of the northern Appalachian Basin beginning in southern New York and extending through northern and western Pennsylvania, eastern Ohio, western Maryland, most of West Virginia and ending in western Virginia.

40.     Marcellus Shale encompasses an area of approximately 95,000 square miles or 60.8 million acres.

41.     Marcellus Shale is but one of many geologic horizons found under the surface of Pennsylvania.

42.     There are other geologic horizons including, but not limited to, Utica Shale offering the potential of commercially viable extraction of oil, Dry Gas and Natural Gas Liquids within Pennsylvania.

43.     Marcellus Shale is the largest gas play in the United States with proven reserves of 42.8 trillion cubic feet of which approximately 32.7 trillion cubic feet is in Pennsylvania.

44.  The Marcellus Shale gas play began in 2004 in Washington County, Pennsylvania.

45.  Early drillers applied lessons learned in the Barnett Shale gas play in Texas and applied them to the Marcellus Shale gas play in Pennsylvania.

46.  Early drillers used hydraulic fracturing technology to crack the rock with a mixture of water, sand and chemicals at high pressure down a vertical shaft.

47.  To improve results, these early drillers switched to a horizontal drilling process, which begins with drilling a typical vertical well and then turning the drill 90° to bore through the desired gas bearing strata, allowing the well run along the length of the geologic seam as opposed to bisecting it.

48.  Unlike vertical drilling, horizontal drilling allows for several wells to be drilled from the same well pad in a radial pattern.

49.  Individual horizontal wells may extend over one mile in length.

50.  Horizontal drilling enables gas companies to drain gas from one square mile or 640 acres from a single well pad, corresponding to the industry convention for size of a Drilling Unit.

51.  Commercialization of the Marcellus Shale gas play began ramping up following the issuance of a press release by Penn State on January 17, 2008, claiming Marcellus Shale contains 50 trillion cubic feet of gas.

http://news.psu.edu/story/191364/2008/1/17/uncoventional-gas-reservoir-could-boost-us-supply.

52.     Future commercialization of other geologic horizons including, but not limited to, Utica Shale can leverage the existing infrastructure in place for past, current and future Marcellus Shale production in Pennsylvania.

53.     The future as to the commercialization of Utica Shale is approaching as one test tract in Tioga County is estimated to contain one trillion cubic feet of gas.

## PAST LEASING PRACTICES

54.     Prior to the Penn State press release, gas companies with information about the potential of the Marcellus Shale gas play quietly entered into leases with Pennsylvania Landowners for what had been the standard $25 per acre signing bonus and 12.5% royalty.

55.     On information and belief, large Pennsylvania Landowners such as farmers and ranchers, leased oil and gas rights for decades, if not generations, to exploration and production companies.

56.     Prior to the advent of the economic feasibility of fracking to extract natural gas, such large landowners had no expectation that exploration and production companies would attempt gas production under such oil and gas leases.

57.     Most Pennsylvania Landowners relied on payments made by the exploration and production companies such as the bonus for signing such leases as a means of paying property taxes during the term of their respective leases.

58.     On information and belief, many landowners and landowners from preceding generations repeated the practice of using such signing bonus from the exploration and production companies to pay property taxes for decades, if not generations, leading up to the advent of fracking.

59.     Most, if not all, Pennsylvania Landowners lack access to proprietary information concerning the commercial viability of drilling for oil and gas.

60.     Conversely, the exploration and production companies are in the business of acquiring, developing and maintaining proprietary information concerning the commercial viability of drilling for oil and gas.

## LEASE ACQUISITION DURING THE MARCELLUS SHALE BOOM

61.     Exploration and production companies leveraged their access to proprietary geologic information to identify the commercially viable core of Marcellus Shale in northeast Pennsylvania for exploration and production of natural gas.

62.     To fully exploit the commercial opportunity of Marcellus Shale in northeast Pennsylvania, exploration and production companies had to acquire as much oil and gas rights acreage as possible.

63.     Exploration and production companies employed Landmen or contracted with independent land services companies to deploy teams of Landmen to identify parcels within the commercially viable core of Marcellus Shale in northeast Pennsylvania, to conduct title searches related to those parcels to identify owners of the respective mineral estates and ultimately to contact those identified owners to secure leases of the mineral estate.

64.     At the beginning of the Marcellus Shale boom, exploration and production companies competed vigorously against each other to acquire leases for oil and gas rights in northeast Pennsylvania.

65.     Such competition benefited Pennsylvania Landowners in obtaining higher bonus payments, higher royalty and enhanced protections in addenda such as surface rights.

66.     Exploration and production companies incentivized Landmen to secure as many leases on a daily and weekly basis on behalf of the exploration and production company.

67.     The exploration and production companies' urgency to secure leases to establish market position in the vacuum of a finite number of mineral estates within the commercially viable core of Marcellus Shale in northeast Pennsylvania provided the conditions necessary for the unscrupulous procurement of oil and gas leases from Pennsylvania Landowners.

68.     An oil and gas lease is a misnomer as it operates as a fee simple determinable for the mineral estate.

69.     A fee simple determinable for the mineral estate operates to sever the ownership of certain minerals from the ownership of the surface of the land.

70.     The mineral estate conveyed by Pennsylvania Landowners typically includes all geologic horizons including, but not limited to, Marcellus Shale and Utica Shale.

71.     The exploration and production companies authorized Landmen to use oil and gas lease forms, containing language drafted and approved by the exploration and production companies, to acquire oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale under the land of each such Pennsylvania Landowner.

72.     The oil and gas lease forms varied, immaterially, with respect to general formatting and the ordering of the usual boilerplate.

73.     The oil and gas lease forms also varied, materially, with respect to the royalty clause.

74.     Upon information and belief, there is a subset of oil and gas leases with royalty clauses that are ostensibly silent to the unsophisticated landowner on

the subject of costs, if any, being charged as deductions against royalties accruing to the landowner.

75.     Upon information and belief, there is a subset of oil and gas leases which only permit deductions for costs paid to non-affiliated third parties.

76.     Upon information and belief, there is a subset of oil and gas leases with royalty clauses which purport to be "free of cost."

77.     Upon information and belief, there is a subset of oil and gas leases with royalty clauses which expressly provide for the deduction of costs against royalties accruing to the landowner.

78.     Landmen presented the oil and gas lease forms as part of a pitch to a Pennsylvania Landowner either at a landowner group meeting, a landowner residence or a Landman office to secure leases.

79.     Landmen generally pitched the positive monetary aspect to a Pennsylvania Landowner as an inducement to secure a lease.

80.     Landmen responded to questions regarding surface rights concerns of landowners to secure a lease.

81.     Landmen fielded demands from landowners on the amount of the bonus based on acreage to secure a lease.

82.     Landmen fielded demands from landowners on the royalty percentage to secure a lease.

83.     Landmen also fielded demands from landowners to receive royalties free of cost or to otherwise avoid deductions.

84.     In each such case, Landmen exercised the flexibility of adapting the standard pre-printed lease form through various addenda to address a given concern or demand of a landowner to secure a lease.

85.     Upon information and belief, Landmen retrieved a lease addendum most closely adapted to address a given concern or demand, for example, from a set of folders in the trunk of a Landman's car to secure a lease.

86.     Upon information and belief, Landmen alternatively made edits to a lease form using a word processor program on a laptop and then printed a revised lease form from a printer connected to the laptop based, for example, in the Landman's car to secure a lease.

87.     Included among the changes Landmen could and did make with blanket permission from the exploration and production companies was the incorporation of a certain set of addenda which was given as a matter of course to landowners who requested them as these were considered throwaways by the exploration and production companies.

88.     One example of a term given as a matter of course to Pennsylvania Landowners who requested them is an increase in the royalty from 12.5% to as much as 20%.

89.     Landmen negotiated with certain Pennsylvania Landowners who made demands regarding financial terms and surface rights concerns which exceeded their blanket authority to make certain changes to secure leases.

90.     In such cases, Landmen had to obtain the express authority from the exploration and production companies to modify certain financial and surface rights terms to secure leases.

91.     The exploration and production companies gave such permission depending on the value of the land owned by the hard-bargaining landowner to the exploration and production companies.

92.     Included among the changes Landmen could and did make with express permission from the exploration and production companies was the incorporation of a certain set of addenda which was only conceded to landowners who strenuously insisted on such terms.

93.     One example of a term conceded by an exploration and production company in an addendum to a lease to satisfy a Pennsylvania Landowner who strenuously objected to receiving royalty payments reduced by deductions for post-production costs is the Market Enhancement Clause.

94.     The Market Enhancement Clause typically contains the following language:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all

oil, gas or other proceeds accruing to the Lessor under
this lease or by state law shall be without deduction,
directly or indirectly, for the cost of producing, gathering,
storing, separating, treating, dehydrating, compressing,
processing, transporting and marketing the oil, gas and
other products produced hereunder to transform the
product into marketable form; however, any such costs
which result in enhancing the value of the marketable oil,
gas or other products to receive a better price may be
deducted from Lessor's share of production so long as
they are based on Lessee's actual cost of such
enhancements.   However, in no event shall Lessor
receive a price that is less than, or more than, the price
received by Lessee.

95.    Such terms were offered as an inducement to Pennsylvania

Landowners to secure leases of highly valued mineral estates within the

commercially viable core of Marcellus Shale in northeast Pennsylvania.

## SPECIFIC CONDUCT OF CHESAPEAKE ENERGY AND WILLIAMS PARTNERS IN VIOLATION OF UTPCPL

96.    Upon information and belief, Chesapeake Energy, through its effort to

expand its activities in the exploration and drilling for natural gas in the United

States, overleveraged its balance sheet with excessive debt by the end of 2011.

97.    Upon information and belief, Chesapeake Energy faced a projected

cash-flow shortage of approximately $10 billion in 2012.

98.    Upon information and belief, Chesapeake Energy planned to divest

approximately $11.5 billion to cover its operations in 2012.

99.   Upon information and belief, Chesapeake Energy expected to raise $4.9 billion from the sale of its entire oil and gas gathering and processing business.

100.   Chesapeake Energy divested its midstream assets in a series of transactions.

101.   On June 8, 2012, Global Infrastructure Partners, a private equity firm, acquired all of Chesapeake Energy's interest in Chesapeake Midstream Partners, LP for $2.2 billion.

102.   On July 24, 2012, Chesapeake Midstream Partners, LP changed its name to Access Midstream Partners, LP ("Access Midstream").

103.   On December 11, 2012, Williams agreed to acquire a 50% stake in Access Midstream GP, LLC ("Access GP"), the general partner of Access Midstream, and approximately 25% of the limited partner units of Access Midstream for $2.4 billion.

104.   On December 11, 2012, Access Midstream announced an agreement to acquire Chesapeake Midstream Operating, LLC from Chesapeake Energy for $2.16 billion.

105.   Chesapeake Midstream Operating, LLC owned Chesapeake Energy's natural gas gathering and processing assets in various gas plays, including Marcellus in Pennsylvania.

106.   Upon information and belief, the book value for the aforementioned divested assets was approximately $2.4 billion, thus resulting in a premium of approximately $1.76 billion to Chesapeake Energy.

107.   Prior to the dropdown, Chesapeake Energy and its midstream unit executed a series of gas gathering agreements which provided for a guaranteed minimum rate of return with low risk to interest potential purchasers of the midstream assets.

108.   Upon information and belief, the gas gathering agreements between Chesapeake Energy and its midstream unit were not negotiated at arm's length; thus, resulting in a scheme of artificially inflated and/or unreasonably excessive post-production costs to be passed on to Pennsylvania Landowners.

109.   The series of transactions constituting the dropdown of the midstream assets from Chesapeake Energy to Access Midstream have the effect of a financial loan.

110.   Upon information and belief, the costs for Midstream Services increased significantly and materially following the dropdown of the midstream assets.

111.   Upon information and belief, the artificially inflated post-production costs were passed on to and continue to be passed on to Pennsylvania Landowners.

112.   Chesapeake Defendants funded the debt service on what is effectively a loan using royalty funds payable to Pennsylvania Landowners.

113.   Upon information and belief, contemporaneously with the dropdown, Chesapeake Energy and Access Midstream executed transition service agreements in which Access Midstream paid Chesapeake Defendants to provide management, labor and other related services on behalf of Access Midstream to facilitate continued operations of Midstream Services.

114.   Upon information and belief, Chesapeake Defendants did not disclose to Pennsylvania Landowners the transition services agreements in which Chesapeake Defendants received a premium in excess of the actual cost of Midstream Services purportedly borne by both the Chesapeake Defendants and Pennsylvania Landowner as allocated by royalty interest; thus, resulting in a scheme of artificially-deflated royalty payments to Pennsylvania Landowners, who are to share in revenue realized related to the sale of gas.

115.   In June 2014, Williams announced its intent to acquire 100% of the general partner of Access Midstream for approximately $6 billion and to merge Williams Partners with and into Access Midstream.

116.   On February 2, 2015, the merger between Williams Partners and Access Midstream closed and the surviving entity was renamed Williams Partners.

117.   As a consequence of the merger, Williams Partners, as the renamed successor entity, remains liable for unlawful acts and practices of Access Midstream.

## COUNT I

### COMMONWEALTH V. WILLIAMS PARTNERS
### VIOLATION OF UTPCPL
### 73 P.S. § 201-2(4)(v),(vii) and (xxi)

118.   The preceding paragraphs are incorporated herein as though fully set forth below.

119.   In gathering, treating, compressing and processing natural gas from Marcellus Shale and any other Natural Gas Play under land leased from Pennsylvania Landowners, and in otherwise engaging in the conduct more fully described herein with respect to any Natural Gas Play, Williams Partners are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth within the meaning of 73 P. S. § 201-2(3).

120.   By reason of the foregoing, Williams Partners charged inflated prices for Midstream Services for natural gas produced by Chesapeake Defendants from Marcellus Shale which were passed on to Pennsylvania Landowners.

121.   By misrepresenting and/or omitting material facts concerning the inflated prices for Midstream Services for Pennsylvania Landowners receiving a royalty check from Chesapeake Defendants, Williams Partners misled

Pennsylvania Landowners into believing they were being charged deductions for Midstream Services borne of a free and fair market.

122.   Specifically, Williams Partners, by engaging in the practices set forth above, have:

    a.    Deceptively entered into agreements with Chesapeake Defendants for the provision of Midstream Services for Marcellus Shale natural gas by misleading Pennsylvania Landowners to believe that deductions for said Midstream Services charged to each such landowner was borne of a free and fair market;

    b.    Deceptively concealed from Pennsylvania Landowners the significant and material amount by which Midstream Services deductions charged to each such landowner were inflated to satisfy a guaranteed rate of return to Williams Partners, while indicating that the deductions for Midstream Services resulted from arm's length negotiations, thereby causing a likelihood of confusion or misunderstanding for such landowners who are led to believe that deductions for Midstream Services resulted from arm's length negotiations; and

c.      As a result of Williams Partners' acts in deceiving Pennsylvania

Landowners that deductions for Midstream Services charged to

each such landowner was borne of a free and fair market,

landowners who believed they were being charged deductions

for Midstream Services resulting from arm's length

negotiations, in fact, were charged with knowingly duplicitous

deductions resulting from inflated charges for certain

Midstream Services to satisfy a guaranteed rate of return to

Williams Partners.

123.   Williams Partners violated the UTPCPL:

a.      Each time a Pennsylvania Landowner was assessed an inflated

deduction for Midstream Services to satisfy a guaranteed rate of

return to Williams Partners in connection with the Chesapeake

midstream assets dropdown;

b.      Each time a Pennsylvania Landowner failed to receive a royalty

payment as retaliation for complaining against assessment of

inflated deductions for Midstream Services; and

c.      Each time a Pennsylvania Landowner received a letter stating a

purported reason for wrongfully taking inflated deductions for

Midstream Services;

124.    Williams Partners' conduct more fully described herein is,
accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

125.    The aforesaid methods, acts or practices constitute unfair or deceptive
acts or practices within the meaning of Section 201-2(4) of the UTPCPL,
including, but not limited to:

a.    "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

b.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

c.    "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);  and

d.    "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

126.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the UTPCPL.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Commonwealth respectfully requests this Honorable Court to enter an Order:

A.   Declaring Williams Partners' conduct to be in violation of the UTPCPL;

B.   Permanently enjoining Williams Partners and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in the acts and practices alleged in this complaint and any other acts and practices which violate the UTPCPL;

C.   Directing Williams Partners to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.   Directing Williams Partners pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

E.      Directing Williams Partners to disgorge and forfeit all profits they

have derived as a result of their unfair and deceptive acts and practices as set forth

in this complaint;

F.      Directing Williams Partners to pay the Commonwealth for the costs of

its investigation and prosecution of this action;

G.      Directing Williams Partners to forfeit their right or franchise to

engage in any business involving exploration, drilling, extraction, gathering,

compression, transportation and sale of natural gas from any Natural Gas Play

within the Commonwealth of Pennsylvania until such time as all monies have been

paid for restitution, costs and civil penalties; and

H.      Providing any other such relief as the Court may deem necessary and

appropriate.

## COUNT II

**COMMONWEALTH V. CHESAPEAKE DEFENDANTS**
**VIOLATION OF UTPCPL**
**73 P.S. § 201-2(4)(v),(vii) and (xxi)**

127.    The preceding paragraphs are incorporated herein as though fully set

forth below.

128.    In exploring, drilling, extracting, gathering, compressing, transporting

and selling natural gas from Marcellus Shale and any other Natural Gas Play under

land leased from Pennsylvania Landowners, and in otherwise engaging in the

conduct more fully described herein with respect to any Natural Gas Play, Chesapeake Defendants are engaging in trade or commerce that directly or indirectly harmed Pennsylvania Landowners in this Commonwealth within the meaning of 73 P. S. § 201-2(3).

129.   By reason of the foregoing, Chesapeake Defendants assessed inflated deductions for Midstream Services against royalty checks payable to Pennsylvania Landowners.

130.   By misrepresenting and/or omitting material facts concerning the inflated deductions for Midstream Services, Chesapeake Defendants misled Pennsylvania Landowners into believing they were being charged deductions for Midstream Services borne of a free and fair market.

131.   Specifically, Chesapeake Defendants, by engaging in the practices set forth above, have:

    a.   Deceptively entered into oil and gas leases, extracted, marketed and sold Marcellus Shale natural gas by misleading Pennsylvania Landowners that royalties paid to each such landowner were reduced by deductions for Midstream Services borne of a free and fair market;

    b.   Deceptively concealed from Pennsylvania Landowners the significant and material amount by which deductions from

29

royalties to be paid to each such landowner to satisfy a guaranteed rate of return to Williams Partners or to otherwise cover inflated inter-affiliate transactions, while indicating that the deductions for Midstream Services result from arm's length negotiations, thereby causing a likelihood of confusion or misunderstanding for such landowners who are led to believe that deductions for Midstream Services result from arm's length negotiations;

c.    Deceptively concealed from Pennsylvania Landowners the significant and material amount by which payments from Williams Partners to Chesapeake Defendants in excess of the actual cost for Midstream Services constitute revenues realized, while indicating gross sales reported to each such landowner reflect all revenue realized in connection with the sale of gas, thereby causing a likelihood of confusion or misunderstanding for such landowners who are led to believe that gross sales reflect all revenues realized.

d.    As a result of Chesapeake Defendants' acts in deceiving Pennsylvania Landowners that royalties paid to each such landowner were reduced by deductions for Midstream Services

borne of a free and fair market, landowners who believed they were being paid their bargained for royalties reduced by deductions for Midstream Services resulting from arm's length negotiations, in fact, were charged with knowingly duplicitous deductions resulting from inflated charges for certain Midstream Services to satisfy a guaranteed rate of return to Williams Partners or to otherwise cover inflated inter-affiliate transactions.

132. Chesapeake Defendants violated the UTPCPL:

    a.    Each time a Pennsylvania Landowner was assessed an inflated deduction for midstream services;

    b.    Each time a Pennsylvania Landowner was assessed a retroactive deduction for midstream services to satisfy a guaranteed rate of return to Williams Partners or for marketing in connection with an inter-affiliate transaction and based on the *Kilmer* decision which did not have any collateral estoppel effect on each such landowner;

    c.    Each time a Pennsylvania Landowner failed to receive a royalty payment as retaliation for complaining against assessment of inflated deductions;

d.    Each time a Pennsylvania Landowner received a royalty

statement wherein gross sales did not include the premium

Chesapeake Defendants received in excess of the actual cost of

Midstream Services;

e.    Each time an artificially high drilling, extraction, processing,

compression or transportation payment was made to an affiliate

causing inflated deductions against royalty payments to

Pennsylvania Landowners;

f.    Each time an artificially high drilling, extraction, processing,

compression or transportation payment was made to a

purported third-party in a supposedly arm's length transaction

causing inflated deductions against royalty payments to

Pennsylvania Landowners; and

g.    Each time Chesapeake Defendants sent a letter to a

Pennsylvania Landowner stating a purported reason for

wrongfully taking deductions.

133.   Chesapeake Defendants' conduct more fully described herein is,

accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

134.    The aforesaid methods, acts or practices constitute unfair or deceptive acts or practices within the meaning of Section 201-2(4) of the UTPCPL, including, but not limited to:

a.    "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

b.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

c.     "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii);  and

d.    "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

135.    The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the UTPCPL.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commonwealth respectfully requests this Honorable

Court to enter an Order:

A.     Declaring the Chesapeake Defendants' conduct to be in violation of

the UTPCPL;

B.     Permanently enjoining the Chesapeake Defendants and any agents,

successors, assigns, and employees acting directly or through any corporate or

business device from engaging in the acts and practices alleged in this complaint

and any other acts and practices which violate the UTPCPL;

C.     Directing the Chesapeake Defendants to restore to Pennsylvania

Landowners any moneys which may have been acquired by means of any violation

of this act pursuant to Section 201-4.1 of the UTPCPL;

D.     Directing the Chesapeake Defendants pursuant to Section 201-8(b) of

the UTPCPL to pay civil penalties in the amount of One Thousand Dollars

($1,000) for each and every violation of the UTPCPL, increasing to Three

Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60)

or older, and such other victims as may be discovered between the date of the

filing of this complaint and trial of this matter;

E.      Directing the Chesapeake Defendants to disgorge and forfeit all profits they have derived as a result of their unfair and deceptive acts and practices as set forth in this complaint;

F.      Directing the Chesapeake Defendants to pay the Commonwealth for the costs of its investigation and prosecution of this action;

G.      Directing the Chesapeake Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.      Providing any other such relief as the Court may deem necessary and appropriate.

## SPECIFIC CONDUCT OF CHESAPEAKE DEFENDANTS IN VIOLATION OF UTPCPL

136.    Upon information and belief, Chesapeake Defendants entered into oil and gas leases with Pennsylvania Landowners for the purpose of exploring, drilling, extracting, gathering, compressing, transporting and selling natural gas from Marcellus Shale and any other Natural Gas Play under the land of each such Pennsylvania Landowner.

137.   Upon information and belief, Chesapeake Defendants deployed Landmen to obtain oil and gas leases from Pennsylvania Landowners owning land over commercially viable Marcellus Shale gas play.

138.   The Chesapeake Defendants empowered the Landmen to use unfair and deceptive negotiation tactics with Pennsylvania Landowners such as:

a.   Failure to disclose facts material to making a decision as to signing an oil and gas lease; and

b.   Making affirmative statements containing a falsity or prevarication.

139.   The sales pitches by Landmen to Pennsylvania Landowners included:

a.   High pressure;

b.   Leveraging information advantage:

c.   Dissuading contact with other landowners to compare terms;

d.   Dissuading contact with anyone else to discuss terms;

e.   Presenting 'take it or leave it' contracts; and

f.   Limiting time for consideration of contract.

140.   Chesapeake Defendants, directly or indirectly through Landmen, made the following misrepresentations to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

a.   Stating that if anyone in the drilling unit were to sign the lease now, the money would be placed in escrow for future payment; otherwise, if anyone signed later, such person would lose out on the money or otherwise receive much less;

b.   Representing that all the neighboring properties were leased and the gas company would drill to capture the gas whether the landowner signed or not;

c.   Stating that if the landowner did not sign the lease that day, it would be the landowner's last chance to sign and the gas company would extract the gas one way or another;

d.   Telling a landowner an attorney was not necessary when signing a lease because the landowner would get a 12.5% royalty because that was the law in Pennsylvania;

e.   Representing to a landowner that all of the neighboring properties were leased and that royalties totaling $500,000 at 20% could be expected without disclosing any impact from deductions;

f.   Agreeing in negotiations to a 20% royalty and a no deduction clause; instead, presenting a lease for signing that provided for only a 12.5% royalty and permitted deductions;

g.  Telling a landowner, in response to a question about the possibility of the price per acre increasing, that the price per acre for the signing bonus does not increase despite knowing that it may;

h.  Showing landowners copies of spreadsheets called "royalty calculators," which reflect how much money a landowner can expect to make in royalty payments each year over a twenty year period based on the number of acres in production and the price of gas, with no references to deductions;

i.  Coercing a landowner to agree in writing to permit a pipeline running diagonally across a landowner's field;

j.  Taking $3,000 in deductions from a Pennsylvania Landowner who was not previously informed that it might purportedly cost the landowner money in deductions if the gas had to be shipped farther away;

k.  Charging a Pennsylvania Landowner deductions for compression when such service was not being done; and

l.  To avoid complying with a recently-enacted setback requirement, seeking a waiver from an 89-year old

Pennsylvania Landowner as purportedly being necessary to
proceed on the existing lease.

### Chesapeake Defendants Use of Royalty Calculator as an Unfair and Deceptive Inducement to Secure Leases

141.   Upon information and belief, Landmen, at the direction of
Chesapeake Defendants, failed to disclose the economic effect of deductions in
royalty spreadsheet calculators when pitching the potential ranges of royalty
payments based on a certain percentage and anticipated production levels as
consideration for signing the oil and gas lease.

142.   The royalty spreadsheet calculators, as used by Landmen, lacked any
field for any type of deduction against any hypothetical royalty for review by a
Pennsylvania Landowner prior to entering into an oil and gas lease.

143.   Upon information and belief, Chesapeake Defendants, directly or
indirectly through Landmen, concealed material facts from Pennsylvania
Landowners concerning the applicability of deductions against prospective royalty
payments.

### Chesapeake Defendants Created a Likelihood of Confusion or of Misunderstanding as to Which Party Is the Offeror and the Offeree as an Unfair and Deceptive Inducement to Forbear from Considering Competing Offers

144.   Most, if not all, landowners lack sophistication in understanding that
the oil and gas leases presented by the Landmen at the direction of Chesapeake

Defendants to the landowners for execution was construed by Chesapeake

Defendants as an offer by the landowners to be accepted by the Chesapeake

Defendants and not the converse.

145.   The dynamic of the Landman knocking, often unannounced and

unscheduled, on the door of a landowner's house to pitch an oil and gas lease with

the Chesapeake Defendants with lease forms authorized by Chesapeake

Defendants in the hands of the Landman would reasonably confuse most, if not all,

landowners, that the Chesapeake Defendants were making the offer and that upon

execution by the landowner, the deal was struck as the grant of a fee simple

determinable was conveyed.

146.   Instead, Chesapeake Defendants maintained that they could and, in

fact, did reject oil and gas leases with Pennsylvania Landowners who believed that

they had a deal which foreclosed each such landowner from considering or

accepting offers from any other gas exploration and production company.

## Chesapeake Defendants Used Affiliate Transactions as an Artifice to Inflate Costs and Reduce Royalty Payments

147.   Most, if not all, landowners lack sophistication in understanding that

the oil and gas leases presented by the Landmen at the direction of Chesapeake

Defendants provided Chesapeake Defendants with free rein to structure the sale of

natural gas from the wellhead through a series of affiliate transactions before being

sold to an unrelated third party.

40

148.   Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the degree of self-dealing by Chesapeake Defendants in selling natural gas to an unrelated third party.

149.   Upon information and belief, Landmen, at the direction of Chesapeake Defendants, failed to disclose the opportunity by Chesapeake Defendants to inflate the reporting of post-production costs at each step of a series of affiliate transactions which had the effect of reducing royalty payments to Pennsylvania Landowners.

150.   Upon information and belief, Chesapeake Defendants, directly or indirectly through Landmen, concealed material facts from Pennsylvania Landowners concerning the structure of the sale of natural gas from the wellhead through a series of affiliate transactions before being sold to an unrelated third party to inflate costs; thus, reducing royalty payments to Pennsylvania Landowners.

151.   Chesapeake Defendants assessed the inflated costs as deductions against the royalty checks payable to Pennsylvania Landowners.

152.   Upon information and belief, Chesapeake Defendants prepared and mailed 1099 statements to Pennsylvania Landowners which falsely reported the deductions as income to Pennsylvania Landowners to shift the income tax obligation.

**Chesapeake Defendants Use of Market Enhancement Clause as an Unfair and Deceptive Inducement to Secure Leases**

153.   Most, if not all, Pennsylvania Landowners lack sophistication related to the applicability of deductions against prospective royalty payments.

154.   Most, if not all, landowners lack sophistication related to the drafting of industry-specific oil and gas lease terms.

155.   Conversely, the exploration and production companies have the sophistication relative to the drafting of industry-specific oil and gas lease terms due to years of experience in executing oil and gas leases.

156.   Some landowners wanted further assurance in the contract that deductions would not be assessed against royalty payments resulting from the usual and customary sale of natural gas.

157.   Upon information and belief, Chesapeake Defendants, directly or indirectly through Landmen, offered the Market Enhancement Clause to certain Pennsylvania Landowners to overcome their objections to being assessed deductions against royalties resulting from the usual and customary sale of natural gas.

158.   The Market Enhancement Clause is typically found in the addendum to a lease with standard language otherwise providing for deductions against royalties resulting from the usual and customary sale of natural gas.

159.   Chesapeake Defendants used language in the Market Enhancement Clause which, in its plain language meaning to a layman, ostensibly conveyed the requested assurance against the assessment of deductions, and which, as an industry term of art to a sophisticated person, operated to permit the taking of deductions to perfect the prevarication.

160.   The language in the Market Enhancement Clause which was the proverbial bait to induce certain Pennsylvania Landowners to sign oil and gas leases was:

> ...all oil, gas or other proceeds accruing to the Lessor under this lease or by state law ***shall be without deduction***, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting and marketing the oil, gas and other products produced hereunder to transform the product into marketable form...

(emphasis added)

161.   On information and belief, Chesapeake Defendants knew that the Market Enhancement Clause would not negate the permissive deduction language in the standard lease form in giving the Pennsylvania Landowner, who bargained hard for it, a hollow victory.

162.   Chesapeake Defendants made the following misrepresentations relating to the Market Enhancement Clause to Pennsylvania Landowners who

relied on the affirmative statements or the omission of information material to making the decision to sign an oil and gas lease:

a. Representing that the Market Enhancement Clause benefitted the landowner;

b. Representing that the Market Enhancement Clause protected the landowner from deductions;

c. Stating that it was beneficial for the landowner to have the Market Enhancement Clause because enhancement meant making the gas better and more valuable;

d. Claiming that the Market Enhancement Clause meant that landowners would not be charged deductions to make the gas marketable because the gas was already marketable from the wellhead;

e. Assuring that the landowner would receive at least 12.5% in royalties because that is "state law;"

f. Telling a landowner that because natural gas is dry in northeast Pennsylvania, it would be unlikely and remote to incur expenses for enhancement to process wet gas to market NGLs ("Remote Situations");

g.    Stating that the Market Enhancement Clause meant that the landowner could possibly receive more money for the gas if Chesapeake Defendants were able to get a higher price through enhancement; and

h.    Leading a landowner to believe that there would be no post-production costs deductions due to Chesapeake Defendants' silence on the subject during negotiations.

163.    In practice, regardless of the representations made by Chesapeake Defendants, directly or indirectly through Landmen, to such landowners, Chesapeake Defendants charged deductions against royalties to be paid to those very landowners who sought assurances that they would be insulated from deductions on the premise that the Market Enhancement Clause permitted all the deductions the Pennsylvania Landowners were led to believe were excluded by the terms of the oil and gas lease.

164.    Chesapeake Defendants have willfully resorted to taking such deductions despite representing otherwise to generate cash needed to cover losses, debt service or negative cash flows due to Chesapeake Defendants' past spending practices.

## Chesapeake Defendants Unfair and Deceptive Reinterpretation of Leases

165.   Due to noticing unexpected deductions on royalty check statements resulting from production on an oil and gas lease believed by Pennsylvania Landowners to be protected from deductions by the Market Enhancement Clause or to be otherwise free of cost, Pennsylvania Landowners contacted the Chesapeake Defendants to dispute the deductions.

166.   The Chesapeake Defendants replied, by letter, to those Pennsylvania Landowners with the explanation that the gas was marketable at the wellhead and the post-production services enhanced the value of the gas.

167.   Pennsylvania Landowners were the unwitting victims of a bait and switch as the Chesapeake Defendants misled such landowners into believing that such post-processing services done to transform the gas into a marketable form would not be deducted between the wellhead and the market.

168.   Pennsylvania Landowners also contacted the Chesapeake Defendants to dispute increased deductions.

169.   The Chesapeake Defendants replied, by letter, to those Pennsylvania Landowners with the explanation that such landowners would receive no more than or no less than the price received by Chesapeake Defendants for the gas.

170.   The Chesapeake Defendants further explained, by letter, to those Pennsylvania Landowners that the gas is sold at the wellhead to its affiliate CEMI

which takes title and possession and sells it downstream at the connection point of the interstate pipeline.

171.   Upon information and belief, this explanation is belied by the contract between Chesapeake and CEMI that provides that CEMI does not take title and possession of the gas at the wellhead, but rather at the connection point of the interstate pipeline when CEMI sells the gas to a third party.

172.   The Chesapeake Defendants further responded, by letter, to Pennsylvania Landowners claiming that the price it receives from CEMI is 97% of the weighted average sales price ("WASP") of the pooled gas sold to third parties, less the costs incurred to get the gas to the third parties.

173.   Chesapeake further states, by letter, that Chesapeake, not Pennsylvania Landowners, pays CEMI the 3% marketing fee as it is purported borne solely by Chesapeake.

174.   Pennsylvania Landowners receive 97% of the WASP less costs, which is net of the 3% marketing fee, since Chesapeake's letter provides that the royalty that is paid to landowners is based upon the proceeds Chesapeake receive from the sale – which was what Chesapeake received from CEMI.

175.   Moreover, the Chesapeake Defendants misrepresent the royalty check statement by deducting the marketing fee twice: first, by netting the fee in the price

as reflected on the statement in the Price column and second, by including the fee as a deduction as reflected on the statement in the Deduct column.

176.   The explanation given by the Chesapeake Defendants to such landowners misrepresents the operation of the Market Enhancement Clause or free of cost leases to mollify those into accepting the deductions as appropriate.

177.   Pennsylvania Landowners also contacted the Chesapeake Defendants to dispute royalty statements which reflected a zero or negative balance payable to such landowners.

178.   The Chesapeake Defendants replied, by letter, to those Pennsylvania Landowners with the explanation that the holding in *Kilmer v. Elexco Land Services, Inc.*, 605 Pa. 413 (March 24, 2010) permitted the taking of deductions in January 2012.

179.   The Chesapeake Defendants sent such letters to Pennsylvania Landowners who had previously relied on the representations of the Chesapeake Defendants to be protected from such deductions by the Market Enhancement Clause or to be otherwise free of cost.

180.   The Chesapeake Defendants informed Pennsylvania Landowners that it would, and did, take deductions for post-productions services retroactively to March 24, 2010.

181.   Upon information and belief, this explanation is belied by the conduct of the Chesapeake Defendants which had paid royalties without taking deductions for years including the almost two years between issuance of the *Kilmer* decision and the notice of taking.

182.   Chesapeake Defendants made the following misrepresentations to Pennsylvania Landowners who relied on the affirmative statements or the omission of information material to accepting the truth or accuracy of the deductions:

    a.   Representing that the gas was marketable at the wellhead in order to take deductions for purported value enhancements between wellhead and the point of sale to a third party;

    b.   Representing that CEMI is a Chesapeake affiliate that acquires title and possession of the gas at the wellhead without disclosing that CEMI actually acquires title and possession at the interconnection point where the gas is sold;

    c.   Representing that a sale to an affiliate to effect an end-run around the Market Enhancement Clause and a subsequent sale to a third party resulted in the Pennsylvania Landowner receiving no more than or no less than the price received by Chesapeake Defendants; and

d.   Representing that the *Kilmer* decision permitted the taking of

deductions from Pennsylvania Landowners who believed, in

reliance of representations made by Chesapeake Defendants to

sign a lease, to be protected from deductions by the Market

Enhancement Clause or to be otherwise free of cost.

183.   Chesapeake Defendants have willfully made such representations to

justify continuing to take such deductions

## COUNT III

### COMMONWEALTH V. CHESAPEAKE DEFENDANTS
### VIOLATION OF UTPCPL
### 73 P.S. § 201-2(4)(v),(vii) and (xxi)

184.   The preceding paragraphs are incorporated herein as though fully set

forth below.

185.   In exploring, drilling, extracting, gathering, compressing, transporting

and selling natural gas from Marcellus Shale and any other Natural Gas Play under

land leased from Pennsylvania Landowners, and in otherwise engaging in the

conduct more fully described herein with respect to any Natural Gas Play,

Chesapeake Defendants are engaging in trade or commerce that directly or

indirectly harmed Pennsylvania Landowners in this Commonwealth within the

meaning of 73 P. S. § 201-2(3).

186.   By reason of the foregoing, Chesapeake Defendants misrepresented the applicability of deductions, the degree of self-dealing and the meaning of the Market Enhancement Clause to Pennsylvania Landowners.

187.   By misrepresenting and/or omitting material facts concerning the applicability of deductions, the degree of self-dealing and the meaning of the Market Enhancement Clause, Chesapeake Defendants misled Pennsylvania Landowners into believing they were signing leases free of deductions, were reaping the full benefit of a sale to an unrelated third party and were otherwise insulated from deductions through the Market Enhancement Clause.

188.   Specifically, Chesapeake Defendants, by engaging in the practices set forth above, have:

a.   Deceptively entered into oil and gas leases, extracted, marketed and sold Marcellus Shale natural gas by promising to Pennsylvania Landowners that royalties paid to each such landowner was transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations;

b.   Deceptively concealed from Pennsylvania Landowners that deductions would be taken from royalties to be paid to each such landowner based on the need to generate cash to cover

51

losses, debt service or negative cash flows due to Chesapeake
Defendants' past spending practices, while indicating that
royalties are transparently based on a certain, agreed upon
percentage either free of deductions or otherwise prohibited
except for Remote Situations, thereby causing a likelihood of
confusion or misunderstanding for landowners who are led to
believe that the royalties paid to them are transparently based
on a certain, agreed upon percentage either free of deductions
or otherwise prohibited except for Remote Situations;

c.    Deceptively concealed from Pennsylvania Landowners that
deductions would be taken from royalties to be paid to each
such landowner based on a latent meaning of industry terms not
at the time fully developed under Pennsylvania jurisprudence,
while indicating that royalties are transparently based on a
certain, agreed upon percentage either free of deductions or
otherwise prohibited except for Remote Situations, thereby
causing a likelihood of confusion or misunderstanding for
landowners who are led to believe that the royalties paid to
them are transparently based on a certain, agreed upon

percentage either free of deductions or otherwise prohibited except for Remote Situations; and

d.  As a result of Chesapeake Defendants' acts in deceiving Pennsylvania Landowners that royalties are transparently based on a certain, agreed upon percentage either free of deductions or otherwise prohibited except for Remote Situations, landowners who believed they were being paid their bargained for royalties, in fact, received less royalties and continue to receive less royalties than promised resulting from the taking of deductions.

189.  Chesapeake Defendants violated the UTPCPL:

a.  Each time a Pennsylvania Landowner was assessed a deduction based on a Market Enhancement Clause expense;

b.  Each time a Pennsylvania Landowner was assessed an inflated deduction;

c.  Each time a Pennsylvania Landowner was assessed a retroactive deduction based on the *Kilmer* decision which did not have any collateral estoppel effect on each such landowner;

d. Each time a Pennsylvania Landowner failed to receive a royalty payment as retaliation for complaining against assessment of Market Enhancement Clause deductions;

e. Each time a Pennsylvania Landowner failed to receive a royalty payment as retaliation for complaining against assessment of inflated deductions;

f. Each time an artificially high drilling, extraction, processing, compression or transportation payment was made to an affiliate causing inflated deductions against royalty payments to Pennsylvania Landowners;

g. Each time an artificially high drilling, extraction, processing, compression or transportation payment was made to a purported third-party in a supposedly arm's length transaction causing inflated deductions against royalty payments to Pennsylvania Landowners;

h. Each time a Pennsylvania Landowner received a smaller royalty payment because Chesapeake Defendants underreported the decimal interest the landowner holds in a drilling unit;

i.    Each time Chesapeake Defendants sent a letter to a
      Pennsylvania Landowner stating a purported reason for
      wrongfully taking deductions;

j.    Each time a representation was made to a Pennsylvania
      Landowner to use a certain amount of acreage for a well pad
      but more land was used instead;

k.    Each time a representation was made to a Pennsylvania
      Landowner to use a certain area of land for a well pad but
      another area was used instead;

l.    Each time a representation was made to a Pennsylvania
      Landowner that land would not be destroyed for a well pad but
      land was destroyed regardless;

m.    Each time a royalty was paid to a Pennsylvania Landowner
      without deducting Market Enhancement Clause expenses and
      without disclosing that deductions may be taken retroactively
      and with interest; and

n.    Each time unfair and high pressure sales tactics were employed
      to coerce a Pennsylvania Landowner to sign an oil and gas lease
      or a modification to an existing oil and gas lease.

190. Chesapeake Defendants' conduct more fully described herein is, accordingly, proscribed and unlawful pursuant to 73 P. S. § 201-3.

191. The aforesaid methods, acts or practices constitute unfair or deceptive acts or practices within the meaning of Section 201-2(4) of the UTPCPL, including, but not limited to:

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services" in violation of 73 P.S. § 201-2(4)(ii);

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

c. "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii); and

d. "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

192.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the UTPCPL.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commonwealth respectfully requests this Honorable Court to enter an Order:

A.   Declaring the Chesapeake Defendants' conduct to be in violation of the UTPCPL;

B.   Permanently enjoining the Chesapeake Defendants and any agents, successors, assigns, and employees acting directly or through any corporate or business device from engaging in the acts and practices alleged in this complaint and any other acts and practices which violate the UTPCPL;

C.   Directing the Chesapeake Defendants to restore to Pennsylvania Landowners any moneys which may have been acquired by means of any violation of this act pursuant to Section 201-4.1 of the UTPCPL;

D.   Directing the Chesapeake Defendants pursuant to Section 201-8(b) of the UTPCPL to pay civil penalties in the amount of One Thousand Dollars ($1,000) for each and every violation of the UTPCPL, increasing to Three Thousand Dollars ($3,000.00) for each violation involving a victim age sixty (60) or older, and such other victims as may be discovered between the date of the filing of this complaint and trial of this matter;

G.     Directing the Chesapeake Defendants to forfeit their right or franchise to engage in any business involving exploration, drilling, extraction, gathering, compression, transportation and sale of natural gas from any Natural Gas Play within the Commonwealth of Pennsylvania until such time as all monies have been paid for restitution, costs and civil penalties; and

H.     Providing any other such relief as the Court may deem necessary and appropriate.

Respectfully submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

By:   _Joseph S. Betsko_____
Joseph S. Betsko
Senior Deputy Attorney General
PA Bar #82620

Norman W. Marden
Deputy Attorney General
PA Bar #203423

Office of Attorney General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA  17120
(717) 787-4530
(717) 705-7110 (fax)

Attorneys for the Commonwealth of Pennsylvania

COMMONWEALTH OF PENNSYLVANIA   )
                                           )     SS

COUNTY OF DAUPHIN               )

## AFFIDAVIT OF VERIFICATION

I, Maryann E. Walsh, depose and state that I am a Senior Civil Investigator

for the Office of Attorney General, Antitrust Section, and that I am authorized to

make this affidavit and that the factual allegations contained within the Complaint

are true and correct to the best of my knowledge, information and belief.

_____
Maryann E. Walsh
Senior Civil Investigator

Sworn to and subscribed before

me this 8th day

of December, 2015.

_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
THRESSA L. SELLERS, NOTARY PUBLIC
HARRISBURG CITY, DAUPHIN COUNTY
MY COMMISSION EXPIRES MAY 26, 2017

# IN THE COURT OF COMMON PLEAS
## OF BRADFORD COUNTY, PENNSYLVANIA

|  |  |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : |
| **Plaintiff,** | : |
| v. | : **CIVIL COMPLAINT** |
| **CHESAPEAKE ENERGY CORP.;** | : **Case No:** |
| **CHESAPEAKE APPALACHIA, LLC;** | : |
| **CHESAPEAKE OPERATING, INC.;** | : |
| **CHESAPEAKE ENERGY MARKETING,** | : |
| **INC.; and WILLIAMS PARTNERS, LP,** | : |
| **Defendants.** | : |

## CERTIFICATE OF SERVICE

I hereby certify that on this date, December 9, 2015, a true and correct copy of the Commonwealth's Complaint was served on the parties listed below by depositing same in the United States mail, first class certified mail with return receipt, postage pre-paid, satisfying the requirements of Pa. R.C.P. 403, 404 and 424.

Chesapeake Energy Corp.
6100 North Western Avenue
Oklahoma City, OK  73118

Chesapeake Appalachia, LLC
6100 North Western Avenue
Oklahoma City, OK  73118

Chesapeake Operating, Inc.                Chesapeake Energy Marketing, Inc.
6100 North Western Avenue                 6100 North Western Avenue
Oklahoma City, OK  73118                   Oklahoma City, OK  73118

Williams Partners, LP
1 Williams Center
Tulsa, OK  74172


                                          Respectfully Submitted,


                                          Joseph S. Betsko
                                          Senior Deputy Attorney General